## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SERVICE EMPLOYEES
INTERNATIONAL UNION,

     Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD,

     Respondent.

Case No. 25-1119

## PETITION FOR REVIEW

Pursuant to § 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f), and Federal Rule of Appellate Procedure 15, the Service Employees International Union ("SEIU") hereby petitions the Court for review of the final agency action titled "Joint Employer Status Under the National Labor Relations Act" issued by the National Labor Relations Board ("NLRB") and published in the Federal Register on February 26, 2020 at Volume 85, pages 11,184 through 11,236. A copy of that final agency action is attached to this Petition as Exhibit A.

DATED: May 2, 2025

Respectfully submitted,

s/ *Adam Bellotti*
Adam Bellotti (abellotti@bredhoff.com)
Grace Rybak (grybak@bredhoff.com)*
BREDHOFF & KAISER P.L.L.C.
805 15th Street NW, Suite 1000
Washington, D.C. 20005
202-842-2600

Steven Ury (steven.ury@seiu.org)
John D'Elia (john.d'elia@seiu.org)
Service Employees International Union
1800 Massachusetts Avenue NW
Washington, D.C. 20036

*Counsel to the Petitioner*

* Petition for admission to be filed

## CERTIFICATE OF SERVICE

On May 2, 2025, I caused a copy of this Petition to be filed on the following

via email and first-class mail:


Ruth E. Burdick (Ruth.Burdick@nlrb.gov)
Deputy Associate General Counsel
Appellate and Supreme Court Litigation Branch
National Labor Relations Board
1015 Half Street SE, Washington, DC 20570–0001

Dawn Goldstein (Dawn.Goldstein@nlrb.gov)
Assistant General Counsel
Contempt, Compliance, and Special Litigation Branch
National Labor Relations Board
1015 Half Street SE, Washington, DC 20570–0001

Samuel B. Harris (via email only)
Samuel.Harris@nlrb.gov

Craig Ewasiuk (via email only)
Craig.Ewasiuk@nlrb.gov


s/ *Adam Bellotti*
Adam Bellotti

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner Service Employees International Union ("SEIU") hereby makes the following disclosures:

The SEIU is an unincorporated labor organization as defined by the National Labor Relations Act, 29 U.S.C. § 152. It has no parent corporation and no publicly-traded corporation has an ownership interest in it. The SEIU represents approximately 2 million workers throughout the United States and Canada, including many workers whose terms and conditions of employment are determined by more than one employer. The SEIU seeks to safeguard and advance workers' welfare and security and to elevate its members and their families by improving wages, benefits, and working conditions.

s/ *Adam Bellotti*
Adam Bellotti

# EXHIBIT A

# NATIONAL LABOR RELATIONS BOARD

**29 CFR Part 103**

**RIN 3142–AA13**

## Joint Employer Status Under the National Labor Relations Act

**AGENCY:** National Labor Relations Board.

**ACTION:** Final rule.

**SUMMARY:** The National Labor Relations Board (NLRB or Board) has decided to issue this final rule for the purpose of carrying out the provisions of the National Labor Relations Act (NLRA or Act) by establishing the standard for determining whether two employers, as defined in Section 2(2) of the Act, are a joint employer under the NLRA. The Board believes that this rulemaking will foster predictability and consistency regarding determinations of joint-employer status in a variety of business relationships, thereby enhancing labor-management stability, the promotion of which is one of the principal purposes of the Act. Under this final rule, an entity may be considered a joint employer of a separate employer's employees only if the two share or codetermine the employees' essential terms and conditions of employment, which are exclusively defined as wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction.

**DATES:** This rule has been classified as a major rule subject to Congressional review. The effective date is April 27, 2020. However, at the conclusion of the congressional review, if the effective date has been changed, the National Labor Relations Board will publish a document in the **Federal Register** to establish the new effective date or to withdraw the rule.

**FOR FURTHER INFORMATION CONTACT:** Roxanne L. Rothschild, Executive Secretary, National Labor Relations Board, 1015 Half Street SE, Washington, DC 20570–0001, (202) 273–2917 (this is not a toll-free number), 1–866–315–6572 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. The Act

The NLRA sets forth a number of rights and responsibilities that apply to employers, employees, and labor organizations representing employees, in furtherance of the Act's overarching goals of promoting labor relations stability,[1] protecting employees' right to designate representatives of their own choosing "for the purpose of collective bargaining or other mutual aid or protection," [2] and preventing unfair labor practices by employers and labor organizations.[3]

The NLRA also defines the terms "employer" and "employee." Under Section 2(2) of the Act, "the term 'employer' includes any person acting as an agent of an employer, directly or indirectly," but excludes certain governmental entities, entities subject to the Railway Labor Act, or any labor organization (other than when acting as an employer). Section 2(3) of the Act provides that "the term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter [of the Act] explicitly states otherwise . . . but shall not include . . . any individual having the status of an independent contractor. . . ." 29 U.S.C. 152(3).

The text of the Act and its legislative history further establish that, in determining whether an employment relationship exists between a putative employer and employee, common-law agency principles are controlling. See, *e.g., NLRB* v. *United Ins. Co. of America,* 390 U.S. 254, 256 (1968). Thus, in making this determination, the Board is bound by common-law principles, which require that it focus on the control exercised by a putative employer over a person performing work for it. Id; see also *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U.S. 318, 322–323 (1992).

The Act does not contain the term "joint employer," much less define it. As discussed below, the Board and reviewing courts have developed that concept in adjudication over the years to address situations where two or more separate entities engaged in a business relationship jointly affect the terms and conditions of employment of a group of employees. See *Boire* v. *Greyhound Corp.,* 376 U.S. 473 (1964) (holding that Board's determination that bus company possessed "sufficient control over the work" of its cleaning contractor's employees to be considered a joint employer was not reviewable in federal district court); *Indianapolis Newspapers, Inc.,* 83 NLRB 407, 408–409 (1949) (finding that two newspaper businesses, Star and INI, were not joint employers, despite their integration, because "there [wa]s no indication that Star, by virtue of such integration, t[ook] an active part in the formulation or application of the labor policy, or exercise[d] any immediate control over the operation, of INI"). Consistent with the statutory requirement that the common law of agency be applied, joint-employer determinations have focused on the extent to which the separate companies exercise control over the persons performing the work. Id.

As also discussed below, Section 6 of the Act authorizes the Board to "make, amend, and rescind . . . such rules and regulations as may be necessary to carry out the provisions of this subchapter." See *American Hosp. Ass'n* v. *NLRB,* 499 U.S. 606 (1991) (affirming authority of NLRB to enact rules establishing bargaining units for acute care hospitals). The Board has determined that it is appropriate to do so now in order to define who may be a joint employer under the Act.

### B. The Development of the Joint-Employment Doctrine Under the NLRA

The general formulation of the Board's joint-employer standard is firmly established. "The Board will find that two separate entities are joint employers of a single work force if the evidence shows that they 'share or codetermine those matters governing the essential terms and conditions of employment.' " *CNN America, Inc.,* 361 NLRB 439, 441 (2014) (quoting *TLI, Inc.,* 271 NLRB 798 (1984), enfd. mem. sub nom. *Gen. Teamsters Local Union No. 326* v. *NLRB,* 772 F.2d 894 (3d Cir. 1985)), enf. denied in part 865 F.3d 740 (DC Cir. 2017). This standard derives from language in *Greyhound Corp.,* 153 NLRB 1488, 1495 (1965), enfd. 368 F.2d 778 (5th Cir. 1966), and was endorsed in *NLRB* v. *Browning-Ferris Industries of Pennsylvania, Inc.,* 691 F.2d 1117, 1122–1123 (3d Cir. 1982). It is rooted in longstanding Board precedent and has been consistently approved by reviewing courts.

Notably, however, the Board has never attempted to comprehensively define the "essential terms and conditions of employment" that are relevant to the joint-employer inquiry, even though the standard itself inherently implies that it is control over those terms and conditions of employment that is determinative of joint-employer status.[4] And even when a term or condition of employment is deemed "essential" for the purpose of

---

[1] Section 1 of the Act, 29 U.S.C. 151.

[2] Section 7 of the Act, 29 U.S.C. 157.

[3] Section 8 of the Act, 29 U.S.C. 158.

[4] The Board has held that a joint-employer finding requires "a showing that the employer meaningfully affects matters relating to the employment relationship such as hiring, firing, discipline, supervision, and direction." *Laerco Transportation,* 269 NLRB 324, 325 (1984); accord *TLI, Inc.,* 271 NLRB at 798–799. But this list did not purport to be exhaustive.

determining joint-employer status, the joint-employer standard described above does not specify the extent of control that must be shown before the two entities may be found to "share or codetermine" that essential term or condition. As fully described in the Notice of Proposed Rulemaking (NPRM), the Board's treatment of the latter issue has evolved over the years.[5] Nevertheless, for at least 30 years (from no later than 1984 to 2015), evidence of indirect control was typically insufficient to prove that an entity was the joint employer of another employer's workers. Even direct and immediate supervision of another employer's employees was insufficient to establish joint-employer status where such supervision was "limited and routine."[6]

[5] As more fully described in the NPRM, the Board has consistently recognized that direct control of essential terms and conditions is relevant to this determination, while the extent to which indirect control was a factor has changed over time. Compare *Floyd Epperson,* 202 NLRB 23, 23 (1973) (dairy company was the joint employer of truck drivers supplied to it by an independent trucking firm based on evidence of both direct and indirect control over the working conditions of the drivers), enfd. 491 F.2d 1390 (6th Cir. 1974), with *Airborne Express,* 338 NLRB 597, 597 fn. 1 (2002) (holding that "the essential element" in a joint-employer analysis "is whether a putative joint employer's control over employment matters is direct and immediate" (citing *TLI, Inc.,* 271 NLRB at 798–799)); see also *NLRB* v. *CNN America, Inc.,* 865 F.3d 740, 748–751 (D.C. Cir. 2017) (finding that Board erred by failing to adhere to "direct and immediate control" standard); *SEIU Local 32BJ* v. *NLRB,* 647 F.3d 435, 442 (2d Cir. 2011) ("An essential element of any joint employer determination is 'sufficient evidence of immediate control over the employees.'" (quoting *Clinton's Ditch Co-op Co.* v. *NLRB,* 778 F.2d 132, 138 (2d Cir. 1985))).

As also described in the NPRM, the relevance to the joint-employer determination of an entity's contractually reserved but unexercised authority over another company's employees has also changed over time. See *Hychem Constructors, Inc.,* 169 NLRB 274 (1968) (petrochemical manufacturer was not a joint employer of its construction subcontractor's employees even though their cost-plus agreement reserved to the manufacturer a right to approve wage increases and overtime hours and the right to require the subcontractor to remove any employee whom the manufacturer deemed undesirable); *Jewel Tea Co.,* 162 NLRB 508, 510 (1966) (department store was a joint employer of the employees of two independent companies licensed to operate specific departments of its store based on its reserved contractual authority). In *AM Property Holding Corp.,* the Board found that a "contractual provision giving [a property owner] the right to approve [its cleaning contractor's] hires, standing alone, [was] insufficient to show the existence of a joint employer relationship." 350 NLRB 998, 1000 (2007), enfd. in relevant part sub nom. *SEIU Local 32BJ* v. *NLRB,* 647 F.3d 435 (2d Cir. 2011). The Board explained that "[i]n assessing whether a joint employer relationship exists, the Board does not rely merely on the existence of such contractual provisions, but rather looks to the actual practice of the parties." Id.

[6] See, e.g., *AM Property Holding Corp.,* 350 NLRB at 998; *Airborne Express,* 338 NLRB at 597; *TLI, Inc.,* 271 NLRB at 798.

The law governing joint-employer determinations changed significantly in August 2015. At that time, a divided Board overruled the then-extant precedent described above and substantially relaxed the requirements for proving a joint-employer relationship. Specifically, a Board majority held that it would no longer require proof that a putative joint employer has exercised any "direct and immediate" control over the essential terms and conditions of employment of another company's workers. *Browning-Ferris Industries of California, Inc. d/b/a BFI Newby Island Recyclery,* 362 NLRB 1599, 1600 (2015) (*Browning-Ferris*), affd. in part, reversed in part and remanded 911 F.3d 1195 (D.C. Cir. 2018). The majority in *Browning-Ferris* explained that, under its new standard, a company could be deemed a joint employer even if its control over the essential working conditions of another business's employees was indirect, limited and routine, or contractually reserved but never exercised. Id. at 1613–1614. At the same time, however, the *Browning-Ferris* majority stated that "[e]ven where the common law *does* permit the Board to find joint employer status in a particular case, the Board must determine whether it would serve the purposes of the Act to do so. . . ." Id. at 1610 (emphasis in original); see also id. at 1614 ("[I]t is certainly possible that in a particular case, a putative joint employer's control might extend only to terms and conditions of employment too limited in scope or significance to permit meaningful collective bargaining.").

In December 2018, the United States Court of Appeals for the District of Columbia Circuit issued its decision on review of the Board's *Browning-Ferris* decision. See *Browning-Ferris Industries of California, Inc.* v. *NLRB,* 911 F.3d 1195 (*Browning-Ferris* v. *NLRB*). Consistent with the principles stated above, the court held that the Board was required to apply the common law of agency in determining whether an entity was a joint employer of particular employees. Whether proceeding by adjudication or rulemaking, then, the Board "must color within the common-law lines identified by the judiciary." Id. at 1208. The court upheld the Board's longstanding right-to-control standard as "an established aspect of the common law of agency." Id. at 1209. In addition, the court also concluded that the common law "permits consideration of those forms of indirect control that play a relevant part in determining the essential terms and conditions of employment." Id. at 1199–1200. The court therefore affirmed *Browning-Ferris's* "articulation of the joint-employer test as including consideration of both an employer's reserved right to control and its indirect control over employees' terms and conditions of employment." Id. at 1200. In so holding, the court recognized that *Browning-Ferris* did not present the issue of whether either indirect control or a contractually reserved but unexercised right to control can be dispositive of joint-employer status absent evidence of exercised direct and immediate control. Id. at 1213, 1218.

The court, however, faulted the *Browning-Ferris* Board for failing to confine its inquiry to "indirect control over the essential terms and conditions of the workers' employment." Id. at 1209. Specifically, the court found that, in considering the factor of indirect control, *Browning-Ferris* failed to

> hew to the relevant common-law boundaries that prevent the Board from trenching on the common and routine decisions that employers make when hiring third-party contractors and defining the terms of those contracts. To inform the joint-employer analysis, the relevant forms of indirect control must be those that "share or co-determine those matters governing essential terms and conditions of employment." By contrast, those types of employer decisions that set the objectives, basic ground rules, and expectations for a third-party contractor cast no meaningful light on joint-employer status.

Id. at 1219–1220 (internal citations omitted). The court remanded the case to the Board, and the Board accepted the remand.[7]

### C. NPRM

On September 14, 2018, the Board issued its joint-employer NPRM. There, the Board proposed the following rule:

> An employer, as defined by Section 2(2) of the National Labor Relations Act (the Act), may be considered a joint employer of a separate employer's employees only if the two employers share or codetermine the employees' essential terms and conditions of employment, such as hiring, firing, discipline, supervision, and direction. A putative joint employer must possess and actually exercise substantial direct and immediate control over the employees' essential terms and conditions of employment in a manner that is not limited and routine.

[7] The court also found that the *Browning-Ferris* Board had neglected to apply the second step of its newly-fashioned standard, under which, "even if it finds that the common law would deem a business to be a joint employer, the Board will also ask whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining." Id. at 1221 (internal quotation omitted). The court directed the Board to address this issue on remand as well.

83 FR at 46696. The proposed rule also included a number of hypothetical examples illustrating how it would apply to particular scenarios.

In the NPRM, the Board acknowledged that the Agency historically has made major policy determinations through adjudication, but stated that it interpreted Section 6 of the Act as authorizing the Board to engage in this rulemaking, adding that rulemaking on the issue of determining joint-employer status is preferable to adjudication in order to provide clarity and stability to this area of the law. The NPRM further stated the Board's preliminary view, subject to potential revision in response to comments, that a joint-employer doctrine under which the duty to bargain is imposed only on entities that have played an active role in establishing essential terms and conditions of employment best serves the Act's purposes of promoting collective bargaining and minimizing industrial strife. The NPRM invited comments on these issues and, indeed, on all aspects of the proposed rule, including input from employees, unions, and employers regarding their experience in workplaces where multiple entities have some authority over the workplace.

The Board set an initial comment period of 60 days, with 7 additional days allotted for reply comments. Thereafter, the Board extended these deadlines three times, including an extension to allow interested parties to comment on the impact of the D.C. Circuit's decision in *Browning-Ferris* v. *NLRB*.[8]

## II. Summary of Changes to the Proposed Rule

In this section, we provide a summary overview of changes to the proposed rule.

### A. Overview

The final rule, like the NPRM, provides that an entity is a joint employer of a separate employer's employees only if the two employers share or codetermine the employees' essential terms or conditions of employment. However, the Board has modified the proposed rule to define "share or codetermine" as the possession and exercise of "such substantial direct and immediate control over one or more essential terms or conditions of their employment as would warrant finding that the entity meaningfully affects matters relating to the employment relationship with those employees." The Board has also modified the proposed rule to factor indirect control over essential terms or conditions of employment, contractually reserved control over essential terms or conditions of employment, and control over mandatory subjects of bargaining other than essential terms and conditions of employment into the joint-employer analysis, "but only to the extent [they] supplement[] and reinforce[] evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment."

Consistent with these provisions, evidence of contractually reserved control over an essential term or condition of employment is probative for the purpose of determining whether an entity possesses or exercises direct and immediate control over that essential term or condition. Plainly, the fact that an entity has a contractually reserved right to control an essential term or condition is probative of whether it possesses control over that term. Such evidence may also be probative of whether the control possessed and exercised is "substantial," as that term is defined in the final rule (see Sec. II.E, " 'Substantial' direct and immediate control", infra). Similarly, evidence of indirect control over an essential term or condition of employment may be probative of whether the control possessed and exercised is substantial.

Depending on the circumstances of a particular case, evidence of control over a nonessential term or condition that nonetheless constitutes a mandatory subject of bargaining may be probative of whether an entity possesses and exercises substantial direct and immediate control over an essential term or condition of employment. One can readily foresee cases where the parties dispute the significance or sufficiency of evidence that an entity exercises substantial direct and immediate control over an essential term or condition of employment, such as by claiming that the evidence is not credible or is too isolated or sporadic to meet the substantiality standard, but where the entity's control over one or more related nonessential terms may tend to support a finding of substantial direct and immediate control over an essential term or condition. For example, an entity's control over grievance adjustment or drug or alcohol testing might be probative of its direct and immediate control over discipline or supervision, and an entity's control over dress codes or attendance rules might be probative of its direct and immediate control over discipline.

Evidence of an entity's contractually reserved or indirect control over an essential term or condition of employment, or its control over mandatory but nonessential subjects of bargaining, is not, however, otherwise probative of whether the entity "meaningfully affects matters relating to the employment relationship." Under the final rule, a putative joint employer reaches that threshold only through possession and exercise of substantial direct and immediate control over one or more essential terms and conditions of employment.

### B. Indirect Control

The Board has modified the proposed rule to factor indirect control into the joint-employer analysis, but not to find it sufficient without more to make an entity a joint employer. Accordingly, the final rule provides that evidence of indirect control over essential terms and conditions of employment is probative of joint-employer status, but only to the extent that it supplements and reinforces evidence of direct and immediate control over essential terms and conditions.

The definitions of the several essential terms and conditions of employment include statements of what does and does not count as direct and immediate control over the essential term and condition being defined. These statements may bear on indirect control, since what does not count as direct and immediate control *may* count as indirect control. However, consistent with the D.C. Circuit's decision in *Browning-Ferris* v. *NLRB*, the definition of "indirect control" excludes "control or influence over setting the objectives, basic ground rules, or expectations for another entity's performance under a contract," and evidence of control that by definition does not count as direct and immediate control may fall within this exclusion and so not constitute indirect control, either. For example, the definition of "[h]ours of [w]ork" states that "[a]n entity does not exercise direct and immediate control over hours of work by establishing an enterprise's operating hours or when it needs the

---

[8] See Order dated January 11, 2019. The NPRM set the deadline for initial comments as November 13, 2018, and comments replying to comments submitted during the initial comment period were due November 20, 2018. On October 30, 2018, the Board extended the deadlines for submitting initial and reply comments for 30 days, to December 13, 2018, and December 20, 2018, respectively. On December 10, 2018, the deadlines were extended for an additional 30 days, to January 14, 2019, and January 22, 2019, respectively. After the D.C. Circuit issued its decision in *Browning-Ferris* v. *NLRB,* the Board extended the deadlines a third and final time to permit commenters to address issues raised by the court's decision. The deadline for initial comments was extended to January 28, 2019, and for reply comments to February 11, 2019.

services provided by another employer.'' But establishing an enterprise's operating hours may not be evidence of indirect control, either. A business that contracts, for example, with a food service contractor to staff its employee lunchroom surely sets ''basic ground rules or expectations'' for that contractor by specifying the hours when the lunchroom will be open. Thus, specifying those hours would be neither direct and immediate control nor indirect control. In other instances, however, what is excluded by definition from direct and immediate control *may* constitute indirect control. Accordingly, what is indirect control over an essential term and condition of employment versus what is merely a setting of objectives, basic ground rules or expectations for a contractor's performance is an issue of fact to be determined on a case-by-case basis.

### C. Contractually Reserved But Unexercised Right To Control

The final rule recognizes contractually reserved but unexercised control as a potentially relevant consideration. It provides that evidence of an entity's contractually reserved but never exercised authority over the essential terms and conditions of another employer's employees is probative of joint-employer status, but only to the extent it supplements and reinforces evidence of direct and immediate control over essential terms and conditions of employment.

In addition, although not stated explicitly in the regulatory text, the distinction drawn between indirect control that may be relevant to a joint-employer determination and ''decisions that set the objectives, basic ground rules, and expectations for a third-party contractor'' [9]—*i.e.,* the ''routine components of a company-to-company contract'' [10]—also applies to contractually reserved but unexercised control. That is, if a contract reserves to an entity a right to control one or more matters involving the objectives, basic ground rules, or expectations for a third-party contractor, such evidence will not be probative of joint-employer status. For example, contractual safety, performance, and quality standards are generally ''routine components of a company-to-company contract'' [11] and do not support a finding of joint-employer status. This necessarily follows from the final rule's definition of indirect control. If actual influence over the objectives, basic ground rules,

or expectations for a third-party contractor is not probative of joint-employer status, as the D.C. Circuit held in *Browning-Ferris* v. *NLRB,* then necessarily a contractual but unexercised right to control such matters cannot be probative of such status, either. See *Browning-Ferris* v. *NLRB,* 911 F.3d at 1221 (''[A] joint employer's control—whether direct or indirect, *exercised or reserved*—must bear on the essential terms and conditions of employment, and not on the routine components of a company-to-company contract.'') (emphasis added; internal quotation and citation omitted).

### D. Limited and Routine Control

The proposed rule stated, in relevant part, that ''[a] putative joint employer must possess and actually exercise substantial direct and immediate control over the employees' essential terms and conditions of employment *in a manner that is not limited and routine*'' (emphasis added). The Board has decided to revise the proposed rule to delete ''limited and routine'' as a general qualifying term and instead to use that term solely in the context of defining what is and is not direct and immediate control over supervision. Thus, the final rule provides that an entity does not exercise direct and immediate control over supervision when its instructions are limited and routine and consist primarily of telling another employer's employees what work to perform, or where and when to perform the work, but not how to perform it. The final rule does not otherwise use the phrase ''limited and routine.''

### E. ''Substantial'' Direct and Immediate Control

The final rule retains the requirement that direct and immediate control over essential terms and conditions of employment be ''substantial'' to give rise to joint-employer status. The Board has decided, however, to define ''substantial direct and immediate control'' in the final rule. As defined, ''substantial'' direct and immediate control means direct and immediate control that has a regular or continuous consequential effect on an essential term or condition of employment of another employer's employees. Such control is not ''substantial'' if it is only exercised on a sporadic, isolated, or de minimis basis. Thus, the exercise of even direct and immediate control may be so isolated, sporadic or de minimis that it fails to establish that the putative joint employer meaningfully affects matters relating to the employment relationship.

### F. ''Essential'' Terms And Conditions of Employment

The proposed rule, in relevant part, states that ''[a]n employer may be considered a joint employer of a separate employer's employees only if the two entities share or codetermine the employees' essential terms and conditions of employment, *such as* hiring, firing, discipline, supervision, and direction'' (emphasis added). The phrase ''such as'' suggested that the specifically enumerated essential terms—hiring, firing, discipline, supervision, and direction—might not be exhaustive, but the proposed rule left unanswered whether additional terms and conditions could be deemed essential, and if so, what those terms and conditions might be.

The final rule expands the list of essential terms and conditions to include wages, benefits, and hours of work. Additionally, to provide greater certainty and remove a potential issue from litigation, the final rule makes the list of essential terms exhaustive. Finally, the final rule has been revised to provide that an entity's control over other mandatory subjects of bargaining not considered essential terms and conditions of employment is probative of joint-employer status, but only to the extent it supplements and reinforces evidence of direct and immediate control over essential terms and conditions of employment.

### G. Hypothetical Scenarios in the NPRM

The proposed rule included a number of hypothetical scenarios, termed ''examples.'' They were included to provide additional guidance on the practical application of the proposed rule. The Board has decided to omit the hypothetical scenarios from the final rule and has instead provided more specific guidance in the text of the rule itself, as discussed below.

## III. Justification for Using Rulemaking, Rather Than Adjudication, To Revise the Joint-Employer Standard

### A. Authority To Engage in Rulemaking

Congress has delegated general rulemaking authority to the Board. Specifically, Section 6 of the National Labor Relations Act, 29 U.S.C. 156, provides that the Board ''shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the [Administrative Procedure Act (APA)], such rules and regulations as may be necessary to carry out the provisions of [the Act].''

Although the Board historically has made most substantive policy determinations through case

---

[9] *Browning-Ferris* v. *NLRB,* 911 F.3d at 1220.
[10] Id. at 1221.
[11] Id.

adjudication, it has, with Supreme Court approval, engaged in substantive rulemaking. *American Hosp. Ass'n.* v. *NLRB,* 499 U.S. 606 (1991) (upholding Board's rulemaking on appropriate bargaining units in the healthcare industry); see also *NLRB* v. *Bell Aerospace Co.,* 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance within the Board's discretion.").

Further, Section 6 authorizes the final rule as necessary to carry out Sections 2, 7, 8, 9, and 10 of the Act, 29 U.S.C. 152, 157, 158, 159, and 160, respectively. Specifically, Section 2(2) of the Act defines "employer" and Section 2(3) defines "employee." Section 7 of the Act defines the employee rights that the Act protects, including the right to bargain collectively through representatives of their own choosing, the right to engage in other concerted activities for the purpose of collective bargaining or mutual aid or protection, and the right to refrain from these activities. Section 8 of the Act defines unfair labor practices under the Act. Of particular relevance is Section 8(a)(5), which provides that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of *his* employees" (emphasis added). Section 9 of the Act sets forth the Board's responsibilities for conducting representation elections, and Section 10 of the Act provides the Board with the authority to investigate, prevent, and remedy unfair labor practices. The Board's joint-employer doctrine implicates each of these provisions of the Act, and Section 6 grants the Board the authority to promulgate rules that carry out those provisions.

*B. The Preference for Rulemaking Over Adjudication*

In the NPRM, we expressed a preliminary belief that rulemaking in this area of the law is desirable for several reasons. Specifically, the NPRM stated that rulemaking, rather than adjudication, would enable the Board to gather information from a wide variety of interested parties and to provide greater clarity to the joint-employer analysis. Rulemaking would also respect the reasonable expectations of regulated parties by ensuring that further changes to the law in this area would only be made prospectively in a new rulemaking proceeding, whereas with case adjudication, changes in the law may be made retroactively. After carefully considering nearly 29,000 comments, the Board continues to believe that rulemaking, rather than

adjudication, is the better method to revise and clarify the standard for determining joint-employer status under the Act.

First, the Board has been well served by public comment on the issue. The Board received numerous helpful comments from a wide variety of sources, many with considerable legal expertise and/or a great deal of relevant experience. Having considered these comments, the Board has refined the proposed rule in several ways, outlined above in Section II and discussed more fully below in Sections V and VI.

It is likely that the Board would not have received as much input from revisiting the joint-employer standard through adjudication rather than rulemaking. Rulemaking has given interested persons a way to provide input through the convenient comment process, and participation was not limited, as in the adjudicatory setting, to legal briefs filed by the parties and amici. Further, the comments confirm that it was especially important for the Board to receive feedback in light of the recent oscillation on the joint-employer standard, after decades of stability, beginning with *Browning-Ferris,* which overruled longstanding Board precedent and substantially relaxed the evidentiary requirements for finding a joint-employer relationship, and followed by *Hy-Brand Industrial Contractors, Ltd. & Brandt Construction Co.,* 365 NLRB No. 156 (2017) (*Hy-Brand I*), which restored the prior standard, but which was then vacated for procedural reasons in *Hy-Brand Industrial Contractors, Ltd. & Brandt Construction Co.,* 366 NLRB No. 26 (2018) (*Hy-Brand II*),[12] resulting in reinstatement by default of the joint-employer standard adopted in *Browning-Ferris.*

Second, rulemaking has made it possible for the Board to provide greater clarity with respect to the standard than would likely be accomplished through adjudication. Although the Board has decided, in response to comments, to omit the examples that were set forth in the text of the proposed rule, the final rule provides clarity by, for example, setting forth actions that will and actions that will not constitute direct and immediate control over each essential term and condition of employment. This is regulatory guidance that could be dismissed as dicta if set forth in an adjudicatory decision in a case in which it was not essential to the outcome. By providing such guidance, the final rule will

comport with the Supreme Court's instruction that the Board should provide parties with "certainty beforehand as to when [they] may proceed to reach decisions without fear of later evaluations labeling [their] conduct an unfair labor practice." *First Nat'l Maint. Corp.* v. *NLRB,* 452 U.S. 666, 679 (1981).

Third, the Board continues to believe, as discussed in the NPRM, that by establishing the joint-employer standard through the Board's Rules and Regulations, the final rule will enable employers, unions, and employees to plan their affairs free of the uncertainty that significant changes to the joint-employer doctrine could be made, and retroactively applied, via case adjudication. *NLRB* v. *Wyman-Gordon Co.,* 394 U.S. 759, 777 (1969) (Douglas, J., dissenting) ("The rule-making procedure performs important functions. It gives notice to an entire segment of society of those controls or regimentation that is forthcoming.").

Finally, the decision to engage in rulemaking regarding the standard for determining joint-employer status is consistent with the similar determinations, by the United States Department of Labor (DOL) and the United States Equal Employment Opportunity Commission (EEOC), to similarly address this issue through rulemaking.[13]

In sum, and as indicated in the NPRM with respect to the proposed rule, the Board believes that the final rule will foster predictability and consistency regarding determinations of joint-employer status in a variety of business relationships, thereby enhancing labor-management stability, the promotion of which is one of the principal purposes of the Act.

**IV. Recusal Issues**

A number of commenters claim that Chairman Ring, Member Emanuel, and/or Member Kaplan entered into this rulemaking with unalterably closed minds as to the outcome and consequently that each should recuse himself from participating in it. For the reasons that follow, the Board rejects these contentions.

"[A]n individual should be disqualified from rulemaking only when there has been a clear and convincing showing" that the official "has an

---

[12] Mot. for reconsideration denied 366 NLRB No. 93 (2018) (*Hy-Brand III*).

[13] See Joint Employer Status Under the Fair Labor Standards Act, 85 FR 2820 (Jan. 16, 2020) (to be codified 29 CFR part 791); Introduction to the Fall 2019 Regulatory Plan, 84 FR 71091 (Dec. 26, 2019) (listing EEOC Fall 2019 Unified Rulemaking Agenda, Joint Employer Status Under the Federal Equal Employment Opportunity Statutes (RIN: 3046–AB16)).

unalterably closed mind on matters critical to the disposition of the proceeding." *Air Transp. Ass'n of America, Inc.* v. *NMB,* 663 F.3d 476, 487 (D.C. Cir. 2011) (quoting *C & W Fish Co.* v. *Fox,* 931 F.2d 1556, 1564 (D.C. Cir. 1991)). Moreover, "[a]n administrative official is presumed to be objective and 'capable of judging a particular controversy fairly on the basis of its own circumstances.' " *Steelworkers* v. *Marshall,* 647 F.2d 1189, 1208 (D.C. Cir. 1980) (quoting *United States* v. *Morgan,* 313 U.S. 409, 421 (1941)). Further, "[w]hether the official is engaged in adjudication or rulemaking," the fact that he or she "has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute cannot overcome that presumption." Id. That presumption is also not overcome "when the official's alleged predisposition derives from [his or] her participation in earlier proceedings on the same issue." Id. at 1209. Expanding on the latter point, the D.C. Circuit has explained that "[t]o disqualify administrators because of opinions they expressed or developed in earlier proceedings would mean that 'experience acquired from their work . . . would be a handicap instead of an advantage.' " Id. (quoting *FTC* v. *Cement Inst.,* 333 U.S. 683, 702 (1948)). More recently, the D.C. Circuit has similarly emphasized that it would "'eviscerate the proper evolution of policymaking were we to disqualify every administrator who has opinions on the correct course of his agency's future actions.' " *Air Transp. Ass'n of America,* 663 F.3d at 488 (quoting *C & W Fish Co.,* 931 F.2d at 1565).

Consistent with the foregoing precedent, each participating Member has determined that there is no basis to recuse himself from this rulemaking. Indeed, comparison of the final rule with the proposed rule in itself clearly demonstrates that the Members did not engage in this endeavor with "an unalterably closed mind." After considering nearly 29,000 comments, the Board has revised the proposed rule in several significant respects. Throughout this rulemaking process, the Board has been willing to reconsider the preliminary views expressed in the NPRM and to revise the rule as found appropriate.

One commenter raises arguments based on section 1, paragraph 6 of Executive Order 13770, entitled "Ethics Commitments by Executive Branch Appointees," 82 FR 9333 (Jan. 28,

2017).[14] As other commenters correctly note, the cited provision is inapplicable.[15] Section 1, paragraph 6 of Executive Order 13770 is a pledge that states: "I will not for a period of 2 years from the date of my appointment participate in any particular matter involving specific parties that is directly and substantially related to my former employer or former clients, including regulations and contracts." This paragraph, read together with the definitions of "former employer," "former client," and "directly and substantially related" set forth in Executive Order 13770, prohibits a Board Member from participating in a "particular matter involving specific parties" in which his or her former employer or own former client is a party or the representative of a party. Section 2(s) of Executive Order 13770 provides that a particular matter involving specific parties has the same meaning as set forth in 5 CFR 2641.201(h).[16] 5 CFR 2641.201, which contains interpretive guidance for the post-employment restrictions found in 18 U.S.C. 207, states that "only those particular matters that involve a specific party or parties fall within the prohibition" of 18 U.S.C. 207(a)(1), and that

[s]uch a matter typically involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identified parties, such as a specific contract, grant, license, product approval application, enforcement action, administrative adjudication, or court case.

5 CFR 2641.201(h)(1). Further, the regulation states that "[l]egislation or rulemaking of general applicability and the formulation of general policies, standards or objectives, or other matters of general applicability are not particular matters involving specific parties." Id. 2641.201(h)(2).

Here, the joint-employer rulemaking—unlike an administrative adjudication of a case—is not a "specific proceeding affecting the legal rights of the parties" to that proceeding. Rather, this rulemaking is a matter of general applicability. See 5 CFR 2641.201(h)(1)-

(2). Further, the phrase "including regulations" in the pledge recusal provision in section 1, paragraph 6 of Executive Order 13770 "is not intended to suggest that all rulemakings are covered," but instead is a "reminder that regulations sometimes may be particular matters involving specific parties, although in rare circumstances." Ethics Pledge: Revolving Door Ban—All Appointees Entering Government, DO–09–11 at 2 (Mar. 26, 2009) ("certain rulemakings may be so focused on the rights of specifically identified parties as to be considered a particular matter involving specific parties"); see also Guidance on Executive Order 13770, LA–17–03 (Mar. 20, 2017). Because the joint employer rulemaking is not directed at specific parties, the cited provision of Executive Order 13770 does not apply, and arguments based on Executive Order 13770 are misplaced.

Citing Member Emanuel's participation in *Hy-Brand I,* one commenter argues that Member Emanuel should recuse himself because "[i]t is clear where [he] stands on the important issues at stake in this rulemaking" and because he has "expressed those strong views."[17] However, the fact that Member Emanuel expressed views on the joint-employer standard in *Hy-Brand I* is insufficient to demonstrate that Member Emanuel has engaged in this rulemaking with an unalterably closed mind. See *Air Transp. Ass'n of America, Inc.,* 663 F.3d at 487–488; *Steelworkers,* 647 F.2d at 1208–1209. Accordingly, the AFT's argument is unfounded.

Commenters also argue that Member Emanuel should recuse himself because his participation in this rulemaking would "accomplish the same goals" that he could not accomplish in *Hy-Brand I,* and this would be inconsistent with his "ethical obligations."[18] As an initial matter, Member Emanuel's disqualification from *Hy-Brand I* was unrelated to the substantive issues in that case. It was based on the fact that Member Emanuel had been a shareholder in the law firm that represented Leadpoint Business Services, one of the parties before the Board in *Browning-Ferris;* it had nothing to do with the substance of the case or the joint-employer standard. See *Browning-Ferris* v. *NLRB,* 911 F.3d at 1205–1206. To the extent the AFT is suggesting that Member Emanuel should be disqualified from participating in this

---

[14] See comment of Service Employees International Union (SEIU).

[15] See comments of Ranking Member Virginia Foxx of the U.S. House of Representatives Committee on Education and Labor (Ranking Member Foxx); HR Policy Association.

[16] Section 2(s) additionally states that the definition of a particular matter involving specific parties shall also include "any meeting or other communication relating to the performance of one's official duties with a former employer or former client, unless the communication applies to a particular matter of general applicability and participation in the meeting or other event is open to all interested parties." This portion of the provision does not apply here.

[17] See comment of American Federation of Teachers (AFT) at 4.

[18] Id.; see also comments of AFL–CIO; SEIU; Congressional Progressive Caucus; Attorneys General of New York, Pennsylvania, et al.; Center for American Progress Action Fund.

rulemaking because he has "[policy] goals," neither Member Emanuel's underlying philosophy, nor his previously expressed views, nor his initial participation in *Hy-Brand I* constitute grounds for his disqualification or establish that Member Emanuel has an unalterably closed mind on matters critical to this rulemaking. See *Air Transp. Ass'n of America, Inc.,* 663 F.3d at 487–488; *Steelworkers,* 647 F.2d at 1208–1209.

Moreover, and as emphasized above, the final joint-employer rule applies prospectively only. Thus, the final rule will not effectively reinstate the Board's vacated decision in *Hy-Brand I,* it will not affect the outcome in *Browning-Ferris* (currently pending before the Board on remand from the D.C. Circuit), and it will not affect Leadpoint or any other party in *Browning-Ferris.*[19]

Although the Board's Designated Agency Ethics Official (DAEO) determined that Member Emanuel was disqualified from participation in the *Hy-Brand* cases, the DAEO subsequently determined that Member Emanuel was not disqualified from participating in this rulemaking and provided guidance to all Board members with respect to general recusal considerations. With respect to the DAEO's latter determination, one comment faulted the DAEO's memorandum for purportedly failing to apply the recusal standard for rulemaking "in light of the NPRM's particularly suspect history," asserting that there should be a "more fulsome" public examination of the DAEO's opinion or memorandum.[20] This vague claim does not undermine the DAEO's determination.

Another commenter has suggested that the DAEO's memorandum is flawed because it was issued while the Board's recusal procedures were under review.[21] The Board's report on those procedures issued on November 19, 2019.[22] Nothing in that report or in the fact that the review was underway at the time the DAEO issued her memorandum

undermines the DAEO's opinion regarding Member Emanuel's participation.

One commenter also contends that Member Emanuel's participation in this rulemaking creates an appearance of preferential treatment of a client (Leadpoint) of his former law firm because the client would "derive the same impermissible benefit as it would have from *Hy-Brand I.*"[23] Accordingly, this commenter argues that Member Emanuel's participation "runs afoul" of section 1, paragraph 6 of Executive Order 13770, as well as 5 CFR 2635.101(b)(8) and (14). Id. 5 CFR 2635.101(b)(8) states: "Employees shall act impartially and not give preferential treatment to any private organization or individual." 5 CFR 2635.101(b)(14) similarly requires employees to "endeavor to avoid" any actions that would create the appearance that they are violating the law or applicable ethical standards, as "determined from the perspective of a reasonable person with knowledge of the relevant facts."

As discussed above, section 1, paragraph 6 of Executive Order 13770 does not apply to this rulemaking and thus does not support SEIU's claim. Further, because the final rule will apply prospectively only and will not affect pending unfair labor practice cases such as *Browning-Ferris,* and because there is no evidence that Member Emanuel has acted other than impartially or given preferential treatment to anyone through this rulemaking, there is no basis for finding that Member Emanuel's participation is contrary to 5 CFR 2635.101(b)(8), and no reasonable person with knowledge of the relevant facts would find that Member Emanuel's participation in this rulemaking would create an appearance that the law or ethical standards have been or are being violated.

Two commenters argue that Chairman Ring and Member Emanuel are "too biased to participate in rulemaking" based on unfair labor practice litigation involving McDonald's USA, LLC (the McDonald's litigation).[24] Those commenters cite Chairman Ring's and Member Emanuel's former law firms' work in connection with the McDonald's litigation and then-pending motions for Chairman Ring and Member Emanuel to recuse themselves from that case. These commenters argue that the

participation of Chairman Ring and Member Emanuel in this rulemaking is "no less problematic" because it would enable Chairman Ring and Member Emanuel "to tailor a rule for the McDonald's case that would directly benefit their former firms' client."

The Board issued its decision approving a proposed settlement of the McDonald's litigation on December 12, 2019. See *McDonald's USA, LLC,* 368 NLRB No. 134 (2019). Chairman Ring took no part in the consideration of the case, and the motion for his recusal was dismissed as moot. Id., slip op. at 1 fn. 2. For the reasons explained in the decision, the motion to recuse Member Emanuel was denied. Id. Moreover, as discussed above, the final rule applies prospectively only and thus will have no substantive effect on the now-concluded McDonald's litigation.[25] As such, there is no reasonable basis for concluding that the participation of Chairman Ring and Member Emanuel in this rulemaking would involve preferential treatment of any party to the McDonald's litigation or create an appearance of partiality or preferential treatment. Accordingly, the pendency of the McDonald's litigation at the time the NPRM was published neither requires nor supports Chairman Ring's or Member Emanuel's recusal from participation in this rulemaking.

Finally, to the extent that any commenter's argument regarding the McDonald's litigation is based on 5 CFR 2635.502(a)–(b), the argument is misplaced. 5 CFR 2635.502(a)(1) states that, unless he receives prior authorization, an employee should not participate in a particular matter involving specific parties that he knows is likely to affect the financial interests of a member of his household, or in which he knows that a person with whom he has a covered relationship is

---

[19] The question of what standard should apply in *Browning-Ferris* on remand was not addressed by the D.C. Circuit, which declined to rule on BFI's challenge to the retroactive application of the *Browning-Ferris* standard in that case. See 911 F.3d at 1222.

[20] Comment of Chairman Robert C. "Bobby" Scott of the House Committee on Education and Labor and Ranking Member Patty Murray of the Senate Committee on Health, Education, Labor, and Pensions (Chairman Scott and Ranking Member Murray) at 16.

[21] Comment of Congressional Progressive Caucus.

[22] See NLRB's Ethics Recusal Report, *https://www.nlrb.gov/reports/other-agency-reports/ethics-recusal-report* (last visited Jan.15, 2020). The Board subsequently announced plans to modify aspects of the report not material to the issues discussed here. Id.

[23] Comment of SEIU at 20.

[24] Comment of SEIU National Fast Food Workers Union at 2 (capitalization altered); see also id. at 3 (citing *McDonald's USA, LLC, a Joint Employer, et al.* "Charging Parties' Motion for Recusal of Chairman Ring and Member Emanuel," Case 02–CA–093893 et al. (Aug. 14, 2018)); see also comment of SEIU at 21.

[25] The fact that the Board had proposed a joint-employer rule was taken into consideration in the decision to approve the settlement in the McDonald's litigation, but only to the extent that the Board recognized that the standard adopted in a final rule "[would] likely supplant any standard arising from the [McDonald's] litigation," and therefore "a decision regarding joint-employer status" in that litigation "may have limited precedential value." 368 NLRB No. 134, slip op. at 7. Importantly, in weighing the risks inherent in continued litigation, the Board observed that "there [was] no guarantee that McDonald's would be found to be a joint employer with its Franchisees" "[e]ven under the joint-employer standard articulated in *Browning-Ferris,*" considering that the Board "has generally not held franchisors to be joint employers with their franchisees" and that "the Board in [*Browning-Ferris*] explicitly disclaimed an intent to address the joint-employer standard in the context of the relationship between a franchisor and a franchisee." Id., slip op. at 6–7.

or represents a party,[26] if he determines that a reasonable person with knowledge of the relevant facts would question his impartiality in the matter. For reasons already stated, because this CFR provision applies to "particular matters involving specific parties," it does not apply to a rulemaking of broad application such as this one. Id.; see also Office of Government Ethics Legal Advisory, DO–06–029, "Particular Matter Involving Specific Parties," "Particular Matter," and "Matter," at 9 fn. 10 (Oct. 4, 2006) ("[R]ulemaking 'would not, except in unusual circumstances covered under section 502(a)(2), raise an issue under section 502(a)[.]' ") (quoting OGE Informal Advisory Letter 93 x 25 (Oct. 1, 1993)).

5 CFR 2635.502(a)(2) also includes a "catchall" provision, which states: "An employee who is concerned that circumstances *other than those specifically described in this section* would raise a question regarding his impartiality should use the process described in this section to determine whether he should or should not participate in a particular matter" (emphasis added). But because the final rule applies prospectively only and does not affect the outcome of any pending litigation, no such concerns are present here.

## V. Response to Comments

The Board received almost 29,000 comments from interested organizations, labor unions, business owners, members of Congress, state attorneys general, academics, and other individuals. The Board has carefully reviewed and considered these comments as discussed below.

### A. Comments Regarding the Development of the Joint-Employer Doctrine Under the Act

The Board received numerous comments on the development of the joint-employer doctrine under the Act. In general, those comments acknowledge the accuracy of the Board's description of that development in the NPRM, which is briefly summarized above in Section I. As more fully developed there, for at least 30 years (from no later than 1984 to 2015), evidence of direct and immediate control over essential terms and conditions of employment was required to prove that an entity was the joint employer of another business's workers.

This requirement disappeared in August 2015 with the issuance of *Browning-Ferris,* which held that joint-employer status could be based on evidence of indirect or reserved-but-unexercised control, without more.

Several commenters criticize the proposed rule's return to the Board's joint-employer standard as it existed before *Browning-Ferris.*[27] These commenters contend that the Board cannot simply revert to the pre–*Browning-Ferris* joint-employer standard because the Board precedent upon which that standard was based—*Laerco* and its progeny—departed without explanation from the standard articulated in *Greyhound Corp.,* 153 NLRB at 1488, by disregarding evidence of contractually reserved authority and indirect control as evidence of joint-employer status and discounting evidence of supervision and direction that was "limited and routine." See *Laerco,* 269 NLRB at 326; *TLI,* 271 NLRB at 798–799. In the view of these commenters, these departures led to a narrowing of the joint-employer standard without "the benefit of any explicit modification of the earlier *Greyhound* standard." [28]

In addition, some commenters contend that the final rule's "direct and immediate" standard was "manufactured" by the Board in *Airborne Express,* with no explanation and no citation to the common law.[29] These commenters point to Restatement (Second) of Agency (1958) Sec. 220(1), comment d, which states that "the control or right to control needed to establish the relation of master and servant may be very attenuated." Some commenters argue that the proposed rule's requirement that a putative joint employer must possess and actually exercise substantial direct and immediate control over employees' working conditions "amounts to little more than a 'categorical rule' that drains reserved and/or indirect control of any relevance." At least one commenter observes that the common-law "right-to-control" principle is consistent with Section 2(11) of the NLRA, which defines "supervisor" as "any individual *having authority,* in the interest of the employer," to perform one or more of 12 supervisory functions. 29 U.S.C. 152(11) (emphasis added).[30]

Contrary to these comments, the pre–*Browning-Ferris* Board precedent

described above is consistent with the common law of joint-employment relationships in the context of the Act. Even assuming that *Laerco, TLI,* and *Airborne Express* did not adequately explain the basis for requiring substantial direct and immediate control, the Board has provided that explanation here.

As the D.C. Circuit has held, "the common law inquiry is not woodenly confined to indicia of direct and immediate control; an employer's indirect control over employees *can be a relevant consideration.*" *Browning-Ferris* v. *NLRB,* 911 F.3d at 1209 (emphasis added). And again, the court upheld "as fully consistent with the common law the Board's determination" in *Browning-Ferris* "that both reserved authority to control and indirect control *can be relevant factors* in the joint-employer analysis." Id. at 1222 (emphasis added). The Board agrees that reserved authority to control and indirect control are relevant considerations. To state the obvious, however, the court also acknowledged the significance of direct and immediate control to the common-law joint-employer analysis when it stated that "the common-law inquiry is not woodenly *confined* to indicia of direct and immediate control," id. at 1209 (emphasis added), and the court expressly did not decide whether either indirect control or contractually reserved but unexercised authority, without more, could establish joint-employer status under the Act, id. at 1213, 1218. Accordingly, the final rule makes evidence of indirect control and contractually reserved but unexercised authority probative of joint-employer status insofar as it supplements and reinforces evidence of direct and immediate control over essential terms and conditions of employment. The final rule is therefore consistent with the D.C. Circuit's decision in *Browning-Ferris.* And by requiring evidence of direct and immediate control, it is also consistent with *Laerco* and its progeny.

The final rule, moreover, is consistent with the Board's pre-1984 precedent, which deemed indirect control relevant to joint-employer status without holding that it was sufficient, standing alone, to establish that status. For example, in *Floyd Epperson,* 202 NLRB at 23, the Board considered the fact that the putative joint employer, a dairy company, had indirect control over the wages of drivers supplied by another employer. But the Board's conclusion that the dairy company was a joint employer of the drivers relied on "all the circumstances" of the case, including the fact that the company

---

[26] Pursuant to 5 CFR 2635.502(b)(1)(iv), an employee is considered to have a "covered relationship" with "[a]ny person for whom the employee has, within the last year, served as officer, director, trustee, general partner, agent, attorney, consultant, contractor, or employee."

[27] See comments of Laborers' International Union of North America (LIUNA); International Union of Operating Engineers (IUOE); AFL–CIO.

[28] See comment of IUOE.

[29] See comments of State Attorneys General; the AFL–CIO.

[30] See comment of AFL–CIO.

dictated the specific routes that drivers were required to take when transporting its goods, "generally supervise[d]" the drivers, and had authority to modify their work schedules. Id. As explained in the NPRM, in *Floyd Epperson* and like cases arising before 1984, the Board was not called upon to decide, nor did it assert, that an entity's indirect influence over another company's workers' essential working conditions, standing alone, could establish a joint-employer relationship.

Some commenters argue that the rule conflicts with the policies and purposes of the NLRA by purportedly diminishing opportunities for collective bargaining and eliminating protections for those seeking to exercise their rights under the Act.[31] Another commenter argues that while the *Browning-Ferris* standard facilitates collective bargaining when chosen by workers, promotes enforcement of the Act, and provides clear standards, the proposed rule fails on each of these counts.[32] Other commenters take the opposite position, arguing that the proposed rule encourages collective bargaining by fostering predictable joint-employer determinations in a variety of business relationships, thereby promoting labor-management stability, one of the principal purposes of the Act.[33] In agreement with the latter commenters, the Board believes that the final rule promotes national labor policy by appropriately imposing bargaining obligations solely on entities that have actually exercised substantial direct and immediate control over essential terms and conditions of employment.

*B. Comments Regarding Indirect Control*

Many commenters support requiring actual exercise of substantial direct and immediate control in order to establish joint-employer status. In this regard, commenters assert, among other things, that this requirement is practical;[34] is long-accepted[35] and has always been a fundamental aspect of the joint-employer standard;[36] is consistent with court precedent, the common law, the pertinent Restatements, and/or congressional intent;[37] appropriately

assigns unfair labor practice liability to the employer responsible for the violation;[38] and enables businesses to enter into a variety of business relationships and to establish certain high-level requirements (*e.g.,* minimum training levels) with the confidence that they will not be held responsible for another entity's employees.[39] Further, some commenters state that pre–*Browning-Ferris* precedent addressing the meaning of direct and immediate control will provide helpful guidance to parties.[40]

Relatedly, several commenters state that evidence of indirect control may be "probative,"[41] relevant, or permissibly considered, but that the common law, the courts, and/or the Taft-Hartley Congress would not support finding joint-employer status absent evidence of direct or immediate control.[42] In this connection, one commenter states that the Board may choose to address whether indirect control could be "dispositive," noting that the D.C. Circuit in *Browning-Ferris* v. *NLRB* left that question unanswered.[43] However, another commenter takes the position that the extent to which control is exercised has limited or no relevance.[44]

In contrast, several commenters say that consideration of indirect control is consistent with the common law, the pertinent Restatements, court decisions (including *Browning-Ferris* v. *NLRB*),[45] and the practices of other federal agencies that consider indirect control under other statutes.[46] One commenter asserts that considering indirect control is necessary in order to capture how

control is actually exercised in the workplace.[47] Some commenters state that indirect control can be just as effective and significant as direct control.[48] Further, some commenters state that the Board failed to adequately justify its "preliminary belief" in the NPRM that, without requiring direct and immediate control, it would be difficult to police the line between independent commercial contractors and genuine joint employers.[49]

Citing various sections of the Act, several commenters argue that indirect control is either relevant to, or an independently sufficient basis for finding, joint-employer status. Specifically, they cite the definition of "employer" in Section 2(2),[50] of "supervisor" in Section 2(11),[51] and of "agent" in Section 2(13),[52] and the policies set forth in Section 1.[53]

Under the common law, some forms of indirect control are relevant to the joint-employer analysis. Consistent with this principle, the final rule makes clear that evidence of indirect control over essential terms and conditions of employment is probative of joint-employer status, but only to the extent that it supplements and reinforces evidence of direct and immediate control over essential terms and conditions of employment. Nothing in the Act itself or joint-employer precedent compels us to adopt a rule that permits a finding of joint-employer status based solely on an entity's indirect control over another entity's employees, and the Board declines to do so. With regard to comments that cite various sections of the Act, none of the cited sections requires a conclusion that one entity's exercise of merely indirect control over another entity's employees is sufficient to make the former entity a joint employer. Further, the Board believes that the policies of the Act are furthered, not hindered, by requiring only those entities to come to the bargaining table that have sufficient control over essential terms and conditions of employment to warrant a finding that they meaningfully affect matters relating to the employment relationship, and that direct and immediate control over at least one essential term is necessary to warrant such a finding.

---

[31] See comments of National Employment Law Project (NELP); Economic Policy Institute (EPI).

[32] See comment of State Attorneys General.

[33] See comments of American Supply Association; Chamber of Commerce.

[34] Comment of International Foodservice Distributors Association.

[35] Comments of International Foodservice Distributors Association; Restaurant Law Center.

[36] Comment of National Retail Federation.

[37] Comments of Coalition for a Democratic Workplace (CDW); Chamber of Commerce; HR Policy Association; Ranking Member Foxx;

American Staffing Association; Council on Labor Law Equality (COLLE); Restaurant Law Center.

[38] Comments of COLLE; Americans for Tax Reform.

[39] Comment of National Association of Truckstop Operators.

[40] Comments of International Bancshares Corporation; Restaurant Law Center; COLLE.

[41] Comment of CDW.

[42] Comments of CDW; HR Policy Association; American Staffing Association; Retail Industry Leaders Association (RILA).

[43] Comment of Jenner & Block, LLP.

[44] Comment of SEIU.

[45] Comments of Southern Poverty Law Center; United Brotherhood of Carpenters and Joiners of America; Congressional Progressive Caucus; Greater Boston Legal Services; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW); AFL–CIO; International Brotherhood of Teamsters (IBT); United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO (UA); 1199SEIU United Healthcare Workers East; LIUNA; Spivak Lipton LLP; IUOE; Members of Congress; Chairman Scott and Ranking Member Murray; Communications Workers of America, AFL–CIO (CWA); NELP; James van Wagtendonk; SEIU; Attorneys General of New York, Pennsylvania, et al.; SEIU Local 32BJ.

[46] Comments of UA; James van Wagtendonk.

[47] Comment of NELP.

[48] See, *e.g.,* Comment of Kelly Sagaser.

[49] Comments of Chairman Scott and Ranking Member Murray; Attorneys General of New York, Pennsylvania, et al.

[50] Comments of A. Feola; AFL–CIO; UA; SEIU.

[51] Comments of UAW; AFL–CIO.

[52] Comment of SEIU.

[53] Comments of IUOE; Members of Congress.

Several commenters state that the term "direct and immediate control" is unclear and will lead to uncertainty and litigation over its meaning.[54] Some commenters also state that the final rule should define the term,[55] and some propose definitions or advocate for particular interpretations of that phrase.[56]

For the reasons stated by many commenters, the final rule provides guidance on distinguishing what does and does not evidence direct and immediate control over each essential term and condition of employment. We believe that that this approach helps clarify the meaning of "direct and immediate control." Moreover, the several definitions of essential terms and conditions of employment— specifically, of what does not constitute evidence of direct and immediate control—also shed light on the meaning of indirect control.

Many commenters are critical of the term "indirect control," saying, among other things, that it is undefined, ambiguous, and/or seemingly limitless.[57] Some commenters note that there are different types of indirect control, and they cite the *Browning-Ferris* court's distinction between forms of indirect control that involve sharing or codetermining those matters governing essential terms and conditions of employment, which may be relevant to a joint-employer determination, and employer decisions that set the objectives, basic ground rules, and expectations for a third-party contractor, which are not.[58] Relatedly, other commenters state or imply that joint-employer status should not be found based solely on a business having the ability to cancel a contract with a subcontractor or franchisee.[59]

Further, several commenters propose defining, or describe, "indirect control" as involving or including control exercised through intermediaries or controlled third parties,[60] or some

version of that concept.[61] Relatedly, other commenters state that, in determining the meaning of indirect control, it may be useful to consider the common-law "subservient doctrine."[62]

Based on these comments, the Board has decided to provide more clarity by expressly defining "indirect control" in the final rule in a manner that largely tracks the distinction that the D.C. Circuit articulated in *Browning-Ferris* v. *NLRB*. Thus, under the final rule, "indirect control" means indirect control over essential terms and conditions of employment of another employer's employees, but not control or influence over setting the objectives, basic ground rules, or expectations for another entity's performance under a contract. In defining indirect control, the Board has opted to focus on the connection between the entity's actions and the employees' essential terms and conditions of employment, rather than on how alleged control is communicated. However, the final rule is not intended to immunize an entity from joint-employer status based solely on how its control is communicated, if the other requirements of joint-employer status otherwise are met. In this connection, as the D.C. Circuit observed in *Browning-Ferris* v. *NLRB*, the common law has never countenanced the use of intermediaries or controlled third parties to avoid the creation of a master-servant relationship, and we do not intend this rule to do so. Relatedly, as *Browning-Ferris* v. *NLRB* discussed, the subservant doctrine takes into account control exercised through an intermediary.

One commenter states that indirect control should be considered along with all of the facts and circumstances, including how often indirect control is actually exercised, how many employees are impacted by the indirect control, and whether the indirect control governs a significant number of essential terms and conditions of employment.[63] In addition, several commenters propose examples of indirect control or other arrangements that should not demonstrate joint-employer status, such as determining the skills of the individuals who will perform services;[64] establishing conduct requirements to ensure that the company's employees, property, and

customers are protected;[65] deciding that the services of temporary workers supplied by another company are no longer needed at one's worksite;[66] establishing the amount that the customer is willing to pay for services;[67] cost-plus contracts;[68] corporate social-responsibility policies;[69] ensuring compliance with regulatory obligations;[70] permitting employees to participate in basic benefit plans such as retirement, health, dental, and life insurance;[71] establishing minimum wages, where the direct employer is permitted to pay more;[72] and establishing requirements concerning performance management, products, quality, or safety.[73]

The final rule incorporates several aspects of these comments. Preliminarily and as a general matter, the rule states that joint-employer status must be determined on the totality of the relevant facts in each employment setting. More specifically, the final rule provides guidance as to kinds of indirect control that may not be probative of joint-employer status. It does so in the several definitions of essential terms and conditions in stating what does *not* constitute direct and immediate control of each essential term. Thus, for example, the final rule provides that direct and immediate control excludes setting minimal hiring standards; setting minimal standards of performance or conduct; refusing to allow another employer's employee to continue performing work under a contract; entering into a cost-plus contract; maintaining standards that are required by government regulation; and permitting another employer, under an arms-length contract, to participate in its benefit plans. These same acts also would not constitute evidence of indirect control to the extent they involve setting the objectives, basic ground rules, or expectations for another entity's performance under a contract.[74] See *Browning-Ferris* v. *NLRB,* 911 F.3d at 1220 ("[E]mployer

---

[54] Comments of UAW; 1199SEIU United Healthcare Workers East; SEIU; Signatory Wall and Ceiling Contractors Alliance.

[55] See, *e.g.*, Comment of Restaurant Law Center.

[56] Comments of SEIU; National Retail Federation; American Hotel & Lodging Association.

[57] Comments of American Staffing Association; American Action Forum; International Sign Association; Restaurant Law Center; American Hotel & Lodging Association; FedEx Corporation; HR Policy Association; National Association of Home Builders; General Counsel Peter Robb; Chamber of Commerce.

[58] Comments of the American Hotel & Lodging Association; COLLE; Restaurant Law Center.

[59] See, *e.g.*, Comment of Dean Johnson.

[60] Comments of Selby Schwartz; United Brotherhood of Carpenters and Joiners of America; UAW; Spivak Lipton LLP; HR Policy Association; SEIU; Wholesale Delivery Drivers, General Truck

Drivers, Chauffeurs, Sales, Industrial and Allied Workers, Local 848, IBT; Chairman Scott and Ranking Member Murray.

[61] See, *e.g.*, Comment of Kentucky Equal Justice Center ("via supervisors and other lower-level direct overseers").

[62] See, *e.g.*, Comment of SEIU.

[63] Comment of Jenner & Block, LLP.

[64] Comment of Restaurant Law Center.

[65] Id.

[66] Comment of Jenner & Block, LLP.

[67] Comment of Restaurant Law Center.

[68] Comments of Restaurant Law Center; COLLE.

[69] Comments of COLLE; RILA; HR Policy Association.

[70] Comment of HR Policy Association.

[71] Id.

[72] Comment of John B. Hirsch.

[73] Comment of HR Policy Association.

[74] On the other hand, conduct excluded by definition from evidencing direct and immediate control may evidence indirect control where it does *not* involve setting the objectives, basic ground rules, or expectations for another entity's performance under a contract. See Sec. II.B, "Summary of Changes to the Proposed Rule: Indirect Control."

decisions that set the objectives, basic ground rules, and expectations for a third-party contractor cast no meaningful light on joint-employer status.").

While not specifically addressed in the text of the final rule, so-called social responsibility provisions, such as contractual provisions requiring workplace safety practices, sexual harassment policies, morality clauses,[75] wage floors, or other measures to encourage compliance with the law or to promote desired business practices generally will not make joint-employer status more likely under the Act. Typically, such provisions will constitute the setting of basic ground rules or expectations for a third-party contractor. We cannot rule out the possibility, however, that a social-responsibility provision may be probative of joint-employer status to the extent it goes beyond merely setting basic ground rules or expectations for a third-party contractor and evidences substantial control over one or more essential terms or conditions of employment.

One commenter asserts that the NPRM created confusion by providing that joint-employer status would be limited to entities that play an active role in "establishing" essential terms and conditions of employment.[76] The commenter states that it would undermine the Act's goals if the Board immunized from joint-employer status entities that did not initially establish terms and conditions of employment, but that were nonetheless instrumental in post-establishment interpretation and implementation of those terms and conditions, in preventing modifications of them, or in "endorsing, ratifying, and incorporating" them.[77]

The proposed rule was not intended to limit joint-employer status in this way. The text of the proposed rule did not thus limit joint-employer status, and neither does the text of the final rule. Thus, an entity may be found to be a joint employer where it possesses and exercises substantial direct and immediate control over essential terms and conditions of employment by maintaining or revising them without having established them in the first instance.

One commenter states that we should rely on indirect control that is "actual and measurable"—*i.e.,* indirect control would be probative of joint-employer status if it can be readily identified and objectively measured.[78] While the final rule does not incorporate the commenter's proposed "actual and measurable" standard, it does limit the scope of probative "indirect control" evidence in other ways. Consistent with the D.C. Circuit's decision in *Browning-Ferris* v. *NLRB,* the final rule provides that control or influence over setting the objectives, basic ground rules, or expectations for a third-party contractor does not constitute "indirect control" for the purpose of determining joint-employer status. Moreover, the several definitions of essential terms and conditions of employment—specifically, of the statements in those definitions of what does not count as evidence of direct and immediate control—also furnish guidance on what may not count as evidence of indirect control, either. Finally, as to evidence of indirect control that *may* factor into a joint-employer determination, the final rule provides that such evidence is probative of joint-employer status only to the extent it supplements and reinforces evidence of direct and immediate control.

Some commenters describe various fact patterns they said would be problematic under the proposed rule, including a situation where an entity uses a pretextual reason to ask an undisputed employer to discharge an employee, where the request is unlawfully motivated.[79] Rather than lengthening or complicating the final rule with a variety of examples or fact patterns, the final rule clarifies that joint-employer status must be determined on the totality of the relevant facts in each particular employment setting.

One commenter states that the Board should first conduct an independent-contractor analysis to determine whether the Board has jurisdiction before assessing whether direct and immediate control has been exercised.[80] But an entity alleged to be a joint employer of another employer's employees will be the direct employer of its own employees, and the Board's jurisdiction over that entity will be established on this basis, provided the usual statutory and discretionary jurisdictional standards are met. From that point forward, the independent-contractor analysis has little if any

bearing on the joint-employer determination. As the *Browning-Ferris* court discussed, the issue of whether a worker is an independent contractor or an employee is distinct from the issue of whether a worker who is undisputedly the employee of one employer also has a second, joint employer. Accordingly, the Board has not amended the rule to make the suggested change.

## C. Comments Regarding Contractually Reserved But Unexercised Control

Many commenters address the question of whether reserved but unexercised control is relevant to the joint-employer analysis.

A number of commenters argue that the Board should not consider contractually reserved but unexercised control in its joint-employer analysis. One commenter argues that under the right-to-control standard set forth in the Board's decision in *Browning-Ferris,* virtually all user employers, franchisors, etc., would be joint employers simply because their contracts with undisputed primary employers almost always give them the potential to control the terms and conditions of employment of the primary employer's employees, if only because such user employers can simply cancel such contracts if not satisfied with the terms and conditions of employment set by the primary employer.[81] Another commenter argues that finding an entity to be an employer of another entity's employees based solely on the conditions under which the entities have agreed that they might terminate their relationship unjustifiably restricts parties' liberty to contract and contravenes private rights long recognized in Anglo-Saxon jurisprudence.[82] Commenters also argue that a standard incorporating contractually reserved control is vague, elusive, and uncertain, difficult to apply, or unworkable, and that such a standard may be used in an outcome-determinative manner to support a particular result.[83] Another commenter states that considering reserved control may inappropriately or unfairly enmesh an entity, especially a franchisor, in another entity's labor dispute.[84] Finally, a commenter argues that extending joint-employer status to entities on the basis of potential control would conflict with other federal and state statutory schemes, creating unwarranted

---

[75] Morality clauses require employees to maintain standards of behavior to protect the reputation of their employer. See, *e.g., Galaviz* v. *Post-Newsweek Stations,* 380 Fed. Appx. 457, 459 (5th Cir. 2010), and *Bernsen* v. *Innovative Legal Marketing, LLC,* No. 2:11CV546, 2012 WL 3525612 (E.D. Va. June 20, 2012), for examples of morality clauses.

[76] Comment of SEIU.

[77] Id.

[78] Comment of HR Policy Association.

[79] See, *e.g.,* Comment of LIUNA.

[80] Comment of Employment Law Alliance.

[81] See comment of General Counsel Robb.

[82] See comment of Chamber of Commerce.

[83] See comments of American Hotel & Lodging Association; International Bancshares Corporation; CDW; International Sign Association; International Foodservice Distributors Association.

[84] See comment of FordHarrison LLP.

difficulties for businesses in their attempts to comply with various federal and state employment-related laws.[85]

In contrast, many commenters argue that the Board's standard should give at least some weight to evidence of an entity's contractually reserved control over essential terms and conditions of employment of another employer's employees.[86] These commenters argue that contractually reserved rights are relevant because they impact and, in some cases, set terms and conditions of employment and claim that the common law deems reserved control relevant because an entity's authority over the work, even if unexercised, prevents another from deciding to render service in a manner different from that which serves the entity holding the reserved control.[87] Another commenter argues that a contractual reservation of authority, particularly when paired with a clause allowing for at-will termination of the contractual relationship, gives the undisputed primary employer a powerful incentive to comply with the wishes of the putative joint employer, without the necessity of any actual exercise of control by the latter.[88] Many commenters argue that the common law, as reflected in relevant Restatements, Restatements and judicial decisions, permits or requires the consideration of reserved but unexercised control.[89] These commenters argue that the D.C. Circuit's recent decision in *Browning-Ferris* v. *NLRB* held that consideration of a company's reserved authority to control terms and conditions of employment is an established aspect of the common law of agency. Commenters also contend that the common law permits or requires consideration of contractually reserved control because the Second Restatement of Agency defines a master as, among other things, someone who has the "right to control," defines a servant as someone subject to the master's right to control, and looks to the extent of control that the master may exercise "by the agreement."[90]

Commenters further argue that the Act itself supports considering contractually reserved but unexercised control, citing the Act's purpose of promoting collective bargaining, which is expressly stated in Section 1 of the Act, and the

asserted need to adapt to changes in today's workforce by extending the right to collective bargaining to a wide variety of contingent workers as a matter of policy.[91] Other commenters claim that effective collective bargaining requires that all entities with the ability to control workers' terms and conditions of employment must participate in collective bargaining, thereby preventing an entity with reserved but unexercised control from upending, after the fact, collective-bargaining agreements made by the primary employer of the employees over whom the entity possesses reserved control.[92] Another commenter argues that general statutory requirements of good-faith bargaining require the presence at the bargaining table of, for instance, an exclusive purchaser of a manufacturer's products, or a major donor that conditions donations to a nonprofit on specified terms and conditions for the nonprofit's employees, each of which possesses effective control over employees' essential terms and conditions of employment by virtue of its economic relationship with their employer.[93]

Two commenters argue that a joint-employer standard that does not consider reserved control would be inconsistent with Section 2(11) of the Act, which defines who is a "supervisor" under the Act.[94] These commenters contend that established Board interpretations of Section 2(11) exclude individuals who possess supervisory authority as defined in Section 2(11) from employee status under Section 2(3), whether or not such authority is exercised.[95] Thus, they maintain, it is inconsistent to hold that a person may be a Section 2(11) supervisor based solely on reserved but unexercised control, but not to find his or her employer a joint employer of the supervised employee based on the same reserved but unexercised control. For example, one commenter argues that no one could dispute that a Director of Nursing in a hospital is a statutory supervisor if the Director retains authority, expressly or implicitly, to direct nurses supplied by a staffing agency when the Director observes that the nurses are not providing services correctly. In that commenter's view, a proper joint-employer framework would

provide that the hospital that employs the Director of Nursing must be a joint employer of the supplied nurses.[96] Other commenters point out that the NPRM does not exclude consideration of reserved but unexercised control, but merely clarifies that it is insufficient to establish joint-employer status absent evidence of actual exercise of such control.[97]

Having carefully considered these comments, the Board has decided to modify the proposed rule to provide that an entity's contractually reserved but never exercised authority over the essential terms and conditions of employment of another employer's employees is probative of joint-employer status, but only to the extent that evidence of such authority supplements and reinforces evidence of actually exercised direct and immediate control.

The Board agrees with those commenters who suggest that an entity's ability to cancel a contract or terminate a business relationship with another entity should not be deemed reserved control relevant to the joint-employer inquiry.[98] As stated above, reserved or indirect control is not relevant to the joint-employer analysis, whether such control is exercised or not, where it bears on "the objectives, basic ground rules, or expectations for another entity's performance under a contract." See text of Final Rule (Rule) Sec. 103.40(E), infra; *Browning-Ferris* v. *NLRB,* 911 F.3d at 1221 ("[A] joint employer's control—whether direct or indirect, exercised or reserved—must bear on the essential terms and conditions of employment, and not on the routine components of a company-to-company contract.") (internal quotation and citation omitted). Consistent with this principle, entities' decisions about the conditions under which their business relationships may end are ordinary incidents of contractual relationships that are not probative of joint-employer status. Cf., *e.g., First Nat'l Maint. Corp.* v. *NLRB,* 452 U.S. 666, 677–679, 687–688 (1981) (company had no duty to bargain with representative of its own employees over decision to terminate contract and discharge employees).

The Board agrees with commenters who observe that the common law and the Act *permit* consideration of reserved control, the approach adopted by the final rule. In response to commenters' concerns about vague and unlimited

---

[85] See comments of General Counsel Robb.

[86] See comments of IBT; NELP.

[87] NELP cites Restatement of Employment Law Sec. 1.04.

[88] Comment of CWA.

[89] See comments of Chairman Scott and Ranking Member Murray; Equal Justice Center; Spivak Lipton LLP; IUOE.

[90] See comments of Chairman Scott and Ranking Member Murray; AFL–CIO; IBT; IUOE; Attorneys General of New York, Pennsylvania, et al.

[91] See comments of IUOE; Professor Alexia Kulwiec.

[92] See comments of IUOE; NELP.

[93] See comment of International Brotherhood of Electrical Workers Local 21 (IBEW Local 21).

[94] See comments of UAW; AFL–CIO.

[95] AFL–CIO cites *Yamada Transfer,* 115 NLRB 1330, 1332 (1956), and *U.S. Gypsum Co.,* 93 NLRB 91, 92 fn. 8 (1951).

[96] See comment of AFL–CIO.

[97] See comments of Ranking Member Foxx; CDW.

[98] See, *e.g.,* comments of General Counsel Robb; Job Creators Network; Dean Johnson.

''potential'' control that might have been found probative of joint-employer status under the *Browning-Ferris* standard, the final rule defines and limits what will constitute probative evidence of contractually reserved authority. Under the final rule, such contractually reserved authority, to be probative of joint-employer status, (1) means reserved authority over the essential terms and conditions of employment of another employer's employees, and (2) must supplement and reinforce evidence of direct and immediate control over essential terms and conditions of employment of the other employer's employees. Rule Sec. 103.40(F), (A), infra. It therefore follows that an entity's contractual authority to cancel a contract or terminate a business relationship with another entity is not evidence that the former shares or codetermines matters governing essential terms and conditions of employment of the latter's employees. Accordingly, the rule's approach is consistent with contract-respecting principles of Anglo-Saxon jurisprudence.

Similarly, and consistent with the congressional purpose expressed in the Taft-Hartley amendments,[99] an entity's reserved ''control'' in the sense of its ability to indirectly affect the terms and conditions of employment of another entity's employees as a matter of economic reality—including by being the exclusive purchaser of a manufacturer's products or by a donor conditioning donations to a nonprofit on changes to terms and conditions of employment of the nonprofit's employees—will not be the kind of control that is relevant to the joint-employer analysis. As a matter of economic reality, an employer producing goods or performing services under a contract that is terminable at will has strong incentives to respond to any complaints, suggestions, or requests that the contracting entity may have. The Board is, however, precluded from taking such considerations into account in determining employer status under the Act. See, *e.g., Nationwide Mut. Ins. Co.* v. *Darden,* 503 U.S. at 324–325 (discussing Congress's 1947 amendments to NLRA in response to Supreme Court's expansive interpretation of Sec. 2(3) in *Hearst*); *NLRB* v. *United Ins. Co. of America,* 390 U.S. at 254 (same). It necessarily follows

that the Board cannot rely on such considerations in determining joint-employer status, either.

For the following reasons, the Board is unpersuaded by the arguments by analogy to the Board's analysis of supervisory status under Section 2(11) of the Act.

First, determining supervisory status under Section 2(11) turns on the interpretation of statutory language that differs from the statutory language governing employer or employee status under Section 2(2) and 2(3), respectively. The history of interpretation of Section 2(11) has not been straightforward or free from controversy. See, *e.g., NLRB* v. *Kentucky River Commty. Care, Inc.,* 532 U.S. 706, 712–721 (2001) (discussing history of interpretation of parts of Sec. 2(11)). Given the intricacy of Section 2(11) and its different purpose from Section 2(2), it should not be surprising that the Board applies different standards to the analysis of supervisory status and joint-employer status.

Second, while the commenters correctly observe that the *possession* of authority under Section 2(11) establishes supervisory status, it is well established that the Board looks beyond mere job titles or conclusory statements of supervisory status in order to determine whether an individual is actually a supervisor under Section 2(11). See, *e.g., Coral Harbor Rehab. & Nursing Ctr.,* 366 NLRB No. 75, slip op. at 1, 17 (2018) (''[W]hat the statute requires is evidence of actual supervisory authority visibly translated into tangible examples demonstrating the existence of such authority.''). Accordingly, while the Board need not apply congruent standards to analyze these different statutory relationships, the legal tests are in fact less divergent than the commenters suggest.

Finally, ''an individual must exercise supervisory authority over employees of the employer at issue, and not employees of another employer, in order to qualify as a supervisor under Section 2(11) of the Act.'' *Crenulated Co.,* 308 NLRB 1216, 1216 (1992) (citing cases). Thus, an individual, employed by a hospital, who possesses contractually reserved but unexercised authority responsibly to direct nurses supplied to the hospital by a staffing agency would not, on that basis, be a Section 2(11) supervisor, nor would the hospital, on that basis, be a joint employer of the nurses employed by the staffing agency. However, if the hospital, through the individual, possessed *and exercised* substantial direct and immediate control over essential terms and conditions of employment of the supplied staffing-

agency nurses, the hospital might well be found to be a joint employer of the supplied nurses, *and* the individual might accordingly be found to be a statutory supervisor. Accordingly, in practice, the legal tests for joint employer and supervisory status are likely to converge on consistent results in individual cases.

Many commenters provide examples of industries or business relationships involving what the commenters identify as potential or reserved control.[100] The final rule incorporates the well-established legal principle that joint-employer status must be determined on the totality of the relevant facts in each particular employment setting. Rule Sec. 103.40(A), infra. Accordingly, the outcome of a joint-employer analysis in individual cases will not be determined based on the industry or type of business relationship involved, but rather will result from application of the standards set forth in the final rule to the particular facts of the case. See, *e.g., Boire* v. *Greyhound Corp.,* 376 U.S. at 481 (''[W]hether Greyhound possessed sufficient indicia of control to be an 'employer' is essentially a factual issue.'').

Further, many commenters provide examples of specific kinds of contractual reservations of control that should or should not be probative of an entity's status as a joint employer. As made clear above, kinds of reserved ''control'' that are ''routine components of a company-to-company contract,'' *Browning-Ferris* v. *NLRB,* 911 F.3d at 1221, will not be probative of joint-employer status under the rule, and, when necessary, the Board will evaluate evidence of an entity's alleged contractually reserved but unexercised control over another company's employees within this framework. (Consistent with the provisions of the final rule, such an evaluation need not be conducted unless the proponent of joint-employer status proves that the entity exercises direct and immediate

---

[99] See, *e.g., Nationwide Mut. Ins. Co.* v. *Darden,* 503 U.S. 318, 324–325 (1992) (discussing Congress's 1947 amendments to NLRA in response to Supreme Court's expansive interpretation of Sec. 2(3) "employee" in *NLRB* v. *Hearst Publ's Inc.,* 322 U.S. 111 (1944)); *NLRB* v. *United Ins. Co. of America,* 390 U.S. 254 (1968) (same).

[100] For example, commenters including International Bancshares Corporation, Chamber of Commerce, General Counsel Robb, COLLE, International Sign Association, Job Creators Network, FordHarrison LLP, and Jim Steitz, discuss potential or reserved control in business relationships including those between franchisors and franchisees, contractors and subcontractors, parent and subsidiary companies, and companies that generally provide and receive goods or services, including labor, from one another. Commenters including SEIU Local 32BJ, COLLE, Professor Kulwiec; National Association of Home Builders, International Sign Association, American Hotel & Lodging Association, and FordHarrison LLP discuss potential or reserved control in industries including building cleaning and security, food service and hospitality, home healthcare, agriculture, home building, visual communications, and professional employee organizations.

control over at least one essential term and condition of employment.) More specifically, some commenters discuss whether the joint-employer analysis can or should turn on contractual performance requirements and general work standards,[101] or contractually required compliance with regulations or codes, including government-required nondiscrimination provisions.[102] These kinds of contractual requirements are ordinary incidents of any contractual relationship, and they will generally not be probative of joint-employer status under the final rule. See, *e.g., Aldworth Co.,* 338 NLRB 137, 139 (2002) (''[A]ctions taken pursuant to government statutes and regulations are not indicative of joint employer status.''), enfd. sub nom. *Dunkin' Donuts Mid-Atlantic Distrib. Ctr., Inc.* v. *NLRB,* 363 F.3d 437 (D.C. Cir. 2004).

Some commenters discuss whether the joint-employer analysis can or should consider the ability of an entity that uses services provided by another entity's employees to have input on who provides those services, to monitor performance, to dictate times, manner, and method of performance, or a user entity's reservation of the right to reject individual workers provided by a supplier entity and to require that supplied workers comply with the user entity's plant rules and regulations.[103] The final rule clarifies the conditions under which such contractually reserved controls may be probative of a user entity's joint-employer status.[104] Thus, the contractually reserved but unexercised right to have input on who provides services may be probative of joint-employer status if the evidence demonstrates that such input, if provided, would determine which particular individuals another employer will hire and which it will not or would directly result in the discharge of another employer's employee. Rule Sec. 103.40(C)(4) and (5), infra; see also *NLRB* v. *Browning-Ferris Indus. of Pennsylvania,* 691 F.2d at 1125 (facts that BFI ''shared with the brokers the power to approve drivers, and devised the rules under which the drivers were to operate at BFI sites'' contributed to ''substantial evidence which supports the Board's finding that BFI exerted significant control over the work of the drivers'').

An entity's contractually reserved authority to monitor performance ordinarily will not be probative of joint-employer status. If, however, the evidence were to demonstrate that conduct characterized as ''monitoring performance'' also encompasses instructing individual employees *how* to perform their work or issuing performance appraisals to individual employees, that conduct may be probative of joint-employer status. Rule Sec. 103.40(C)(7), infra. And an entity's reserved authority to dictate times, manner, and method of performance may be probative of joint-employer status to the extent such authority encompasses determining work schedules or work hours, including overtime, of another employer's employees, instructing another employer's employees how to perform their work, or assigning particular employees their individual work schedules, positions, and tasks. Rule Sec. 103.40(C)(3), (7), and (8); see also *Cmty. for Creative Non-Violence* v. *Reid,* 490 U.S. 730, 751 (1989) (''In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control *the manner and means* by which the product is accomplished.'') (emphasis added); Restatement of Employment Law Sec. 1.01(a)(3) (''[A]n individual renders services as an employee of an employer if . . . the *employer controls the manner and means* by which the individual renders services.'') (emphasis added).[105]

One commenter also questions whether the joint-employer analysis could consider a user entity's reservation of authority to prevent disruption of its operations or unlawful conduct by a supplier entity's employees on its property, or the user's efforts to monitor, evaluate, and improve the performance of supplied employees where such efforts fall short of controlling the manner, means and details of their performance.[106] In general, policies prohibiting disruption of operations or unlawful conduct constitute the type of basic ground rules and expectations that ''cast no meaningful light on joint-employer status.'' *Browning-Ferris* v. *NLRB,* 911 F.3d at 1219–1220. Efforts to monitor, evaluate, and improve the performance of supplied employees would constitute direct and immediate control of essential terms and conditions if those efforts entailed a decision by the user entity to actually discharge, suspend, or otherwise discipline another entity's employees, to instruct them how to perform their work or issue performance appraisals, or to assign them individual work schedules, positions, and tasks. Rule Sec. 103.40(C)(5)–(8). Thus, contractually reserved authority that, if exercised, would result in the foregoing would be probative of joint-employer status to the extent it supplements and reinforces evidence of direct and immediate control.

Another commenter observes that many businesses outsource janitorial and security services, or production, delivery, and marketing functions.[107] It suggests that any reserved control inherent in such outsourcing should not establish a joint-employment relationship. Under the rule, such ordinary contractual relationships do not make the outsourcing company a joint employer so long as it does not possess and exercise substantial direct and immediate control over essential terms and conditions of employment of employees performing the outsourced functions. Rule Sec. 130.40(A), infra. The commenter further observes that companies have sound business reasons for establishing operational, production, and safety standards in their agreements with suppliers and contractors. For example, it suggests that an aircraft manufacturer's contractual specification of timeframe and production standards for a parts supplier and requirement that the supplier certify that it has a drug and alcohol testing program in place should not weigh towards finding the manufacturer an employer of the supplier's employees. Under the rule, such standards are likely ordinary incidents of contractual relationships that merely set basic ground rules for the supplier's performance under the contract and are therefore not probative of joint-employer status. Rule Sec. 103.40(E), infra.

---

[101] CDW; General Counsel Robb.

[102] National Association of Home Builders; Center for Workplace Compliance.

[103] See comments of General Counsel Robb; Chamber of Commerce.

[104] Again, in all cases, contractually reserved but unexercised control is probative only to the extent it supplements and reinforces evidence of direct and immediate control. Rule Sec. 103.40(A), infra.

[105] Sections 103.40(C)(1)–(8), the definitions of the several essential terms and conditions of employment, do not directly address contractually reserved but unexercised control. Those definitions specify what does, and give examples of what does not, count as direct and immediate control. But as with indirect control, so also with contractually reserved but unexercised control: In many if not most cases, examples of what does not count as direct and immediate control will also come within the scope of routine components of company-to-company contracting and thus not be probative of joint-employer status. However, we are unable to state, a priori, that this will hold true in all cases. Ultimately, therefore, whether a particular type of contractually reserved but unexercised control that would not, if exercised, count as direct and immediate control may nonetheless be probative of joint-employer status is a question of fact to be determined on the evidence in each case.

[106] See comment of General Counsel Robb.

[107] See comment of COLLE.

Two commenters suggest that the Board should clarify that an entity does not exercise control over a term or condition of employment by entering into a contract that dictates a particular employment term for individuals performing services under that contract.[108] To the contrary, another commenter suggests that the Board should examine whether an agreement between contracting parties sets wages and/or other working conditions of one party's employees.[109] The final rule adopts the latter suggestion. Under the final rule, if a contract between two employers actually sets essential terms and conditions of employment for employees who will manufacture goods or perform services under the contract, the two employers have shared or codetermined those essential terms. In this regard, the rule is consistent with the Board's pre–*Browning-Ferris* precedent and with the Third Circuit's formulation of the joint-employer test in *NLRB* v. *Browning-Ferris Industries of Pennsylvania,* 691 F.2d at 1124 (''[W]here two or more employers . . . share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers' within the meaning of the NLRA.'').

One commenter suggests that the Board should require proof that a joint employer exercises actual supervision and direction on an ongoing basis.[110] The final rule is partially consistent with this suggestion, in that a finding that an entity exercises ongoing supervision and direction (as the rule defines those terms) over the employees of another entity will likely suffice to establish a joint-employer relationship. However, because supervision and direction are only two of eight essential terms and conditions of employment defined by the rule, the final rule does not adopt the commenter's suggestion to the extent it implies that control over supervision and direction are *necessary* to a joint-employer finding. Evidence of control over other essential terms and conditions of employment may suffice to establish joint-employer status even absent supervision and direction.

Many commenters suggest that if the Board decides to consider indicia of reserved, unexercised control, it do so with specific limits.[111] The final rule

makes clear that evidence of reserved, unexercised control will only be found probative to the extent it supplements and reinforces evidence of actually exercised direct and immediate control. However, the Board finds it impractical to attempt to quantitatively predetermine how specific factual evidence will weigh in all future cases.

Two commenters suggest that the Board should draw clear lines between the kinds of reserved control it will not find probative of joint-employer status (such as brand standards in franchise agreements) and those it will find probative (such as contractually reserved authority to codetermine essential terms and conditions of employment).[112] The Board agrees with this comment and has attempted to provide the guidance requested in both the regulatory text and this accompanying supplementary material.

Another commenter suggests that the Board should consider reserved control probative of joint-employer status only insofar as it embodies an entity's specific right to displace another entity and directly control the other entity's employees, as opposed to possession by the first entity of some economic influence over the entity that retains day-to-day control over its own employees.[113] The final rule adopts this suggestion insofar as the rule will not permit finding joint-employer status solely on the basis of an entity's economic influence. However, the ''share or codetermine'' standard does not require displacement by one entity of another company's control because the underlying premise of that standard is that two entities *together* determine the terms and conditions of employment of a single group of employees. See, *e.g., NLRB* v. *Browning-Ferris Indus. of Pennsylvania,* 691 F.2d at 1125 (finding joint-employer relationship where ''BFI and the brokers together determined the drivers' compensation and shared in the day to day supervision of the drivers'').

A commenter suggests that the Board should not consider reserved control as a sufficient basis to permit, as primary, activity otherwise prohibited as secondary under Section 8(b)(4) of the Act.[114] The final rule is consistent with this suggestion. Thus, under the rule, Company A's contractually reserved but unexercised control over terms and conditions of employment of Company B's employees will not, standing alone,

permit a union representing Company B's employees to picket against Company A with an object prohibited by Section 8(b)(4). However, under the final rule, evidence of Company A's contractually reserved but unexercised control over essential terms and conditions of employment of Company B's employees will be probative of joint-employer status to the extent it supplements and reinforces evidence of exercised direct and immediate control. Rule Sec. 103.40(A). If Company A is found to be a joint employer of Company B's employees, action by Company's B's employees' bargaining representative against Company A that would otherwise be secondary and unlawful absent the joint-employer finding would be lawful primary activity.

Another commenter suggests that the Board should consider, in individual unfair labor practice cases, whether a putative joint employer actually controls the specific term(s) or condition(s) of employment implicated in the case, whether or not it possesses or exercises control over other terms and conditions of employment.[115] In brief, the current rule does not change the Board's existing policies with regard to the allocation of unfair labor practice liability among multiple employers.

Finally, a commenter suggests that the Board should explain the term ''active role'' used in the NPRM and define the frequency with which an entity must actually exercise contractually reserved control and the scope of such exercise in order to be found a joint employer.[116] The final rule does not include the term ''active role,'' but it does provide guidance on these issues. The rule requires possession and exercise of ''substantial direct and immediate control over one or more essential terms or conditions'' of employment, it specifies what will constitute ''direct and immediate'' control over each essential term or condition of employment, and it defines ''substantial'' direct and immediate control. Rule Sec. 103.40(A), (C)(1)–(8), (D). The rule does not otherwise specify predetermined thresholds of exercised control that will be necessary to support a finding of a joint-employer status. Rather, such status will be determined within the framework of the rule based on the totality of the relevant facts in each particular employment setting. Rule Sec. 103.40(A).

---

[108] See comments of General Counsel Robb; Job Creators Network.

[109] See comment of IBEW Local 21.

[110] See comment of HR Policy Association.

[111] For example, Center for Workplace Compliance suggests that the Board should accord reserved control less weight than actual control, and quantify the weight that should be given. Relatedly, HR Policy Association suggests

specifically limiting the consideration of reserved control to ten percent of the analysis.

[112] See comments of Restaurant Law Center; International Franchise Association (IFA).

[113] See comment of RILA.

[114] See comment of HR Policy Association.

[115] See comment of IFA.

[116] See comment of CWA.

*D. Comments Regarding Actual Exercise Requirement*

Many commenters present practical and legal arguments for and against the proposed rule's requirement that an entity actually exercise control over terms and conditions of employment of another entity's employees in order to be found a joint employer of those employees. As reflected in the final rule and discussed below, the Board has decided to retain this requirement.

Beginning with practical arguments about an actual exercise requirement, many commenters argue that such a requirement introduces ambiguity into the analysis, makes outcomes less predictable, or otherwise prejudices interested parties in any potential litigation of joint-employer issues.[117] These commenters argue that an exercise requirement complicates the analysis because, unlike contractually reserved control, exercised control cannot be analyzed simply by reference to documents. In contrast, these commenters argue, a standard that did not require evidence of exercised control would allow parties to set expectations at the outset of their contractual relationship and to allocate rights and duties in advance of any allegation of joint employment. With regard to litigation, one commenter argues that an exercise requirement introduces a ''worst evidence rule,'' where the Board will ignore express language of the contract unless a party can show that an entity has actually exercised control.[118] Commenters argue that an exercise requirement will subject the outcome to the vagaries of the litigation process, with slight factual differences leading to opposite outcomes, will require extensive mini-trials—which may take place months or years after the fact—over individual instances of alleged exercised control, and will impose an unfair evidentiary burden on unions.[119]

Commenters also argue that an actual exercise requirement will prevent effective collective bargaining, because an entity subject to another entity's reserved authority will be unable to effectively bargain over terms and conditions of employment subject to that authority, and could allow an entity that had not participated in bargaining to upend any collective-bargaining agreement covering terms and conditions of employment over which the entity possessed contractually

reserved, unexercised control.[120] Another commenter suggests that just-cause provisions in collective-bargaining agreements between a staffing agency and its employees would be meaningless if entities to which the agency supplied services retained a contractual right to exclude employees from the worksite without cause.[121] Relatedly, commenters argue that an exercise requirement would erode the duty to bargain under Section 8(a)(5) by allowing an entity to move in and out of joint-employer status tactically by acting to control employment conditions when it finds it necessary to do so, but refraining from exercising its reserved control when it prefers to avoid the legal obligations incumbent upon a joint employer.[122] Finally, a commenter argues that imposing an actual exercise requirement is not supported by the Board's expressed desire to avoid involving uninterested entities in the bargaining relationships of their business partners because an entity that contracts to reserve control over terms and conditions of employment of another entity's employees may be as interested in the employment relationship as is the undisputed employer.[123]

Other commenters argue that an actual exercise requirement is a bright-line rule that will make it easier for parties to predict outcomes, encourage economically fruitful business relationships and contractual arrangements, and promote stability by providing the Board and the courts with a consistent standard.[124] One commenter argues that an exercise requirement ensures meaningful collective bargaining, while a standard that permits finding joint-employer status based solely on contractually reserved control does not.[125] Finally, one commenter seeks guidance as to how much weight, if any, the Board will afford various factors evidencing reserved control, guidance that assertedly was missing from *Browning-Ferris.*[126]

After carefully considering all of the commenters' arguments, the Board has decided to retain the actual exercise requirement in the final rule. Whether or not evidence of actual exercise of control was required, it would clearly be relevant under any permissible joint-employer standard. Accordingly, the

Board disagrees with any contention that requiring evidence of actual exercise of direct and immediate control unnecessarily complicates the joint-employer analysis. For similar reasons, the Board disagrees with the suggestion that the rule's approach introduces a ''worst evidence rule.'' To the contrary, an entity's actual exercise of direct and immediate control over essential terms and conditions of employment of another entity's employees is the best evidence that the first entity is a joint employer of those employees and is properly subjected to the consequences of that finding under the Act. Moreover, the rule does take parties' contractual allocation of rights and responsibilities into account as part of the totality of the relevant facts in each particular employment setting. This approach is consistent with the long line of Board and court decisions emphasizing the fact-dependent nature of the joint-employer inquiry. *E.g., Boire* v. *Greyhound Corp.,* 376 U.S. at 481.

The Board has concluded that an actual exercise requirement will provide businesses more certainty over whether the Board will or will not find them to be joint employers of another employer's employees and to conduct themselves accordingly. An actual exercise requirement is also a bright-line rule that will make it easier for the Board, and ultimately for the courts, to reach consistent decisions across a range of individual cases. And the Board has responded to commenters' requests for guidance about the meaning of contractually reserved but unexercised control and the extent to which we will find it probative of a joint-employer relationship in Part V.C, ''Response to Comments: Comments Regarding Contractually Reserved But Unexercised Control,'' above.

The Board finds unpersuasive arguments that an exercise requirement imposes an unfair burden of proof on unions. To the contrary, a putative joint employer's actual exercise of direct and immediate control is readily observable by employees, who can then share the information with unions or others. Evidence of reserved but unexercised control, in contrast, is more likely to be known only by the contracting parties themselves. In any event, in unfair labor practice cases, the burden in every case is on the General Counsel to establish the complaint allegations,[127] while in representation cases, NLRA Section 9(c) instructs the Board to investigate a

---

[117] See comments of IBT; SEIU Local 32BJ; Employment Law Alliance; AFL–CIO.

[118] See comment of LIUNA.

[119] See comments of LIUNA; SEIU Local 32BJ.

[120] See comments of LIUNA; IUOE.

[121] See comment of IBT.

[122] See comments of AFL–CIO; IUOE.

[123] See comment of LIUNA.

[124] See comments of National Retail Federation; CDW; FedEx Corporation.

[125] See comment of CDW.

[126] See comment of General Counsel Robb.

[127] See, *e.g., Laborers Local 1177 (Qualicare-Walsh),* 269 NLRB 746, 746 (1984) (''The burden of proof regarding jurisdiction, *as with all other elements of a prima facie case,* is on the General Counsel.'') (emphasis added).

petition and direct a hearing "if it has reasonable cause to believe that a question of representation affecting commerce exists." Section 11 of the Act further provides for the issuance of subpoenas on the application of any party with respect to "all hearings and investigations." Accordingly, the rule's actual exercise requirement does not unfairly burden unions.

Finally, the Board disagrees with arguments that an exercise requirement will impede collective bargaining, interfere with the formation of efficacious collective-bargaining relationships, or permit entities to move in and out of joint-employer status and thus selectively affect terms and conditions of employment of other employers' employees without incurring obligations under the Act. Nothing in this rule changes the ordinary rights and obligations of employees, employers, and unions under the Act. Every employer remains subject to all rights and obligations defined by Sections 8 and 9 of the Act with respect to its employees. Thus, an employer that possesses and exercises substantial direct and immediate control over employees' terms and conditions of employment must, if those employees are represented, bargain on request with their representative as required by Section 8(a)(5). The rule does not excuse joint employers from that duty, nor does it deprive represented employees of their remedies under Section 8(a)(5) with respect to an employer that unilaterally changes their terms and conditions of employment without first giving their representative notice and an opportunity to request bargaining, or of their remedies under Section 8(a)(5) within the meaning of Section 8(d) with respect to an employer that fails to adhere to the terms of a collective-bargaining agreement with their representative. Moreover, a collective-bargaining agreement may, in certain circumstances, impose restraints on an entity's exercise of contractually reserved authority over essential terms and conditions of employment governed by the agreement, though the entity is not party to the agreement. Cf. *Atterbury* v. *United States Marshals Serv.,* 941 F.3d 56, 62–64 (2d Cir. 2019) (U.S. Marshals Service acted unlawfully by requiring discharge of security guards employed by a contractor without providing process required by "just cause" provision of guards' collective-bargaining agreement with contractor). Accordingly, an exercise requirement will not prevent parties with an actual interest in controlling terms and conditions of employment of another

employer's employees from safeguarding their contractually reserved authority to do so by engaging in bargaining, either directly or through a representative.

Turning to legal arguments about an exercise requirement, some commenters assert that the Board only began in 1984 to require evidence that an entity had exercised control over another entity's employees as part of the joint-employer analysis, and that, at that time, the Board did not articulate a legal justification for doing so.[128] Without accepting the commenters' characterization of the Board's pre–*Browning-Ferris* precedent, the Board has concluded that the final rule's approach is warranted for the reasons explained herein.

Some commenters oppose an actual exercise requirement by arguing that the common law, as reflected in judicial decisions, restatements of the law, and elsewhere, requires giving contractually reserved but unexercised control dispositive weight.[129] Other commenters note that contractual rights exist even if they have never been exercised, and contend that an exercise requirement is inconsistent with court and Board decisions recognizing that while highly skilled professionals like nurses or low-skilled workers like janitors may require little or only "routine" supervision, such workers nevertheless remain employees of the employer providing that supervision.[130] One commenter further argues that imposing an actual exercise requirement raises predictability concerns similar to those that motivated the Supreme Court's rejection of an actual-control test in favor of a reserved-control test in a dispute over copyright ownership in

*Community for Creative Non-Violence* v. *Reid,* 490 U.S. 730 (1989).[131] Finally, commenters argue that imposing an exercise requirement puts the Board's standard in conflict with other state and federal standards, including Health Insurance Portability and Accountability Act, Medicaid and Medicare, the Affordable Care Act, Title VII of the Civil Rights Act of 1964 (Title VII), the Fair Labor Standards Act (FLSA), and Uniformed Services Employment and Reemployment Rights Act—and with guidance from the EEOC, Internal Revenue Service (IRS), U.S. Citizenship and Immigration Services, and DOL.[132]

On the other side of the issue, commenters argue that an exercise requirement is consistent with the common law as reflected in court decisions, prior Board decisions, legislative history of the NLRA, and relevant restatements of law.[133] Other commenters argue that courts have approved the Board's focus on actual control.[134] Many of the same commenters also point out that the D.C. Circuit in *Browning-Ferris* v. *NLRB* held that reserved control was relevant to

[128] See comments of Senator Murray and Representative Scott (joined by numerous other Senators and Representatives); IBT.

[129] See comments of Julia Tomassetti; AFL–CIO; NELP; SEIU; Attorneys General of New York, Pennsylvania, et al. Commenters cite, inter alia, *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U.S. 318, 323 (1992) (quoting *Reid,* 490 U.S. at 751–752); *Singer Mfg. Co.* v. *Rahn,* 132 U.S. 518, 523 (1889); *Garcia-Celestino* v. *Ruiz Harvesting, Inc.,* 898 F.3d 1110, 1121 (11th Cir. 2018) (quoting *NLRB* v. *Associated Diamond Cabs, Inc.,* 702 F.2d 912, 920 (11th Cir. 1983)); *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of North Am.* v. *NLRB,* 603 F.2d 862, 874 (D.C. Cir. 1978) (quoting *Williams* v. *United States,* 126 F.2d 129, 132 (7th Cir. 1942)), cert. denied 317 U.S. 655 (1942); *Dovell* v. *Arundel Supply Corp.,* 361 F.2d 543, 545 (D.C. Cir. 1966) (quoting *Grace* v. *Magruder,* 148 F.2d 679, 681 (D.C. Cir. 1945)); Restatement (Second) of Agency, Secs. 2(1), 2(2), 220(1), 220(2)(a), and 220 cmt. d; William A. Gregory, The Law of Agency and Partnership 114 at Sec. 50 (West Group Hornbook Series, 3d ed. 2001).

[130] See comments of LIUNA; AFL–CIO. AFL–CIO cites *Holyoke Visiting Nurses Ass'n* v. *NLRB,* 11 F.3d 302, 307 (1st Cir. 1993), and *Syufy Enterprises,* 220 NLRB 738, 740 (1975).

[131] See comment of AFL–CIO.

[132] See comments of Representative Scott and Senator Murray; UA; Professor Kulwiec; James van Wagtendonk.

[133] See comments of HR Policy Association; General Counsel Robb; CDW; IFA; RILA; Center for Workplace Compliance. Commenters cite, inter alia, *Kelley* v. *S. Pac. Co.,* 419 U.S. 318, 324 (1974); *Shenker* v. *Baltimore & Ohio R.R. Co.,* 374 U.S. 1, 6 (1963); *NLRB* v. *Pennsylvania Greyhound Lines, Inc.,* 303 U.S. 261, 263 (1938); *Jones* v. *Royal Admin. Servs., Inc.,* 887 F.3d 443 (9th Cir. 2018); *NLRB* v. *CNN America, Inc.,* 865 F.3d 740 (D.C. Cir. 2017); *Butler* v. *Drive Auto. Indus. of America, Inc.,* 793 F.3d 404, 409, 410 (4th Cir. 2015); *Doe I* v. *Wal-Mart Stores, Inc.,* 572 F.3d 677, 683 (9th Cir. 2009); *Galino* v. *New York State Education Dep't,* 460 F.3d 361, 379 (2d Cir. 2006); *Clinton's Ditch Co-op Co.* v. *NLRB,* 778 F.2d at 138; *NLRB* v. *Browning-Ferris Indus. of Pennsylvania,* 691 F.2d 1117 (3d Cir. 1982); *Zapex Corp.* v. *NLRB,* 621 F.2d 328, 333 (9th Cir. 1980); *Herbert Harvey, Inc.* v. *NLRB,* 424 F.2d 770, 776–777 (D.C. Cir. 1969); *NLRB* v. *Greyhound Corp.,* 368 F.2d 778, 781 (5th Cir. 1966), enfg. 153 NLRB 1488 (1965); *Vernon* v. *California,* 10 Cal. Rptr. 3d 121, 130–131 (Cal. Ct. App. 2004); *SEIU Local 434* v. *City of Los Angeles,* 275 Cal. Rptr. 508 (Cal. Ct. App. 1990); *Airborne Express,* 338 NLRB 597 (2002); *TLI, Inc.,* 271 NLRB 798 (1984); *Laerco Transportation,* 269 NLRB 324 (1984); *Sun-Maid Growers of California,* 239 NLRB 346 (1978); *Clayton B. Metcalf,* 223 NLRB 642 (1976); *Hamburg Industries, Inc.,* 193 NLRB 67 (1971); *Greyhound Corp.,* 153 NLRB 1488 (1965); H.R. Rep. No. 80–245, at 18 (1947), *reprinted in* 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, at 292, 309 (1959); H.R. Rep. No. 80–510, at 32–33 (1947) (Conf. Rep.), *reprinted in* 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, at 505, 536–537 (1959); Restatement (Second) of Agency Secs. 5(2), 226, 227 & cmt. d; Restatement of Employment Law Secs. 1.01(a)(3) & cmts. a and c and illus. 5, 1.04(b).

[134] See comments of International Foodservice Distributors Association; National Retail Federation; CDW.

determining joint-employer status under the common law, but the court did not find that it was sufficient, in and of itself and absent any actual exercise of control, to establish a joint-employment relationship under the Act. 911 F.3d at 1213.[135]

Finally, one commenter argues that the Board, as an executive agency with subject-matter expertise, is not required to apply the common law in its rulemaking, that nothing in the Act or in Supreme Court precedent interpreting the Act requires the Board to follow the common law, and that there are, in any case, no relevant uniform common-law principles.[136]

After carefully considering all of the comments on both sides of the issue, we conclude that the rule's approach falls within the boundaries of the common law as applied in the particular context of the NLRA.

We disagree with the argument that an actual exercise requirement is inconsistent with Board and court cases finding employment relationships where employees require little or only routine supervision.[137] Under the rule, supervision is only one of eight essential terms and conditions of employment relevant to the joint-employer analysis, and an entity that possesses and exercises substantial direct and immediate control over other essential terms may be found to be a joint employer absent evidence that the entity exercises such control over supervision. In any case, in each of the decisions the commenter cites in support of this argument, the Board found that the entity at issue not only possessed but actually exercised substantial direct and immediate control over terms and conditions of employment of the employees at issue. See *Holyoke Visiting Nurses Ass'n,* 310 NLRB 684, 685–686 (1993); *Syufy Enterprises,* 220 NLRB at 739.

Nor is an exercise requirement inconsistent with *Community for Creative Non-Violence* v. *Reid,* 490 U.S. 730 (1989). The issue in *Reid* was who owned the copyright in a statue created by an artist on commission. The Supreme Court reviewed several conflicting interpretations of the statutory phrase "a work prepared by an employee within the scope of his or her employment" in Sec. 101(1) of the Copyright Act of 1976. 490 U.S. at 738–739. Possible alternative interpretations included (1) "that a work is prepared by an employee whenever the hiring party

retains the right to control the product,'' (2) "that a work is prepared by an employee . . . when the hiring party *has actually wielded control* with respect to the creation of a particular work,'' and (3) "that the term 'employee' within Sec. 101(1) carries its common-law agency meaning.'' Id. at 739 (emphasis added). The Court did not reject an actual control test (the second interpretation) in favor of a reserved control test (the first interpretation). Rather, the Court rejected both of these interpretations as inappropriately focused on the relationship between the hiring party and *the product,* while the statutory language at issue focused on the relationship between *the hired and hiring parties.* Id. at 741–742. Having concluded that the Copyright Act requires a court to ascertain, under the common law of agency, whether a work was prepared by an employee or an independent contractor, the Court proceeded to analyze the record under the factors relevant to the independent-contractor determination, set forth in Section 220(2) of the Restatement (Second) of Agency. Id. at 750–753. The Court found that "the extent of control the hiring party exercises over the details *of the product* is not dispositive,'' but the Court's independent-contractor analysis suggests that the hiring party there neither possessed nor exercised *any* control over the manner in which and means by which the independent-contractor artist produced the work. Id. at 752–753 (emphasis added). Accordingly, *Reid* is no more instructive on the specific issue here than myriad other judicial decisions finding that a worker was an independent contractor absent either reserved or exercised control by a common-law principal.

The Board also disagrees with the numerous arguments that an actual exercise requirement puts the Board's standard in conflict with other statutory regimes. First, vastly different areas of law identified by commenters involve widely different concerns and should not, as a normative matter, necessarily require the application of identical tests to determine joint-employer status. Second, to the extent that different standards stem from different statutory definitions of employment relationships, those differences reflect the judgment of Congress that different standards should apply in those settings—differences the Board is not at liberty to ignore.[138] While the Board

recognizes that divergent standards may pose difficulties for businesses seeking to achieve—or courts to enforce—compliance with different statutory obligations, this is nothing new. Businesses and courts are accustomed to this state of affairs. Moreover, it is likely that no joint-employer rule the Board could adopt could achieve uniformity with all the statutory standards identified by the commenters. Thus, failure to achieve such uniformity cannot be a valid criticism of the rule.

Finally, the Board agrees that it may reasonably expect some deference from the courts with regard to our exercise, through rulemaking, of Congressional authority delegated to us in Section 6 of the Act. See *NLRB* v. *Food & Commercial Workers,* 484 U.S. 112, 123 (1987); *Chevron, U.S.A., Inc.* v. *N. Res. Def. Council, Inc.,* 467 U.S. 837 (1984). But it is well established that where the Supreme Court has determined the clear meaning of statutory terms, agencies, including the Board, are not thereafter free to depart from the Court's interpretation. *Lechmere, Inc.* v. *NLRB,* 502 U.S. 527, 536–537 (1992); *Maislin Indus., U.S., Inc.* v. *Primary Steel, Inc.,* 497 U.S. 116, 131 (1990). Here—as the Board and the courts have previously recognized—the Court has determined that the Taft-Hartley amendments reflect Congressional intent that the terms "employer'' and "employee'' within the Act are to be given their common-law agency meaning. *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U.S. at 324–325 (citing *NLRB* v. *United Ins. Co. of America,* 390 U.S. at 254).[139] And as stated by the D.C. Circuit in *Browning-Ferris* v. *NLRB,* the Board "must color within the common-law lines identified by the judiciary.'' *Browning-Ferris* v. *NLRB,* supra at 1208. The final rule respects this principle.

The Board is also not persuaded by the argument that there are no relevant uniform common-law principles because the joint-employer concept is foreign to the common law. As courts and the Board have observed, "[t]he basis of the [joint-employer] finding is simply that one employer while contracting in good faith with an

---

[135] General Counsel Robb also advances this argument.

[136] See comment of General Counsel Robb.

[137] See comment of AFL–CIO.

[138] Compare, for example, NLRA Sec. 2(2) (exempting "any State or political subdivision thereof'' from definition of "employer'' with FLSA Sec. 203(d) (" 'Employer' includes any person

acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency . . .'').

[139] See also *Browning-Ferris* v. *NLRB,* 911 F.3d at 1206 ("Under Supreme Court and circuit precedent, the National Labor Relations Act's test for joint-employer status is determined by the common law of agency.''); id. at 1228 (Randolph, J., dissenting) ("[T]he common law . . . is supposed to control our decision and should have controlled the Board's.''); *Browning-Ferris,* 362 NLRB at 1610 ("In determining whether an employment relationship exists for purposes of the Act, the Board must follow the common-law agency test.'').

otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer'' to permit a finding that the first entity is *also* an employer of the employees. *NLRB* v. *Browning-Ferris Indus. of Pennsylvania,* 691 F.2d at 1123 (citing *Walter B. Cooke,* 262 NLRB 626, 640 (1982)). Common-law principles governing the employer/ employee relationship, while sometimes difficult to ascertain with precision, are far from non-existent.[140] Finally, the Board is unpersuaded by the argument that the Supreme Court's discussion in *Hearst,* 322 U.S. at 125–126, warrants departing from the common-law analysis in this area. See *Nationwide Mut. Ins.,* 503 U.S. at 325 (''[A] principle of statutory construction can endure just so many legislative revisitations, and *Reid'*s presumption that Congress means an agency law definition for 'employee' unless it clearly indicates otherwise signaled our abandonment of *Silk's* emphasis on construing that term 'in the light of the mischief to be corrected and the end to be attained.' '' (quoting *Hearst,* 322 U.S. at 124, and citing *U.S.* v. *Silk,* 331 U.S. 704, 713 (1947)).

*E. Comments About Limited and Routine Control*

Several commenters state that treating limited and routine control as irrelevant to determining joint-employer status is consistent with and/or required by the Act, court decisions, the common law, and/or pertinent Restatements.[141] In this regard, one commenter notes that the D.C. Circuit in *Browning-Ferris* v. *NLRB* did not hold that limited and routine control could establish joint-employment status.[142] Additionally, several commenters suggest definitions or interpretations of the words ''limited'' and ''routine,'' or the phrase ''limited or routine,'' and make arguments for or against the rule based on their suggested definitions or interpretations.[143] One commenter notes that the NPRM itself suggested a definition of ''limited or routine'' by

stating: ''The Board generally [has] found supervision to be limited and routine where a supervisor's instructions consist[ ] mostly of directing another business's employees what work to perform, or where and when to perform the work, but not how to perform it.'' [144] Further, some commenters note that there is a body of case law to which the Board, the courts, and parties may look for guidance regarding the term's meaning.[145]

On the other side, some commenters argue that failing to consider limited and routine control as evidence of joint-employer status is inconsistent with the Act, the common law, court decisions, and/or pertinent Restatements.[146] One commenter asserts that, in the common-law master-servant relationship, the relevant question is whether the entity can exercise meaningful control, not the extent to which that control is exercised.[147] One commenter notes that pre–*Browning-Ferris* decisions did not adequately explain their holding that limited and routine control does not tend to support a joint-employer finding.[148]

Further, many commenters assert that the terms are vague, undefined, confusing, or contradictory, and/or that their use in the rule would create unanswered, potentially fact-intensive questions that will require litigation to answer.[149] Some commenters also state that excluding ''limited or routine'' control as probative evidence of joint-employer status creates a loophole that will enable entities to exercise control over employees' working conditions while avoiding responsibilities under the Act.[150]

Upon consideration of these comments, the Board has decided to modify the proposed rule to eliminate ''limited and routine'' as a general qualifying term and to use that term solely in the context of defining what is, and what is not, direct and immediate control over supervision. Thus, under the final rule, an entity does not exercise direct and immediate control over supervision where its instructions

are ''limited and routine and consist primarily of telling another employer's employees what work to perform, or where and when to perform the work, but not how to perform it.'' Rule Sec. 103.40(C)(7). This is consistent with how the term was discussed in the NPRM's supplementary information and the case law cited therein. See 83 FR at 46683 (citing *Flagstaff Medical Center,* 357 NLRB 659, 667 (2011), enfd. in relevant part 715 F.3d 928 (D.C. Cir. 2013); *AM Property Holding Corp.,* 350 NLRB at 1001; *G. Wes Ltd. Co.,* 309 NLRB 225, 226 (1992)). None of the authorities cited by commenters supports an absolutist position—*i.e.,* as requiring the Board to treat limited and routine control of all essential terms and conditions as either categorically irrelevant or categorically relevant to determining joint-employer status. Indeed, some of the cited authorities deal with the issue of independent-contractor status, which is analytically distinct from joint-employer status.[151] See *Browning-Ferris* v. *NLRB,* 911 F.3d at 1213–1215.

As noted above, the final rule defines ''substantial direct and immediate control'' as ''direct and immediate control that has a regular or continuous consequential effect on an essential term or condition of employment'' and further provides that the exercise of direct and immediate control over an essential term or condition of employment is not ''substantial'' if it is ''only exercised on a sporadic, isolated, or de minimis basis.'' This definition is necessary to specify what constitutes ''substantial'' direct and immediate control, and the inclusion of clear standards for determining substantiality avoids the concerns identified by commenters with the NPRM's exclusion of ''limited and routine'' control as evidence of joint-employer status.

Several commenters provide examples of limited or routine control that should not be deemed probative of joint-employer status. These examples include contracted-for standards,[152] requiring another party to adopt corporate social-responsibility policies,[153] timeliness-of-completion requirements,[154] statutory and

---

[140] Cf. *Cimorelli* v. *New York Century R. Co.,* 148 F.2d 575, 577 (6th Cir. 1945) (''We are dealing here with a legal problem so difficult that law writers were unclear and perplexed about it long before we came on the scene and no doubt they will so continue after we have gone, but there are extant certain intelligible, if imperfect, legal rules by which there may be an ascertainment of when a person is the employee of another, although his contract of employment is not directly made with such person.'').

[141] Comments of HR Policy Association; Chamber of Commerce; National Retail Federation.

[142] Comment of RILA.

[143] Comments of 1199SEIU United Healthcare Workers East; SEIU; AFL–CIO; UAW; NELP; CWA; IUOE; HR Policy Association.

[144] Comment of AFL–CIO.

[145] See, *e.g.,* Comment of International Bancshares Corporation.

[146] Comments of AFL–CIO; NELP; CWA; IUOE; IBT; UAW.

[147] Comment of SEIU.

[148] Comment of AFL–CIO.

[149] Comments of SEIU Local 32BJ; SEIU; Southern Poverty Law Center; Asian Pacific American Labor Alliance, AFL–CIO (APALA); CWA; Texas RioGrande Legal Aid; IBT; AFL–CIO; Signatory Wall and Ceiling Contractors Alliance; 1199SEIU United Healthcare Workers East.

[150] Comments of SEIU; Equal Justice Center; Southern Poverty Law Center; Labor & Employment Committee of the National Lawyers Guild.

[151] See, *e.g.,* comment of CWA (citing *FedEx Home Delivery* v. *NLRB,* 563 F.3d 492 (D.C. Cir. 2009)); comment of IBT (citing *McGuire* v. *United States,* 349 F.2d 644 (9th Cir. 1965)); see also *Browning-Ferris* v. *NLRB,* 911 F.3d at 1214 (''[A]t bottom, the independent-contractor and joint-employer tests ask different questions.'').

[152] Comments of CDW; National Retail Federation; International Bancshares Corporation.

[153] Comment of National Retail Federation.

[154] Comment of HR Policy Association.

regulatory compliance requirements,[155] isolated instances of notifying a supplier company that certain employees are not welcome on the user entity's property due to misconduct,[156] a retailer controlling the hours that a vendor can operate in the retailer's store,[157] requiring a contracting employer to provide services during certain hours,[158] and economic controls such as cost-plus contracts or generalized caps on contract costs.[159] Conversely, several commenters provide examples of control that is not limited or routine, such as setting employee pay and/or paying them directly,[160] hiring or being involved in hiring decisions,[161] firing employees,[162] disciplining employees,[163] and directing "the manner in which the business shall be done, as well as the result to be accomplished." [164]

The final rule incorporates many of the commenters' examples in appropriate places. For example, most of the examples in the former category—*i.e.,* examples of control that should not be deemed probative of joint-employer status—are identical, or nearly so, to examples excluded by the rule from constituting evidence of direct and immediate control of essential terms and conditions of employment: Various standards set by contract, setting schedules for completion of a project, setting standards required by government regulation, refusing to allow another employer's employees to access one's premises or to perform work under a contract, establishing an enterprise's operating hours or when it needs the services provided by another employer, and entering into cost-plus contracts. Rule Sec. 103.40(C)(1)–(8). Indeed, those same examples involve setting the objectives, basic ground rules, and expectations for another entity's performance under a contract, which does not count as even indirect control of essential terms and conditions and is irrelevant to determining joint-employer status. Rule Sec. 103.40(E). With regard to examples in the latter category—*i.e.,* examples of control that is *not* limited or routine— these are incorporated in the final rule in provisions specifying what

constitutes direct and immediate control over the several essential terms and conditions of employment. Rule Sec. 103.40(C)(1)–(8).

One commenter asserts that the common law requires the Board to weigh "all of the incidents of the relationship" or to consider the amount of control necessary for the particular work or workplace.[165] The final rule clarifies that joint-employer status "must be determined on the totality of the relevant facts in each particular employment setting."

One commenter states that the Board should consider that, in some cases, a "routine" contractual term will directly implicate the terms and conditions of employment, particularly in industries where the cost of a contract is almost entirely the cost of labor, or where an entity has only one customer.[166] The proposed rule used the term "routine" to characterize a kind of control over terms and conditions of employment, not a kind of contractual term. Thus, the comment has no bearing on what role "limited and routine" control over terms and conditions of employment should play in the joint-employer analysis. Nevertheless, the final rule clarifies that the "limited and routine" qualifier applies only in the context of supervision. However, to the extent that the commenter is suggesting that joint-employer status is established based solely on the circumstances the commenter posits, the Board disagrees. The final rule makes clear that entering into a cost-plus contract, "with or without a maximum reimbursable wage rate," is not direct and immediate control over wages. In the Board's view, it is improper to find a joint-employment relationship merely because one entity, in an arms-length transaction, negotiates the maximum wage rate that it is willing to reimburse under a cost-plus contract. While the direct employer may face economic pressures that make it difficult to negotiate a higher wage rate with its employees, this should not be sufficient to make the other party to the contract a joint employer with the direct employer. See *Browning-Ferris* v. *NLRB,* 911 F.3d at 1220 ("[R]outine contractual terms, such as a very generalized cap on contract costs, . . . would seem far too close to the routine aspects of company-to-company contracting to carry weight in the joint-employer analysis.").

One commenter states that, in jobs where employees are rarely directly supervised in their day-to-day tasks, the employer's level of day-to-day

supervision is less relevant.[167] That may be true, but substantial direct and immediate control in the area of supervision is only one of the ways in which joint-employer status can be established. In various workplace situations, one or another of the essential terms and conditions of employment, such as supervision, may have greater or lesser significance in making a joint-employer determination. See also Supplementary Information Section V.D, "Response to Comments: Comments Regarding Actual Exercise Requirement," supra.

One commenter states that much supervision by undisputed employers is routine, and therefore the fact that supervision is routine should not be a basis for declining to find joint-employer status.[168] Even assuming that some undisputed employers supervise their employees in a manner that would not be sufficient, standing alone, to make a separate entity a joint employer if the separate entity engaged in such supervision, there is no support in the law and no sound reason to draw the conclusion that a separate entity that engages in only limited and routine supervision must be deemed a joint employer on that basis. Moreover, even if an undisputed employer supervises its employees in a routine manner, it exercises direct and immediate control over other essential terms and conditions of employment, including wages, benefits, hiring, and discharge. Thus, the comment posits a false equivalency between the undisputed employer and the putative joint employer.

## F. Comments About "Substantial" Direct and Immediate Control

Many commenters provide positive feedback regarding the requirement of "substantial" direct and immediate control. Specifically, commenters state that this requirement is clear, predictable, and/or rational;[169] is consistent with the common law and court decisions, including *Browning-Ferris* v. *NLRB;*[170] was the well-settled legal standard before the Board's decision in *Browning-Ferris;*[171] ensures that entities are not forced into relationships as "joint employers" with

---

[155] Comments of HR Policy Association; National Retail Federation.

[156] Comment of COLLE.

[157] Comment of National Retail Federation.

[158] Comments of International Bancshares Corporation; National Retail Federation.

[159] Comment of CDW.

[160] Comment of David Kaufmann.

[161] Comment of HR Policy Association.

[162] Comment of COLLE.

[163] Id.

[164] Comment of HR Policy Association.

[165] Comment of IBT.

[166] Comment of SEIU Local 32BJ.

[167] Comment of NELP.

[168] Comment of CWA.

[169] Comments of then-Chairwoman Virginia Foxx of the U.S. House of Representatives Committee on Education and the Workforce and then-Chairman Tim Walberg of the U.S. House Subcommittee on Health, Employment, Labor, and Pensions; General Counsel Robb.

[170] Comment of Ranking Member Foxx; cf. comment of National Retail Federation (discussing "significant" control).

[171] Comment of American Staffing Association.

others they deal with only in arms-length transactions;[172] promotes collective bargaining by ensuring that only the necessary parties are in attendance at the bargaining table;[173] and preserves franchisees' ability to run the day-to-day operations of their businesses without compromising the brand standards required of the franchise model.[174] Further, some commenters cite Section 8(b)(4) of the Act and argue that entities with attenuated control over another business's employees should not be deemed a primary employer and embroiled in that business's labor disputes.[175]

In contrast, many commenters argue that the Board should not impose the "substantial" qualifier, effectively advocating that *any* exercise of direct and immediate control over an essential term, no matter how limited, should render an entity a joint employer. Some argue that the "substantial" qualifier is contrary to the Act, the common law, court decisions, and/or pertinent Restatements.[176] Others assert that it would impair employees' ability to engage in meaningful collective bargaining.[177]

For many of the reasons discussed in the positive comments, the Board continues to believe that it is appropriate to include the "substantial" qualifier in the final rule. Contrary to some of the negative comments, inclusion of the qualifier will not impair meaningful collective bargaining. In fact, meaningful bargaining would be impaired if the final rule dispensed with a substantiality requirement, since the requirement ensures that only those entities that meaningfully affect matters relating to the employment relationship are present at the bargaining table. Rule Sec. 103.40(A). It also would be contrary to the purposes and policies of the Act to impose liability for another company's unfair labor practices on an entity that does not exercise "substantial" direct and immediate control over essential terms and conditions of employment of that company's employees, or to subject that entity to secondary economic pressure. Further, the substantiality requirement is consistent with longstanding pre–*Browning-Ferris* Board precedent. See, *e.g., Quantum Resources Corp.,* 305 NLRB 759, 760 (1991) (relying on entity's "substantial" control over

hiring, promotion, base wage rates, hours, and working conditions of another employer's employees to find the entity a joint employer). As discussed in the NPRM, prior to *Browning-Ferris* the Board held that even direct and immediate control may not establish joint-employer status where that control is too limited in scope. See NPRM, 83 FR at 46686–46687 (citing *Flagstaff Medical Center,* 357 NLRB at 667; *Lee Hospital,* 300 NLRB 947, 948–950 (1990)). Nothing in the critical comments cited above undercuts the reasonableness of this precedent or of the substantiality requirement.

Several commenters contend that the term "substantial" is undefined, vague, and/or will require litigation to clarify.[178] Some commenters pose specific questions about its meaning, such as whether it is quantitative (*i.e.,* whether it designates control over a large number of essential terms and conditions), qualitative (*i.e.,* whether it designates "massive" control over just one essential term), or both.[179] Further, several commenters suggest that the final rule should define the term and/or explain what is, and what is not, substantial control, and many commenters suggest definitions.[180] One commenter claims that the NPRM's suggestion that controlling only one essential term or condition is insufficient would permit the Board to find not only that an entity that controls only wages is not an employer, but also that employees have no employer at all where control over essential terms and conditions is sufficiently splintered among multiple entities.[181] One commenter asserts that if the Board does not find joint-employer status where control is "exercised rarely," this would allow an entity that sets initial wages not to be an employer, and it would also be inconsistent with the Act's definition of "supervisor" in Section 2(11).[182] The same commenter also asserts that the NPRM's description of the term suggests that a hospital whose employees are the sole supervisors of visiting nurses would not be their joint employer, contrary to the Act and the common law.[183]

In response to the comments, the Board has decided to expressly define "substantial direct and immediate control" in the final rule. Specifically, the final rule provides that "[s]ubstantial direct and immediate control" means direct and immediate control that has a regular or continuous consequential effect on an essential term or condition of employment of another employer's employees." The rule further specifies that control is not "substantial" if it is "exercised on a sporadic, isolated, or de minimis basis." The final rule thus clarifies that a party asserting joint-employer status must prove that the putative joint employer (i) exercises direct and immediate control over one or more essential terms or conditions of employment of another entity's employees, (ii) that the control exercised over that essential term or those essential terms has "a regular or continuous consequential effect" and is not "sporadic, isolated, or de minimis," and (iii) that the substantial direct and immediate control thus exercised over that essential term or those essential terms warrants finding that the putative joint employer "meaningfully affects matters relating to the employment relationship" with another employer's employees. Of course, the final rule is necessarily general, and future cases adjudicated under the rule will give further meaning and guidance.

The example proposed by one commenter of employees with no employer at all because control is divided among numerous entities no one of which exercises substantial control over any essential term or condition strikes us as unrealistic. The rule presumes that employees have a direct employer, and the comment does not persuade us to abandon that presumption.

Regarding the example of setting wages, the commenter seems to assume that a one-time setting of initial wages would compel a finding of joint-employer status. The Board would not make that assumption. Suppose a user entity is party to a long-term contract with a supplier employer. The user entity sets the initial wages to be paid the supplied workers. Years go by, the user entity never exercises any further control or influence over wages, and the supplier employer repeatedly adjusts the supplied employees' wages. Whether the user entity is a joint employer of the supplied employees based on that one-time initial setting of wages does not have a self-evident affirmative answer. On the other hand, where a user entity's one-time setting of supplied employees' wages has a continuous consequential effect on

---

[172] Comment of COLLE.

[173] Comment of Restaurant Law Center.

[174] Comment of Brian Carmody.

[175] See, *e.g.,* comment of General Counsel Robb.

[176] Comments of SEIU;IBT.

[177] See, *e.g.,* comment of UA.

[178] Comments of SEIU; CWA; IBT; Center for American Progress Action Fund; General Counsel Robb; LIUNA; AFL–CIO; SEIU Local 32BJ.

[179] See, *e.g.,* comment of Texas RioGrande Legal Aid.

[180] Comments of Jenner & Block, LLP; International Franchise Association; CDW; Restaurant Law Center; National Retail Federation; Associated Builders and Contractors, Inc.

[181] Comment of AFL–CIO.

[182] Id.

[183] Id.

those employees' wages, such evidence may suffice to establish that entity's joint-employer status. Finally, regarding the hospital example and the interplay of Section 2(11) and joint-employer status, see the discussion in Section V.C, "Response to Comments: Comments Regarding Contractually Reserved But Unexercised Control," supra.

One commenter states that the Board must clarify the relationship between "substantial" direct and immediate control and "limited and routine" control.[184] The final rule provides the requested clarification. It deletes "limited and routine" as a general qualifying term and, instead, specifies that the phrase applies only to supervision. It explains what limited and routine supervision means: Telling another employer's employees what work to perform, or where and when to perform the work, but not how to perform it. Rule Sec. 103.40(C)(7). And it contrastingly defines direct and immediate control over supervision to mean actually instructing another employer's employees how to perform their work or actually issuing employee performance appraisals.

Several commenters suggest examples of what should not be deemed substantial direct and immediate control, such as establishing eligibility criteria to provide services,[185] requiring corporate social-responsibility initiatives,[186] and requiring supplier employers to provide minimum amounts of leave to their employees.[187] Many of the suggested examples have been incorporated in the final rule. For example, in defining what is and is not "direct and immediate control" over specific essential terms and conditions of employment, the final rule excludes setting minimal hiring standards or minimum standards of performance or conduct.

## G. Comments Regarding "Essential" Terms and Conditions of Employment

In the NPRM, the Board proposed that "an employer may be considered a joint employer of a separate employer's employees only if the two employers share or codetermine the employees' essential terms and conditions of employment, such as hiring, firing, discipline, supervision, and direction."

The majority of comments concerning this aspect of the proposed rule do not contest the overarching principle that the Board's joint-employer standard

should focus on a putative joint employer's control over employees' *essential* terms and conditions of employment, such as hiring, firing, discipline, supervision, and direction.[188] A few comments, however, contend that a joint-employer analysis should examine whether an entity shares or codetermines *any* term or condition of employment that is a mandatory subject of bargaining, whether deemed "essential" or not.[189] Additional comments ask the Board to clarify whether or not the proposed list of essential terms and conditions of employment is exclusive, *i.e.,* whether it consists of the enumerated terms and conditions and no others.[190] Still other comments ask the Board to clarify the number of essential terms and conditions of employment an employer must share or codetermine to be considered a joint employer. Finally, the Board received comments proposing expansion of the proposed list of essential terms and conditions to include wages,[191] benefits,[192] hours of work,[193] health and safety,[194] training,[195] drug testing,[196] and access for union representatives,[197] among others.

After carefully considering these comments, the Board has decided to modify the proposed rule in several respects. Under the final rule, essential terms and conditions of employment "means wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction." Thus, the list of essential terms and conditions of employment has been expanded and made exclusive. To be found a joint employer under the final rule, an entity must possess and exercise such substantial direct and immediate control over one or more essential terms or conditions of employment as would

warrant finding that the entity meaningfully affects matters related to the employment relationship, and joint-employer status is determined on "the totality of the relevant facts in each particular employment setting." Thus, direct and immediate control over at least one essential term or condition is necessary, but the final rule makes clear that it is not necessarily sufficient. Moreover, under the final rule, control over mandatory subjects other than essential terms and conditions may be relevant to joint-employer status, depending upon the other evidence in the case. As provided in the final rule, "the entity's control over mandatory subjects of bargaining other than the essential terms and conditions of employment is probative of joint-employer status, but only to the extent it supplements and reinforces evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment."

The Board believes a standard that requires an entity to possess and exercise substantial direct and immediate control over essential terms and conditions of employment is consistent with the purposes and policies of the Act, as discussed in greater detail below in the justification for the final rule. The Act's purpose of promoting collective bargaining is best served by a joint-employer standard that places at the bargaining table only those entities that control terms and conditions that are most material to collective bargaining. Moreover, a less demanding standard would unjustly subject innocent parties to liability for others' unfair labor practices and coercion in others' labor disputes. A fuzzier standard with no bright lines would make it difficult for the Board to distinguish between arm's-length contracting parties and genuine joint employers. Accordingly, preserving the element of direct and immediate control over *essential* terms and conditions draws a discernible and predictable line, providing "certainty beforehand" for the regulated community. See *First Nat'l Maint. Corp.* v. *NLRB,* 452 U.S. at 679.

Turning to the merits of specific comments, the Board agrees that a proper standard should not disregard control over mandatory subjects of bargaining that do not qualify as essential terms or conditions, and the final rule does not limit the joint-employer analysis to essential terms. That said, the Board has long focused the joint-employer analysis primarily on a putative joint employer's control over essential terms and conditions of

---

[184] Id.

[185] Comment of HR Policy Association.

[186] Comment of RILA.

[187] Comment of HR Policy Association.

[188] Comments of CDW (supporting the general framework of the proposed rule's focus on essential terms and conditions of employment); U.S. House of Representatives Committee on Education and the Workforce (supporting a rule that examines an employer's control over essential terms and conditions of employment); SEIU (agreeing that the common law requires the Board to examine control over essential terms and conditions of employment); United Brotherhood of Carpenters and Joiners of America (same).

[189] Comments of UAW; IUOE; AFL–CIO.

[190] Comments of General Counsel Robb; IUOE.

[191] Comments of National Retail Federation; United Brotherhood of Carpenters and Joiners of America.

[192] Comments of SEIU Local 32BJ; Jenner & Block, LLP.

[193] Comments of General Counsel Robb; SEIU Local 32BJ.

[194] Comments of 1199SEIU United Healthcare Workers East; IUOE.

[195] Comment of IUOE.

[196] Comment of SEIU Local 32BJ.

[197] Id.

employment. See, *e.g., Browning-Ferris,* 362 NLRB at 1613 (adhering to the Board's traditional focus on "those matters governing the essential terms and conditions of employment"); *Laerco Transportation,* 269 NLRB at 325 (the "joint employer concept recognizes that two or more business entities are in fact separate but that they share or codetermine those matters governing the essential terms and conditions of employment"); *Greyhound Corp.,* 153 NLRB at 1495 (finding joint-employer relationship where an employer shared or codetermined "matters governing essential terms and conditions"); *Maas Bros.,* 88 NLRB 129, 135 (1950) (employees working for entrepreneurs that ran individual departments within a larger department store not included in a storewide unit where the entrepreneurs, not the department store, controlled "the essential terms and conditions of employment" governing the employees).

Two commenters argue that the Ninth Circuit's decision in *Sun-Maid Growers of California* v. *NLRB,* 618 F.2d 56 (9th Cir. 1980), supports a standard that renders an entity a joint employer if it controls any term or condition of employment, regardless of whether the term or condition is deemed "essential." [198] The Board finds this argument unpersuasive. To be sure, in *Sun-Maid,* the court stated that a "joint employer relationship exists when an employer exercises authority over employment conditions which are within the area of mandatory collective bargaining." Id. at 59. However, the court in *Sun-Maid* was not called upon to decide whether joint-employer status may be established absent control over essential terms and conditions, since the court found that the putative joint employer in *Sun-Maid* did control at least one essential term (hours of work) and possibly two (hours of work and direction). Id. at 59 (finding joint-employer status where entity controlled "work schedules, assigned the work and decided when additional electricians were needed"); see also *Tanforan Park Food Purveyors Council* v. *NLRB,* 656 F.2d 1358, 1361 (9th Cir. 1981) (finding joint-employer relationship where putative joint employer controlled "wage rates, vacation, holiday, and work schedules, and employee supervision[, which] lie within the core of mandatory collective bargaining").

Moreover, several federal appellate courts have approved the Board's longstanding insistence on control of essential terms and conditions of employment to make an entity a joint employer. See *Adams & Assoc., Inc.* v. *NLRB,* 871 F.3d 358, 377 (5th Cir. 2017); *Dunkin' Donuts Mid-Atlantic Distrib. Ctr., Inc.* v. *NLRB,* 363 F.3d 437, 440 (D.C. Cir. 2004); *Rivera-Vega* v. *ConAgra, Inc.,* 70 F.3d 153, 163 (1st Cir. 1995); *Carrier Corp.* v. *NLRB,* 768 F.2d 778, 781 (6th Cir. 1985); *NLRB* v. *Browning-Ferris Indus. of Pennsylvania, Inc.,* 691 F.2d at 1124; ; see also *Browning-Ferris* v. *NLRB,* 911 F.3d at 1220 (" '[G]lobal oversight' is a routine feature of independent contracts. Wielding direct and indirect control over the 'essential terms and conditions' of employees' work lives is not.") (internal citation omitted).

Some commenters argue that the Board should require direct and immediate control of *all* essential terms and conditions of employment to subject an entity to the duty to bargain collectively as a joint employer.[199] The Board rejects this position. The Board has never required direct and immediate control of all essential employment terms in order to deem an entity a joint employer of another employer's employees. Rather, it has consistently evaluated joint-employer status based on the totality of the relevant facts in each case.

Contrary to a commenter's contention, the Board's longstanding requirement of control over essential terms and conditions of employment, to which both the proposed and final rules adhere, is consistent with the Supreme Court's decision in *Boire* v. *Greyhound Corp.,* 376 U.S. 473 (1964).[200] In *Boire,* the question presented was a narrow one: Whether an employer could challenge in federal district court the Board's determination that two entities constituted a joint employer of a group of employees and its direction of an election in a unit composed of those employees based on a petition that named both entities as the employer. See id. at 476–477. The Court held that Congress had limited judicial review to the courts of appeals and that Greyhound could not challenge the Board's decision and direction of election in federal district court. See id. The Court did not reach the merits of the Board's joint-employer finding, but it observed that "whether Greyhound possessed sufficient indicia of control to be an 'employer' is essentially a factual issue." Id. at 481. The commenter asserts that because the Court did not reference "essential terms and conditions of employment," the Board may not require control over essential terms. However, the Court did not pass

on the joint-employer determination in *Greyhound,* much less preclude the standard adopted in the final rule. Indeed, the final rule is consistent with the Court's observation that joint-employer status is "essentially a factual issue." Under the final rule, "[j]oint-employer status must be determined on the totality of the relevant facts in each particular employment setting." Rule Sec. 103.40(A).

We also disagree with the assertion that requiring control of essential terms and conditions cannot be squared with *Management Training Corp.,* 317 NLRB 1355 (1995).[201] Prior to *Management Training,* the Board asserted jurisdiction over a government contractor only if the contractor controlled "the entire package of employee compensation, *i.e.,* wages and fringe benefits." *Res-Care, Inc.,* 280 NLRB 670, 674 (1986). In *Management Training,* the Board rejected this standard. 317 NLRB at 1358. In doing so, the Board criticized the "emphasis in *Res-Care* on control of economic terms and conditions [as] an oversimplification of the bargaining process." Id. at 1357. The Board explained:

While economic terms are certainly important aspects of the employment relationship, they are not the only subjects sought to be negotiated at the bargaining table. Indeed, monetary terms may not necessarily be the most critical issues between the parties. . . . [I]t may be that the parties' primary interest is in the noneconomic area. It was shortsighted, therefore, for the Board to declare that bargaining is meaningless unless it includes the entire range of economic issues.

Id.

The proposed rule was, and the final rule is, consistent with *Management Training.* The Board in *Management Training* faulted *Res-Care* for making wages and benefits the *sine qua non* of collective bargaining. The proposed and final rules do not limit essential terms and conditions to wages and benefits. Essential terms and conditions include non-economic as well as economic terms, and joint-employer status may be found under the rule based on an entity's control over non-economic essential terms only.

Nothing in Section 8(a)(5) and (d) of the Act prohibits the Board from promulgating a joint-employer rule that requires control over essential terms and conditions of employment. Under Section 8(a)(5) and (d), an employer is obligated to bargain with its unit employees' representative "with respect to wages, hours, and other terms and conditions of employment," commonly

---

[198] See comments of UAW; AFL–CIO.

[199] See, *e.g.* comment of General Counsel Robb.
[200] See comment of UAW.

[201] See comment of AFL–CIO.

referred to as "mandatory" subjects of bargaining. *NLRB* v. *Borg-Warner Corp.,* 356 U.S. 342, 349 (1958). But there is no inconsistency between this obligation and basing joint-employer status on control over a subset of mandatory subjects, *i.e.,* essential terms and conditions. The two issues are widely different. Section 8(d) mandates what the unit employees' undisputed employer must bargain *about*; the instant joint-employer rule provides the standard for determining whether an entity *other than* the unit employees' undisputed employer is also an employer, *i.e.,* a joint employer, with a duty to bargain. Whether one has a duty to bargain is analytically prior to, and distinct from, what one must bargain about *if* one has a duty to bargain.[202]

That said, the Board believes, after considering the relevant comments, that control over mandatory subjects other than essential terms and conditions should play a role in the joint-employer analysis. Accordingly, the final rule provides that evidence of such control is probative of joint-employer status "to the extent it supplements and reinforces evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment." Rule Sec. 103.40(A).

Several commenters addressed whether the final rule should make the list of essential terms and conditions of employment exhaustive—*i.e.,* the enumerated terms and conditions and no others—and how many essential terms and conditions an entity must control to be deemed a joint employer. As to the latter, comments suggest a range of possibilities—from any essential term and condition,[203] to more than one,[204] a significant number,[205] or all essential terms and conditions of employment.[206]

After careful consideration, the Board has decided to modify the proposed rule in two relevant respects. First, the final rule makes the list of essential terms

and conditions of employment exclusive. This will provide clarity and predictability for the regulated community and remove an issue from litigation. Second, under the final rule, an entity must "possess and exercise such substantial direct and immediate control over one or more essential terms or conditions of . . . employment as would warrant finding that the entity meaningfully affects matters relating to the employment relationship" with another employer's employees. This reflects the Board's recognition that direct and immediate control over one essential term may warrant a finding of joint-employer status—but on the other hand, it may not, and control even over more than one essential term may fall short of the mark where an entity has exercised such control so infrequently that the evidence fails to support a finding that the entity meaningfully affects matters relating to the employment relationship.

Finally, the Board agrees that wages, benefits, and hours of work should be included in the list of essential terms and conditions of employment. The language of the Act supports including wages and hours of work. Section 8(d) defines collective bargaining as the "performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to *wages, hours,* and other terms and conditions of employment" (emphasis added). Section 9(a) provides that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to *rates of pay, wages, hours of employment,* or other conditions of employment" (emphasis added). Congress clearly understood that wages and hours of work would be central to collective bargaining, and this supports adding them to the list of essential terms and conditions of employment.

Board precedent likewise supports including wages, hours of work, and benefits among the essential terms and conditions. See, *e.g., Quantum Resources Corp.,* 305 NLRB at 760–761 (finding that entity shared or codetermined "those matters governing the essential terms and conditions of employment" based in part on evidence of its substantial control over "levels of compensation . . . hours . . . and benefits"); *Lee Hospital,* 300 NLRB at 950 (corporation hired by hospital to operate anesthesia department and

recovery room not a joint employer of nurses where hospital exclusively determined essential terms and conditions of employment, including "wages" and "fringe benefit policies"); *Pacific Mutual Door Co.,* 278 NLRB 854, 858–859 (1986) (finding joint-employer status based on entity's sufficient control over essential terms and conditions of employment, including hours, wages, and "benefits received as paid holidays and paid vacations").

The courts, too, have understood essential terms and conditions of employment to include wages, hours of work, and benefits. See *Adams & Assoc., Inc.* v. *NLRB,* 871 F.3d at 378 (finding joint-employer status where entity "jointly developed the wage structure" and exclusively determined "the holiday schedule" for all employees) (internal quotation marks omitted); *Dunkin' Donuts Mid-Atlantic Distrib. Ctr., Inc.* v. *NLRB,* 363 F.3d at 440–441 (finding joint-employer status where entity determined "employee wage and benefit rates . . . discontinued an employee bonus program . . . [and set] rating categories used to determine whether drivers received incentive awards"); *Rivera-Vega* v. *ConAgra, Inc.,* 70 F.3d at 163 (factors in a joint-employer determination include "ultimate power over changes in employer compensation [and] benefits"); *Carrier Corp.* v. *NLRB,* 768 F.2d at 781 (finding joint-employer status where employer "consulted the [putative joint employer] over wages and fringe benefits"); *Jefferson County Cmty. Ctr. For Developmental Disabilities, Inc.* v. *NLRB,* 732 F.2d 122, 127 (10th Cir. 1984) (employer maintained sufficient control over terms and conditions of employment "to be capable of effective bargaining" where it had "final decision-making authority over the essential terms and conditions of employment, including wages [and] fringe benefits") (internal quotation marks omitted); *NLRB* v. *Browning-Ferris Indus. of Pennsylvania, Inc.,* 691 F.2d 1117, 1124 (3d Cir. 1982) (finding joint-employer status where entity "established work hours" and "determined [employees'] compensation").

Two commenters contend that the list of essential terms and conditions of employment must or should include each of the indicia of supervisory status set forth in Section 2(11).[207] The final

[202] This distinction was clearly recognized in *Browning-Ferris,* where the Board majority stated:

For example, it is certainly possible that in a particular case, a putative joint employer's control might extend only to terms and conditions of employment too limited in scope or significance to permit meaningful collective bargaining. Moreover, as a rule, a joint employer will be required to bargain only with respect to such terms and conditions which it possesses the authority to control.

362 NLRB at 1614.

[203] See comment of AFL–CIO.

[204] See comment of American Staffing Association.

[205] See comment of Jenner & Block, LLP.

[206] See comments of International Warehouse Logistics Association; Association of Corporate Counsel.

[207] See comments of AFL–CIO; UAW. Sec. 2(11) defines "supervisor" as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to
Continued

rule's list of essential terms and conditions does not include several of these supervisory indicia,[208] but there is no contradiction between the final rule and Section 2(11) of the Act. Nothing in the text of the Act or its legislative history links Section 2(11) and joint-employer status. Nor does the Act or its legislative history otherwise suggest that the Board must find that an entity is a joint employer of another employer's employees based solely on supervisory indicia such as the authority to lay off, recall, promote, etc. To the contrary, under longstanding Board precedent, it is possible for two businesses to remain separate employers despite the fact that employees of the first business assertedly exercise Section 2(11) authority over employees of the second business. *Crenulated Co.,* 308 NLRB at 1216 ("It is well established that an individual must exercise supervisory authority over employees of the employer at issue, and not employees of another employer, in order to qualify as a supervisor under Section 2(11) of the Act"); *Eureka Newspapers, Inc.,* 154 NLRB 1181, 1185 (1965) (finding that district dealers employed by newspaper were not statutory supervisors despite alleged supervisory authority over carriers who were not employed by newspaper). See also Section V.C, "Response to Comments: Comments Regarding Contractually Reserved But Unexercised Control," supra.

Two additional points should be emphasized here. First, as described above, control over a mandatory subject of bargaining that is not an "essential" term is relevant in a joint-employer analysis under this final rule. Such control can supplement and reinforce evidence of possession or exercise of direct and immediate control over a particular essential term and condition of employment, as discussed above. Second, when applying this final rule, the Board will not be bound by a putative joint employer's characterization of its conduct. For example, under the circumstances of a particular case, an employment action codetermined by a putative joint employer and characterized as a "layoff" could in fact be a discharge. Similarly, "rewarding" another employer's employee could, depending on the circumstances, be tantamount to

bestowing a benefit. Relatedly, if a putative joint employer directly and immediately resolved (*i.e.,* adjusted) another employer's employee's grievance over rate of pay or suspension for misconduct, that would evidence direct and immediate control over the essential terms and conditions of wages and discipline.

*H. Comments on Employer Status Under Other Statutes and the Common Law*

Several comments address the doctrine of joint employment as it has been interpreted under other statutes. In general, as explained below, we believe that joint-employer determinations under other statutes are instructive but of limited utility to the joint-employer inquiry under the NLRA.

Several commenters observe that the FLSA broadly defines "employ" as to "suffer or permit to work" and "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."[209] But Congress defined "employer" in the FLSA more broadly than under the NLRA. Joint-employer determinations under the FLSA, therefore, are unreliable guides for determining joint-employer status under the NLRA.

Two commenters assert that courts consider evidence of indirect control and the "economic realities" of the work relationship when determining whether an entity is a joint employer under the FLSA.[210] Again, however, joint-employer status under the FLSA is based on that statute's expansive definition of "employer," and has been based as well on federal regulations providing that joint-employer determinations under the FLSA may be based solely on evidence of indirect control. See *In re Enter. Rent–A–Car Wage & Hour Emp't Practices Litig.,* 683 F.3d 462, 468 (3d Cir. 2012) (finding joint employment "[w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, *directly or indirectly*" (quoting 29 CFR Sec. 791.2(b))) (emphasis added).[211] The NLRA does not define "employer" thus broadly.

Other commenters point out that the Occupational Safety and Health Administration (OSHA) applies a policy

under which, on multi-employer worksites, more than one employer may be cited for a hazardous condition that violates an OSHA standard.[212] See *Solis* v. *Summit Contractors, Inc.,* 558 F.3d 815 (8th Cir. 2009) (holding that OSHA regulations (29 CFR Sec.1910.12) permitted the issuance of citations to "controlling employers," even when they did not create the safety hazard and when its employees were not exposed to the hazard). Likewise, a commenter observes that IRS regulations provide that an entity may be considered an employer based on the *right* to control the way services are performed, and that the right need not be exercised.[213] The Board's task, however, is to formulate a joint-employer standard based on the common law applied in the context of the NLRA. Since a joint-employer finding under the NLRA entails a duty to bargain, the Board must consider when a putative joint employer's participation in collective bargaining is required for such bargaining to be meaningful. And since such a finding renders otherwise secondary activity primary, the Board also must consider Congress's concern with limiting third parties' exposure to economic warfare in labor disputes. These considerations have no bearing on joint-employer determinations by OSHA or the IRS, which therefore shed little light on joint-employer determinations under the Act.

Some commenters observe that the joint-employer inquiry under the FLSA is performed on a case-by-case basis, and that this inquiry is always fact-specific under the common law.[214] Consistent with these comments, joint-employer determinations under the final rule will be determined on the totality of the relevant facts in each particular employment setting.

Some commenters contend that the proposed joint-employer standard will impact numerous areas of labor-management relations and federal and state workplace laws.[215] Such impact is the inevitable consequence of any joint-employer standard, and the Board believes that the final rule sets forth a standard that best furthers the purposes and policies of the NLRA.

One commenter observes that indirect and reserved control are relevant factors in joint-employer determinations under Title VII, citing, inter alia, *Myers* v. *Garfield & Johnson Enters.,* 679 F. Supp. 2d 598, 611 (E.D. Pa. 2010) ("[A]n

---

adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

[208] The essential terms and conditions of employment set forth in Sec. 103.40(C)(1)–(8) does not include transfer, lay off, recall, promote, reward, or adjustment of grievances.

[209] See comments of NELP; UA; Professor Kulwiec.

[210] See comments of Greater Boston Legal Services; Justice at Work.

[211] On January 16, 2020, the Department of Labor issued a final rule that made relevant revisions to the regulatory text quoted above. See 85 FR 2820 (Jan. 16, 2020).

[212] See comments of NELP; UA.

[213] See comment of UA.

[214] See comments of NELP; SEIU.

[215] See comments of NELP; Weinberg, Roger & Rosenfeld.

employee may be considered 'employed' by a third party as well as by the nominal employer if the third party has a right to control the employee's conduct, either directly or through the third party's control over the employer.''), and *Virgo* v. *Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1361 (11th Cir. 1994) (''We find that actual control is a factor to be considered when deciding the 'joint employer' issue, but the authority or power to control is also highly relevant.'') [216] Under the final rule, evidence of indirect and reserved but unexercised control are probative of joint-employer status, but only to the extent that such evidence supplements and reinforces evidence of direct and immediate control. To the extent the latter proviso makes the joint-employer standard under the Act narrower than the comparable standard under Title VII, our task is to formulate a joint-employer standard based on the common law applied in the particular context of the NLRA, as explained above. In any event, the decisions in *Myers* and *Virgo* relied on evidence of direct and immediate control over essential terms and conditions of employment. In *Myers,* which was before the court on a motion to dismiss for failure to state a claim, the court cited a complaint allegation that the putative joint employer participated in the daily supervision of the direct employer's employees. 679 F. Supp. 2d at 610. In *Virgo,* the court cited evidence that the putative joint employer paid all costs and expenses related to all the employees of the direct employer. 30 F.3d at 1361.

Several commenters cite the Restatement (Second) of Agency, in particular Sections 2(2) and 220, for the proposition that an employee is a worker who is subject to the employer's ''control or *right to control*'' and complain that the proposed rule ''wholly discounts'' reserved control.[217] These commenters also point out that Restatement (Second) of Agency Sec. 220 cmt. d states that this right of control may be ''very attenuated.'' Some commenters observe that in *Browning-Ferris* v. *NLRB,* 911 F.3d at 1211, the D.C. Circuit stated that ''the 'right to control' runs like a *leitmotif* through the Restatement (Second) of Agency (emphasis in original).'' [218] Other commenters contend that the ''right to control'' standard is a core component

and widely recognized feature of case law applying common-law-agency principles and assert that the right of control is sufficient to establish a common-law master-servant relationship.[219]

Initially, as explained more fully below, a master-servant relationship under the common law of independent-contractor status is not synonymous with joint-employer status.

In any case, the Board agrees with one commenter that, although the court in *Browning-Ferris* v. *NLRB* stated that the Board is required to ''color within the common-law lines'' with respect to its joint-employer rule, 911 F.3d at 1208, the final rule does not exceed the bounds of common-law principles.[220] Like that commenter, the Board is aware of no court that has found that reserved, unexercised control, standing alone, was sufficient to create a joint-employer relationship under the NLRA. Moreover, the final rule does not ''wholly discount'' or otherwise exclude consideration of reserved, unexercised control. Rather, it provides that contractually reserved but never exercised authority over essential terms and conditions of employment of another employer's employees is probative of joint-employer status, but only to the extent that it supplements and reinforces evidence of direct and immediate control. Again, the narrowing proviso reflects a joint-employer standard based on the common law applied in the particular context of the NLRA.

One comment contends that consideration of indirect control over employees' wages and working conditions is consistent with common-law agency doctrine.[221] The Board agrees, and observes that the D.C. Circuit has likewise held that an entity's ''indirect control over employees can be a relevant consideration'' in the common-law inquiry. *Browning-Ferris* v. *NLRB,* 911 F.3d at 1209. Accordingly, under the final rule, evidence of an entity's indirect control over essential terms and conditions of employment of a direct employer's employees is probative of joint-employer status to the extent it supplements and reinforces evidence of direct and immediate control over a particular essential term and condition of employment.

One commenter observes that Section 220 of the Restatement (Second) of Agency includes many considerations

that are broader and less formalistic than the proposed rule, such as whether the one employed is engaged in a distinct occupation or business and whether the work is a part of the regular business of the putative employer.[222] However, these considerations relate to determining whether a worker is an employee or an independent contractor. As explained more fully below, they are instructive but of limited utility in the joint-employer context.

Another commenter argues that when determining what the D.C. Circuit and the common law mean by indirect control, it may be useful to consider the so-called subservant doctrine, under which employer-employee relationships are established by indirect control.[223] See Restatement (Second) of Agency Sec. 5(2); see also id., cmt. e. In defining indirect control in the final rule, the Board has focused on the connection between the entity's actions and the employees' essential terms and conditions of employment, not on how alleged control is communicated. However, the final rule is not intended to immunize an entity from joint-employer status based solely on how its control is exercised. Direct and immediate control exercised through an intermediary remains direct and immediate. See *Browning-Ferris* v. *NLRB,* 911 F.3d at 1217 (''[T]he common law has never countenanced the use of intermediaries or controlled third parties to avoid the creation of a master-servant relationship.'').

*I. Comments on Independent-Contractor Precedent*

Many commenters address the relevance—or lack of relevance—of independent-contractor precedent to the joint-employer inquiry. As noted by one commenter, in NLRB v. United Insurance Co. of America, 390 U.S. at 256, the Supreme Court held that the determination of whether a worker is a statutorily protected employee or a statutorily exempt independent contractor is governed by common-law agency principles.[224] In *Community for Creative Non-Violence* v. *Reid,* the Supreme Court listed common-law factors relevant to making the employee-versus-independent contractor determination:

In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the

---

[216] See comment of UA.

[217] See comments of IBT; Greater Boston Legal Services; State Attorneys General; AFL–CIO; SEIU (citing Sec. 220(1) (emphasis added)).

[218] See comments of State Attorneys General; Spivak Lipton LLP.

[219] See comments of SEIU; UA.

[220] See comment of CDW.

[221] See comment of Labor Law, Antitrust Law, and Economics Professors (Law and Economics Professors).

[222] See comment of NELP.

[223] See comment of SEIU.

[224] See comment of State Attorneys General.

skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

490 U.S. at 751–752; see also *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U.S. at 323–324. These so-called *Reid* factors are largely adopted from Section 220(2) of the Restatement (Second) of Agency. As another commenter notes, the Supreme Court has instructed that, in assessing employee status, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." United Ins., 390 U.S. at 256.[225]

Several commenters acknowledge that various elements of the independent-contractor test are inapplicable to determining joint-employer status.[226] These commenters point out that where there is no dispute that certain workers are employees of some entity, many of the factors of the common-law test are already satisfied and provide no meaningful guidance to help determine whether another entity constitutes a joint employer. Cf. *Clackamas Gastroenterology Assoc., P.C.* v. *Wells,* 538 U.S. 440, 445 fn. 5 (2003) (explaining that the independent-contractor factors "[we]re not directly applicable" in determining whether physician shareholders who owned a professional corporation were "employees" because the court was "not faced with drawing a line between independent contractors and employees").

Moreover, as observed by one commenter, in *Browning-Ferris* v. *NLRB,* 911 F.3d at 1212–1213, the D.C. Circuit rejected the contention that the independent-contractor and joint-employer inquiries are "essentially the same," adding that the argument "lacks any precedential grounding."[227] As noted by another commenter, the court explained that although independent-contractor cases can be "instructive in the joint-employer inquiry to the extent that they elaborate on the nature and extent of control necessary to establish a common-law employment relationship," the independent-contractor inquiry omits the key

questions, for deciding the joint-employer issue, of who controls the workers and when and how that control is exercised. Id. at 1215.[228] "In short," the court concluded, "using the independent-contractor test exclusively to answer the joint-employer question would be rather like using a hammer to drive in a screw: it only roughly assists the task because the hammer is designed for a different purpose." Id.

Consistent with these commenters, the Board believes that the common-law factors relative to determining employee or independent-contractor status are instructive but of limited utility in the joint-employer context. Application of those factors is appropriate to determine whether a putative employer has the "right to control the manner and means by which the product is accomplished," *Reid,* 490 U.S. at 751–752, and therefore independent-contractor principles assist in determining whether a putative employer has such a "right to control." But they do not assist in answering the key questions in the joint-employer inquiry: *who* is exercising that control, *when,* and *how.* This is consistent with the court's decision in *Browning-Ferris* v. *NLRB,* 911 F.3d at 1214–1215.

A commenter contends that the common law of independent-contractor status is instructive in the joint-employer context to the extent it assists in identifying the *forms* of control that are relevant to employer status.[229] In this regard, the Board agrees with a different commenter that under the *Reid* factors, both indirect and reserved control are relevant to determining employer status under the common law. 490 U.S. at 751–752.[230] The Board further agrees that independent-contractor precedent also makes reserved control relevant to determining employer status. Thus, under the final rule, evidence of indirect control and of unexercised, contractually reserved authority is relevant in the joint-employer inquiry to the extent such evidence supplements and reinforces evidence of direct and immediate control over essential terms and conditions.

One of the above commenters further argues that the common law of independent-contractor status— specifically, the Restatement (Second) of Agency—makes clear that contractually reserved authority, standing alone, is sufficient to establish an employment relationship.[231] The commenter cites, inter alia, Sections 2 and 220, which

define a "master" as someone who "controls *or has the right to control*" another and a "servant" as someone employed by the master who is "subject to the [master's] control or *right to control*" (commenter's emphasis). But "sufficient to establish an employment relationship" under the Restatement of Agency, which summarizes the common law of independent-contractor status, is not the same as sufficient to establish joint-employer status under the NLRA for all the reasons explained above.

*J. Comments About the Impact of the D.C. Circuit's Decision in Browning-Ferris Industries of California, Inc. v NLRB*

The Board received many comments regarding the impact of the D.C. Circuit's decision in *Browning-Ferris* v. *NLRB* on this rulemaking. Commenters debate whether the court's decision permits the proposed rule, requires changes to the proposed rule, or removes the authority of the Board to engage in this rulemaking at all. Those comments and the Board's responses are described below.

Some commenters contend that the proposed rule is inconsistent with the D.C. Circuit's conclusions in *Browning-Ferris* v. *NLRB*.[232] They point out that the court upheld the *Browning-Ferris* standard's consideration of reserved and indirect control as rooted in the common law and instructed the Board to color within common-law lines in the joint-employer rulemaking. They argue that the final rule must include consideration of reserved and indirect control, and they claim that the proposed rule, which did not expressly acknowledge a role for those forms of control, contradicts the D.C. Circuit's decision.

Some commenters, on the other hand, argue the proposed rule is consistent with the D.C. Circuit's decision.[233] One commenter, for example, argues that although the court held that consideration of indirect and reserved control is rooted in the common law, it did not hold that the joint-employer standard must be coextensive with the common law. To the contrary, the court acknowledged the *Browning-Ferris* two-

---

[225] See comment of AFL–CIO.

[226] See comments of AFL–CIO; Restaurant Law Center; COLLE.

[227] See comment of State Attorneys General.

[228] See comment of CDW.

[229] See comment of AFL–CIO.

[230] See comment of CDW.

[231] See comment of AFL–CIO.

[232] See, *e.g.,* comments of Legal Aid Society; United Brotherhood of Carpenters and Joiners of America; Congressional Progressive Caucus; UAW; IBT; National Women's Law Center; United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, SEIU; 1199SEIU United Healthcare Workers East; SEIU National Fast Food Workers Union; LIUNA; IUOE; Senator Murray and Representative Scott; NELP; AFT; James van Wagtendonk.

[233] See comments of Restaurant Law Center; CDW.

step standard: A necessary-but-not-sufficient common-law analysis at step one, followed by an NLRA-based analysis of whether the common-law joint employer exercises sufficient control over the terms and conditions of employment of another employer's employees to permit meaningful collective bargaining. A second commenter also points out that the proposed rule does not expressly prohibit consideration of indirect or reserved control and therefore does not contradict the court's decision.

Another commenter argues that it is irrelevant whether the rule is consistent with *Browning-Ferris* v. *NLRB* because the court's decision does not control the Board's rulemaking.[234] Because the propriety of the rulemaking was not before the court, the commenter maintains that the court's instruction that the rulemaking must ''color within the common-law lines identified by the judiciary,'' 911 F.3d at 1208, is dicta. The commenter also states that rulemaking is an executive function, not a judicial one, and he concludes from this that the judiciary cannot dictate what the Board's rule should say unless the rule contradicts the Act or Supreme Court precedent, and the proposed rule does not.

The Board believes that the final rule is consistent with *Browning-Ferris* v. *NLRB*. It incorporates indirect and reserved-but-unexercised control over essential terms and conditions and treats them as probative of joint-employer status to the extent they supplement and reinforce evidence of direct and immediate control. The latter limitation serves a purpose similar to the second step of the *Browning-Ferris* standard—*i.e.,* to ensure that only those entities that ''meaningfully affect[] matters relating to the employment relationship'' are found to be joint employers. Rule Sec. 103.40(A). But whereas *Browning-Ferris* left the regulated community utterly at sea as to what ''sufficient control . . . to permit meaningful collective bargaining'' actually meant, the final rule provides ample guidance. Moreover, the final rule's treatment of these factors as non-dispositive does not contradict the court's decision because the court did not decide whether either indirect or reserved-but-unexercised control can be dispositive of joint-employer status. 911 F.3d at 1213, 1218. The final rule thus comports with the court's decision.

Commenters propose multiple changes to the proposed rule based on the D.C. Circuit's criticisms of *Browning-Ferris*. Specifically,

commenters propose (1) to provide legal scaffolding distinguishing between control over essential terms and conditions of employment and control over the basic contours of contracted-for service; and (2) to specify the terms and conditions that are essential to meaningful collective bargaining, and to clarify what meaningful collective bargaining entails.[235] As explained below, we believe the final rule appropriately resolves the court's critiques of the *Browning-Ferris* standard.

The first set of comments responds to the court's criticism of the Board's application of the indirect control factor in *Browning-Ferris*. The court criticized the *Browning-Ferris* Board for failing ''to hew to the relevant common-law boundaries that prevent the Board from trenching on the common and routine decisions that employers make when hiring third-party contractors and defining the terms of those contracts.'' Id. at 1219. The court remanded the case with instructions ''to erect some legal scaffolding that keeps the inquiry within traditional common-law bounds.'' Id. at 1220.

Commenters make various proposals for how the rule could erect the ''legal scaffolding'' the D.C. Circuit directed the Board to provide. One commenter proposes that the Board list and define essential terms and conditions of employment.[236] Two other commenters propose that the rule explain the difference between global oversight of a company-to-company business relationship and actual control over the essential terms and conditions of employment of another employer's employees.[237]

Some commenters propose that the rule exclude from the joint-employer inquiry specific actions they say fall within the routine contours of most joint undertakings. One commenter, for example, proposes the rule state that the following factors do not support joint-employer status: Decisions that set the objectives, basic ground rules, and expectations for a third-party contractor; use of a cost-plus contract; routine contractual terms; supervision that is inherent to any joint undertaking; global oversight; cooperation and coordination between a service recipient and a contractor's employees; and the basic contours of a contracted-for service.[238]

A second commenter proposes that the rule define ''substantial control'' to exclude control asserted for the following reasons: To achieve compliance with legally mandated requirements, to enforce product and service standards in the franchise industry, to implement corporate social responsibility initiatives, to establish deadlines, to preserve quality control, to protect the brand, to implement and enforce employee uniform guidelines, to implement third-party delivery and courier services, to provide optional training programs, and to authorize multi-employer associations to bargain on behalf of employer-members.[239]

The final rule provides the legal scaffolding the D.C. Circuit found lacking in the Board's *Browning-Ferris* standard. It responds to the Court's holding that indirect control over the basic contours of a contracted-for service does not support joint-employer status by defining ''indirect control'' to exclude ''setting the objectives, basic ground rules, or expectations for another entity's performance under a contract.'' It also addresses the D.C. Circuit's admonishment that ''not every aspect of control counts. . . . The critical question is *what* is being controlled,'' 911 F.3d at 1220 (emphasis in original), by requiring that indirect control be asserted over essential terms and conditions of employment and by listing those essential terms exhaustively. The rule thus provides the legal scaffolding necessary to keep the joint-employer inquiry within common-law bounds and to ensure that routine control inherent to any joint undertaking does not support joint-employer status.

The final rule should also provide a satisfactory response to the specific exclusions sought by several commenters because it provides examples of specific acts that will not constitute direct and immediate control over essential terms and conditions.[240] The rule provides, for example, that allowing another employer's employees to participate in benefit plans, establishing an enterprise's operating hours, setting deadlines for services, setting minimal hiring, performance, or conduct standards pursuant to regulatory requirements, bringing misconduct or poor performance to another employer's attention, entering into a cost-plus contract, or instructing employees regarding what work to perform and where and when to perform it but not how to perform it, among other similar actions, will not

---

[234] See comment of General Counsel Robb.

[235] See comments of CDW; RILA; HR Policy Association; Associated Builders and Contractors Inc.; IFA; American Hotel & Lodging Association; General Counsel Robb; Jenner & Block, LLP; Restaurant Law Center.

[236] See comment of Restaurant Law Center.

[237] See comments of Job Creators Network; IFA.

[238] See comment of RILA.

[239] See comment of CDW.

[240] See comments of RILA; CDW.

constitute direct and immediate control. These examples provide the specificity sought by some commenters and further clarify the distinction between control over essential terms of employment that supports joint-employer status and routine features of company-to-company contracting that do not.[241]

The second set of comments responds to the court's criticism of the *Browning-Ferris* standard's second step, which requires consideration of "whether the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining." *Browning-Ferris*, 362 NLRB at 1600. Regarding this step, the Court criticized the *Browning-Ferris* Board on two counts. First, it said that "the Board never delineated what terms and conditions are 'essential' to make collective bargaining 'meaningful.'" *Browning-Ferris* v. *NLRB*, 911 F.3d at 1221–1222 (quoting *Browning-Ferris*, 362 NLRB at 1600). Second, it said that the Board failed to "clarify what 'meaningful collective bargaining' might require." Id. at 1222.

In response to the Court's critique, commenters request that the rule define the terms and conditions "essential" to make collective bargaining "meaningful" and clarify what "meaningful collective bargaining" requires. To that end, one commenter proposes the rule identify the subjects over which a joint employer must negotiate and specify that they do not include decisions to change aspects of the contracting arrangement affecting employment terms, to reallocate bargaining responsibilities between employers, or to end a service arrangement.[242]

The final rule addresses the shortcomings the court identified in *Browning-Ferris*'s treatment of the second step of its framework by eliminating that step and returning to the traditional standard requiring substantial direct and immediate control over essential terms and conditions of employment. Moreover, the final rule lists the essential terms and conditions, thus providing the definition the court requested. The final rule also sheds light on what meaningful collective

bargaining requires by specifying that to qualify as a joint employer of another employer's employees, an entity "must possess and exercise such substantial direct and immediate control over one or more essential terms or conditions of their employment as would warrant finding that the entity meaningfully affects matters relating to the employment relationship with those employees." Rule Sec. 103.40(A).

Concerned that the Board's decision in *Browning-Ferris* v. *NLRB* may lead the Board to give indirect and reserved control too much weight, several commenters propose that the rule limit the roles that these forms of control play in the joint-employer analysis. One commenter, for example, requests that the rule specify that indirect and reserved control are relevant only insofar as they are asserted over essential terms and conditions of employment.[243] Another commenter proposes limiting indirect and reserved control to a specific right to displace a contractor and directly control its employees, or alternatively, to decisions made by the putative joint employer and conveyed indirectly using the contractor as intermediary.[244]

The final rule clarifies the contours and limits of indirect and reserved control consistent with both the commenters' requests and the D.C. Circuit's opinion. The final rule specifies that indirect and reserved control are probative of joint-employer status only to the extent they supplement and reinforce evidence of direct and immediate control. However, for reasons explained above, the Board has not limited indirect and reserved control to a specific right to displace a contractor and directly control its employees,[245] and has not alternatively defined indirect control as control conveyed through an intermediary.[246]

Other comments advance additional proposals based on *Browning-Ferris* v. *NLRB*. One commenter, for example, proposes that the Board create a two-part standard to comply with the court's decision.[247] The first part would require the putative joint employer to be a joint employer under the common law, and the second part would be the standard in the proposed rule. The Board declines this proposal because the final

rule does not need to consist of a two-part standard to comply with the court's decision. The court did not require a two-part structure for the joint-employer standard. It held only that the standard must stay within the bounds of the common law. *Browning-Ferris* v. *NLRB*, 911 F.3d at 1208. As explained above, the final rule is consistent with that holding.

Another commenter requests that the Board add "significant" to the rule to match the phrasing used by the D.C. Circuit where it stated that "for roughly the last 25 years, the governing framework for the joint-employer inquiry has been whether both employers 'exert significant control over the same employees' in that they 'share or co-determine those matters governing the essential terms and conditions of employment.'" Id. at 1209 (quoting *NLRB* v. *Browning-Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d at 1124).[248] The Board declines the invitation because the final rule already requires significant control for joint-employer status. It requires an entity to share or codetermine employees' essential terms and conditions of employment, which is what the D.C. Circuit referred to as "significant" control. Again, in the quote above, the D.C. Circuit explained that the traditional standard required joint employers to "exert significant control . . . *in that* they share or codetermine those matters governing the essential terms and conditions of employment." Id. (emphasis added). The Third Circuit posited the same equivalence, stating that "where two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers' within the meaning of the NLRA." *Browning-Ferris Indus. of Pennsylvania* v. *NLRB*, 691 F.2d at 1124. Thus, "significant" control *means* sharing or codetermining those matters governing essential terms and conditions of employment. The proposed and final rules require as much and thus require "significant" control as defined by the D.C. Circuit.

Commenters also discuss whether the D.C. Circuit's decision affects the Board's authorization to promulgate a joint-employer standard via rulemaking rather than case adjudication, or at least the propriety of doing so. Two commenters argue that by advising that the rulemaking must color within common-law lines rather than directing the Board to adopt a specific rule or no

---

[241] As explained above, however, not every instance of control that fails by definition to qualify as direct and immediate control necessarily also fails to qualify as indirect control or a routine feature of company-to-company contracting. Although this will typically be the case, it remains a question of fact to be resolved on a case-by-case basis. See Sec. II.B, "Summary of Changes to the Proposed Rule: Indirect Control," supra; Sec. V.B, "Response to Comments: Comments Regarding Indirect Control," supra.

[242] See comment of RILA.

[243] See comment of Associated Builders and Contractors, Inc.

[244] See comment of RILA.

[245] See Sec. V.C, "Response to Comments: Comments Regarding Contractually Reserved But Unexercised Control," supra.

[246] See Sec. V.B, "Response to Comments: Comments Regarding Indirect Control," supra.

[247] See comment of World Floor Covering Association.

[248] See comment of Jenner & Block, LLP.

rule at all, the court acknowledged the propriety of the rulemaking.[249] Another commenter notes the court appeared deferential to the rulemaking process because it emphasized that it issued its decision only after the Board specifically requested it to proceed notwithstanding the rulemaking process.[250]

Other commenters argue that *Browning-Ferris* v. *NLRB* undermines the authority of the Board to engage in rulemaking on the joint-employer standard. One commenter, for example, argues that under the logic of the court's decision, the Board's authority extends only to applying common-law principles to specific facts, thus rendering the rulemaking beyond its statutory authority.[251] Another commenter argues that the Board cannot engage in rulemaking regarding the meaning of Section 2(2) of the Act because it does not have discretion to define the employment relationship other than how it is defined by the common law, which the Board must apply in adjudication.[252]

The Board does not agree that *Browning-Ferris* v. *NLRB* limits its authority to engage in rulemaking on the joint-employer standard. That issue was not before the court. Moreover, the D.C. Circuit did not indicate at any point in its decision that rulemaking regarding joint-employer status is inappropriate. If anything, the court's majority decision implicitly accepted the rulemaking as appropriate by acknowledging it and instructing the Board, in its rulemaking, to ''color within the common-law lines identified by the judiciary.'' *Browning-Ferris* v. *NLRB,* 911 F.3d at 1208. The dissent also acknowledged that ''the Board may establish standards through rulemaking or adjudication.'' Id. at 1226 (citing 29 U.S.C. 156). There is thus nothing in the court's decision indicating that the Board does not have the authority to engage in this rulemaking, and much to indicate the opposite.

Moreover, the arguments against the rulemaking mistake substance for process. The common law of agency must inform the substance of the joint-employer rule, not the process by which it is promulgated. The Board is free to establish the joint-employer standard through rulemaking or case adjudication, so long as the substance of the standard colors within common-law lines. The final rule stays within those

bounds and is therefore consistent with *Browning-Ferris* v. *NLRB.*

One commenter argues that any rulemaking is premature while *Browning-Ferris* v. *NLRB* is pending and could still be reviewed en banc by the full D.C. Circuit or appealed to the Supreme Court.[253] The Board does not agree that the status of *Browning-Ferris* v. *NLRB* undermines the rulemaking process because, as the Board informed the D.C. Circuit, the final rule will be prospective only and thus not affect that case. Id. at 1206. Also, as explained in the NPRM, the Board initiated this rulemaking to invite broad public participation in formulating a joint-employer standard and to provide certainty and stability that will allow employers, unions, and employees to plan their affairs free of the fear that the standard may change at any time through case adjudication, and possibly retroactively. *See* Standard for Determining Joint-Employer Status, 83 FR 46681, 46686. *Browning-Ferris* v. *NLRB* does not affect the validity of these reasons and therefore does not affect the propriety of the rulemaking.

### K. Comments Regarding Empirical Data on the Joint-Employer Standard's Impact on Workplaces With Multiple Possible Employer Entities

Many commenters cite the rise of contingent employment and alternative workforce arrangements as a significant reason for opposing the proposed rule, and many commenters have described this economic trend in detail. For example, one commenter represents that the percentage of U.S. workers who participate in flexible contract work as their primary job increased 56 percent between 2007 and 2017, and that roughly 10 percent of workers in 2017 were employed in ''alternative work arrangements,'' including 10.6 million independent contractors, 2.6 million on-call workers, 1.4 million temporary help agency workers, and 933,000 workers provided by contract firms.[254] Another commenter similarly asserts that 94 percent of the net growth in employment between 2005 and 2014 involved alternative work arrangements.[255] Many commenters contend that contingent employment results in lower wages and poor workplace conditions.[256]

Relatedly, other commenters argue that the increased outsourcing of business functions to contractors and subcontractors has resulted in the ''fissuring'' of the workplace, where two or more firms control the terms and conditions of employment.[257] Often, the commenter argues, large corporations enter into contracts that restrict subcontractors' ability to grant wage increases or institute other changes in the workplace. The commenter further contends that for workers in such circumstances to be able to engage in meaningful collective bargaining, the law must bring large corporations that reserve control over or indirectly control those workers' terms and conditions of employment to the bargaining table along with the subcontractors. Without such a requirement, it contends, companies can use alternative workforce arrangements to evade liability for violations of labor standards and avoid collective bargaining.[258]

Other commenters argue that the Board's refusal to address these issues would constitute a failure on the part of the Board to adapt the Act to the changing patterns of industrial life.[259] Numerous commenters cite these trends as reasons why the Board should retain the *Browning-Ferris* standard, arguing that it better enables workers to bargain with entities like franchisors and contractors and hold them accountable for labor law violations.[260] Moreover, several commenters argue or suggest that the Board should consider economic factors when determining whether an entity is a joint employer.[261]

After considering these comments, the Board is not persuaded that the trend toward increased contingent or temporary employment relationships warrants abandoning the initial proposal to restore to the joint-employer standard the requirement that a putative joint employer exercise substantial direct and immediate control over essential terms and conditions of employment. Instead, meaningful collective bargaining is best promoted by a standard that places at the bargaining table only those entities that actually control, directly and immediately, the essential terms and conditions of employment of another

---

[249] See comments of HR Policy Association; General Counsel Robb.

[250] See comment of Chamber of Commerce.

[251] See comment of Paul Thomas.

[252] See comment of Professor Michael Harper.

[253] See comment of SEIU National Fast Food Workers Union.

[254] See comment of SEIU.

[255] See comment of Congressman Scott, Senator Murray, et al.

[256] See comments of Law and Economics Professors; Congressman Scott and Senator Murray; Legal Aid at Work; APALA.

[257] See, *e.g.,* comment of EPI.

[258] See also comments of Attorneys General of New York, Pennsylvania, et al.; AFT; Teamsters Local 848.

[259] Comments of Congressman Scott and Senator Murray; see also IUOE; Wimmer.

[260] See comments of Members of Congress; EPI; Congressman Scott and Senator Murray; Justice in Motion; Karyn Panitch.

[261] See comments of Law and Economics Professors; Southern Poverty Law Center; CWA.

employer's employees. That said, the final rule makes indirect and reserved-but-unexercised control over essential terms and conditions probative of joint-employer status to the extent they supplement and reinforce direct and immediate control. Accordingly, the final rule does make indirect and reserved control relevant to the joint-employer analysis.

Opponents of the proposed rule cite research purportedly indicating that the proposed rule would have negative economic consequences for workers. Specifically, one commenter contends that the proposed rule would make collective bargaining among subcontracted and temporary workers nearly impossible, and that this would result in an annual transfer of $1.3 billion from workers to employers.[262]

In contrast, supporters of the proposed rule contend that *Browning-Ferris* has had negative economic consequences, including causing franchisors to ''distance'' themselves from franchisees so that franchisors will not be found joint employers.[263] One commenter cites as an example a franchisee who stopped receiving employee handbooks, job application materials, and recruitment assistance from the franchisor.[264] According to a study by economist Ronald Bird, franchisor ''distancing'' has resulted in lost output of between $17.2 billion and $33.3 billion per year.[265] Additionally, commenters cite a study claiming that *Browning-Ferris* has caused job growth in the hotel industry to slow.[266] Many commenters argue that the *Browning-Ferris* standard has subjected potential joint employers to higher litigation costs.[267] Against these negative consequences, one commenter suggests that the *Browning-Ferris* standard would not necessarily improve economic outcomes for workers.[268] It also argues that it is proper for the Board to rely on the experience of commenters in this rulemaking, especially in the absence of comprehensive data.

One commenter contends that the negative economic and social effects of outsourcing cited by critics of the proposed rule have to be weighed against the economic opportunities that outsourcing provides.[269] The commenter also contends that the growth of contingent employment was not a valid reason for adopting the *Browning-Ferris* standard and is not a valid reason for keeping it. Further, the commenter argues that a joint-employer standard based on economic influence would be unworkable and would not necessarily result in better outcomes for employees. The commenter adds that it is not the purpose of the Act to support collective bargaining outcomes favoring labor. Relatedly, another commenter points out that 500,000 SEIU members provide security services and are employed by contractors, and it argues this shows that outsourcing has not prevented unionization or stifled collective bargaining.[270]

The final rule is not based on a prediction by the Board regarding purported economic impacts, if any, on workers' wages or the economy generally. Rather, as explained throughout, returning to the joint-employer framework that predated *Browning-Ferris*—a framework that no court has ever found impermissible on common-law grounds—is warranted on policy grounds. Its requirement of direct and immediate control over essential terms and conditions of employment will best promote meaningful collective bargaining. That same requirement, plus the rule's exhaustive enumeration of those essential terms and conditions and its descriptions of what does and does not count as direct and immediate control with respect to each essential term or condition all draw clear and readily discernible lines. Thus, the final rule should produce predictable outcomes, and accordingly provide members of the regulated community with the ability to structure their affairs with at least one contingency removed from consideration.

*L. Comments on the Hypothetical Scenarios Contained in the Text of the Proposed Rule*

Many commenters write favorably regarding the hypothetical scenarios—called ''examples'' in the NPRM—contained in the regulatory text of the proposed rule, stating, among other things, that they are helpful;[271] address common situations that the Board has not necessarily had the opportunity to address before;[272] allow the Board to advise, now, whether those situations satisfy the proposed rule's standard rather than leaving them unresolved to some indefinite future time;[273] and provide the type of additional ''scaffolding'' that the D.C. Circuit in *Browning-Ferris* v. *NLRB* said was missing from the *Browning-Ferris* joint-employer standard.[274]

By contrast, many commenters criticize the scenarios, stating, among other things, that they are unhelpful;[275] some of them are inconsistent with the text of the proposed rule or the commentary in the NPRM;[276] many of them raise unanswered questions;[277] the NPRM failed to explain their regulatory force;[278] they assume that employers make explicit exercises of power that are not always made explicit in the real world;[279] they fail to consider the interplay of multiple factors, which is what actual cases almost always involve;[280] and they suggest that exercising control over a single term of employment, without regard to its significance, could create joint-employer status.[281]

Having considered these comments and on further review, the Board has decided not to include in the final rule the examples from the proposed rule. As several commenters note, real-life fact patterns are likely to be far more complex than those portrayed in the examples' hypothetical scenarios, and therefore the scenarios are not that useful. Nevertheless, as discussed elsewhere, the Board has sought to clarify the joint-employer standard by adding definitions of its key terms to the regulatory text. The Board believes that this captures the benefits of the examples while avoiding the more negative aspects noted by some commenters. The Board also believes that this approach helps provide the ''scaffolding'' that the court in *Browning-Ferris* v. *NLRB* found lacking in the *Browning-Ferris* standard.

Additionally, one commenter states that the Board should consider the totality of the circumstances in each case, including both evidence of a putative joint employer's control as well as evidence of its lack of control.[282]

---

[262] See comment of EPI; see also comments of IBT; Equal Justice Center.

[263] See comments of IFA; Johnson and Graham.

[264] Comment of Ranking Member Foxx.

[265] Comment of Chamber of Commerce.

[266] Comments of American Action Forum; U.S. Senate Committee on Health, Education, Labor, and Pensions (Senate HELP Committee).

[267] Comments of International Warehouse Logistics Association; Competitive Enterprise Institute; Restaurant Law Center.

[268] Comment of IFA.

[269] Comment of Chamber of Commerce.

[270] Comment of FordHarrison LLP.

[271] Comments of the Restaurant Law Center; International Bancshares Corporation; and Associated Builders and Contractors, Inc.

[272] Comment of COLLE.

[273] Id.

[274] Id.

[275] Comment of 1199SEIU United Healthcare Workers East.

[276] Comments of 1199SEIU United Healthcare Workers East; SEIU; Employment Law Alliance.

[277] Comment of SEIU.

[278] Id.

[279] Comment of IBT.

[280] Comments of General Counsel Robb; AFL–CIO; SEIU Local 32BJ; 1199SEIU United Healthcare Workers East; IUOE; SEIU; Employment Law Alliance.

[281] Comments of General Counsel Robb; SEIU; Employment Law Alliance.

[282] Comment of the Employment Law Alliance.

Consistent with this comment, the final rule makes clear that joint-employer status "must be determined on the totality of the relevant facts in each particular employment setting." Rule Sec. 103.40(A).

The final rule also incorporates, in various ways, other feedback received on the hypothetical scenarios from the proposed rule. Specifically, one commenter notes that Examples 1 and 2 did not provide any guidance as to the impact of a finding of control over the wage rate.[283] The final rule clarifies what "direct and indirect control" over wages is and is not.

Regarding Examples 2 and 11, one commenter states that, in the contract-security industry, a company must be able to impose certain requirements and should be able to have a contract employee removed from its property for poor or unprofessional performance or for engaging in illegal activities.[284] The final rule clarifies that an entity does not exercise "direct and immediate control" where it refuses to allow another employer's employee to access its premises or to continue performing work under a contract.

Regarding Example 6, one commenter suggests making it clear that Franchisor has not exercised direct and immediate control over essential terms and conditions of employment of Franchisee's employees to the extent Franchisor merely recommends or coordinates the availability of certain benefits that Franchisee is not obligated to offer to its employees.[285] The final rule makes clear that an entity does not exercise direct and immediate control over benefits by permitting another employer, under an arms-length contract, to participate in its benefit plans.

Regarding Example 2, one commenter notes that some employers may use unfounded complaints from other entities to terminate employees' employment.[286] Regarding Example 3, one commenter asks whether a user entity that makes use of coded language and thinly veiled complaints to direct a supplier of temporary employees not to furnish African-American employees would qualify as having exercised "direct and immediate" control over those workers' terms of employment.[287] The final rule makes clear that joint-employer status will be determined "on the totality of the relevant facts in each

particular employment setting." Thus, the Board will consider the facts of each case, including the degree of control that the putative joint employer exercises.

One commenter states that the examples do not indicate how many instances of direct and immediate control are required and that, while several examples describe control that is "direct and immediate," none explains whether an entity would be deemed a joint employer based on the facts in those examples, or how many other "essential terms and conditions" an employer must control.[288] As discussed above, the definition of "substantial direct and immediate control" in the final rule states that the entity must "possess and exercise such substantial direct and immediate control over one or more essential terms or conditions of . . . employment as would warrant finding that the entity meaningfully affects matters relating to the employment relationship" with another employer's employees.

## M. Comments Regarding the Propriety of Using Rulemaking To Revisit the Joint-Employer Standard and of the Adequacy of the Rulemaking Process

The Board's general rulemaking authority has been recognized both by commenters supporting the rule and by those opposing the rule.[289] Several commenters favor using rulemaking to revise the joint-employer standard. They contend that rulemaking will promote predictability and stability in a way that "sequential adjudications" will not,[290] that rulemaking allows for the submission of comments that are not tied to the particular facts in a specific case,[291] and that rulemaking permits more thorough deliberation via the notice-and-comment process.[292] In addition, some commenters argue that the proposed rule would further policy goals that have been stalled in Congress.[293]

One commenter acknowledges that the Board has statutory authority to promulgate a rule on joint-employer status, but urges the Board to rely on several other provisions of the Act, as well as Section 6, in promulgating this

rule.[294] As noted by that commenter, Section 6 authorizes the Board to make rules and regulations "as may be necessary to carry out the provisions of this Act."[295] The commenter cites *Chamber of Commerce of the United States* v. *NLRB,* 721 F.3d 152, 160 (4th Cir. 2013), where the court explained that Section 6 requires some other section of the Act to provide either explicit or implicit authority to issue a particular rule. The court there found that the Board had exceeded its statutory authority when it promulgated a rule requiring employers to post in the workplace a notice informing employees of their rights under the Act. As noted above, the Board has determined that Section 6 authorizes the final rule as necessary to carry out Sections 2, 7, 8, 9, and 10 of the Act, 29 U.S.C. 152, 157, 158, 159, and 160, respectively.

In contrast, other commenters oppose the Board's use of rulemaking to establish the joint-employer standard. For the following reasons, the Board finds these arguments unpersuasive.

One commenter states that a desire by the Board to avoid policy oscillation cannot serve as a proper basis for rulemaking because the proposed rule would represent further oscillation with respect to the joint-employer standard.[296] However, the Board's desire is not to avoid change in this area of the law altogether but to best effectuate the policies of the Act, consistent with the common law and informed by the comments we have received. Further, the Board believes that rulemaking will provide greater predictability for members of the regulated community than a standard established through adjudication, where retroactive application of new policies and standards is the Board's usual practice. See, *e.g., SNE Enterprises,* 344 NLRB 673, 673 (2005).

Some commenters argue that the Board's reference in the NPRM to "continuing uncertainty" in the labor-management community in the wake of the Board's decision in *Browning-Ferris* was unfounded.[297] The Board disagrees. The continuing uncertainty referred to arose from the adjudicatory shifts in the joint-employer standard that had taken place within a relatively short period of

---

[283] Comment of General Counsel Robb.

[284] Comment of John B. Hirsch.

[285] Comment of Polsinelli PC.

[286] Comment of Wholesale Delivery Drivers, General Truck Drivers, Chauffeurs, Sales, Industrial and Allied Workers, Local 848, IBT.

[287] Comment of Legal Aid Justice Center.

[288] Comment of SEIU.

[289] See Comment of Senate HELP Committee; Society of Human Resource Management; see also comment of IUOE (acknowledging as a general matter that Sec. 6 authorizes the Board to engage in rulemaking, but arguing that rulemaking is not necessary in these circumstances).

[290] Comment of Jenner & Block, LLP.

[291] Comment of Restaurant Law Center.

[292] Comment of Chamber of Commerce.

[293] See comments of Members of Congress; Society of Human Resource Management.

[294] Comment of National Federation of Independent Businesses (NFIB).

[295] Comment of NFIB at 2. See also comment of Professor Harper (arguing that the proposed rule was not within the Board's authority because it purports to articulate an abstractly stated law defining the employment relationship, rather than the relevance of that relationship to particular provisions of Sec. 8 or 9 of the Act).

[296] See comment of IUOE.

[297] Comment of Law and Economics Professors at 10; EPI at 2–3.

time beginning with *Browning-Ferris,* as noted above.[298] Moreover, the vacatur of *Hy-Brand I* in *Hy-Brand II* did not reflect a Board majority to return to the *Browning-Ferris* standard on doctrinal grounds, and this certainly prompted reasonable doubt among the Board's stakeholders regarding the post–*Hy-Brand II* status of the *Browning-Ferris* standard, which sprang back into place by default rather than conviction. It is surely the case that this state of affairs was unstable and demanded resolution.

One commenter argues that rulemaking is inappropriate because the reasons justifying past rulemakings by the Board—judicial rejection of adjudicatory attempts to formulate a standard regarding bargaining units in the healthcare industry; the purported need to provide a comprehensive update of the Board's representation-election rules—are absent here.[299] But Section 6 of the Act broadly authorizes the Board to make rules and regulations "as may be necessary to carry out the provisions of [the Act]," and the Board has identified the provisions of the Act that this rulemaking effectuates.[300] Supreme Court precedent also supports the Board's discretion to act through rulemaking rather than adjudication. See *NLRB* v. *Bell Aerospace Co.,* 416 U.S. at 294 ("[T]he choice between rulemaking and adjudication lies in the first instance within the Board's discretion."). Nothing in the Act or judicial precedent warrants a conclusion that the Board may only engage in rulemaking for reasons the Board has cited in the past.

Another commenter suggests that rulemaking is suspect because it is a "purely political process" and because adjudication is the Board's "normal" process.[301] Preliminarily, it is not clear what the commenter means by a "purely political process." To the extent the commenter refers to policy-based views that influence how a Board member applies the Act and that tend to correlate with a member's party affiliation, case adjudication is no less "political" than rulemaking. No less than case adjudication, rulemaking involves reasoned decision-making, conducted within the constraints of the APA and subject to judicial review. As demonstrated below, the Board has

carefully considered all comments with an open mind, and the final rule we have formulated represents our reasoned determination regarding the appropriate standard for determining joint-employer status. The fact that the Board has not routinely engaged in rulemaking in the past does not preclude us from doing so now (see *Bell Aerospace Co.,* 416 U.S. at 294), and while the Board typically makes substantive policy determinations through adjudication rather than rulemaking, this has been criticized by numerous commentators.[302]

Several commenters contend that adjudication is preferable to rulemaking because adjudication assertedly permits the Board to develop joint-employer doctrine more carefully, one case at a time.[303] But rulemaking enables the Board to provide the regulated community greater certainty beforehand, as the Supreme Court has instructed that we should do. *First Nat'l Maint. Corp.* v. *NLRB,* 452 U.S. at 679. The Board also observes that in substance, the final rule codifies the Board's joint-employer law as it existed before *Browning-Ferris,* and therefore it reflects the Board's application of the joint-employer doctrine in numerous pre–*Browning-Ferris* cases. Moreover, disputes over joint-employer status will continue to arise and be resolved through adjudication under the standard set forth in the final rule, and the joint-employer doctrine will therefore continue to develop.

One commenter argues that it is a vice, rather than a virtue, that a standard

codified in a regulation is more difficult to change than one developed through adjudication, especially because a regulation would, in its view, deprive the Board of the flexibility needed to take into account "ever-changing factors in our dynamic economy."[304] As discussed above, however, we believe that the comparative stability of rulemaking over case adjudication as the means of establishing the joint-employer standard is a virtue, as it will enhance labor-management stability, the promotion of which is one of the principal purposes of the Act. To the extent the commenter is arguing that the Board should consider economic factors, the Board declines to base the final rule on consideration of "the wider universe of all underlying economic facts that surround an employment relationship," as the Board did in *Browning-Ferris* itself. *Browning-Ferris,* 362 NLRB at 1611 fn. 68, 1615. And the Board agrees with former Members Miscimarra and Johnson that "the inescapable conclusion to be drawn from the Taft-Hartley legislation repudiating [*NLRB* v. *Hearst Publications,* 322 U.S. 111 (1944)] is that Congress must have intended that common-law agency principles, rather than . . . policy-based economic realities . . . govern the definition of employer . . . under the Act." *Browning-Ferris,* 362 NLRB at 1625. Moreover, while the Board believes that the stability and predictability provided through rulemaking is both beneficial and consistent with the Supreme Court's guidance in *First National Maintenance,* the final rule will not prevent the Board from implementing change when appropriate, either through adjudication that further refines the rule, consistent with its text, or through additional rulemaking.

One commenter argues that rulemaking is an inefficient use of Board resources.[305] While the Board has devoted significant resources to this effort, we have done so efficiently and reasonably and have concluded that the effort is worth the long-term stability and predictability the final rule will provide.

Another commenter suggests that it would have been more efficient for the Board to have engaged in interpretive rulemaking, as an interpretative rule could accomplish similar goals and would not require the Board to respond to comments.[306] As an initial matter, the commenter does not explain how an interpretive rule would be appropriate

---

[298] See Sec. III.B, "Justification for Using Rulemaking, Rather than Adjudication, to Revise the Joint-Employer Standard: The Preference for Rulemaking over Adjudication," supra.

[299] Comment of IUOE.

[300] See Sec. III.A, "Justification for Using Rulemaking, Rather than Adjudication, to Revise the Joint-Employer Standard: Authority to Engage in Rulemaking," supra.

[301] Comment of Professor George Gonos at 2–3.

[302] See R. Alexander Acosta, Rebuilding the Board: An Argument for Structural Change, over Policy Prescriptions, at the NLRB, 5 FIU L. Rev. 347, 351–52 (2010); Merton C. Bernstein, The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act, 79 Yale L.J. 571, 589–90, 593–98 (1970); Samuel Estreicher, Policy Oscillation at the Labor Board: A Plea for Rulemaking, 37 Admin. L. Rev. 163, 170 (1985); Jeffrey S. Lubbers, The Potential of Rulemaking by the NLRB, 5 FIU L. Rev. 411, 414–17, 435 (2010); Kenneth Kahn, The NLRB and Higher Education: The Failure of Policymaking Through Adjudication, 21 UCLA L. Rev. 63, 84 (1973); Charles J. Morris, The NLRB in the Dog House—Can an Old Board Learn New Tricks?, 24 San Diego L. Rev. 9, 27–42 (1987); Cornelius Peck, The Atrophied Rule-making Powers of the National Labor Relations Board, 70 Yale L.J. 729, 730–34 (1961); Cornelius J. Peck, A Critique of the National Labor Relations Board's Performance in Policy Formulation: Adjudication and Rule-Making, 117 U. Pa. L. Rev. 254, 260, 269–72 (1968); David L. Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv. L. Rev. 921, 922 (1965); Carl S. Silverman, The Case for the National Labor Relations Board's Use of Rulemaking in Asserting Jurisdiction, 25 Lab. L.J. 607 (1974); Berton B. Subrin, Conserving Energy at the Labor Board: The Case for Making Rules on Collective Bargaining Units, 32 Lab. L.J. 105 (1981).

[303] See comments of NC National Employment Lawyers Association; UA.

[304] Comment of IUOE at 8.

[305] Comment of Cohen.

[306] Comment of Thomas.

in these circumstances. "[T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.' " *Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 97 (2015) (quoting *Shalala* v. *Guernsey Mem'l Hosp.,* 514 U.S. 87, 99 (1995)). "If the rule cannot fairly be seen as interpreting a statute or a regulation, and if . . . it is enforced, 'the rule is not an interpretative rule exempt from notice-and-comment rulemaking.' " *Catholic Health Initiatives* v. *Sebelius,* 617 F.3d 490, 494 (D.C. Cir. 2010) (quoting *Cent. Texas Tel. Coop., Inc.* v. *FCC,* 402 F.3d 205, 212 (D.C. Cir. 2005)). "Joint employer" is not a statutory term, and no Board rule or regulation currently defines it, so interpretive rulemaking is not an option here. Even if it were, the opportunity to receive input through the notice-and-comment process was one of the reasons the Board decided to embark on this rulemaking, and being able to receive, consider, and respond to comments outweighs any efficiency that might be gained from foregoing that process. Furthermore, an interpretive rule would not provide the stability and predictability that will be provided by the final rule as the culmination of notice-and-comment rulemaking. See *Perez,* 575 U.S. at 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

One commenter asserts that the proposed rule runs counter to the APA's "presumption against changes in current policy." [307] The commenter further argues that an agency "must provide a more substantial explanation for a policy that departs from its former views where 'its new policy rests upon factual findings that contradict those which underlay its prior policy.' " Comment of Attorneys General of New York, Pennsylvania, et al. (quoting *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)).

In *Fox,* the Court clarified that its "opinion in *State Farm* neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance." 556 U.S. at 514. Moreover, the Court explained that while an agency must provide a more detailed justification when, for example,

"its new policy rests upon factual findings that contradict those which underlay its prior policy," further explanation was needed "for disregarding facts" rather than for "the mere fact of policy change." Id. at 515–516. Because there is no heightened standard that must be met in order to justify a change in the Board's joint-employer standard, and because the Board has fully explained its reasoning and has not disregarded any relevant facts, the claim of the commenter is misplaced.

In any event, the Board is firmly convinced that the final rule is an improvement over the standard set forth in *Browning-Ferris,* for several reasons. As discussed above, at the first step of the *Browning-Ferris* analysis, where the Board considered the putative joint employer's control over the terms and conditions of employment of another employer's workers, the Board failed to draw meaningful distinctions between direct control and indirect and/or reserved-but-unexercised control, giving them equal weight. At the second step of the *Browning-Ferris* analysis, the Board seemingly recognized that these different kinds of control cannot be accorded equal weight by requiring consideration of whether the putative joint employer's control is "too limited in scope or significance to permit meaningful collective bargaining." 362 NLRB at 1614. However, *Browning-Ferris* provided no guidance for determining when "meaningful collective bargaining" is possible, and the *Browning-Ferris* Board neglected even to attempt that analysis. Moreover, *Browning-Ferris* failed to provide meaningful guidance on the definition of "essential" terms and conditions of employment, and it also provided "no blueprint for what counts as 'indirect' control." *Browning-Ferris* v. *NLRB,* 911 F.3d at 1220. As a result of these flaws, the *Browning-Ferris* Board impermissibly based its joint-employer finding on "routine feature[s] of independent contracts," precluding enforcement of its decision. Id.

The final rule comprehensively addresses all these shortcomings more fully than would be possible in the adjudication of a case. It re-establishes a commonsense hierarchy that recognizes the superior force of evidence of actually exercised direct and immediate control as compared with indirect and reserved-but-unexercised control. It provides an exhaustive list of "essential" terms and conditions of employment, and for each essential term it specifies what will and will not count as direct and immediate control over that essential term. In these

ways, the final rule provides vital guidance regarding the circumstances in which joint-employer status will and will not attach. The final rule also erects the "legal scaffolding" demanded by the D.C. Circuit in *Browning-Ferris* v. *NLRB* to ensure that the joint-employer inquiry will be confined "within traditional common-law bounds." Id. And by defining the relative weight of direct and immediate control and other types of control, the final rule eliminates the cumbersome two-step *Browning-Ferris* analysis, with its standardless inquiry into whether meaningful collective bargaining is possible.

One commenter argues that the Board has failed to adequately consider the costs of the proposed rule relative to its benefits, beyond mere costs to small businesses and labor unions. [308] The commenter argues that courts have required consideration of cost, citing *Michigan* v. *EPA,* 135 S. Ct. 2699, 2711 (2015); *Bus. Roundtable* v. *SEC,* 647 F.3d 1144 (D.C. Cir. 2011); and *Corrosion Proof Fittings* v. *EPA,* 947 F.2d 1201 (5th Cir. 1991). The commenter also argues that the Board is ignoring economic theory and research on the consolidation and abuse of indirect power wielded by third parties over market wages and, hence, direct employers' wage-setting decisions. In addition, the commenter contends that the NPRM fails to comply with Executive Order 13725, "Steps to Increase Competition and Better Inform Consumers and Workers to Support Continued Growth of the American Economy," which, the commenter asserts, encourages agencies to "build upon efforts to detect abuses such as . . . anticompetitive behavior in labor and other input markets, exclusionary conduct, and blocking access to critical resources that are needed for competitive entry." Law and Economics Professors at 16 (ellipsis in original) (quoting Executive Order 13725, Sec. 2(b), 81 FR 23417 (Apr. 15, 2016)). In this regard, the commenter argues that the Board must at least explain why it failed to deem franchisors that include no-poaching clauses in franchise agreements as joint employers.

Contrary to the suggestion of the commenter, and for reasons already explained, it is inappropriate to base the joint-employer standard on studies regarding economic impact because the Board is constrained to base the standard on the common law, applied in the particular context of the Act.

---

[307] See comment of Attorneys General of New York, Pennsylvania, et al., at 8 (citing *Motor Vehicle Manufacturers Assn.* v. *State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)).

[308] See comment of Law and Economics Professors.

Moreover, the cases cited by the commenter involve statutes that, unlike the Act, contain wording indicating that costs must be considered. See *Michigan* v. *EPA,* 135 S. Ct. at 2704, 2707–2708, 2711–2712 (finding provision of the Clean Air Act directing agency to regulate emissions from power plants if the agency finds regulation "appropriate and necessary" indicated, when read naturally and in context with related provision concerning costs, that agency had to consider cost when making the finding); *Business Roundtable,* 647 F.3d at 1146, 1156 (finding agency failed to adequately consider effect on efficiency, competition, and capital formation, as required by Section 3(f) of the Exchange Act and Section 2(c) of the Investment Company Act of 1940, in promulgating rule at issue); *Corrosion Proof Fittings,* 947 F.2d at 1207–1208, 1215 (finding agency failed to give adequate weight to the requirement under the Toxic Substances Control Act that it promulgate the least burdensome reasonable regulation required to protect the environment). Accordingly, this argument is misplaced.

With respect to Executive Order 13725, that order encourages, but does not require, independent agencies to comply with the order. Id. Sec. 3(b). As the NLRB is an independent agency, see 44 U.S.C. 3502(5), it is not required to comply with Executive Order 13725.

Finally, the Board does not agree with the notion that joint-employer status should arise from the purported effect on competition for labor from franchisor-franchisee no-poaching agreements. For one thing, competition for labor is only one factor in the wage an employer offers. Moreover, the disputed no-poaching agreements, as described by the commenter, limit the ability of franchisees to hire employees of the franchisor or other franchisees of that franchisor. Such provisions place no limit on cross-franchise competition for labor. Regardless of whether one fast food franchise can hire an employee away from another franchisee of the same franchisor, a no-poaching agreement between a franchisee and franchisor would not prevent the franchisee from hiring an employee away from franchisees of a different franchisor. Whatever highly attenuated influence no-poaching agreements may have on market wages, it is a far cry from direct and immediate control over wages as defined in the final rule—the kind of control that warrants placing the entity that exercises it at the bargaining table.

One commenter argues that the proposed rule violates Executive Order 13771, "Reducing Regulation and Controlling Regulatory Costs," which requires that "for every one new regulation issued, at least two prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process." [309] However, Executive Order 13771 does not govern independent regulatory agencies, such as the NLRB, under 44 U.S.C. 3502(5). OMB Memorandum M–17–21–OMB, Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs" (Apr. 5, 2017) at 3, 9. Accordingly, the Board is not obligated to eliminate any regulations in connection with promulgating this final rule.

Several commenters argue that the Board failed to properly consider the value of taking no action, or the value of promulgating a standard that makes entities with sufficient market power joint employers, because the Board did not base its decision on empirical data or economic and public policy research.[310]

To the extent the commenters are contending that the Board failed to consider alternatives, the contention is incorrect. The Board sought comment on "all aspects" of the proposed rule, including whether the common law dictated the approach of the proposed rule or of *Browning-Ferris* or left room for either approach, and the Board has received and considered thousands of comments concerning the proper joint-employer standard. Standard for Determining Joint-Employer Status, 83 FR at 46687; see also id. at 46696 (noting that Board considered and rejected possibility of taking no action).

To the extent the commenters are arguing that the Board should have engaged in an economic analysis assessing the value of taking no action, the argument has no merit. As stated repeatedly herein, the joint-employer standard is governed by the common law as applied within the context of the Act, not by broader economic factors. See, *e.g., Browning-Ferris,* 362 NLRB at 1611 fn. 68, 1615 (rejecting consideration of "the 'wider universe of all underlying economic facts that surround an employment relationship' "); id. at 1625 (dissenting opinion) (indicating that common-law agency principles, rather than an expansive policy-based economic realities and statutory purpose approach, govern the definition of employer and employee under the Act).

One commenter asserts that the Board has failed to provide sufficient time for comments.[311] Specifically, it contends that the NPRM provided only seven days after initial comments were due for the filing of reply comments, and that this amount of time was insufficient to review the 26,197 comments that had been submitted as of January 28, 2019.

Contrary to this commenter, the time provided for comments was more than sufficient. Preliminarily, the APA provides no minimum comment period, and many agencies, including the Board in past rulemaking proceedings, have afforded comment periods of only 30 days. Agencies have discretion to provide still shorter periods and are simply "encouraged to provide an appropriate explanation for doing so." Administrative Conference of the United States Recommendation 2011–2 (June 16, 2011), at 3.

The NPRM, which issued September 14, 2018, announced a deadline for initial comments of November 13, 2018, and that reply comments needed to be received on or before November 20, 2018. The Board then extended the comment period three times, for a total of 76 additional days. This included an extension the Board granted following the D.C. Circuit's decision in *Browning-Ferris* v. *NLRB* in order to permit the public an opportunity to address that decision. Ultimately, comments needed to be received on or before January 28, 2019, and comments replying to the comments submitted during the initial comment period needed to be received no later than 14 days later, February 11, 2019.[312] Although the APA does not require this reply period, the Board provided it to give itself the best opportunity to gain all information necessary to make an informed decision. The nearly 29,000 comments submitted and the depth of analysis many of them provide are ample testament to the adequacy of the comment period.

Several commenters argue that the Board should have held public hearings in connection with this rulemaking, as it has done in prior rulemakings. Commenters assert that hearings would provide more input and would help dispel the impression that the outcome was preordained.[313] However, the APA

---

[309] See comment of Texas RioGrande Legal Aid at 4 (quoting Executive Order 13771, 82 FR 9339 (Jan. 30, 2017)).

[310] See comments of Law and Economics Professors; CWA; SEIU.

[311] See comment of AFL–CIO.

[312] NLRB Further Extends Time for Submitting Comments on Proposed Joint-Employer Rulemaking in Light of D.C. Circuit's Recent *Browning-Ferris* Decision, NLRB (Jan. 11, 2019), *https://www.nlrb.gov/news-outreach/news-story/nlrb-further-extends-time-submitting-comments-proposed-joint-employer-1.*

[313] See comments of AFL–CIO; IUOE; Members of Congress; Cohen; IBT.

does not require public hearings. Further, while the Board understands the value of public hearings and is willing to hold hearings in appropriate circumstances, it has seen public hearings devolve into nothing more than individuals reading their already-submitted written comments aloud. In those circumstances, the Board gains little additional information from a public hearing while expending significant time and resources to hold it.[314] In light of these considerations, the Board decided not to hold public hearings in connection with this rulemaking. However, as noted above, the nearly 29,000 comments submitted and the depth of analysis many of them provide are ample testament to the adequacy of the opportunities for public participation in this rulemaking process. In addition, the Board stated in the NPRM that it would review the public's comments and consider joint-employer issues "afresh, with the good-faith participation of all members of the Board," 83 FR at 46687, and has done so. The Board thus rejects the suggestion that the outcome of this rulemaking was preordained. Indeed, the several changes to the proposed rule reflected in the final rule, based on comments received, clearly demonstrate the contrary.

The AFL–CIO argues that the Board violated the APA by relying on arguments and evidence outside the rulemaking record [315]—specifically, petitions for rulemaking filed by the CDW and other organizations (including the HR Policy Association, the Restaurant Law Center, and the IFA). The AFL–CIO notes that the Board did not mention the petitions in the NPRM, that the petitions had not otherwise been disclosed, that the AFL–CIO did not learn about the petitions until December 6, 2018, and that the petitions were not made part of the rulemaking record. Further, the AFL–CIO asserts that the Board departed from past practice by failing to disclose the petitions in the NPRM. Additionally, the AFL–CIO asserts that the NPRM did not explain the change in practice.

The HR Policy Association counters that the Board did not act improperly, and it asserts that (1) the Board did not rely on the petitions; (2) the Board was not required to include the petitions in the record; (3) by submitting the petitions with its comments, the AFL–CIO has provided the public an opportunity to comment on the petitions; and (4) many of the organizations involved issued press releases regarding their petitions, and there was media coverage about potential rulemaking. HR Policy Association at 3–5 and fn. 8 (citing June 2018 press releases and news reports regarding rulemaking petitions).[316]

The Board has not relied on materials outside of the administrative record in this rulemaking. The administrative record contains each of the petitions for rulemaking, including those cited by the AFL–CIO. In addition, the Board did not undertake this rulemaking based on any of these petitions. Each of the petitions was filed *after* the Board had publicly announced that it planned to promulgate a rule on the joint-employer standard.

One commenter also argues that changes made to the proposed rule in response to the D.C. Circuit's decision in *Browning-Ferris* v. *NLRB* would likely result in a final rule that is not a logical outgrowth of the proposed rule.[317] In this regard, the commenter asserts that the D.C. Circuit has held that "a final rule was not a logical outgrowth of the proposed rule because the court could not conclude 'that petitioners, ex ante, should have anticipated the changes to be made in the course of the [2012] rulemaking.'" Comment of AFL–CIO at 62 (alteration in original) (quoting *Daimler Trucks North America, LLC* v. *EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013)). The commenter asserts that interested

parties could not anticipate and meaningfully comment on changes made in response to the D.C. Circuit's decision. In addition, the commenter argues that "'[a]gency notice must describe the range of alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decisionmaking.'" Id. at 63 (quoting *Small Refiner Lead Phase-Down Task Force* v. *EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983)).

Apparently assuming that the commenter's "logical outgrowth" argument concerns the role that indirect and reserved-but-unexercised control may play in the final rule, other commenters counter that the proposed rule did not require the Board to ignore indirect or reserved control.[318] One such commenter contends that Examples 4 and 11 in the proposed rule concerned indirect control.[319] Moreover, the commenter argues that the NPRM asked for feedback regarding the common law and thus indicated that such feedback could result in changes to the proposed rule.

"To satisfy the [APA]'s notice requirement, 5 U.S.C. Sec. 553(b)(3), an agency's final action must be a logical outgrowth of its proposed rule." *Idaho Conservation League* v. *Wheeler,* 930 F.3d 494, 508 (D.C. Cir. 2019). "A final rule qualifies as a logical outgrowth 'if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" Id. (quoting *CSX Transp., Inc.* v. *Surface Transp. Board,* 584 F.3d 1076, 1079 (D.C. Cir. 2009)). "On the other hand, a final rule is not a logical outgrowth if 'interested parties would have had to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from the proposed rule.'" Id. (quoting *CSX Transp.,* 584 F.3d at 1080 (alteration in original)).

Here, the rule proposed in the NPRM relevantly stated: "A putative joint employer must possess and actually exercise substantial direct and immediate control over the employees' essential terms and conditions of employment in a manner that is not limited and routine." The NPRM stated that the proposed rule "reflects the Board's preliminary view, subject to potential revision in response to comments, that the Act's purposes of promoting collective bargaining and

---

[314] See Letter from Chairman Ring to Senator Murray (Nov. 8, 2019), *https://www.nlrb.gov/sites/default/files/attachments/news-story/node-7827/ring-murray-rulemakings-final.pdf.*

[315] The AFL–CIO contends that an agency "cannot rely on arguments or evidence that are not made part of the rulemaking record." Comment of AFL–CIO at 59. For support, the AFL–CIO states that 5 U.S.C. Sec. 706 "direct[s] courts to 'review the whole record or those parts of it cited by a party' in determining whether agency action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Id. (quoting 5 U.S.C. Sec. 706).

[316] Specifically, HR Policy Association cites the following: Callie Harman, NAM Joins Business Groups to Petition NLRB on Joint-Employer Rulemaking, National Association of Manufacturers (June 14, 2018), *https://www.shopfloor.org/2018/06/nam-joins-business-groups-petition-nlrb-joint-employer-rulemaking/;* Sean P. Redmond, Coalition Files Petition for Joint Employer Rulemaking, U.S. Chamber of Commerce (June 19, 2018), *https://www.uschamber.com/article/coalition-files-petition-joint-employer-rulemaking;* Joyce Hanson, Restaurant Group Pushes NLRB on Joint Employer Issue, Law360 (June 20, 2018), *https://www.law360.com/articles/1055108/restaurant-group-pushes-nlrb-on-jointemployer-issue;* CDW Seeks Rulemaking to Remedy BFI, CDW (June 13, 2018), *https://myprivateballot.com/2018/06/13/cdw-seeks-rulemaking-remedy-bfi/;* Industry Petitions NLRB for Joint-Employer Rulemaking, Independent Lubricant Manufacturers Association (June 18, 2018), *https://www.ilma.org/ILMA/ILMA/ILMA-News/June/Industry_Petitions_NLRB_for_Joint-Employer_Rulemaking.aspx.*

[317] See comment of AFL–CIO.

[318] See, *e.g.,* comment of CDW.

[319] Id.

minimizing industrial strife are best served by a joint-employer doctrine that imposes bargaining obligations on putative joint employers that have actually played an active role in establishing essential terms and conditions of employment.'' The NPRM also stated that the Board ''seeks comment on all aspects of its proposed rule,'' including whether ''the common law dictate[s] the approach of the proposed rule or of *Browning-Ferris*.''

In *Browning-Ferris* v. *NLRB,* the D.C. Circuit partially affirmed the Board's articulation of the joint-employer test in *Browning-Ferris,* ''including [its] consideration of both an employer's reserved right to control and its indirect control over employees' terms and conditions of employment.'' 911 F.3d at 1199–1200. The court expressly did not decide, however, whether either reserved or indirect control, without more, could establish a joint-employer relationship. Id. at 1213, 1218.

Consistent with the D.C. Circuit's decision in *Browning-Ferris* v. *NLRB,* the final rule refines the rule proposed in the NPRM by providing that an entity's indirect control and unexercised, contractually reserved authority over essential terms and conditions of employment of another employer's employees are probative of joint-employer status. For the reasons explained herein, the final rule provides that these factors are probative only to the extent that they supplement and reinforce evidence of direct and immediate control over essential terms and conditions of employment.

Although the final rule modifies the proposed rule in this and other respects, the final rule remains a logical outgrowth of the proposed rule. First, the final rule, like the proposed rule, requires proof of ''substantial direct and immediate control'' to establish joint-employer status. The final rule provides that indirect and reserved control are also probative, but the proposed rule was merely silent regarding those forms of control. The proposed rule did not expressly exclude them. The proposed rule also made clear the Board's understanding that the joint-employer standard had to be consistent with the common law, and it referred to the *Browning-Ferris* standard and requested comments regarding whether the common law dictated that standard. Thus, the proposed rule reasonably signaled that inclusion in the final rule of indirect and reserved-but-unexercised control was entirely possible. Moreover, the NPRM described the development of the joint-employer doctrine, including cases such as *Floyd Epperson,* 202 NLRB at 23, in which the Board

considered evidence of both direct and indirect control in finding joint-employer status. Given all this, interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period. See *Idaho Conservation League,* 930 F.3d at 508. In short, the final rule is a logical outgrowth of the proposed rule.

## N. Comments Regarding the Practical Consequences of Adopting the Final Rule Versus Retaining Browning-Ferris

Many commenters argue that clarifying the joint-employer standard as proposed in the NPRM will make joint-employer determinations more predictable, and that greater predictability in this regard is desirable.[320] More specifically, commenters contend that businesses desire guidance on this issue and have delayed plans to grow as they wait for a ''permanent fix.'' [321] On the other side, commenters argue that retaining the *Browning-Ferris* standard will promote predictability because it is a recent precedent that the Board has infrequently applied,[322] and it will continue to govern in pending cases given the final rule's prospective application.[323] Some commenters claim that while the NPRM cited a need to counteract uncertainty, it cited no evidence that *Browning-Ferris* actually created uncertainty.[324]

Having considered these comments, the Board believes that the final rule will promote predictability and certainty and will do so more effectively than retaining the *Browning-Ferris* standard. As recounted in the NPRM, the last several years have seen oscillation in this area of labor law, starting with *Browning-Ferris's* overruling of preexisting precedent, the overruling of *Browning-Ferris* in *Hy-Brand I,* and the vacatur of *Hy-Brand I* in *Hy-Brand II,* which reinstated *Browning-Ferris* by default, not based on the doctrinal convictions of a Board majority. See 83 FR at 46682. Thereafter, the D.C. Circuit remanded the Board's decision in *Browning-Ferris,* citing its overbroad and erroneous application of the ''indirect control'' factor and its failure to explain or apply the second

step of the standard announced in that decision. In addition to the uncertainties created by this recent history, there is the vagueness of the *Browning-Ferris* standard itself, which failed to draw meaningful distinctions between direct control and indirect and/or reserved-but-unexercised control. The final rule addresses these shortcomings, better effectuates applicable common-law principles, provides more guidance to the regulated community, and prevents the unsettling of expectations that occurs when precedent is overruled by adjudication and the new standard is applied retroactively.

Commenters also variously claim that retaining or discarding *Browning-Ferris* will have an adverse effect on the economy. Some contend that *Browning-Ferris* encourages entities to bring job functions in-house, which can increase costs.[325] Others argue that *Browning-Ferris* discourages entities from contracting with small businesses, which may be owned by minorities.[326] In contrast, some commenters argue that exempting from joint-employer status entities that exercise only indirect control will encourage ''fissuring'' of the workplace through widespread outsourcing of contract work.[327] Commenters argue that such contracting shifts costs onto employees and unions,[328] allows companies to evade their legal obligations,[329] impedes employees from organizing and engaging in other protected activities to improve their working conditions,[330] and harms minority workers employed by subcontractors,[331] among other deleterious consequences.[332] In addition, the one commenter contends that no commenter has provided specific evidence of *Browning-Ferris's* adverse economic impact.[333]

---

[320] Comments of Senate HELP Committee; Polsinelli PC; Carpets Plus Color Tile.

[321] Comment of Tamra Kennedy, small business owner; see also comments of Food Marketing Institute; IFA Franchisee Forum.

[322] Comments of AFL–CIO; IUOE; CWA.

[323] Comments of Attorneys General of New York, Pennsylvania, et al.

[324] Comments of AFL–CIO; Attorneys General of New York, Pennsylvania, et al.

[325] Comments of Competitive Enterprise Institute; American Staffing Association.

[326] Comments of Chamber of Commerce; IFA.

[327] Comments of Law and Economics Professors; Attorneys General of New York, Pennsylvania et al.; Southern Poverty Law Center.

[328] Comments of Law and Economics Professors; SEIU.

[329] Comments of LIUNA; 1199SEIU United Healthcare Workers East.

[330] Comments of NELP; Jobs with Justice; Karyn Panitch.

[331] Comments of APALA.

[332] See, *e.g.,* comment of Law and Economics Professors (arguing that to protect competition in fissured labor markets, the Board should retain *Browning-Ferris* or, alternatively, adopt a test similar to those used by antitrust authorities that asks whether an entity has sufficient market power to justify joint-employer status).

[333] See comment of AFL–CIO; see also comment of Pacific Management Consulting Group (asserting the absence of reliable evidence that *Browning-Ferris* negatively impacted the revenues of publicly-traded franchise restaurants).

In determining the appropriate joint-employer standard, the Board does not rely on the various purported economic effects that commenters predict the final rule will have on the economy at large or on workers' wages. The final rule is governed by the common law of joint-employer relationships in the particular context of the Act and further based on a policy judgment that it would frustrate, rather than promote, national labor policy to draw into a collective-bargaining relationship an entity that has never exercised any substantial direct and immediate control over essential terms and conditions of employment of another employer's employees. Thus, as it did in *Browning-Ferris,* the Board rejects consideration of "the wider universe of all underlying economic facts that surround an employment relationship." 362 NLRB at 1611 fn. 68, 1615 (citing, inter alia, *Hearst,* 322 U.S. 111) (internal quotes omitted). The Board also finds unpersuasive comments stating that this approach will limit employees' rights under the Act when an entity is found not to be a joint employer because it has not actually exercised substantial direct and immediate control over the essential terms and conditions of another employer's employees. In that situation, the employees will still have a statutory employer, and they will have all the rights safeguarded by Section 7 of the Act: The right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for mutual aid or protection, and to refrain from any or all of these activities. None of those rights will be forfeited. Again, the standard is based on applicable common-law principles in the context of the Act, not on favoring more (or fewer) statutory employers of a given group of employees as a matter of socio-economic policy.

Some commenters argue that legally required actions franchisors take to protect their trademark and service mark should not be considered evidence of joint-employer status.[334] Relatedly, some commenters argue that corporate social responsibility standards, or ethics-based policies that entities require their subcontractors to follow, should not be considered evidence of joint-employer status.[335]

By contrast, the one commenter argues that the Board should not disregard evidence of influence where it is subjectively motivated by concerns such as compliance with the law or

protection of a brand.[336] The commenter also argues that any negative impact of *Browning-Ferris* on franchising is minimal given that a franchisor can allocate liability by imposing an indemnification clause on its franchisees. Other commenters argue that, under a narrower joint-employer standard, franchisors will exert more control because there is less risk of liability, and this will undermine franchisees' independence.[337] And according to another commenter, *Browning-Ferris* or a similar standard is necessary to countermand "blatant restrictions" on labor-market competition in the franchising industry, such as franchisors' use of "no-poaching" agreements.[338]

As explained elsewhere, the Board has decided not to include in the final rule any provisions that are tailored to particular industries or business models. Instead, the final rule establishes a single, generally applicable standard that assesses the "totality of the relevant facts in each particular employment setting." As appropriate, the Board will take the nature of the particular business or industry into consideration in applying the standard articulated in the final rule to the facts of the specific case.

Importantly, however, we note that routine contracting practices of independent businesses will not evidence joint-employer status under the final rule. Such practices include provisions in business contracts that set the objectives, basic ground rules, or expectations for another entity's performance under a contract. As discussed above, and in agreement with the D.C. Circuit, the final rule differentiates "those aspects of indirect control relevant to status as an employer" from "those quotidian aspects of common-law third-party contract relationships," which "cast no meaningful light on joint-employer status." *Browning-Ferris* v. *NLRB,* 911 F.3d at 1220. For example, a franchisor's maintenance of brand-recognition standards (*e.g.,* a requirement that the employees of its franchisees wear a particular uniform) will not evidence direct control over employees' "essential" working conditions. See *Love's Barbeque*

*Restaurant No. 62,* 245 NLRB 78, 120 (1979), and cases cited therein, enfd. in part sub nom. *Kallmann* v. *NLRB,* 640 F.2d 1094 (9th Cir. 1981).

Of course, the Board will examine the circumstances of the franchisor-franchisee relationship in each particular case to determine whether the franchisor has exercised direct and immediate control over the essential terms and conditions of employment of the franchisee's employees. Whether a franchisor exercises control over essential working conditions is measured objectively and is not based on the franchisor's subjective intent. The possibility that the franchisor can "work around" joint-employer liability by negotiating an indemnification clause is not a sufficient reason to find that its brand-protection measures should be considered evidence of joint-employer status. Put somewhat differently, as between franchisors and franchisees, we decline to put our thumb on the scale. That is exactly what we would do if we imposed a joint-employer standard that compels franchisors to contract around an otherwise forced choice between protecting their brand and incurring joint-employer status, or avoiding joint-employer status by abandoning their legal duty to protect their brand.

Similarly, a variety of corporate social responsibility standards are routine contracting practices and will not be considered evidence of joint-employer status. Examples include an entity's requirement that another employer adopt safety and quality standards[339] or harassment guidance.[340] As to the claimed economic effects of no-poaching agreements on market wages, the Board has addressed that comment already.[341]

Commenters present conflicting views regarding the effect the proposed rule would have on collective bargaining. Some contend that *Browning-Ferris* improperly places at the negotiating table entities with widely different interests or attenuated control over employment terms.[342] Others say that a more restrictive standard will impede meaningful bargaining. These commenters argue that workers will be unable to bargain with the entity that effectively controls their working

---

[335] Comments of HR Policy Association; Competitive Enterprise Institute.

---

[336] See Comment of AFL–CIO.

[337] Comments of Chairman Scott and Ranking Member Murray; Franchisee Advocacy Consulting.

[338] See comment of Law and Economics Professors; see also comment of American Association of Franchisees & Dealers (arguing that the Board should determine whether a franchisor's direct economic control, such as over the cost of labor, undermines the franchisee's equity ownership in the business).

---

[339] See comments of COLLE; Restaurant Law Center.

[340] See comments of HR Policy Association; Center for Workplace Compliance.

[341] See Sec. V.M, "Response to Comments: Comments Regarding the Propriety of Using Rulemaking to Revisit the Joint-Employer Standard and of the Adequacy of the Rulemaking Process," supra.

[342] Comments of General Counsel Robb; CDW.

conditions [343]—an entity that can terminate its contract with the subcontractor without any legal consequences [344]—or that they will be unable to bargain over a particular issue if the entity that controls that issue and that issue only is not their joint employer, [345] among other things. [346] And some commenters, citing *Management Training Corp.,* 317 NLRB 1355 (1995), argue that limiting consideration of control to ''essential'' working conditions will frustrate bargaining. [347]

The Board shares the concerns of those commenters who observe that the *Browning-Ferris* standard may place at the table entities that lack sufficient control over terms and conditions of employment to warrant their participation in collective bargaining. The Board recognizes that the second step of that standard addressed that concern, but the *Browning-Ferris* Board's failure to flesh out the requirements of that step or provide illustrative guidance through application rendered that step effectively meaningless. In contrast, the Board believes that the final rule fosters meaningful bargaining by requiring that an entity exercise such substantial direct and immediate control over one or more essential working conditions ''as would warrant a finding that the entity meaningfully affects matters relating to the employment relationship.'' [348] Contrary to

commenters who cite *Management Training* against the proposed rule, that decision supports the standard adopted in the final rule. See 317 NLRB at 1355, 1357–1359. In *Management Training,* a government entity that was exempt from the NLRA had to approve certain economic terms and conditions before the private-sector government contractor could implement them. However, the contractor was able to effect noneconomic terms without approval. Despite the government entity's control over some working conditions, the Board found it appropriate to assert jurisdiction over the contractor. The Board's decision in *Management Training* demonstrates its conviction that employees can engage in meaningful collective bargaining with their employer even though another entity controls some essential terms and conditions and cannot be compelled to participate in collective bargaining, whether on jurisdictional grounds as in *Management Training* or because it is not a joint employer of the employees at issue. [349]

One commenter contends that an entity's requirement that another employer comply with government regulations should be considered evidence of direct control, citing *Watsonville Register-Pajaronian,* 327 NLRB 957 (1999), and related cases. [350] In those cases, the Board held that an employer has a duty to bargain over ''discretionary action taken to comply with [a government regulation].'' 327 NLRB at 959; accord *Dickerson-Chapman, Inc.,* 313 NLRB 907, 942 (1994); *Long Island Day Care Services,* 303 NLRB 112, 116–117 (1991); *Hanes Corp.,* 260 NLRB 557, 557, 562 (1982).

This argument is misplaced. The rule does not provide that employers have no duty to bargain over discretionary action taken to comply with a government regulation. Rather, it addresses which entity—the employees' direct employer, or a third party—must engage in such bargaining. Requiring the direct employer to comply with government regulations does not evidence joint-employer status because requiring such compliance is part of the basic ground rules or expectations for that employer's performance under a contract. Thus, considering such requirements as evidence of joint-employer status would be contrary to the common-law principles stated in

*Browning-Ferris* v. *NLRB,* 911 F.3d at 1219–1220.

Commenters argue that by eliminating the bargaining obligation of an entity that exercises indirect control over the terms and conditions of employment of another employer's employees, the proposed rule will cause labor unrest, such as strikes. [351] This concern is overstated. The commenters present no evidence that there was more labor unrest prior to *Browning-Ferris,* when indirect control alone was not dispositive of joint-employer status. In any event, the Board has modified the proposed rule to make indirect control of essential terms and conditions probative of such status, provided it supplements and reinforces evidence of direct and immediate control.

Some commenters advance arguments related to Section 8(b)(4)'s prohibition on secondary picketing. For example, the one commenter contends that joint-employer status should not render an otherwise neutral entity a ''primary'' employer lawfully subject to picketing unless the entity is directly and substantially involved in controlling the term or condition of employment in dispute. [352] In contrast, some commenters argue that by narrowing the joint-employer standard, the proposed rule undermines First Amendment and other precedent that grants employees wide leeway to engage in picketing. [353]

This rulemaking solely concerns the joint-employer standard, not other legal doctrines. The Board therefore declines the request to modify standards regarding secondary picketing. Certainly, as was stated in the NPRM, a finding of joint-employer status may determine whether picketing directed at a particular business is primary and lawful, or secondary and unlawful. In that sense, the final rule's clarification of the joint-employer standard should make it easier to determine whether an entity is a joint employer and thus a lawful target of picketing along with employees' direct employer. The Board is not inclined, however, to rule that an entity may be a joint employer *and* remain shielded from picketing under certain circumstances, as the above comments effectively request. By the same token, the Board is equally unwilling to use this rulemaking to narrow the range of activity prohibited by Section 8(b)(4). Both goals are extraneous to the task at hand.

In addition, commenters argue that narrowing the joint-employer standard

---

[343] Comments of NELP; EPI; and SEIU Local 32BJ.

[344] Comment of Professor Kulwiec (citing *Local No. 447, Plumbers (Malbaff Landscape Construction),* 172 NLRB 128 (1968)); see also James Hannley (noting that a franchisor can terminate its relationship with the franchisee if employees of the franchisee engage in organizing).

Professor Kulwiec also posits that the concern over having too many employers at the bargaining table is overstated because the existence of a joint-employer relationship does not require bargaining unless the Board finds that the unit is appropriate for collective bargaining.

[345] Comments of AFL–CIO; SEIU Local 32BJ.

[346] See, *e.g.,* Law and Economics Professors (citing Sec. 1 of the NLRA in arguing that the NLRA was designed to restore ''equal[ ] . . . bargaining power between employers and employees'' and ''stabiliz[e] . . . competitive wage rates and working conditions within and between industries,'' through bargaining between workers with ''full freedom of association [and] actual liberty of contract'' and employers ''organized in the corporate or other forms of ownership association'').

[347] Comments of AFL–CIO; SEIU Local 32BJ.

[348] In this regard, we adhere to the view articulated in the NPRM that the NLRA's ''policy of promoting collective bargaining to avoid labor strife and its impact on commerce is not best effectuated by inserting into a collective-bargaining relationship a third party that does not actively participate in decisions establishing unit employees' wages, benefits, and other essential terms and conditions of employment.'' 83 FR at 46687.

[349] See also Supplementary Information Sec. V.G, ''Response to Comments: Comments Regarding 'Essential' Terms and Conditions of Employment,'' supra.

[350] See comment of AFL–CIO.

[351] Comment of UA.

[352] See comments of General Counsel Robb; World Floor Covering Association.

[353] Comments of SEIU Local 32BJ; AFT.

will cause small employers to become solely liable for the NLRA violations of larger contracting entities.[354] However, this rulemaking is not outcome-driven. The Board's task is not to craft a rule that either maximizes or minimizes third-party exposure to unfair labor practice liability. It is to ensure that a third party genuinely *is* the joint employer of a separate employer's employees before exposing it to such liability and to otherwise-secondary economic pressures, and before imposing on it a duty to bargain with the representative of those employees. For all the reasons stated herein, the final rule fulfills that task and does so with greater clarity, predictability, and fidelity to the purposes and policies of the Act than did *Browning-Ferris.*

Finally, one commenter argues that eliminating the relevance of contractually reserved authority, which is objective and documentable, will engender litigation and impose recordkeeping and related costs.[355] However, the proposed rule did not eliminate contractually reserved authority, and the final rule deems evidence of contractually reserved authority probative of joint-employer status to the extent it supports and reinforces evidence of direct and immediate control.

*O. Comments Regarding the Circumstances Under Which a Joint Employer Will Be Found Liable for Another Employer's Unfair Labor Practices*

Many commenters favor the proposed rule to the extent it exposes substantial direct and immediate control over another employer's employees' terms and conditions of employment.[356] These commenters observe that the ''direct and immediate control'' requirement will allow their members, such as franchisors and large retailers, to oversee the general performance of franchisees or retail business partners without being held liable for events in workplaces over which they have little or no control.

Other commenters urge us to adopt a final rule that would further limit unfair labor practice liability even when an entity is found to be joint employer of another's employees. One commenter,

for example, suggests imposing liability only where the joint employer is involved in the unlawful act or controls the essential term or condition of employment at issue in the unlawful act, or where the unfair labor practice cannot be adequately remedied without its participation.[357] Similarly, another commenter urges the Board to adopt an ''instrumentality test,'' under which liability would be imposed on a joint employer only if it controls or has the right to control the particular instrumentality alleged to have caused the harm.[358] Other commenters urge the Board to apply the standard set forth in *Capitol EMI Music,* 311 NLRB 997 (1993), enfd. 23 F.3d 399 (4th Cir. 1994), and impose liability on a joint employer for non-bargaining-related unfair labor practices only where the joint employer knew or should have known of the unlawful act and acquiesced in it by failing to protest or otherwise resist it.[359] Finally, some commenters request that the rule eliminate joint-employer liability altogether and state that a joint employer is not liable for actions taken by another employer.[360]

The Board declines to expand the scope of the proposed rule to change Board precedent regarding the joint-and-several liability of one joint employer for the unfair labor practices committed by another joint employer. Although joint-employer status is a predicate of joint liability, the analyses of the two concepts have often been distinct, each with its own considerations and caselaw. *Capitol EMI Music,* for example, is longstanding precedent regarding an exception to joint-and-several liability of the kind some commenters request, but it and other precedent regarding exceptions to joint liability are not cited or discussed in the NPRM. It is thus doubtful that the public has been properly apprised that this issue could be addressed in the instant rulemaking. See *Idaho Conservation League* v. *Wheeler,* 930 F.3d at 508 (''[A] final rule is not a logical outgrowth if interested parties would have had to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from the proposed rule.'') (second alteration in original) (internal quotation marks omitted).

Moreover, as explained in the NPRM, a significant motive for this rulemaking is to resolve the recent oscillations in

Board law regarding joint-employer status that have occurred in the past several years. The NPRM explained that the rule was necessary ''[i]n light of the continuing uncertainty in the labor-management community created by these adjudicatory variations in defining the appropriate joint-employer standard under the Act.'' 83 FR at 46682. There has been no recent oscillation in the law, however, regarding the issue of joint liability, which the Board did not change or even address in *Browning-Ferris.* Indeed, the Board majority in *Browning-Ferris* emphasized that the decision ''[did] not modify any other legal doctrine, create 'different tests' for 'other circumstances,' or change the way that the Board's joint-employer doctrine interacts with other rules or restrictions under the Act.'' *Browning-Ferris,* 362 NLRB at 1618 fn. 120.

The issue of joint liability is also best resolved on a case-by-case basis. Determining whether one joint employer is jointly and severally liable for the other joint employer's unfair labor practices depends on the nature of the joint-employment relationship and the type of violation alleged. As the Board explained in *Capitol EMI Music,* ''traditional'' joint-employment relationships, where each joint employer has a representative at a worksite and shares supervision of the employees, might call for a different analysis of liability than an arrangement where one joint employer simply supplies employees to another but takes no part in their daily direction. 311 NLRB at 1000. The Board was also careful to limit the exception to joint liability announced in *Capitol EMI Music* not just to a specific kind of joint-employment relationship but also to a specific unfair labor practice, one that depends on an unlawful motive. Id. at 1001. The Board also observed that the result might be different where a purportedly ''innocent'' joint employer nevertheless benefits from a co-employer's unlawful conduct, or where an employer arrangement allows a joint employer to inquire into its co-employer's actions. Id. at 999. The Board believes this case-by-case approach is sound, and therefore decline the invitation to address joint liability in the final rule.

*P. Comments Regarding Industry-Specific Standards*

Several commenters discuss particular industries or business relationships,[361] such as home

---

[354] Comments of AFL–CIO; IUOE.

[355] See comment of AFL–CIO. Conversely, the IFA argues that *Browning-Ferris* has increased legal spending by encouraging individuals to pursue the ''deeper pockets'' of larger entities.

[356] See comments of the Restaurant Law Center; National Retail Federation; American Road & Transportation Builders Association.

[357] See comment of Job Creators Network.

[358] See comment of IFA.

[359] See comments of General Counsel Robb; HR Policy Association.

[360] See comments of World Floor Covering Association; Glover.

[361] Comments of General Counsel Robb; World Floor Covering Association.

builders,[362] the contract-security industry,[363] retailers,[364] and the franchisor-franchisee relationship.[365] As to franchising, for example, some commenters contend that legally required actions franchisors take to protect their trademark and service mark should not be considered evidence of joint-employer status.[366] Commenters say that franchisors protect their brand by providing franchisees, among other things, training,[367] information systems,[368] and guidance on marketing[369] and customer service.[370] The Board has decided not to address particular industries or types of business relationships in the final rule, because doing so would unnecessarily lengthen and complicate the rule. Instead, the final rule provides definitions and other clarifications that are intended to apply to a wide range of industries and business relationships, and the final rule also emphasizes that joint-employer status "must be determined on the totality of the relevant facts in each particular employment setting." The rule addresses contracting practices common to many industries, such as the use of cost-plus contracts and control asserted pursuant to regulatory requirements. The Board anticipates that any industry-specific refinements will be developed case by case through adjudication.

## VI. Justification for the Final Rule

The joint-employer doctrine plays an important role in the administration of the National Labor Relations Act (NLRA or the Act). Most notably, the doctrine determines when an entity other than the direct employer of certain employees has a duty to bargain with the representative of those employees, may be liable for unfair labor practices it did not directly commit, and may be targeted as a primary employer in a labor dispute. The joint-employer analysis set forth in this final rule is based on the common law as applied in the particular context of the NLRA.

[362] Comment of National Association of Home Builders.

[363] Comment of John B. Hirsch.

[364] Comment of National Retail Federation.

[365] Comment of IFA.

[366] Comments of General Counsel Robb; David Kaufmann, lead author of ABA Franchise Law Journal article (discussing the Lanham Act, 15 U.S.C. Secs. 1051–1141, the FTC Franchise Rule, 16 CFR part 436, Secs. 436.1 *et seq.,* and the FTC 2007 Franchise Rule Compliance Guide); see also comment of Kaufmann (discussing various state laws).

[367] Comments of IFA; CDW; Polsinelli PC.

[368] Comment of IFA.

[369] Comments of Kaufmann; Keith Randall, franchise business owner.

[370] Comments of CDW.

Certain considerations must be taken into account under the Act that may not apply in other contexts. The Board must consider when an entity's participation in collective bargaining is required for there to be meaningful bargaining over the terms and conditions of employees directly employed by another employer. The Board also must consider under what circumstances it is appropriate to impose liability on an entity that did not directly commit an unfair labor practice. And the Board must consider Congress's concern with limiting third parties' exposure to economic warfare in labor disputes.

The Board intends in this final rule to return, with clarifying guidance, to the carefully balanced law as it existed before the Board's departure in *Browning-Ferris.* Before, the Board found joint-employer status only when the additional entity had direct and immediate control, as opposed to indirect influence or unexercised, contractually reserved authority, over one or more of the most contextually meaningful, essential terms and conditions of employment such that, considering all of the circumstances, the entity meaningfully affected matters relating to the employment relationship. Indirect influence or unexercised, contractually reserved authority were considered, in weighing the circumstances, as supplementing and reinforcing evidence of direct and immediate control, but neither was dispositive. The *Browning-Ferris* Board disrupted this precedent—without due regard to issues of liability and limiting the scope of labor disputes, and with inadequate consideration of meaningful bargaining—to establish that indirect or unexercised, contractually reserved control could alone be dispositive.

As noted above, in reviewing the Board's *Browning-Ferris* decision, the United States Court of Appeals for the District of Columbia Circuit held that, under the common law, indirect and unexercised reserved control can factor in the Board's joint-employer analysis, but the Board exceeded the bounds of the common law by "failing to distinguish evidence of indirect control that bears on workers' essential terms and conditions from evidence that simply documents the routine parameters of company-to-company contracting." *Browning-Ferris* v. *NLRB,* 911 F.3d at 1213, 1216. The court did not pass on whether indirect or unexercised reserved control could ever alone be dispositive.

By returning to the Board's prior precedent, this final rule answers that open question. In applying the common law in the context of the NLRA, the Board will not find indirect or unexercised reserved control, alone, dispositive, but such control will be relevant to the extent it supplements and reinforces evidence of direct and immediate control. The Board's analysis here, in the words of the D.C. Circuit, "color[s] within the common-law lines identified by the judiciary." Id. at 1208. The standard we adopt in this final rule dates back at least to the Board's adoption in *Laerco Transportation,* 269 NLRB 324 (1984), and *TLI, Inc.,* 271 NLRB at 798–799, of the United States Court of Appeals for the Third Circuit's explication of the joint-employer doctrine in *NLRB* v. *Browning-Ferris Industries of Pennsylvania, Inc.,* 691 F.2d 1117, 1124 (3d Cir. 1982). In the ensuing decades, no reviewing court ever suggested the Board's standard was at variance with the common law, or that it must be extended to the outer bounds of the common law. Nevertheless, the Board's 2015 *Browning-Ferris* decision departed from this established body of precedent.

With this final rule, the Board has endeavored to provide greater clarity, guided by the many comments received, as to how it will determine joint-employer status. Joint-employer determinations have always been fact-intensive, and they will continue to be so. The Board is confident, however, that a more precise definition of the key terms and analytical points will facilitate consistent application of the standard across a broad spectrum of industries and business-to-business relationships. This specificity stands in contrast to the uncertainty the Board's *Browning-Ferris* decision created and that the D.C. Circuit justifiably criticized, including by its failure to stay within common-law bounds in its treatment of indirect control and to give any content whatsoever to the second, NLRA-based step of the standard announced therein.

Broadly, an entity shares or codetermines the essential terms and conditions of another employer's employees—that is, may be considered a joint employer of those employees—when it possesses and exercises substantial direct and immediate control over the employees' essential terms and conditions. The final rule's definitions of "essential terms and conditions of employment," "direct and immediate control," and when direct and immediate control is "substantial" are explained below, as is the final rule's treatment of indirect control and unexercised, contractually reserved authority and of certain common business practices.

## A. Essential Terms and Conditions of Employment

In *Laerco Transportation,* the Board first described the essential terms and conditions of employment in the joint-employer analysis as including, non-exhaustively, "hiring, firing, discipline, supervision, and direction." 269 NLRB at 325. *Browning-Ferris* aside, the Board has repeated this non-exclusive list ever since, including in the NPRM. The final rule adds wages, benefits, and hours of work to this list, and it makes the list of essential terms and conditions of employment an exclusive, closed list.

First, the inclusion of these three terms and conditions, urged by many commenters, is a commonsense addition. "Wages" and "hours" feature prominently in the NLRA. See Sections 8(d) and 9 of the Act. And Board precedent has assumed wages, benefits, and hours of work are essential terms and conditions of employment for purposes of the joint-employer analysis. See, *e.g., Quantum Resources Corp.,* 305 NLRB at 760–761 (wages); *G. Heileman Brewing Co.,* 290 NLRB 991, 1000 (1988) (benefits), enfd. 879 F.2d 1526 (7th Cir. 1989); *Gourmet Award Foods, Northeast,* 336 NLRB 872, 874–875 (2001) (hours of work).

Second, setting essential terms and conditions of employment as including *only* wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction brings much needed certainty to the joint-employer analysis. An entity's control relating to these matters, moreover, has proven most relevant, in the Board's experience, in determining when it is warranted to find a bargaining obligation, liability for unfair labor practices, and status as a primary in a labor dispute. Indeed, no Board case has been identified where control over any other term or condition of employment carried the day in a joint-employer analysis. As provided in the final rule, however, control over other mandatory subjects of bargaining is also probative, but only to the extent it supplements and reinforces evidence of direct and immediate control over essential terms and conditions of employment.

## B. Direct and Immediate Control

Direct and immediate control distinguishes the obvious, meaningful control exercised over employees from attenuated indirect and unexercised reserved control, which is much less significant in identifying a joint employer, and from routine features of company-to-company contracting that are not relevant to joint-employer status at all. The final rule defines direct and immediate control with respect to each of the eight essential terms and conditions of employment based on lines drawn in the Board's pre-*Browning-Ferris* precedent. The Board determined that this approach provided better and more precise guidance than the hypothetical factual examples in the proposed rule, which were widely criticized in the comments.

Over wages, an entity exercises direct and immediate control if it actually determines the wage rates, salary, or other rate of pay that is paid to another employer's individual employees or job classifications. See, *e.g., Quantum Resources Corp.,* 305 NLRB at 760–761 (finding the user employer jointly employed the supplier employer's employees in part because the user employer designated wage rates, authorized changes in wage rates, and pushed through raises for employees). But it does not exercise such control by entering into a cost-plus contract (with or without a maximum reimbursable wage rate). See, *e.g., Goodyear Tire & Rubber Co.,* 312 NLRB 674, 678 (1993) (a cost-plus contract setting forth the wage reimbursement is not evidence of a joint-employer relationship); see also *Browning-Ferris,* 911 F.3d at 1220. Over benefits, an entity exercises direct and immediate control if it actually determines the fringe benefits to be provided or offered to another employer's employees. This would include selecting the benefit plans (such as health insurance plans and pension plans) and/or level of benefits provided. Compare *G. Heileman Brewing,* 290 NLRB at 1000 (finding joint-employer status in part because the user employer exercised authority over granting benefits), with *TLI, Inc.,* 271 NLRB at 798–799 (attendance of the user employer's representative at bargaining sessions and outlining the user employer's need to cut labor costs did not show direct control over terms and conditions because the representative made no specific proposals; it was up to the supplier employer and union to work out needed savings from wages and benefits). An entity does not exercise direct and immediate control by permitting another employer, under an arm's-length contract, to participate in its benefit plans.

Over hours of work, an entity exercises direct and immediate control if it actually determines work schedules or the work hours, including overtime, of another employer's employees. See *Gourmet Award Foods,* 336 NLRB at 874–875 (finding joint-employer status in part because the user employer determined hours of work and work schedules, including overtime); *G.*

*Heileman Brewing,* 290 NLRB at 1000 (finding joint-employer status in part because the user employer set work schedules). An entity does not exercise such control by establishing an enterprise's operating hours or the times when it needs the services provided by another employer. See *Service Employees Local 254 (Women & Infants Hospital),* 324 NLRB 743, 749 (1997) ("The contractual provisions affecting when work must be performed are not indicia of joint employer status. It is not surprising that [the user employer] would require that cleaning be done at times most convenient for the college, or that a cleaner be available at all times to handle emergencies.").

Over hiring, an entity exercises direct and immediate control if it actually determines which employees will be hired and which employees will not. Compare *Le Rendezvous Restaurant,* 332 NLRB 336, 336 (2000) (finding joint-employer status in part because of the user employer's active involvement in hiring a nonunion workforce to replace its existing workforce), with *Flagstaff Medical Center,* 357 NLRB at 667 (interviewing candidates and making recommendations on whom the primary employer should hire did not prove joint-employer status; the direct employer retained final authority over hiring decisions and, in fact, did not follow all the recommendations), and *AM Property Holding Corp.,* 350 NLRB at 1002 (not indicative of joint-employer status for the user employer to suggest individuals for the supplier employer to hire whom the supplier employer independently interviewed before making hiring decisions). An entity does not exercise such control by requesting changes in staffing levels to accomplish tasks or by setting minimal hiring standards such as those required by government regulation. See *Aldworth Co.,* 338 NLRB at 139 ("[A]ctions taken pursuant to government statutes and regulations are not indicative of joint employer status.").

Over discharge, an entity exercises direct and immediate control if it actually decides to terminate the employment of another employer's employee. See, *e.g., Whitewood Maintenance Co.,* 292 NLRB 1159, 1162–1163 (1989) (finding joint-employer status in part because the user employer made the decision to discharge the supplier employers' employees, which the supplier employer carried out), enfd. sub nom. *Texas World Serv. Co.* v. *NLRB,* 928 F.2d 1426 (5th Cir. 1991). An entity does not exercise such control by bringing misconduct or poor performance to the attention of another

employer that makes the actual discharge decision, by expressing a negative opinion of another employer's employee, by refusing to allow another employer's employee to continue performing work under a contract, or by setting minimal standards of performance or conduct, such as those required by government regulation. See *Aldworth Co.,* 338 NLRB at 139 ("[A]ctions taken pursuant to government statutes and regulations are not indicative of joint employer status."); *Southern California Gas Co.,* 302 NLRB 456, 462 (1991) (not evidence of joint-employer status for the user employer to indicate it no longer wanted a particular employee to work at the facility; the user employer was only "exercis[ing] . . . the right of an owner or occupant to protect his premises"); *Chesapeake Foods,* 287 NLRB 405, 407 (1987) (user employer did not exercise control by referring complaints about supplied employees to the supplier employer, and the supplier employer made the decision whether to discharge an employee); *H&W Motor Express, Inc.,* 271 NLRB 466, 468 (1984) (not evidence of joint-employer status for user employer to ask that certain employees to be removed from work under its contract).

Over discipline, an entity exercises direct and immediate control if it actually decides to suspend or otherwise discipline another employer's employee. See *Hobbs & Oberg Mining Co.,* 297 NLRB 575, 587 (1990) (finding joint-employer status partly in reliance on the user and supplier employer jointly giving a supplied employee a written reprimand), affd. 940 F.2d 1538 (10th Cir. 1991), cert. denied 503 U.S. 959 (1992); *G. Heileman Brewing,* 290 NLRB at 1000 (finding joint-employer status in part because the user employer exercised authority over discipline). An entity does not exercise such control by bringing misconduct or poor performance to the attention of another employer that makes the actual disciplinary decision, by expressing a negative opinion of another employer's employee, or by refusing to allow another employer's employee to access its premises or perform work under a contract. See *TLI, Inc.,* 271 NLRB at 799 (finding the user employer did not control discipline because "[w]hen a driver engages in conduct adverse to [the user employer's] operation, [it] supplies [the supplier employer], not the employee, with an 'incident report' whereupon a [supplier employer] representative investigates. Disciplinary notices, or necessary actions, are issued by [the supplier employer]. In addition,

although accidents on the road are reported to [the user employer], it is [the supplier employer] which investigates and determines whether or not the accident was preventable and whether further action is necessary").

Over supervision, an entity exercises direct and immediate control by actually instructing another employer's employees how to perform their work or by actually issuing employee performance appraisals. See, *e.g., International Transfer of Florida, Inc.,* 305 NLRB 150, 150 (1991) (finding the user employer jointly employed the supplier employer's employees because the user employer exercised exclusive daily supervision and direction over those employees, including as to the manner and means of performing the work). An entity does not exercise such control when its instructions are limited and routine and consist primarily of telling another employer's employees what work to perform, or where and when to perform the work, but not how to perform it. See *AM Property Holding Corp.,* 350 NLRB at 1001 (supervision is "limited and routine where a supervisor's instructions consist primarily of telling employees what work to perform, or where and when to perform the work, but not how to perform the work"); see also *G. Wes Ltd. Co.,* 309 NLRB 225, 226 (1992) (concluding user employer's day-to-day supervision was limited and routine where employees were not told "specifically how to do the work or the manner in which they were to perform the assigned tasks . . . . [they] were told what areas were to be worked and with whom the employees were to work, and the work was then left to the employees to perform"); *Southern California Gas,* 302 NLRB at 462 (finding that the "[r]espondent's orders and directions to the day-shift employees were in the nature of routine directions of what tasks were required and where they were to be performed . . . such direction [was] consistent with [r]espondent's object of obtaining results, *i.e.,* the work it contracted for"); *Laerco Transportation,* 269 NLRB at 326 (finding only limited and routine supervision where the user employer resolved "minor problems such as employee personality conflicts" and its involvement was "limited both as to the nature and number of employee problems"; major problems were referred to the supplier employer).

Over direction, an entity exercises direct and immediate control by assigning particular employees their individual work schedules, positions, and tasks. See, *e.g., G. Heileman Brewing,* 290 NLRB at 1000 (finding

joint-employer status in part because the user employer assigned work and schedules). An entity does not exercise such control by setting schedules for completion of a project or by describing the work to be accomplished on a project. See *Chesapeake Foods,* 287 NLRB at 407 (finding it was not significant control for the user employer to "schedul[e] . . . the farms to be worked"); *TLI, Inc.,* 271 NLRB at 799 (finding it was not evidence of joint-employer status where "[t]he Crown foreman instruct[ed] the drivers as to which deliveries [were] to be made on a given day," but "the drivers themselves select[ed] their own assignments, on a seniority basis"); *Laerco Transportation,* 269 NLRB at 325–326 (finding it was not evidence of joint-employer status where the user employer set routes to be followed and the supplier employer provided drivers for those predetermined routes).

### C. When Direct and Immediate Control Is Substantial

It is a well-settled principle in Board law that "[t]o establish joint employer status there must be a showing that the employer meaningfully affects matters relating to the employment relationship." *Laerco Transportation,* 269 NLRB at 325. This has required careful consideration of the totality of the relevant facts in each particular employment setting. *Boire* v. *Greyhound Corp.,* 376 U.S. 473, 481 (1964) ("[W]hether Greyhound possessed sufficient indicia of control to be an 'employer' is essentially a factual issue."); *AM Property Holding Corp.,* 350 NLRB at 1000 ("The question of joint employer status turns on the facts of each particular case."); *Southern California Gas,* 302 NLRB at 461 ("Primarily, the question of joint employer status must be decided on the totality of the facts of the particular case."). Under precedent predating the sharp departure in *Browning-Ferris,* the Board reasonably found entities meaningfully affected matters relating to the employment relationship only where they had direct and immediate control over at least one essential term or condition of employment.

Depending on the circumstances, however, direct and immediate control over only one essential term or condition of employment, or even more than one, has sometimes been found insufficient to meaningfully affect matters relating to the employment relationship. The direct-and-immediate control may be too isolated or sporadic to be meaningful for purposes of imposing bargaining obligations and potential unfair labor practice liability.

See *G. Wes Ltd.,* 309 NLRB at 225 fn. 5 (one isolated incident of user employer interviewing employee whom the supplier employer later hired insufficient to prove that the user employer controlled hiring); *International Shipping Assn.,* 297 NLRB 1059, 1067 (1990) (finding evidence insufficient to prove a joint-employer relationship where the "few occasions when [the user employer] asked certain [supplied] workers to do certain tasks were isolated," and there was "one isolated, vague incident" of the user employer telling an applicant he should tell the supplier employer he should be hired, and he was). Likewise, the direct and immediate control an entity exercises may fall short of meaningfully affecting the employment relationship in the context of other control not exercised. See *Flagstaff Medical Center,* 357 NLRB at 666–667 (the putative joint-employer's limited direct and immediate control was insufficient to establish joint-employer status under the circumstances); *AM Property Holding Corp.,* 350 NLRB at 1001–1002 (user employer's direct and immediate control regarding hiring and setting the wages and benefits of one particular employee and "occasional assignment of work" to other employees was not enough to establish joint-employer relationship under the circumstances); *Women & Infants Hospital,* 324 NLRB at 749 (recurring direction by the user employer necessitated by the lack of a supplier-employer onsite supervisor was not itself enough to warrant a joint-employer finding absent other meaningful evidence); *Pitney Bowes, Inc.,* 312 NLRB 386, 387 (1993) (user employer's issuing undocumented verbal warnings and routine instructions did not meaningfully affect the employment relationship in light of the supplier employer's "nearly complete control over all other significant aspects of the employment relationship, such as hiring, wages, benefits, work rules, assignment of tasks, transfers to other [supplier-employer] customers, and termination").

The final rule reflects this precedent by providing that the Board will consider the totality of the relevant facts in each particular employment setting and that "[s]ubstantial direct and immediate control" means "direct and immediate control that has a regular or continuous consequential effect on an essential term or condition of employment of another employer's employees. Such control is not 'substantial' if only exercised on a sporadic, isolated, or de minimis basis."

The final rule also specifies, as has always been the case, that the party asserting joint-employer status bears the burden of proof. See, *e.g., Hobbs & Oberg Mining Co.,* 297 NLRB at 586.

### D. The Role of Indirect Control and Unexercised, Contractually Reserved Authority

As referenced above, indirect control and unexercised, contractually reserved authority generally reference control that is not direct and immediate. However, the final rule specifies that, within the meaning of the rule, indirect control does not encompass indirect control or influence over setting the objectives, basic ground rules, or expectations for another entity's performance under a contract. This distinction is discussed further in the following section on business practices that are not probative of joint-employer status. By contractually reserved authority, the final rule means the authority that an entity reserves to itself, under the terms of a contract with another employer, over the essential terms and conditions of employment of that other employer's employees, but that has never been exercised.

Under Board law as it existed prior to *Browning-Ferris,* indirect control and unexercised, contractually reserved authority were not alone dispositive of joint-employer status. See *AM Property Holding Corp.,* 350 NLRB at 1000, 1002 ("We find that the contractual provision giving AM the right to approve PBS hires, standing alone, is insufficient to show the existence of a joint employer relationship. In assessing whether a joint employer relationship exists, the Board does not rely merely on the existence of such contractual provisions, but rather looks to the actual practice of the parties . . . . The Board's inquiry with regard to the direction and supervision of Servco employees is properly focused on the practice of the parties, not the language of the contract."); *National Metal Processing, Inc.,* 331 NLRB 866, 869 (2000) (finding user employer was not a joint employer where it only affected unit employees indirectly and had unexercised contractual authority to suspend employees up to 3 days); *J. P. Mascaro & Sons,* 313 NLRB 385, 389 (1993) ("Respondent of necessity may exercise some implicit or indirect control over the operations of [the subcontractor] at the facility to ensure against disruption of its own operations or to assure it secures the services promised, but this is no basis to find the customer-employer is a joint employer of its contractor's employees."), enfd. sub nom. *NLRB* v. *Solid Waste Services,*

*Inc.,* 38 F.3d 93 (2d Cir. 1994); *Goodyear Tire & Rubber,* 312 NLRB at 677 (contractual provision reserving operational control, including over direction and supervision, "in and of itself, was not evidence of joint employer status . . . . [I]t was more appropriate to look to the actual handling of day-to-day business"). But the Board did consider such evidence insofar as it supplemented and reinforced evidence of direct and immediate control over essential terms and conditions of employment. See, *e.g., Le Rendezvous Restaurant,* 332 NLRB at 336 (considering evidence of contractually reserved authority in conjunction with user employer's exercise of direct and immediate control over hiring and discipline); *M.B. Sturgis, Inc.,* 331 NLRB 1298, 1301–1302 (2000) (finding that the contract's broad grant of authority to the user employer over supervision and direction supported evidence of exercised direct control over supervision, direction, and discipline). The final rule is in lockstep with this approach. Indirect control or unexercised, contractually reserved authority cannot alone be dispositive, but either or both are probative of joint-employer status to the extent they supplement or reinforce evidence of direct and immediate control over essential terms and conditions of employment.

### E. Business Practices That Are Not Probative of Joint-Employer Status

The Board is mindful, as was implicit in its pre–*Browning-Ferris* precedent, that there are business practices that are merely "quotidian aspects of common-law third-party contract relationships" that do not make joint-employer status any more or less likely. *Browning-Ferris* v. *NLRB,* 911 F.3d at 1220. A contracting entity commonly seeks to "set the objectives, basic ground rules, and expectations for a third-party contractor," and doing so is not indicative of joint-employer status. Id. This includes contractual provisions obligating the third party to maintain certain practices to comply with legal requirements or for corporate social responsibility reasons. See *Doe I* v. *Wal-Mart Stores, Inc.,* 572 F.3d at 680–683 (contracts that contained a code of conduct requiring Wal-Mart's foreign suppliers to comply with foreign labor laws and permitting Wal-Mart to monitor compliance, and that set forth "deadlines, quality of products, materials used, prices, and other common buyer-seller contract terms" were not evidence that Wal-Mart was a common-law joint employer of its suppliers' employees); *Aldworth Co.,*

338 NLRB at 139 (''[A]ctions taken pursuant to government statutes and regulations are not indicative of joint employer status.'').

Accordingly, under the final rule, the Board does not intend the following to be evidence of joint-employer status: Entering a cost-plus contract (with or without a maximum reimbursable rate); setting minimal standards for hiring, performance, or conduct, such as those required by government regulation; requiring the contractor to institute safety or sexual-harassment policies; a franchisor's protection of its trademark or service mark; or anything else that promotes legal compliance or sets the objectives, basic ground rules, or expectations for a contractor's performance.

## VII. Other Statutory Requirements

### A. The Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (RFA), 5 U.S.C. 601–612, requires an agency promulgating a final rule to prepare a Final Regulatory Flexibility Analysis (FRFA) when the regulation will have a significant impact on a substantial number of small entities. An agency is not required to prepare a FRFA if the Agency head certifies that the rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b). In the NPRM, although the Board believed that this rule would not have a significant economic impact on a substantial number of small entities, the Board issued its Initial Regulatory Flexibility Analysis (IRFA) to provide the public the fullest opportunity to comment on the proposed rule. See 83 FR at 46693. The Board solicited comments from the public that would shed light on potential compliance costs that may result from the rule that it had not identified or anticipated.

The RFA does not define either ''significant economic impact'' or ''substantial number of small entities.'' [371] Additionally, ''[i]n the absence of statutory specificity, what is 'significant' will vary depending on the economics of the industry or sector to be regulated. The agency is in the best position to gauge the small entity impacts of its regulations.'' [372] The Board anticipates low costs of

compliance with the rule for small entities, related to reviewing and understanding the substantive changes to the joint-employer standard.

### 1. Statement of the Need for, and Objectives of, the Rule

The final rule establishes the standard for determining, under the NLRA, whether a business is a joint employer of a group of employees directly employed by another employer. This rule is necessary to foster predictability and consistency in joint-employer determinations under the NLRA, particularly in light of considerable uncertainty regarding the status of the current standard, which was established through adjudication. The guidance furnished by the final rule will enable regulated parties to determine in advance whether their actions are likely to result in a joint-employer finding, which entails or may entail significant consequences under the NLRA: A duty to bargain collectively, exposure to what would otherwise be unlawful secondary union activity, and derivative unfair labor practice liability. Accordingly, a final rule setting forth a comprehensive and detailed standard is vitally important to businesses covered by the NLRA, employees employed by those businesses, and labor organizations that represent or seek to represent those employees. Defining the joint-employer standard through rulemaking also permits the Board to provide more guidance than would be readily achievable through adjudication. The final rule accomplishes these objectives by defining critical elements of the joint-employer standard that have heretofore been undefined and by focusing the inquiry on the factors most relevant to joint-employer status in light of the policies and purposes of the NLRA.

### 2. Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

#### a. Response to Comments Concerning Economic Impact on Small Employers

As stated in the Board's IRFA, the rule ''will only be applied as a matter of law when . . . businesses are alleged to be joint employers in a Board proceeding.'' 83 FR at 46693. After analyzing recent case statistics, the Board found that only .028% of *all* 5.9 million American business firms with employees (both large and small) found themselves in

that position between 2013 and 2017. Id. Because a significant number of these Board proceedings involved large employers, the IRFA concluded that ''an even lower percentage of small businesses [would] be most directly impacted by the Board's application of the rule.'' Id. The Board also examined less direct impacts to small entities— that is, impacts that might arise ''[i]rrespective of an Agency proceeding,'' id.—but found those impacts to be very limited in scope or modest in size. For example, the Board acknowledged that a variety of small entities would bear compliance costs related to reviewing and understanding the rule but found that those costs would not be considered ''significant'' under the RFA. Id. at 46693–95 (estimating compliance costs of $80.26 for unions and $124.37 for small employers).

Some comments criticized the Board's IRFA for finding that the businesses ''most directly impacted by the proposed rule'' are those alleged to be joint employers in a Board proceeding. 83 FR at 46693. By measuring ''most direct[] impact'' in this manner, one commenter argues that the Board has ignored that businesses structure their transactions based in part on the applicable legal costs of compliance and that workers and small businesses bear these costs when the indirect employers have substantial market power, whether or not they are subject to a Board proceeding.[373] Another commenter believes that the Board's approach fails to account for the current, stable joint-employer bargaining relationships that might be disrupted by the rule.[374] Thus, that commenter's view, the proposed rule would cause prolonged labor disputes because larger entities with control over certain terms and conditions of employment would no longer be at the bargaining table.

Other comments similarly criticized the Board for failing to analyze whether the proposed rule would cause competitive harm to small businesses on a broad basis. According to these comments, because the proposed rule allows indirect employers to avoid the cost and responsibility of complying with the NLRA, the rule places small employers at a competitive disadvantage to larger employers.[375] For example, a commenter argues that the revised definition will provide indirect employers that possess substantial

---

[371] 5 U.S.C. 601.

[372] U.S. Small Business Administration (SBA) Office of Advocacy, A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act (SBA Guide) 18 (Aug. 2017), *https:// www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf.*

---

[373] See comment of Law and Economics Professors.

[374] See comment of AFT.

[375] See Center for American Progress Action Fund; CWA; NELP.

market power greater leverage in their contracting arrangements with businesses that supply labor.[376] Accordingly, larger indirect employers will use this added leverage to siphon off profits from smaller direct employers, limiting the ability of those small businesses to grow. As a result, the commenter argues, the rule will cause a further shift in market power away from small employers. It states that harm to the competitive ability of small businesses, vis-à-vis larger firms, is a direct, cognizable economic impact under the RFA that the Board should have considered.

Respectfully, the foregoing commenters do not raise direct economic impacts under the RFA. The RFA does not require an agency to consider speculative and wholly discretionary responses to the rule, or the indirect impact on every stratum of the economy. What the statute requires is that the regulatory agency consider the direct burden that compliance with a new regulation will likely impose on small entities. *See Mid-Tex Elec. Co-op* v. *FERC,* 773 F.2d 327, 342 (D.C. Cir. 1985) (''[I]t is clear that Congress envisioned that the relevant 'economic impact' was the impact of compliance with the proposed rule on regulated small entities''); *accord White Eagle Co-op. Ass'n* v. *Conner,* 553 F.3d 467, 478 (7th Cir. 2009); *Colorado State Banking Bd.* v. *Resolution Trust Corp.,* 926 F.2d 931, 948 (10th Cir. 1991).

This construction of the RFA, requiring agencies to consider only direct compliance costs, finds support in the text of the Act. Section 603(a) of the RFA states that if an IRFA is required, it ''shall describe the impact of the proposed rule on small entities.'' 5 U.S.C. 603(a). Although the term ''impact'' is undefined, its meaning can be gleaned from Section 603(b), which recites the required elements of an initial regulatory flexibility analysis. One such element is ''a description of the projected *reporting, recordkeeping and other compliance requirements* of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.'' 5 U.S.C. 603(b)(4) (emphasis added). Section 604 further corroborates the Board's conclusion, as it contains an identical list of requirements for a FRFA (if one is required). 5 U.S.C. 604(b)(4).

Additional support for confining the regulatory analysis to direct compliance costs is found in an authoritative guide

published by the Office of Advocacy of the SBA. In the SBA Guide, the SBA explains that ''other compliance requirements'' under Section 603 include the following examples:

(a) Capital costs for equipment needed to meet the regulatory requirements; (b) costs of modifying existing processes and procedures to comply with the proposed rule; (c) lost sales and profits resulting from the proposed rule; (d) changes in market competition as a result of the proposed rule and its impact on small entities or specific submarkets of small entities; (e) extra costs associated with the payment of taxes or fees associated with the proposed rule; and (f) hiring employees dedicated to compliance with regulatory requirements.

SBA Guide at 37. These are all direct, compliance-based costs.

In the IRFA, the Board noted that the only identifiable compliance cost imposed by the proposed rule for entities not named in a Board proceeding related to reviewing and understanding the substantive changes to the joint-employer standard. 83 FR at 46695. Otherwise, there will be no ''reporting, recordkeeping and other compliance requirements'' for these small entities. See 5 U.S.C. 603(b)(4) & 604(b)(4). The same is true of the final rule. And the final rule imposes no mandatory capital costs, no mandatory costs of modifying existing process, no costs of lost sales or profits, and, as discussed further below, no appreciable changes in market competition. See SBA Guide at 37. Lastly, for small entities not party to Board proceedings, there are no costs associated with taxes or fees and no costs for additional employees dedicated to compliance, as no compliance requirements exist. Id.

Consistent with these principles, the Board rejects the view that it must analyze how indirect employers exercise market power within their contracting arrangements to determine the impact upon small businesses, as suggested by the comments discussed above. The D.C. Circuit has firmly rejected the notion that a regulating agency must analyze every indirect and remote economic impact. See *Mid-Tex Elec. Co-op., Inc.* 773 F.2d at 343 (''Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy.''). ''[R]equir[ing] an agency to assess the impact on all of the nation's small businesses possibly affected by a rule would be to convert every rulemaking process into a massive exercise in economic modeling, an approach we have already rejected.'' *Cement Kiln Recycling Coal.* v. *EPA,* 255

F.3d 855, 869 (D.C. Cir. 2001) (citing *Mid-Tex Elec. Coop.,* 773 F.2d at 343).

But a massive exercise in economic modeling is exactly what the commenter asks the Board to undertake. The rule does not require contracting parties to alter their arrangements now or in the future. If indirect employers with market power drive harder bargains with direct employers than they do now, as the commenter predicts, such outcomes will result from the individual choices of economic actors, not from actions required to comply with the rule.[377]

Notwithstanding the indirect nature of the potential impacts raised by these comments, the Board also disagrees that the rule will upset existing collective-bargaining relationships. The Board believes that the rule will promote labor-management stability because it simplifies the test for joint employment, provides for a more consistent standard, and ends the unpredictable oscillations between differing tests for joint employment.

Furthermore, the Board finds no evidence to support the notion that the rule places small employers at a competitive disadvantage to large employers. Employers of all sizes routinely enter into service contracts, and all have an interest in the applicable joint-employer standard. Those private-sector employers that exercise substantial direct and immediate control over the essential working conditions of employees maintain the same legal responsibilities under the NLRA as they had before the rule. And while the rule does decrease liability and responsibilities of employers that do not exercise such control over those essential terms and conditions of employment, the rule does not intrude upon the contractual liberties of direct and indirect entities. Those employers may negotiate contractual terms of their choosing without the undue burden of a complicated joint-employer standard. Accordingly, this rule would provide no additional leverage for employers of any size to manipulate the supply and demand for labor, nor interfere with market access.

One commenter argues that ''[u]nder the proposed narrow standard, small businesses that can't afford to

---

[376] See comment of Law and Economics Professors.

[377] According to the Law and Economics Professors, large indirect employers with substantial market power will have greater leverage to artificially suppress workers' wages and capture these asserted monetary losses experienced by workers affected by the rule. Assuming solely for the sake of argument that this is true, it would not constitute an RFA concern because such transfers would not result in changes to small direct employers' bottom-line profitability to

subcontract out operations will be at a competitive disadvantage to large corporations that can and do outsource.''[378] The commenter presented no evidence to support this conclusion. And other comments in support of the proposed rule note that there is no empirical evidence supporting the proposition that the new rule will place small businesses at a competitive disadvantage to larger companies just because the latter are better situated to subcontract their operations.[379] Absent empirical evidence, the Board is not persuaded that the new standard impacts outsourcing in this manner.

Many critics of the Board's IRFA contend that the Board did not fully consider the impact of requiring direct employers, including small businesses, to bear the full cost of liability under the NLRA. For example, one commenter contends that, since the rule applies to business relationships where the larger entity contracts for services of the smaller employer, the smaller employer will shoulder all liability under the NLRA.[380] This increased legal exposure, says another commenter, will cause significant harm to small businesses because their large customers or franchisors will not be jointly responsible for bargaining, or jointly and severally liable for unfair labor practices. Many other comments offered the same argument.[381]

In the NPRM, the Board noted that liability and liability insurance costs may increase for small entities because they may no longer have larger entities with which to share the cost of any NLRA backpay remedies ordered in unfair labor practice proceedings. There, the Board further stated that these costs could arguably fall within the SBA Guide's category of ''extra costs associated with the payment of taxes or fees associated with the proposed rule.''[382] Having reviewed the comments and further considered the subject, the Board no longer believes that these can be characterized as direct compliance costs since these costs are not directly mandated by the rule.

Unfair labor practice liability is the cost of not complying with the NLRA, not a cost of compliance with the Board's joint-employer rule.[383]

Even if increased unfair labor practice liability were a direct cost attributable to the rule, those costs would not impact a substantial number of small entities. As the Board explained in the NPRM, only .028% of all 5.9 million business firms in the United States were alleged to be joint employers in Board proceedings from 2013 to 2017. *See* 83 FR at 46693. And since the data counts only allegations, not prosecutions or Board decisions, the number of employers who were actually impacted by the Board's joint-employer standard in recent years is even smaller. Accordingly, the Board is not persuaded that any changes to unfair labor practice liability arising from this rule will impact a substantial number of small entities.

Nor does the Board believe the rule creates the prospect of added liability for direct employers subject to organizing campaigns or engaged in collective bargaining. These direct employers have always been the primary target of union organizing aimed at their workers by virtue of their direct control over payroll and other essential terms and conditions of employment. And as the Board stated in the NPRM, the proposed rule may make it easier for employers to collectively bargain without the complications of fragmented bargaining while providing much greater certainty as to their bargaining obligations. See 83 FR at 46695. As was also pointed out there, for at least 30 years (from no later than 1984 to 2015) evidence of indirect control was typically insufficient to prove that one company was the joint employer of another business's workers. See id. at 46693. And the contrary *Browning-Ferris* standard was under challenge for the entirety of its relatively brief existence and, therefore, shrouded in uncertainty. Given this history, the possibility of disturbing existing labor relations for direct employers is very small. But again, the Board believes that these types of costs, if any, are indirect; they arise from a series of subsequent decisions made by individual actors that are not compelled by the rule itself.

b. Response to Comments Concerning Economic Impact on Small Labor Unions

Several comments assert that the Board should have provided a more detailed consideration of the impact upon labor unions, a specific category of small entities directly impacted by the proposed rule. One commenter, for example, believe that the alleged shift in market power away from direct employers will reduce employment and suppress pay and, in turn, cause a reduction in dues contributions to labor unions.[384] Another commenter similarly predicts that, by removing franchisors and larger indirect employers from reach of the NLRA, the proposed rule might frustrate collective bargaining and, thereby, alienate employees.[385] These comments assert that labor unions will find it more difficult to organize employees and maintain existing membership, which will adversely impact dues income. Thus, one commenter contends that the Board should estimate the additional organizing, communications, and bargaining costs imposed upon small unions.[386] Other labor organizations offer similar comments.[387]

The comments on this issue present no reliable empirical evidence to show that the rule would have a significant economic impact on a substantial number of small entity labor unions. One commenter estimates $1.3 billion in yearly transfers from workers in contract firms and temporary help agencies to employers as a result of the rule, and argues that this $1.3 billion annual transfer will necessarily reduce union dues since dues are often calculated as a percentage of gross pay.[388]

The Board finds this analysis unreliable because it makes several critical and unsubstantiated assumptions.[389] Based on the disparity in pay between union and nonunion employees in the economy as a whole (from other research), the comment first assumes that union-organized workers in contract firms and temporary help

---

[378] See comment of NELP.

[379] See comments of Chamber of Commerce; IFA.

[380] See comment of IUOE.

[381] See comment of AFL–CIO; see also comments of AFT; SEIU; Congressmen Scott and Senator Murray; EPI; CWA; Texas Rio-Grande Legal Aid.

[382] The Board also observed that it is without the means to quantify such costs. The RFA explains that in providing initial and final regulatory flexibility analyses, ''an agency may provide either a quantifiable or numerical description of the effects of a proposed rule or alternatives to the proposed rule, *or more general descriptive statements if quantification is not practicable or reliable*.'' 5 U.S.C. Sec. 607 (emphasis added).

[383] Likewise, liability insurance is also a cost not mandated by the rule. In response to the NPRM's statement that there may be compliance costs that are unknown to the Board such as potential increases in liability insurance costs, one comment states that on a local level even minimal impacts on insurance rates could hurt small businesses. The commenter did not provide any supporting data, and the Board believes any potential increases in insurance rates would be minimal and not a direct impact of the rule.

[384] See comment of Law and Economics Professors.

[385] See comment of AFL–CIO.

[386] See comment of AFT. Comments offered in support of the proposed rule suggest just the opposite—that the narrower standard could be beneficial to labor unions because they will no longer be expending resources seeking to establish bargaining relationships with larger indirect employers that have thousands of employees.

[387] See, *e.g.,* comments of CWA; AFT.

[388] See comment of Law and Economics Professors. This estimate is based on information from the comment submitted by EPI.

[389] We refer here to the analysis contained in the comment of EPI, on which the Law and Economics Professors rely.

agencies, on average, earn $146 more per week (or $1.3 billion per year on an aggregate basis) than their nonunion counterparts in these same industries. Then, without any empirical evidence, the comment assumes that the new rule would automatically eliminate the higher pay afforded unionized workers and transfer the $1.3 billion to employers. The stated rationale for taking this analytical leap is that ''the narrow proposed joint-employer standard will make collective bargaining among subcontracted and temporary workers nearly impossible.'' [390]

This analysis is flawed. Initially, it assumes that a pay disparity exists between union and nonunion workers in these industries, that the assumed disparity is consistent in magnitude with the disparity that exists in the overall economy, and that the impact of unionization (and not, for example, cost of living differentials) is the sole explanation for any pay disparity. The commenter presented no evidence to support these assumptions. But, most troublesome, the comment assumes that the new rule will cause union workers to *automatically* lose their union wages because, in its view, subcontracted and temporary workers will immediately forego union representation rather than bargain with just their direct employers. There is no reason to accept the proposition that workers in these industries will abandon collective bargaining en masse. At the very least, the comment presented no evidence to back it up. The contract firms and temporary help agencies that directly control employee payrolls and other essential terms and conditions of employment will continue to do so before and after the rule takes effect. Since the relationships between direct employers, their employees, and employee bargaining representatives will remain intact, there is no reason to assume that unionized employees will automatically lose their union wages. The Board, therefore, rejects this comment's prediction and the corollary assertion advanced by another commenter concerning union dues.[391]

In the NPRM, the Board's IRFA assumed for purposes of analysis that a substantial number of small entity labor unions would be impacted by the rule. See 83 FR at 46693. But the Board also stated its belief that the cost of compliance with the rule would be very low, related to reviewing and understanding the substantive changes to the joint employer standard, meaning

that there would not be a significant impact on a substantial number of small unions. See 83 FR at 46693 and 46695. In reviewing the comments on this subject, the Board finds no other compliance costs to labor unions, and no evidence showing a significant impact. Labor unions certainly have an interest in the rule, as with any other standard or substantive application of the NLRA, but the negative economic impacts on labor unions raised by the comments are wholly speculative and based upon perceived indirect consequences of the rule.

In fact, the rule leaves undisturbed the statutory duties and bargaining obligations of those employers that directly control payroll and other essential terms and conditions of employment for employees. As such, labor unions will still be able organize the workforces of direct employers, engage in collective bargaining with direct employers, and file unfair labor practices charges against direct employers. And the Board has made clear that the new standard will foster predictability and consistency regarding determinations of joint-employer status in a variety of business relationships, thereby promoting labor-management stability. Hence, the Board finds that there is no reliable evidence to support the proposition that the rule will have a significant impact on union organizing or union membership.

### c. Response to Comments Concerning Reporting Requirements

The Board's IRFA stated that the Board did not believe that the rule would impose any new recordkeeping or reporting requirements on small entities. See 83 FR at 46695. One commenter speculates that the rule will actually impose more onerous recordkeeping costs because small businesses will be required to maintain more detailed records of the actual control exercised upon their employees (by those small employers and their larger business partners).[392] The commenter further suggests that the proposed rule may increase litigation costs to small businesses and labor unions because they would have to invest more resources in developing witness-intensive facts in support of a joint-employer theory. But the commenter has not identified cognizable recordkeeping requirements. The RFA defines a ''recordkeeping requirement'' as ''a requirement imposed by an agency on persons to maintain specified records,'' 5 U.S.C. 601(8), and the rule imposes no such

requirement. Additionally, these suggested costs are speculative. There is no reason for direct employers to maintain more detailed records of their work with indirect employers as a result of this rule than the records that they already keep in the normal course of business. In fact, the opposite would be more likely given that the rule will foster predictability and consistency in determining joint-employer status and will reduce the incentive for indirect employers to maintain records solely for the purpose of defending themselves against liability premised on the existence of an alleged joint-employer relationship.

Nor is the Board persuaded that any changes to the evidentiary burden placed upon parties to establish a joint-employer relationship will meaningfully affect the cost of litigation. Assuming an increase in litigation costs for a particular case, the commenter makes no effort to analyze the impact in order to assess the significance. The Board also expects that the new rule will decrease the overall amount of litigation involving the joint-employer standard, which would also decrease litigation costs to unions. In any event, beyond familiarization costs, the Board finds that the new rule imposes no additional costs for reporting, recordkeeping, or other direct compliance requirements, and none of the comments present empirical evidence to the contrary.

### d. Response to Comments Concerning Duplication, Overlap, and Conflict With Other Rules

Some comments contend that the Board has failed to identify all relevant rules and regulations which may ''duplicate, overlap or conflict with the proposed rule,'' as Section 603(b)(5) of the RFA requires.[393] These comments argue that the proposed rule is discordant with the standard under the FLSA,[394] or inconsistent with the definition of ''employer'' used by other agencies such as the IRS.[395] These contentions stretch ''duplicate, overlap or conflict'' beyond their intended meanings.[396] The rule does not duplicate or overlap with any other rule for identifying joint employers under

---

[390] See comment of EPI.

[391] See comment of Law and Economics Professors.

[392] See comment of AFL–CIO.

[393] See Comments of AFL–CIO; United Association of Plumbers and Pipe Fitters (Plumbers).

[394] See Comment of AFL–CIO.

[395] See Comment of Plumbers.

[396] According to the SBA Guide, at 40:

Rules are duplicative or overlapping if they are based on the same or similar reasons for the regulation, the same or similar regulatory goals, and if they regulate the same classes of industry. Rules are conflicting when they impose two conflicting regulatory requirements on the same classes of industry.

the NLRA, and, in fact, will be the only joint-employer standard maintained by the NLRB. Nor does the rule expose regulated entities to conflicting obligations, even if other agencies apply different standards for determining when a joint-employment relationship exists under other statutes.

e. Response to Comments Concerning Public Outreach

One commenter argues that the Board failed to conduct sufficient outreach to small businesses, including small local unions, that will be impacted by the rule. 5 U.S.C. 609.[397] But there have been no surprises: the issues addressed by this rule have been the subject of a robust public debate for several years. And in conjunction with the official publication of the NPRM, the Board worked to widely publicize the proposed rule. Upon issuance, the Board published the NPRM and facts sheets on its website. See The Standard for Determining Joint-Employer Status, NLRB, *https://www.nlrb.gov/about-nlrb/what-we-do/national-labor-relations-board-rulemaking/standard-determining-joint-employer* (last visited Feb. 11, 2020). On September 13, 2018, the Board issued a press release, which was published on its website and distributed by email to subscribers, notifying the public of the proposed rule. See NLRB Office of Public Affairs, Board Proposes Rule to Change its Joint-Employer Standard (Sept. 13, 2018) *https://www.nlrb.gov/news-outreach/news-story/board-proposes-rule-change-its-joint-employer-standard*. The press release was also shared on social media through the Board's official Twitter and Facebook accounts. The Board members themselves have also discussed the proposed rule at various public speaking engagements, including the annual meeting of the Labor and Employment Law Section of the American Bar Association. Given the foregoing efforts and the thousands of comments the Board received in response to the NPRM, the Board believes that the public has been well informed, the pros and cons of the rule have been thoroughly examined, and the impact of the rule on the full range of business entities governed by it have been brought into sharp focus by individuals, businesses, labor unions, and industry trade groups.

3. Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments

The Chief Counsel of Advocacy of the Small Business Administration did not submit comments in response to the NPRM.

4. Description and Estimate of Number of Small Entities to Which the Rule Applies

In order to evaluate the impact of the proposed rule, the Board first identified the entire universe of businesses that could be impacted by a change in the joint-employer standard. According to the United States Census Bureau, there were approximately 5.95 million business firms with employees in 2016.[398] Of those, the Census Bureau estimates that about 5,934,985 million were firms with fewer than 500 employees.[399] While this final rule does not apply to employers that do not meet the Board's jurisdictional requirements, the Board does not have the data to determine the number of excluded entities (nor was data received on this particular issue).[400]

The final rule will only be applied as a matter of law when small businesses are alleged to be joint employers in a Board proceeding. Therefore, the frequency with which the issue comes before the Board is indicative of the number of small entities most directly impacted by the final rule. A review of the Board's representation petitions and unfair labor practice charges provides a basis for estimating the frequency with which the joint-employer issue comes before the Agency. During the five-year period between January 1, 2013, and December 31, 2017, a total of 114,577 representation and unfair labor practice cases were initiated with the Agency. In 1598 of those filings, the representation petition or unfair labor practice charge filed with the Agency asserted a joint-employer relationship between at least two employers.[401] Accounting for repetitively alleged joint-employer relationships in these filings, the Board has identified 823 separate alleged joint-employer relationships involving an estimated 1646 employers.[402] Accordingly, the joint-employer standard most directly impacted approximately .028% of all 5.95 million business firms (including both large and small businesses) over the five-year period. Since a large share of our joint-employer cases involve large employers, the Board expects an even lower percentage of small businesses to be most directly impacted by the Board's application of the rule.

As discussed in the NPRM, irrespective of an Agency proceeding, the rule may be more relevant to certain types of small employers because their

---

[397] See Comment of AFL–CIO.

[398] "Establishments" refer to single location entities—an individual "firm" can have one or more establishments in its network. As we did in the NPRM, the Board has used firm-level data for this FRFA because establishment data is not available for certain types of employers discussed below. Census Bureau definitions of "establishment" and "firm" can be found at *https://www.census.gov/programs-surveys/susb/about/glossary.html* (last visited Feb. 10, 2020).

[399] The U.S. Census Bureau does not specifically define small business, but does break down its data into firms with 500 or more employees and those with fewer than 500 employees. See U.S Department of Commerce, Bureau of Census, 2016 Statistics of U.S. Businesses (SUSB) Annual Data Tables by Establishment Industry (Dec. 2018), *https://www.census.gov/data/tables/2016/econ/susb/2016-susb-annual.html* (from downloaded Excel Table entitled "U.S., 6-digit NAICS"). Consequently, the 500-employee threshold is commonly used to describe the universe of small employers. For defining small business among specific industries, the standards are defined by the North American Industry Classification System (NAICS), which we set forth below.

[400] Pursuant to 29 U.S.C. 152(6) and (7), the Board has statutory jurisdiction over private sector employers whose activity in interstate commerce exceeds a minimal level. *NLRB v. Fainblatt,* 306 U.S. 601, 606–607 (1939). To this end, the Board has adopted monetary standards for the assertion of jurisdiction that are based on the volume and character of the business of the employer. In general, the Board asserts jurisdiction over employers in the retail business industry if they have a gross annual volume of business of $500,000 or more. *Carolina Supplies & Cement Co.,* 122 NLRB 88 (1959). But shopping center and office building retailers have a lower threshold of $100,000 per year. *Carol Management Corp.,* 133

NLRB 1126 (1961). The Board asserts jurisdiction over non-retailers generally where the value of goods and services purchased from entities in other states is at least $50,000. *Siemons Mailing Service,* 122 NLRB 81 (1959).

The following employers are excluded from the NLRB's jurisdiction by statute:

• Federal, state and local governments, including public schools, libraries, and parks, Federal Reserve banks, and wholly-owned government corporations. 29 U.S.C. 152(2).

• Employers that employ only agricultural laborers, those engaged in farming operations that cultivate or harvest agricultural commodities or prepare commodities for delivery. 29 U.S.C. 153(3).

• Employers subject to the Railway Labor Act, such as interstate railroads and airlines. 29 U.S.C. 152(2).

[401] This includes initial representation-case petitions (RC petitions) and unfair labor practice charges (CA cases) filed against employers.

[402] Since a joint-employer relationship requires at least two employers, the Board has estimated the number of employers by multiplying the number of asserted joint-employer relationships by two. Some of these filings assert more than two joint employers; but, on the other hand, some of the same employers are named multiple times in these filings. Additionally, this number is certainly inflated because the data does not reveal those cases where joint-employer status is not in dispute.

business relationships involve the exchange of employees or operational control.[403] 83 FR at 46693. In addition, labor unions, as organizations representing or seeking to represent employees, will be impacted by the Board's change in its joint-employer standard. Thus, the Board identified the following five types of small businesses or entities as those most likely to be impacted by the rule: Contractors/subcontractors, temporary help service suppliers, temporary help service users, franchisees, and labor unions.

(1) Businesses commonly enter into contracts with vendors to receive a wide range of services that may satisfy their primary business objectives or solve discrete problems they are not qualified to address. And there are seemingly unlimited types of vendors who provide these types of contract services. Businesses may also subcontract work to vendors to satisfy their own contractual obligations—an arrangement common to the construction industry. Businesses that contract to receive or provide services often share workspaces and sometimes share control over workers, rendering their relationships subject to application of the Board's joint-employer standard. The Board does not have the means to identify precisely how many businesses are impacted by contracting and subcontracting within the United States, or how many contractors and subcontractors would be small businesses as defined by the SBA.[404]

(2) Temporary help service suppliers (NAICS #561320) are primarily engaged in supplying workers to supplement a client employer's workforce. To be defined as a small business temporary help service supplier by the SBA, the entity must generate receipts of less than $27.5 million annually.[405] In 2012, there were 13,202 temporary service supplier firms in the U.S.[406] Of these business firms, 6,372 had receipts of less than $1,000,000; 3947 had receipts between $1,000,000 and $4,999,999; 1639 had receipts between $5,000,000 and $14,999,999; and 444 had receipts between $15,000,000 and $24,999,999. In aggregate, at least 12,402 temporary help service supplier firms (93.9% of total) are definitely small businesses according to SBA standards. Since the Board cannot determine how many of the 130 business firms with receipts between $25,000,000 and $29,999,999 fall below the $27.5 million annual receipt threshold (nor were any comments submitted on this topic), it will assume that these are small businesses as defined by the SBA. For purposes of this FRFA, as in the NPRM, the Board assumes that 12,532 temporary help service supplier firms (94.9% of total) are small businesses.

(3) Entities that use temporary help services in order to staff their businesses are widespread throughout many types of industries and include both large and small employers. A 2012 survey of business owners by the Census Bureau revealed that at least 266,006 firms obtained staffing from temporary help services in that calendar year.[407] This survey provides the only gauge of employers that obtain staffing from temporary help services, and the Board is without the means to estimate what portion of those are small businesses as defined by the NAICS. Nor were comments received on this topic. For purposes of this FRFA, the Board assumes that all users of temporary services are small businesses.

(4) Franchising is a method of distributing products or services in which a franchisor lends its trademark or trade name and a business system to a franchisee, which pays a royalty and

often an initial fee for the right to conduct business under the franchisor's name and system.[408] The nature and degree of control exercised by franchisors over franchisee operations vary widely and may, depending on the circumstances of a particular franchising relationship, render the relationship subject to application of the Board's joint-employer standard. The Board explained in the NPRM that it does not have the means to identify precisely how many franchisees operate within the United States, or how many are small businesses as defined by the SBA. A 2012 survey of business owners by the Census Bureau revealed that at least 507,834 firms operated a portion of their business as a franchise. But only 197,204 of these firms had paid employees.[409] In the Board's view, only franchisees with paid employees are potentially impacted by the joint-employer standard. Of the franchisees with employees, 126,858 (64.3%) had sales receipts totaling less than $1 million. Based on this available data and the SBA's definitions of small businesses, which generally define small businesses as having receipts well over $1 million, the Board assumes that almost two-thirds of franchisees would be defined as small businesses.[410]

(5) Labor unions, as defined by the NLRA, are entities "in which employees participate and which exist for the purpose . . . of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." [411] By defining which employers are joint employers under the NLRA, the final rule impacts labor unions generally, and more directly impacts those labor unions that organize the specific business sectors discussed above. The SBA's "small business" standard for "Labor Unions and Similar Labor Organizations" (NAICS #813930) is $7.5

---

[403] The Board acknowledges that there are other types of entities and/or relationships between entities that may be affected by this change in the joint-employer rule. Such relationships include but are not limited to lessor/lessee and parent/subsidiary. However, the Board does not believe that entities involved in these relationships would be impacted more than the entities discussed below.

[404] The only data known to the Board relating to contractor business relationships involve businesses that contract with the federal government. In 2014, the DOL reported that approximately 500,000 federal contractor firms were registered with the General Services Administration. *Establishing a Minimum Wage for Contractors,* 79 FR 60634, 60697. However, the Board is without the means to identify the precise number of firms that actually receive federal contracts or to determine what portion of those are small businesses as defined by the SBA. No comments were received on this topic. Even if these data were available, the Board does not have jurisdiction over government entities, and therefore business relationships between federal contractors and the federal agencies will not be impacted by the Board's joint-employer rule. The business relationships between federal contractors and their subcontractors could be subject to the Board's joint-employer rule. However, the Board also lacks the means for estimating the number of businesses that subcontract with federal contractors or determine what portion of those would be defined as small businesses, and no comments were received on this subject.

[405] 13 CFR 121.201.

[406] The Census Bureau only provides data about receipts in years ending in 2 or 7. The 2017 data has not been published, so the 2012 data is the most recent available information regarding receipts. See U.S Department of Commerce, Bureau of Census, 2012 SUSB Annual Data Tables by Establishment Industry, NAICS classification #561320, *https://www2.census.gov/programs-surveys/susb/tables/2012/us_6digitnaics_r_2012.xlsx.*

[407] See U.S. Department of Commerce, Bureau of Census, 2012 Survey of Business Owners, *https://factfinder.census.gov/bkmk/table/1.0/en/SBO/2012/00CSCB46* (last visited Feb. 11, 2020).

[408] See IFA FAQs, found at *https://www.franchise.org/faqs-about-franchising* (last visited Feb. 10, 2020).

[409] See U.S. Department of Commerce, Bureau of Census, 2012 Survey of Business Owners, *https://factfinder.census.gov/bkmk/table/1.0/en/SBO/2012/00CSCB67* (last visited Feb. 11, 2020).

The Board received comments from the IFA and Chamber of Commerce stating that there are 233,000 small business franchisees in the United States. However, the Board is unable to verify the methodology of the underlying study producing that number. Nevertheless, the statistic supplied by these commenters is not far off from Census data showing the total number of franchisees with paid employees in 2012. In the Board's view, Census data is more reliable than a number that is derived from unknown means. Therefore, the Board has decided to rely on the Census's data in performing this analysis.

[410] *See* 13 CFR 121.201.

[411] 29 U.S.C. 152(5).

million in annual receipts.[412] In 2012, there were 13,740 labor union firms in the U.S.[413] Of these firms, 11,245 had receipts of less than $1,000,000, 2022 labor unions had receipts between $1,000,000 and $4,999,999, and 141 had receipts between $5,000,000 and $7,499,999. In aggregate, 13,408 labor union firms (97.6% of total) are small businesses according to SBA standards.

Based on the foregoing, the Board assumes there are 12,532 temporary help supplier firms, 197,224 franchise firms, and 13,408 union firms that are small businesses; and it further assumes that all 266,006 temporary help user firms are small businesses. Therefore, among these four categories of employers that are most interested in the final rule, 489,150 business firms are assumed to be small businesses as defined by the SBA. The Board believes that all of these small businesses, and also those businesses regularly engaged in contracting/subcontracting, have a general interest in the rule and would be impacted by the compliance costs, discussed below, related to reviewing and understanding the rule. But, as previously noted, employers will only be most directly impacted when they are alleged to be a joint employer in a Board proceeding. Given the Board's historic filing data, this number is very small relative to the number of small employers in these five categories.

Throughout the IRFA, the Board requested comments or data that might improve its analysis, 83 FR at 46693, 46695–46696, but no additional data was received regarding the number of small entities to which the rule will apply, other than the comments referenced in n. 409, above.

5. Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

The RFA requires an agency to consider the direct burden that compliance with a new regulation will likely impose on small entities.[414] Thus, the RFA requires the Agency to determine the amount of ''reporting, recordkeeping and other compliance requirements'' imposed on small entities.[415] In providing its FRFA, an agency may provide either a quantifiable or numerical description of the effects of a rule or alternatives to the rule, or ''more general descriptive statements if quantification is not practicable or reliable.''[416]

The Board concludes that the final rule imposes no capital costs for equipment needed to meet the regulatory requirements; no costs of modifying existing processes and procedures to comply with the final rule; no lost sales and profits resulting from the final rule; no changes in market competition as a result of the final rule and its impact on small entities or specific submarkets of small entities; and no costs of hiring employees dedicated to compliance with regulatory requirements.[417] The final rule also does not impose any new information collection or reporting requirements on small entities.

Small entities may incur some costs from reviewing the rule in order to understand the substantive changes to the joint-employer standard. The Board estimates that a labor compliance employee at a small employer who undertook to become generally familiar with the proposed changes may take at most one hour to read the summary of the rule in the introductory section of the preamble. It is also possible that a small employer may wish to consult with an attorney, which we estimated to require one hour as well.[418] Using the Bureau of Labor Statistics (BLS)' most recent estimated wage and benefit costs, the Board has assessed these labor costs to be $144.69.[419]

As to the impact on unions, the Board anticipates they may also incur costs from reviewing the rule. The Board believes a union would consult with an attorney, which is estimated to require no more than one hour of attorney time costing $97.08 (see fns. 418 and 419)) because union counsel should already be familiar with the pre-*Browning-Ferris* standard. Additionally, the Board expects that the additional clarity of the final rule will serve to reduce litigation expenses for unions and other small entities.

The Board does not find the estimated $144.69 cost to small employers and the estimated $97.08 cost to unions in order to review and understand the rule to be significant within the meaning of the RFA. In making this finding, one important indicator is the cost of compliance in relation to the revenue of the entity or the percentage of profits affected.[420] Other criteria to be considered are the following:

—Whether the rule will cause long-term insolvency, *i.e.,* regulatory costs that may reduce the ability of the firm to make future capital investment, thereby severely harming its competitive ability, particularly against larger firms;

—Whether the cost of the proposed regulation will (a) eliminate more than 10 percent of the businesses' profits; (b) exceed one percent of the gross revenues of the entities in a particular sector, or (c) exceed five percent of the labor costs of the entities in the sector.[421]

The minimal cost to read and understand the rule, $144.69 for small employers and $97.08 for small unions, will not generate any such significant economic impacts.

In the NPRM, the Board requested comments from the public that would shed light on any potential compliance costs, 83 FR 46693, and considered those responses in the comments section above.

6. Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities Was Rejected

Pursuant to 5 U.S.C. Sec. 604(a)(6), agencies are directed to examine ''why each one of the other significant

---

[412] 13 CFR 121.201

[413] See U.S Department of Commerce, Bureau of Census, 2012 SUSB Annual Data Tables by Establishment Industry, NAICS classification #722513, *https://www2.census.gov/programs-surveys/susb/tables/2012/us_6digitnaics_r_2012.xlsx.*

[414] See *Mid-Tex Elec. Co-op* v. *FERC,* 773 F.2d at 342 (''[I]t is clear that Congress envisioned that the relevant 'economic impact' was the impact of compliance with the proposed rule on regulated small entities.'').

[415] See 5 U.S.C. 604(a)(4).

[416] 5 U.S.C. 607.

[417] See SBA Guide at 37.

[418] The Board does not believe that more than one hour of time by each would be necessary to read and understand the rule. This is because the new standard constitutes a return to the pre-*Browning-Ferris* standard, with which most employers are already familiar if relevant to their businesses, and with which most labor-management attorneys are also familiar.

[419] For wage figures, see May 2018 National Occupancy Employment and Wage Estimates, found at *https://www.bls.gov/oes/current/oes_nat.htm.* The Board has been administratively informed that BLS estimates that fringe benefits are approximately equal to 40 percent of hourly wages. Thus, to calculate total average hourly earnings, BLS multiplies average hourly wages by 1.4. In May 2018, average hourly wages for labor relations specialists (BLS #13–1075) were $34.01. The same figure for a lawyer (BLS # 23–1011) is $69.34. Accordingly, the Board multiplied each of those wage figures by 1.4 and added them to arrive at its estimate.

[420] See SBA Guide at 18.

[421] Id. at 19.

alternatives to the rule considered by the agency which affect the impact on small entities was rejected.'' In the NPRM, the Board requested comments identifying any other issues and alternatives that it had not considered. See 83 FR 46696.

Several comments suggest that the Board withdraw the proposed rule and leave in place the *Browning-Ferris* joint-employer standard.[422] We considered and rejected this alternative for the reasons stated in Sections V.N and VI, supra. The Board finds it desirable to revise the *Browning-Ferris* standard and to do so through the rulemaking process. Consequently, the Board rejects maintaining the status quo.

One comment proposes two additional alternatives.[423] It suggests that if the Board is to depart from the *Browning-Ferris* standard, the final rule should expand the definition of ''joint employer'' to explicitly include indirect employers ''with sufficient market power in the direct employer's product market or the relevant labor market to determine workers' wages and/or terms and conditions of work.'' The comment further suggests that the Board should, at a minimum, include franchisors that include no-poaching, non-compete, and similar clauses in their franchise agreements, since those provisions restrict labor market competition. The Board discussed these alternatives in Section V.M and V.N and rejected those alternatives for the reasons explained above.

In the NPRM, the Board considered exempting certain small entities. See 83 FR 46696. The Board received no comments on this potential alternative and again rejects this exemption as impractical because such a large percentage of employers and unions would be exempt under the SBA definitions, thereby substantially undermining the purpose of the final rule. Moreover, as this rule often applies to relationships involving a small entity (such as a franchisee) and a large enterprise (such as a franchisor), exemptions for small businesses would decrease the application of the rule to larger businesses as well, potentially undermining the policy behind this rule. Additionally, given the very small quantifiable cost of compliance, it is possible that the burden on a small business of determining whether it fell within a particular exempt category might exceed the burden of compliance. Congress gave the Board very broad

jurisdiction, with no suggestion that it wanted to limit coverage of any part of the Act to only larger employers.[424] As the Supreme Court has noted, ''[t]he [NLRA] is federal legislation, administered by a national agency, intended to solve a national problem on a national scale.'' [425] As such, this alternative is contrary to the objectives of this rulemaking and of the NLRA.

None of the alternatives considered accomplished the objectives of issuing this rule while minimizing costs on small businesses. Accordingly, the Board believes that promulgating this final rule is the best regulatory course of action.

*B. Paperwork Reduction Act*

In the NPRM, the Board explained that the proposed rule would not impose any information collection requirements and accordingly, the proposed rule is not subject to the Paperwork Reduction Act (PRA), 44 U.S.C. 3501–3521. See 83 FR 46696. No substantive comments were received relevant to the Board's analysis of its obligations under the PRA.

*C. Congressional Review Act*

In the NPRM, the Board explained that the provisions of the proposed rule were substantive and that the Board would submit this rule and required accompanying information to the Senate, the House of Representatives, and the Comptroller General as required by the Small Business Regulatory Enforcement Fairness Act (Congressional Review Act or CRA), 5 U.S.C. 801–808. Pursuant to the Congressional Review Act, the Office of Information and Regulatory Affairs designated this rule as a major rule. Accordingly, the rule will become effective April 27, 2020.

**Final Rule**

This rule is published as a final rule.

**List of Subjects in 29 CFR Part 103**

Jurisdictional standards, Election procedures, Appropriate bargaining units, Joint Employers, Remedial Orders.

For the reasons stated in the preamble, the National Labor Relations Board amends 29 CFR part 103 as follows:

[424] However, there are standards that prevent the Board from asserting authority over entities that fall below certain jurisdictional thresholds. This means that extremely small entities outside of the Board's jurisdiction will not be affected by the final rule. See 29 CFR 104.204.

[425] *NLRB* v. *Nat. Gas Util. Dist. of Hawkins Cty., Tenn.,* 402 U.S. 600, 603–604 (1971) (quotation omitted).

**PART 103—OTHER RULES**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 29 U.S.C. 156, in accordance with the procedure set forth in 5 U.S.C. 553.

■ 2. Add subpart D, consisting of § 103.40, to read as follows:

**Subpart D—Joint Employers**

**§ 103.40 Joint Employers.**

(a) An employer, as defined by Section 2(2) of the National Labor Relations Act (the Act), may be considered a joint employer of a separate employer's employees only if the two employers share or codetermine the employees' essential terms and conditions of employment. To establish that an entity shares or codetermines the essential terms and conditions of another employer's employees, the entity must possess and exercise such substantial direct and immediate control over one or more essential terms or conditions of their employment as would warrant finding that the entity meaningfully affects matters relating to the employment relationship with those employees. Evidence of the entity's indirect control over essential terms and conditions of employment of another employer's employees, the entity's contractually reserved but never exercised authority over the essential terms and conditions of employment of another employer's employees, or the entity's control over mandatory subjects of bargaining other than the essential terms and conditions of employment is probative of joint-employer status, but only to the extent it supplements and reinforces evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment. Joint-employer status must be determined on the totality of the relevant facts in each particular employment setting. The party asserting that an entity is a joint employer has the burden of proof.

(b) ''Essential terms and conditions of employment'' means wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction.

(c) ''Direct and Immediate Control'' means the following with respect to each respective essential employment term or condition:

(1) *Wages.* An entity exercises direct and immediate control over wages if it actually determines the wage rates, salary or other rate of pay that is paid to another employer's individual employees or job classifications. An entity does not exercise direct and immediate control over wages by

[422] See comments of Law and Economics Professors; AFL–CIO; CWA.

[423] See comment of Law and Economics Professors.

entering into a cost-plus contract (with or without a maximum reimbursable wage rate).

(2) *Benefits.* An entity exercises direct and immediate control over benefits if it actually determines the fringe benefits to be provided or offered to another employer's employees. This would include selecting the benefit plans (such as health insurance plans and pension plans) and/or level of benefits provided to another employer's employees. An entity does not exercise direct and immediate control over benefits by permitting another employer, under an arm's-length contract, to participate in its benefit plans.

(3) *Hours of work.* An entity exercises direct and immediate control over hours of work if it actually determines work schedules or the work hours, including overtime, of another employer's employees. An entity does not exercise direct and immediate control over hours of work by establishing an enterprise's operating hours or when it needs the services provided by another employer.

(4) *Hiring.* An entity exercises direct and immediate control over hiring if it actually determines which particular employees will be hired and which employees will not. An entity does not exercise direct and immediate control over hiring by requesting changes in staffing levels to accomplish tasks or by setting minimal hiring standards such as those required by government regulation.

(5) *Discharge.* An entity exercises direct and immediate control over discharge if it actually decides to terminate the employment of another employer's employee. An entity does not exercise direct and immediate control over discharge by bringing misconduct or poor performance to the attention of another employer that makes the actual discharge decision, by expressing a negative opinion of another employer's employee, by refusing to allow another employer's employee to continue performing work under a contract, or by setting minimal standards of performance or conduct, such as those required by government regulation.

(6) *Discipline.* An entity exercises direct and immediate control over discipline if it actually decides to suspend or otherwise discipline another employer's employee. An entity does not exercise direct and immediate control over discipline by bringing misconduct or poor performance to the attention of another employer that makes the actual disciplinary decision, by expressing a negative opinion of another employer's employee, or by refusing to allow another employer's employee to access its premises or perform work under a contract.

(7) *Supervision.* An entity exercises direct and immediate control over supervision by actually instructing another employer's employees how to perform their work or by actually issuing employee performance appraisals. An entity does not exercise direct and immediate control over supervision when its instructions are limited and routine and consist primarily of telling another employer's employees what work to perform, or where and when to perform the work, but not how to perform it.

(8) *Direction.* An entity exercises direct and immediate control over direction by assigning particular employees their individual work schedules, positions, and tasks. An entity does not exercise direct and immediate control over direction by setting schedules for completion of a project or by describing the work to be accomplished on a project.

(d) "Substantial direct and immediate control" means direct and immediate control that has a regular or continuous consequential effect on an essential term or condition of employment of another employer's employees. Such control is not "substantial" if only exercised on a sporadic, isolated, or de minimis basis.

(e) "Indirect control" means indirect control over essential terms and conditions of employment of another employer's employees but not control or influence over setting the objectives, basic ground rules, or expectations for another entity's performance under a contract.

(f) "Contractually reserved authority over essential terms and conditions of employment" means the authority that an entity reserves to itself, under the terms of a contract with another employer, over the essential terms and conditions of employment of that other employer's employees, but that has never been exercised.

Dated: February 14, 2020.

**Roxanne L. Rothschild,**
*Executive Secretary.*

[FR Doc. 2020–03373 Filed 2–25–20; 8:45 am]

**BILLING CODE 7545–01–P**