# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**SERVICE EMPLOYEES INTERNATIONAL UNION,**

*Petitioner*,

v.

**NATIONAL LABOR RELATIONS BOARD,**

*Respondent.*

On Petition for Review of a Final Rule of the
National Labor Relations Board

## PAGE PROOF BRIEF OF PETITIONER
## SERVICE EMPLOYEES INTERNATIONAL UNION

Adam Bellotti
Grace Rybak
BREDHOFF & KAISER P.L.L.C.
805 15th St. NW, Suite 1000
Washington, D.C. 20005
202-842-2600
abellotti@bredhoff.com
grybak@bredhoff.com

Steven Ury
John D'Elia
SERVICE EMPLOYEES
INTERNATIONAL UNION
1800 Massachusetts Ave. NW
Washington, D.C. 20036
steven.ury@seiu.org
john.d'elia@seiu.org

*Counsel for Petitioner*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.  Parties and Amici.** The only parties to the present action are the Petitioner and Respondent.

Petitioner Service Employees International Union ("SEIU") is an unincorporated labor organization as defined by the National Labor Relations Act, 29 U.S.C. § 152. It has no parent corporation, and no publicly traded corporation has an ownership interest in it. The SEIU represents approximately 2 million workers throughout the United States and Canada, including many workers whose terms and conditions of employment are determined by more than one employer. The SEIU seeks to safeguard and advance workers' welfare and security and to elevate its members and their families by improving wages, benefits, and working conditions.

Respondent NLRB is an independent agency of the United States established pursuant to the National Labor Relations Act, 29 U.S.C. § 153.

**B.  Ruling Under Review.** The ruling under review in this Action is the NLRB's Final Rule concerning Joint Employer Status Under the National Labor Relations Act. The Final Rule was published on February 26, 2020, in Volume 85 of the Federal Register at pages 11184-11236. The Final Rule was codified at 29 C.F.R. § 103.40.

C.    **Related Cases.** Petitioner is aware of three related cases to the current

Action.

1.    ***SEIU v. NLRB*, Case No. 21-cv-2443-RC (D.D.C.).** SEIU and NLRB

are parties to a pending case in the U.S. District Court for the District of Columbia

concerning the validity of the same final Agency action. On May 5, 2025, the

district court entered a minute order granting the parties' joint motion to hold that

case in abeyance pending final disposition of SEIU's petition for review in this

Court. *See* Dkt. No. 67 (Joint Motion to Vacate Scheduling Order and Hold Case in

Abeyance).

2.    ***Chamber of Commerce of the United States of America, et al. v.***

***NLRB*, Case No. 6:23-cv-00553 (E.D. Tex.) and Case No. 24-40331 (5th Cir.).**

In this case, the U.S. Chamber of Commerce and several employer groups

challenged a 2023 Final Rule published by the NLRB on the same topic, Joint

Employer Status Under the National Labor Relations Act (the "2023 Rule"). The

2023 Rule rescinded and replaced the 2020 Rule that is challenged in this Action.

On or about March 18, 2024, Judge J. Campbell Barker of the Eastern District of

Texas entered a corrected order granting the plaintiffs summary judgment and

vacating the 2023 Rule, including that portion of the 2023 Rule that vacated the

2020 Rule. *See* Dkt. No. 47 (corrected opinion) and Dkt. No. 45 (final judgment).

The effect of Judge Barker's order was to return to the 2020 Rule as the operative

standard governing joint employer status under the NLRA. The NLRB appealed the judgment of the Eastern District of Texas. Dkt. No. 48. Then, on or about July 19, 2024, the NLRB moved for voluntary dismissal of its appeal. *NLRB v. Chamber of Com. of the U.S.*, Case No. 24-40331 (5th Cir. July 19, 2024), Dkt. No. 30. The Fifth Circuit granted the NLRB's Motion for Voluntary Dismissal the same day.

3.      ***SEIU v. NLRB*, Case No. 23-1309 (D.C. Cir.).** In this case, Petitioner SEIU challenged certain aspects of the 2023 Rule that was also the subject of the Chamber of Commerce's challenge in Case No. 6:23-cv-00553. SEIU's challenges to the 2023 Rule were mooted by the NLRB's dismissal of its appeal of the Eastern District of Texas order vacating the 2023 Final Rule. Accordingly, on or about August 13, 2024, the SEIU and NLRB jointly moved for dismissal of the SEIU's action challenging the 2023 Rule. *See SEIU v. NLRB*, Case No. 23-1309, Dkt. No. 2069613. This Court dismissed SEIU's petition challenging the 2023 Rule on August 26, 2024. Case No. 23-1309, Dkt. No. 2071711.

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Circuit Rule 26.1 and D.C. Circuit Rule 26.1, the undersigned counsel hereby certifies as follows:

Petitioner Service Employees International Union is an unincorporated association and labor organization. Petitioner does not have a parent company. No publicly held company has any interest in Petitioner.

s/ *Adam Bellotti*
Adam Bellotti

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. iv

TABLE OF AUTHORITIES .............................................................. vii

GLOSSARY.................................................................................. xiii

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION........................................................2

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF THE CASE..............................................................4

    I.  The National Labor Relations Act...................................................4

        A.   The NLRA Protects Employees' Rights to Organize and Bargain
            Collectively with their Employers. ...........................................4

        B.   The NLRA's Definition of Employer. ......................................6

        C.   The History of Joint-Employer Analysis under the NLRA. ....................7

    II. The NLRB's Rulemaking Proceedings Concerning Joint Employer
       Status Under the NLRA................................................................12

        A.   The Notice of Proposed Rulemaking. ......................................12

        B.   The Final Rule....................................................................13

            a.   The Final Rule's Actual-Exercise Requirement. ..............................14

            b.   The Final Rule's Enumeration of Essential Terms and
                Conditions of Employment. ...........................................17

    III.Rulemaking Proceedings and Litigation Concerning Joint-Employer
       Status after Adoption of the Final Rule.........................................18

STANDARD OF REVIEW ................................................................20

SUMMARY OF ARGUMENT .............................................................21

STANDING .................................................................................24

ARGUMENT ...............................................................................26

    I.  The Final Rule's Actual-Exercise Requirement Is not in Accordance
       with the National Labor Relations Act.........................................26

A.  Common-Law Agency Principles Govern the Interpretation of "Employer" under the NLRA.............................................28

B.  At Common Law, Contractually Reserved Control Is Sufficient to Find Joint Employment Whether or not that Control Has Been Exercised. ...............................................................30

C.  The Final Rule Conflicts with the Common Law Definition of "Employer" by Relegating Reserved Control to a Mere Plus-Factor.....34

II. The 2020 Final Rule Is Arbitrary and Capricious Because the Board Failed to Address How the Actual-Exercise Requirement Threatens Collective Bargaining. ...............................................42

III. The Final Rule's Exclusion of both Reserved and Exercised Control over Health and Safety Matters from the Exhaustive List of Essential Terms and Conditions of Employment Was Arbitrary and Capricious. .................49

CONCLUSION ...............................................................56

CERTIFICATE OF COMPLIANCE .......................................58

CERTIFICATE OF SERVICE ..............................................58

ADDENDUM ...............................................................

1. 5 U.S.C. § 706 Scope of review ..................................1a

2. 29 U.S.C. § 151 Findings and declaration of policy ...............1a

3. 29 U.S.C. § 152 Definitions ....................................2a

4. 29 U.S.C. § 156 Rules and regulations ..........................3a

5. 29 U.S.C. § 157 Right of employees as to organization, etc....................3a

6. 29 U.S.C. § 158 Unfair labor practices ..........................4a

7. 29 U.S.C. § 159 Representatives and elections......................11a

8. 29 U.S.C. § 160 Prevention of unfair labor practices ...........13a

9. 29 C.F.R. § 103.40 Joint Employers .............................19a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFGE Loc. 1929 v. FLRA*,
    961 F.3d 452 (D.C. Cir. 2020) ............................................................. 43

*AFGE v. FLRA*,
    24 F.4th 666 (D.C. Cir. 2022) ............................................................. 43

*AFGE v. FLRA*,
    25 F.4th 1 (D.C. Cir. 2022) ........................................................... 24, 25

*AFL-CIO v. NLRB*,
    57 F.4th 1023 (D.C. Cir. 2023) ......................................................... 3, 18

*Airborne Express*,
    338 NLRB 597 (2002) ....................................................................... 10

*AM Prop. Holding Corp.*,
    350 NLRB 998 (2007) ....................................................................... 10

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) ........................................................ 43, 44

*Amalgamated Utility Workers v. Consol. Edison Co.*,
    309 U.S. 261 (1940) ............................................................................ 6

*Anthony Motor Co., Inc.*,
    314 NLRB 443 (1994) ....................................................................... 39

*Appalachian Shale Prods. Co.*,
    121 NLRB 1160 (1958) ...................................................................... 48

*AT&T Servs., Inc. v. FCC*,
    21 F.4th 841 (D.C. Cir. 2021) ......................................................... 43, 55

*Bloomberg L.P. v. SEC*,
    45 F.4th 462 (D.C. Cir. 2022) ......................................................... 43, 54

*Bobik v. Indus. Comm'n*,
    64 N.E.2d 829 (Ohio 1946) ............................................................... 32

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964).....................................................................................7, 31

*Browning-Ferris Indus. of Cal., Inc.*,
362 NLRB 1599 (2015) ......................................................................10, 11, 40

*Browning-Ferris Indus. of Cal., Inc.*,
369 NLRB No. 139 (2020), *enf't denied sub nom. Sanitary Truck
Drivers & Helpers Loc. 350 v. NLRB*, 45 F.4th 38 (D.C. Cir. 2022)................12

*Browning-Ferris Indus. of Cal., Inc. v. NLRB*,
911 F.3d 1195 (D.C. Cir. 2018).............1, 7, 10-13, 15, 21, 26-30, 33, 36, 38, 41

*Buckeye Mart*,
165 NLRB 87 (1967), *enforced* 405 F.2d 1211 (6th Cir. 1969).........................8

*Bush v. Wilson & Co.*,
138 P.2d 457 (Kan. 1943).................................................................................32

*Canisteo Mining Co.*,
39 NLRB 8 (1942) .............................................................................................7

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019)..............................................................42, 43, 48

*Chamber of Com. of U.S. v. NLRB*,
723 F. Supp. 3d 498 (E.D. Tex. 2024)..............................................................20

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989).........................................................................................29

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015)..........................................................................26

*Dunkin' Donuts Mid-Atlantic Distrib. Ctr., Inc. v. NLRB*,
363 F.3d 437 (D.C. Cir. 2004)..........................................................................41

*Emps. Mut. Liab. Ins. Co. v. Indus. Comm'n*,
284 N.W. 548 (Wis. 1939)................................................................................31

*Fin. Plan. Ass'n v. SEC*,
482 F.3d 493 (D.C. Cir. 2007)..........................................................................27

*Ford Motor Co. v. NLRB*,
441 U.S. 488 (1979)...................................................................39

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
805 F.2d 1050 (D.C. Cir. 1986)................................................49

*Globe Discount City*,
209 NLRB 213 (1974) .................................................................8

*Grand Canyon Air Tour Coal. v. FAA*,
154 F.3d 455 (D.C. Cir. 1998)..................................................43

*Green Valley Co-op. Dairy Co. v. Indus. Comm'n*,
27 N.W.2d 454 (Wis. 1947)......................................................31

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020), *vacated as moot following
revocation of agency action*, 142 S. Ct. 1665 (2022) .........................49

*Greyhound Corp.*,
153 NLRB 1488 (1965), *enforced* 368 F.2d 778 (5th Cir. 1966)...................7, 8

*Harris-Teeter Super Markets*,
293 NLRB 743 (1989) ...............................................................39

*Home Box Off., Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977).......................................................42

*Hoskins Ready-Mix Concrete, Inc.*,
161 NLRB 1492 (1966) ..............................................................37

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)...................................................................25

*Indus. Comm'n v. Meddock*,
180 P.2d 580 (Ariz. 1947) .........................................................32

*Int'l Dark-Sky Ass'n, Inc. v. FCC*,
106 F.4th 1206 (D.C. Cir. 2024).................................................26

*Interstate Nat. Gas Ass'n of Am. v. Pipeline & Hazardous Materials
Safety Admin.*,
114 F.4th 744 (D.C. Cir. 2024)...................................................20

*Jewel Tea Co.*,
  162 NLRB 508 (1966) ..........................................................8, 36, 37, 38

*Johnson-Bateman Co.*,
  295 NLRB 180 (1989) ......................................................................40

*Laerco Transp. & Warehouse*,
  269 NLRB 324 (1984) ...................................................................9, 10

*Link Transp. Corp.*,
  No. 16-CA-289847, 2024 WL 2812297 (May 30, 2024)..................20

*Manhattan Shirt Co.*,
  84 NLRB 100 (1949) ........................................................................37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)......................................................................42, 48

*Nat. Res. Def. Council v. EPA*,
  489 F.3d 1250 (D.C. Cir. 2007).......................................................28

*NLRB v. Browning-Ferris Indus. of Pa., Inc.*,
  691 F.2d 1117 (3d Cir. 1982) ............................................................7

*NLRB v. Hearst Publ'n, Inc.*,
  322 U.S. 111 (1944)....................................................................28, 29

*NLRB v. United Ins. Co. of Am.*,
  390 U.S. 254 (1968)............................................1, 6, 26, 28, 29

*NTEU v. Chertoff*,
  452 F.3d 839 (D.C. Cir. 2006).....................................................24, 25

*S.A. Gerrard Co. v. Indus. Accident Comm'n*,
  110 P.2d 377 (Cal. 1941) ................................................................31

*SEIU Local 32BJ v. NLRB*,
  647 F.3d 435 (2d Cir. 2011) .....................................................10, 13

*Singer Mfg. Co. v. Rahn*,
  132 U.S. 518 (1889)........................................................................30

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ........................................................................... 25

*TLI Inc.*,
    271 NLRB 798 (1984), *enforced* 772 F.2d 894 (3d Cir. 1985) ..................... 9, 10

*United Mercantile, Inc.*,
    171 NLRB 830 (1968) ....................................................................... 8

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) .......................................................... 44

*Value Village*,
    161 NLRB 603 (1966) ....................................................................... 37

*In Re Virginia Mason Hosp.*,
    357 NLRB 564 (2011) ....................................................................... 40

**Statutes and Regulations**

5 U.S.C. § 706(2)(A) ........................................................... 4, 20, 27, 42

29 U.S.C. § 151 .................................................... 5, 42, 44, 47, 50, 53, 56

29 U.S.C. § 152(2) ................................................................ 4, 6, 28

29 U.S.C. § 152(3) ................................................................... 6, 28

29 U.S.C. § 152(13) ..................................................................... 28

29 U.S.C. § 156 ........................................................................... 3

29 U.S.C. § 157 ......................................................................... 1, 4

29 U.S.C. § 158 ........................................................................... 5

29 U.S.C. § 158(a) ..................................................................... 6, 38

29 U.S.C. § 158(b)(3) .................................................................... 38

29 U.S.C. § 158(d) ................................................. 6, 38, 42, 44, 50, 56

29 U.S.C. § 159 ........................................................................... 5

29 U.S.C. § 160 ........................................................................... 5

29 U.S.C. § 160(f)......................................................................................3

29 C.F.R. § 103.40....................................................................................20

29 C.F.R. § 103.40(a)...................................................... 16, 17, 26, 27, 49, 50

29 C.F.R. § 103.40(b) ...........................................................................4, 17, 50

29 C.F.R. § 103.40(c)................................................................................19

29 C.F.R. § 103.40(d)...............................................................................20

Labor Management Relations Act of 1947, Pub. L. 80–101, 61 Stat. 136..............29

**Other Authorities**

83 Fed. Reg. 46681 (proposed Sept. 14, 2018).....................................12, 13

85 Fed. Reg. 11184 (Feb. 26, 2020) .......2-4, 14-18, 26, 28, 34-35, 38, 48-50, 54-55

88 Fed. Reg. 73946 (Oct. 27, 2023).........................................................19

John Higgins, *The Developing Labor Law*, Ch. 16.IV.C.1 (BNA 2025) ...............39

Restatement (Second) of Agency § 2.........................................................11, 32, 33

Restatement (Second) of Agency § 220(1)............................................................11

# <u>GLOSSARY</u>

APA              Administrative Procedure Act

IUOE          International Union of Operating Engineers

NLRA          National Labor Relations Act

NLRB          National Labor Relations Board

NPRM         Notice of Proposed Rulemaking

SEIU          Service Employees International Union

**INTRODUCTION**

The National Labor Relations Act ("NLRA" or "Act") vests in workers a statutory right to collectively bargain with their employers over the conditions under which they work. 29 U.S.C. § 157. The Final Rule challenged here impermissibly curtails that right for millions of workers by enabling companies with the power to control their jobs to escape the bargaining table. It achieves this by limiting employer liability in a manner that is both arbitrary and in conflict with the common-law principles that Congress required the Board to follow when making employer determinations. The Final Rule is unlawful and must be vacated.

The Supreme Court has long held that common-law agency principles govern the interpretation of the term "employer" in the NLRA. *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968). In 2018, this Court applied those principles to the joint-employer context, a common scenario under which two entities possess sufficient control of employees to both qualify as employers. *Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195 (D.C. Cir. 2018). Just over a year later, the National Labor Relations Board ("NLRB" or "Board") disregarded that precedent in the Final Rule. The Rule's joint-employer definition conflicts with the common law, and therefore, contravenes the Act and this Court's precedent.

The Final Rule violates the Administrative Procedure Act ("APA") on multiple, independent grounds. The Rule conflicts with the NLRA's definition of "employer" by requiring actual exercise of control over employee terms and conditions even though the common law treats the *right* to control as the critical factor, sufficient to establish an employment relationship. The Board thus misconstrued common-law requirements, a question on which this Court has already ruled that the Board is entitled to no deference. In addition, the Board's adoption of the Rule was arbitrary and capricious in two ways. The Board failed to consider the destructive effects the Rule will have on collective bargaining, a core objective of the NLRA. Without a rationale, the Board also excluded worker health and safety—a matter of obvious importance—from the list of essential conditions over which an entity's control may produce a duty to bargain. This leaves workers unable to negotiate with entities that control their very bodily safety, an unacceptable result that the Board failed to explain, despite concerns expressed by commenters. For these reasons, the Petition for Review should be granted, and the Final Rule should be vacated.

## STATEMENT OF JURISDICTION

This Action is a Petition for Review of the NLRB's final agency action titled "Joint Employer Status Under the National Labor Relations Act," which was published in the Federal Register on February 26, 2020 at Volume 85, pages

11,184 through 11,236. Pursuant to Section 10(f) of the NLRA, 29 U.S.C. § 160(f),

this Court has jurisdiction to review NLRB final orders, including final rules

promulgated pursuant to NLRA Section 6, 29 U.S.C. § 156, concerning unfair

labor practices. *AFL-CIO v. NLRB*, 57 F.4th 1023, 1033 (D.C. Cir. 2023). Thus, as

to final agency rules regulating the Board's unfair-labor-practice jurisdiction,

Section 10(f) operates as a direct-review statute providing this Court with original

jurisdiction to hear Petitioner's Petition for Review. *Id.* at 1033-34. The Final Rule

challenged in this Action implicates both the Board's representation-case

jurisdiction and its unfair-labor-practice jurisdiction. *See* Final Rule, 85 Fed. Reg.

at 11188 ("Section 9 of the Act sets forth the Board's responsibilities for

conducting representation elections, and Section 10 of the Act provides the Board

with the authority to investigate, prevent, and remedy unfair labor practices. The

Board's joint-employer doctrine implicates each of these provisions of the Act.")

Accordingly, this Court has original jurisdiction to review the Final Rule.

## STATEMENT OF THE ISSUES

1.     Whether the Final Rule's requirement that a putative joint employer

that shares or codetermines the employees' essential terms and conditions of

employment must also "possess and exercise such substantial direct and immediate

control over one or more essential terms or conditions of their employment," Final

3

Rule, 85 Fed. Reg. at 11212 (Feb. 26, 2020), is in accord with the NLRA, 29 U.S.C. § 152(2)? *See* 5 U.S.C. § 706(2)(A).

2.　　　Whether the Final Rule's distinction between those employers that share or codetermine employee terms and conditions of employment and those employers that both share or codetermine employee terms and conditions *and* have exercised substantial and immediate control over one or more essential terms and conditions is arbitrary, capricious, or an abuse of the NLRB's discretion? *See* 5 U.S.C. § 706(2)(A).

3.　　　Whether the Final Rule's exclusion of both reserved and exercised control over health and safety matters from the exclusive list of "essential terms and conditions of employment," 29 C.F.R. § 103.40(b), is arbitrary, capricious, or an abuse of the NLRB's discretion? *See* 5 U.S.C. § 706(2)(A).

## STATEMENT OF THE CASE

### I.　The National Labor Relations Act.

#### A.　The NLRA Protects Employees' Rights to Organize and Bargain Collectively with their Employers.

The NLRA is the primary statute protecting the rights of employees who work for private-sector employers to join unions of their choosing, to bargain collectively through those unions, and to engage in other concerted activity for the purpose of mutual aid or protection. 29 U.S.C. § 157. Congress passed the NLRA because it found that "[t]he denial by some employers of the right of employees to

organize and the refusal by some employers to accept the procedure of collective bargaining [led] to strikes and other forms of industrial strife or unrest," burdening the free flow of interstate commerce. 29 U.S.C. § 151. Congress was particularly concerned that "[t]he inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers . . . tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries." *Id.* To remedy these problems, Congress declared that it was the policy of the United States to "encourag[e] the practice and procedure of collective bargaining and [to] protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing." *Id.*

The NLRA establishes the NLRB, which is charged with two statutory functions. First, the NLRB is charged with the investigation, adjudication, and resolution of unfair-labor-practice charges filed by employees, employers, and unions. 29 U.S.C. §§ 158, 160. Second, the NLRB is charged with investigating questions concerning representation, that is, whether employees want to be represented by a union for the purpose of collective bargaining. 29 U.S.C. § 159. The NLRB is the exclusive means for private-sector employees to redress violations of their NLRA rights, including both their right to act concertedly free of

coercion and their right to organize and bargain by and through an exclusive representative. *Amalgamated Utility Workers v. Consol. Edison Co.*, 309 U.S. 261, 267-70 (1940) (holding that there is no private right of action under the NLRA).

### B.    The NLRA's Definition of Employer.

Under the NLRA, only "employers" must bargain with employees' exclusive representative concerning employees' wages, hours, and terms and conditions of employment. 29 U.S.C. § 158(d). Similarly, only "employers" may be held responsible to remedy the employer unfair labor practices prohibited by Section 8(a). 29 U.S.C. § 158(a). Determining who is the "employer"—or who are the "employers"—of a particular group of employees is, therefore, pivotal to the NLRB's representation and unfair-labor-practice work.

The NLRA defines "employer" to "include[] any person acting as an agent of an employer, directly or indirectly." 29 U.S.C. § 152(2). The Act defines "employee," in turn, to mean "any employee," subject to certain statutory exclusions, including the statutory exclusion for "any individual having the status of an independent contractor." *Id.* § 152(3). Interpreting these bare-bones definitions, the Supreme Court held that Congress intended the Board and courts to "apply general agency principles" to determine who is an employee and who is an employer of a particular group of employees. *United Ins. Co. of Am.*, 390 U.S. at 256.

## C.     The History of Joint-Employer Analysis under the NLRA.

From the NLRB's earliest days administering the Act, it found that two or more separate business entities could jointly employ a particular group of employees. *E.g.*, *Canisteo Mining Co.*, 39 NLRB 8, 10 (1942) (mine leaseholders and mine operator jointly employed miners working at the mines). Since at least 1965, the Board has stated that it would find two separate business entities to be joint employers of a particular group of employees when the employers "share, or codetermine, those matters governing essential terms and conditions of employment" of the employees in question. *Greyhound Corp.*, 153 NLRB 1488, 1495 (1965), *enforced* 368 F.2d 778 (5th Cir. 1966) (on remand from *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). Since 1965, that essential formulation of the joint-employer test has often been used by the Board to conduct its joint-employer analyses, and that formulation has been judicially approved by the reviewing courts to have considered it. *See, e.g.*, *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1119 (3d Cir. 1982); *Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195, 1201 (D.C. Cir. 2018) (hereafter, "*Browning-Ferris California*") (collecting cases endorsing the "share or co-determine those matters governing [the] essential terms and conditions" test).

*How* the proponent of joint-employer status can establish that two separate business entities share or co-determine the essential terms and conditions of

employment has not enjoyed the same level of stability. In the period following *Greyhound Corp.*, the Board often found joint employment based on control over the terms and conditions of employment that had been contractually reserved by the putative joint employer.

Those cases came in two flavors. In some cases, the Board found joint employment based solely on the reservation of control by the putative joint employer without specifically analyzing whether the putative employer had also exercised that reserved control. *See, e.g.*, *Globe Discount City,* 209 NLRB 213, 213–14 & fn. 3 (1974) (finding joint employment based on license agreements, without reference to any exercise of authority); *United Mercantile, Inc.,* 171 NLRB 830, 831–32 (1968) (same); *Buckeye Mart,* 165 NLRB 87, 88 (1967) (finding store owner to be joint employer of employees with shoe seller based only on contractually reserved authority over, *inter alia*, discharge decisions and rules and regulations governing employee conduct), *enforced* 405 F.2d 1211 (6th Cir. 1969). In other cases, the Board found two employers jointly employed the particular employees even though it found that the putative employer had *not*, as a matter of fact, exercised the control over employee terms and conditions it reserved to itself. *See, e.g.*, *Jewel Tea Co.,* 162 NLRB 508, 510 (1966) (finding joint employment based on contractually reserved, unexercised power to effectively control hire, discharge, wages, hours, despite finding that licensor had never exercised such

powers). In both flavors of case, the contractually reserved control of the putative

joint employer was sufficient to support the finding of joint employment, and the

Board found joint employment on that basis without reference to the employer's

exercise of that control.

Without explanation, the Board changed its analysis in the 1980s. In a pair

of cases decided in 1984, the Board focused exclusively on the degree of control

that had been exercised by the putative joint employer without analyzing how, if at

all, the control that had been contractually reserved by the putative joint employer

affected employee terms and conditions. *See TLI Inc.*, 271 NLRB 798, 799 (1984)

(finding no joint employment based on limited operational involvement in

employees' supervision despite lease agreement that provided putative joint

employer would "solely and exclusively be responsible for maintaining operational

control, direction and supervision"), *enforced* 772 F.2d 894 (3d Cir. 1985); *Laerco*

*Transp. & Warehouse*, 269 NLRB 324, 326 (1984) (finding no joint employment

based on limited and routine nature of supervision and assignment conducted by

putative joint employer, despite driver-service agreement that reserved to putative

joint employer control over direction, minimum qualifications, and the right to

reject applicants who did not meet those qualifications). With time, the holdings in

these cases calcified into a test under which the NLRB would not find two separate

business entities to be joint employers unless the proponent of joint-employer

status established (1) that the putative joint employer actually exercised its control; (2) that such control was exercised directly and immediately; and (3) that such control was neither limited nor routine. *See, e.g., AM Prop. Holding Corp.*, 350 NLRB 998, 999–1003 (2007), *enforced in relevant part sub nom. SEIU Loc. 32BJ v. NLRB*, 647 F.3d 435 (2d Cir. 2011); *see also Airborne Express*, 338 NLRB 597, 597 n.1 (2002) (acknowledging that the Board abandoned its earlier joint-employment test in the 1980s but declining concurring Member's invitation to revisit the issue).

In part because it found that evolving business models increasingly split control over terms and conditions of employment among multiple formally separate entities, the Board took a fresh look at these precedents in 2015's *Browning-Ferris Industries of California, Inc.*, 362 NLRB 1599, 1609 (2015), *pet. for rev. granted in part*, *Browning-Ferris California*, 911 F.3d at 1222-23.[1] There, after inviting interested parties and amici to file briefs, the Board held that the additional requirements imposed on the joint-employment test beginning with *Laerco* and *TLI* were neither compelled by the NLRA nor consistent with the

---

[1] In the Final Rule at issue here, several commenters pointed to Professor David Weil's 2017 book, *The Fissured Workplace: Why Work Became so Bad for so Many and What Can be Done About It* (Harvard University Press 2017), as having chronicled these economic developments. *See, e.g.*, National Employment Law Project, Cmt No. NLRB-001462, at 14 n.24 (Jan. 28, 2019); Labor Law, Antitrust Law, and Economics Professors, Cmt. No. NLRB-001418 (Jan. 14, 2019). These same economic changes were highlighted in the Comments SEIU submitted in response to the NPRM. *See* SEIU, Cmt. No. NLRB-001570, at 10-11 (Jan. 28, 2019).

common-law principles that must govern joint-employer determinations under the Act. *Id.* at 1599. Accordingly, to bring the Board's test back in line with the "share or co-determine those matters governing the essential terms and conditions of employment" test upheld by the Third Circuit in 1983's *Browning-Ferris Pennsylvania*, the Board rejected the actual-exercise requirement: "We will no longer require that a joint employer not only *possess* the authority to control employees' terms and conditions of employment, but also *exercise* that authority." *Id.* at 1600. As the Board reasoned, "[r]eserved authority to control terms and conditions of employment, even if not exercised, is clearly relevant to the joint-employment inquiry." *Id.* (citing Restatement (Second) of Agency §§ 2(1), 220(1)). The Board also clarified that control exercised through an intermediary may also establish joint employment. *Id.*

On review, this Court upheld the Board's view that "authorized or reserved right to control is relevant evidence of a joint-employer relationship" as being "wholly [in] accord[] with traditional common-law principles of agency." 911 F.3d at 1213. At the same time, the Court clarified that *Browning-Ferris California* did "not present the question whether the reserved right to control, divorced from any actual exercise of that authority, could alone establish a joint-employer relationship." *Id.* After finding that the Board's restated joint-employer test tracked the common law, the Court remanded to the Board to analyze whether the putative

joint-employer's control bore on the essential terms and conditions of employment or only on the routine components of company-to-company contracting. *Id.* at 1221.

Before the Board issued a revised *Browning-Ferris* decision on remand, it embarked on the rulemaking process that gave rise to this Petition for Review. *See Browning-Ferris Indus. of Cal., Inc.*, 369 NLRB No. 139 (2020), *enf't denied sub nom. Sanitary Truck Drivers & Helpers Loc. 350 v. NLRB*, 45 F.4th 38 (D.C. Cir. 2022).

## II.    The NLRB's Rulemaking Proceedings Concerning Joint Employer Status Under the NLRA.

### A.    The Notice of Proposed Rulemaking.

On September 14, 2018, while *Browning-Ferris California* was pending before this Court, the Board issued a Notice of Proposed Rulemaking on the Standard for Determining Joint-Employer Status under the NLRA. 83 Fed. Reg. 46681-01 (Sept. 14, 2018) ("NPRM").

Under the standard proposed in the NPRM, "[a] putative joint employer must possess and actually exercise substantial direct and immediate control over the employees' essential terms and conditions of employment in a manner that is not limited and routine." 83 Fed. Reg. at 46686. The Board justified this actual-exercise requirement on its view that the Act's goals would be best served by "a joint-employer doctrine that imposes bargaining obligations on putative joint

employers that have actually played an active role in establishing essential terms and conditions of employment." *Id.* In the NPRM, the Board explicitly stated its view that an actual-exercise requirement "is consistent with the common law of joint-employer relationships." *Id.* (citing *SEIU Loc. 32BJ*, 647 F.3d at 442-43). The Board declined to describe what, if any, role reserved-but-unexercised authority would play in the joint-employer analysis. *Id.* at 46687. But the Board invited comments "regarding the current state of the common law on joint-employment relationships," including whether the common law dictates the approach of the proposed rule or that of *Browning-Ferris*. *Id.* The Board also clarified that it would look to exercised control only over those "essential terms and conditions of employment," which it suggested included "hiring, firing, discipline, supervision, and direction." *Id.* at 46686.

Then-Member McFerran dissented from the Board's decision to propose this rule, reasoning in part that the majority's actual-exercise requirement impermissibly deviated from the common law, which allowed employment relationships to be established solely on the existence of reserved-but-unexercised control. *Id.* at 46689.

### B. The Final Rule.

In response to the NPRM, the NLRB received nearly 29,000 comments, including those submitted by Petitioner SEIU and its constituent unions SEIU

32BJ, National Fast Food Workers Union-SEIU, and 1199 SEIU United Healthcare Workers East. *See* 85 Fed. Reg. at 11188. As the Board recounted, many comments argued that "the common law, as reflected in relevant Restatements and judicial decisions, permits or requires the consideration of reserved but unexercised control." *Id.* at 11195. Nevertheless, the Board ultimately voted to retain the actual-exercise requirement and make it part of the Final Rule. *Id.* at 11199.[2]

### a. The Final Rule's Actual-Exercise Requirement.

Responding to comments about what role, if any, contractually reserved but unexercised control should play in the Board's joint-employment test, the Board majority began by stating that it "agree[d] with commenters who observe that the common law and the Act *permit* consideration of reserved control." 85 Fed. Reg. at 11195 (emphasis in original). The Board explained that it would modify the proposed rule to provide that reserved-but-unexercised control "is probative of joint-employer status, but only to the extent that evidence of such authority supplements and reinforces evidence of actually exercised direct and immediate control." *Id.* The Board clarified that reserved-but-unexercised control would be probative only insofar as (1) it was reserved authority over essential terms and

---

[2] Member McFerran's term had ended by the time the NLRB issued the Final Rule, leaving two seats on the five Member Board vacant. Accordingly, the Final Rule was issued by Chairman John Ring and Members William Emanuel and Marvin Kaplan.

conditions of employment and (2) it supplemented and reinforced evidence of direct and immediate control over essential conditions of employment. *Id.* at 11196.

The Board underscored the subsidiary role reserved-but-unexercised control would play in its joint-employment analysis in its discussion of the actual-exercise requirement. After acknowledging commenters' practical and legal arguments against an actual-exercise requirement, the Board opted to "retain the actual exercise requirement in the Final Rule." *Id.* at 11199. The Board reasoned that an actual-exercise requirement "falls within the boundaries of the common law as applied in the particular context of the NLRA." *Id.* at 11201. The Board also stated that its adoption of an actual-exercise requirement was consistent with this Court's decision in *Browning-Ferris California*, purportedly because the limitation that reserved control would be used only to the extent it supplements and reinforces evidence of exercised control "serves a purpose similar to the second step of the *Browning-Ferris* standard—i.e., to ensure that only those entities that meaningfully affect matters relating to the employment relationship are found to be joint employers." *Id.* at 11211 (cleaned up). And again in its final justification for the rule, the Board clarified that it "will not find indirect or unexercised reserved control, alone, dispositive." *Id.* at 11224.

The actual-exercise requirement—and the corresponding subjugation of reserved-but-unexercised control—are key features of the Final Rule's text. Thus, the Final Rule declares that, "[t]o establish that an entity shares or codetermines the essential terms and conditions of another employer's employees, the entity must possess and exercise such substantial direct and immediate control over one or more essential terms or conditions of their employment." *Id.* at 11235 (setting 29 C.F.R. § 103.40(a)). The Final Rule specifically states that "[e]vidence of . . . the entity's contractually reserved but never exercised authority over the essential terms and conditions of employment . . . is probative of joint-employer status, [] *only* to the extent it supplements and reinforces evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment." *Id.* (emphasis added).

Thus, under the Final Rule, no matter how comprehensively a putative joint employer has reserved to itself the ability to maintain, set, or modify the essential terms and conditions of employment, that reserved right to control will never be sufficient to demonstrate the existence of a joint-employer relationship. Rather, the factfinder is permitted to consider that evidence only once the proponent of joint-employer status has already come forward with evidence sufficient to show that the putative joint employer has already exercised that control as a matter of fact—a demonstration that, in and of itself, will be sufficient, on its own, to demonstrate

joint-employer status. 85 Fed. Reg. at 11235 (setting 29 C.F.R. § 103.40(a)). In so doing, the Final Rule pays lip service to the consideration—required by the common law—of reserved-but-unexercised control but relegates evidence of such reserved control to a mere plus factor, insufficient to ever demonstrate joint employment status. *See* Argument I.C, *infra*.

### b. The Final Rule's Enumeration of Essential Terms and Conditions of Employment.

Separate from its adoption of the actual-exercise requirement, the Final Rule adopted a closed set of "essential terms and conditions of employment" and made exercised control over those terms the only relevant determinants of joint employment. The seven "essential" terms and conditions of employment articulated by the Board include: wages; benefits; hours of work; hiring; discharge; discipline; and supervision. 85 Fed. Reg. at 11235-11236 (setting 29 C.F.R. § 103.40(b)). The Final Rule is clear that evidence of the putative joint employer's control over all other mandatory subjects of bargaining—whether exercised or not—is again probative of joint-employer status "only to the extent it supplements and reinforces evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment." *Id.* at 11235 (setting 29 C.F.R. § 103.40(a)).

By setting the list of essential terms and conditions to include only those mandatory subjects of bargaining enumerated in the Final Rule, the Board rejected

commenters' suggestions to add certain other mandatory subjects of bargaining, including health and safety, to the list of essential subjects. 85 Fed. Reg. at 11205. By doing so, the Board ensured that even exercised control over health and safety matters would, like reserved-but-unexercised control, be part of the joint-employer analysis only once the proponent of joint employment came forward with evidence that the employer exercised direct and immediate control over one of the essential terms and conditions of employment. *Id.* at 11207. But the Board never specifically addressed why it chose not to include health and safety among those essential terms and conditions of employment that it found determinative of the existence of a joint employer. *See id.* at 11205-11208.

### III. Rulemaking Proceedings and Litigation Concerning Joint-Employer Status after Adoption of the Final Rule.

Two events that have occurred since the Board issued the 2020 Final Rule have, at least temporarily, shaped the Board's joint-employment analysis.[3]

---

[3] In 2021, Petitioner SEIU filed suit in the District Court for the District of Columbia challenging adoption of the 2020 Final Rule. *See SEIU v. NLRB*, Dkt. No. 1, Case No. 21-2443 (D.D.C. Sept. 17, 2021). That case was stayed because of the initiation of the Board's 2023 Joint-Employer rulemaking process. Then, in 2023, this Court issued *AFL-CIO v. NLRB*, which held that original jurisdiction to challenge NLRB rules impacting the Board's unfair-labor-practice jurisdiction lies in this Court. 57 F.4th at 1033; *see also* Statement of Jurisdiction, *supra* at 2-3. Following *AFL-CIO* and the Eastern District of Texas's decision vacating the 2023 Final Rule, Petitioner SEIU filed this action challenging adoption of the 2020 Final Rule. SEIU's district-court action challenging the 2020 Rule is stayed pending resolution of this case. Minute Order Granting Dkt. No. 67, Case No. 21-2443 (D.D.C. May 5, 2025).

First, in 2023, the Board issued a new rule on joint-employer status under the NLRA that would have rescinded and replaced the 2020 Final Rule challenged here. Under the 2023 Final Rule, the proponent of joint-employer status would have been able to demonstrate that a putative joint employer shared or co-determined the essential terms and conditions of employment if the proponent established that the putative joint employer "possess[ed] the authority to control" one or more of the essential conditions of employment. 88 Fed. Reg. 73946, 74017 (Oct. 27, 2023) (setting 29 C.F.R. § 103.40(c)). As the Board explained, this possession-of-control path to joint employment was designed to bring the joint-employer test's operation into line with the Board's view of common-law requirements, which the Board viewed as turning on "the existence of a putative employer's reserved authority to control the details of the terms and conditions under which work was performed," which "sufficed to establish a common-law employer-employee relationship without regard to whether or in what manner such control was exercised." *Id.* at 73950. The Board also re-enumerated the essential terms and conditions of employment, this time adding "[w]orking conditions related to the safety and health of employees" to the list of essential terms that would chiefly determine joint employment. *Id.* at 74017-18 (setting 29 C.F.R. § 103.40(d)).

In response, employer groups led by the U.S. Chamber of Commerce filed

suit in the Eastern District of Texas, challenging the 2023 Final Rule as

inconsistent with the common law and arbitrary and capricious. *See Chamber of*

*Com. of U.S. v. NLRB*, 723 F. Supp. 3d 498, 510 (E.D. Tex. 2024). The district

court agreed and granted the employer groups' motion for summary judgment to

invalidate the rule on the basis that it was not consistent with the district court's

view of the requirements of the common law of agency. *Id.* at 515. The district

court then addressed the 2023 Final Rule's rescission of the 2020 Final Rule,

holding that the Board's twin rationales were either legally incorrect or arbitrary

and capricious. *Id.* at 517-18. As a result, NLRB Administrative Law Judges

currently apply the 2020 Final Rule's standard.[4]

## STANDARD OF REVIEW

Where petitioners challenge a final rule on the merits, this Court "appl[ies]

the familiar APA standard that requires [the Court] to determine whether the rule is

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.'" *Interstate Nat. Gas Ass'n of Am. v. Pipeline & Hazardous Materials Safety*

*Admin.*, 114 F.4th 744, 749 (D.C. Cir. 2024) (quoting 5 U.S.C. § 706(2)(A)).

---

[4] *See, e.g.*, *Link Transp. Corp.*, No. 16-CA-289847, 2024 WL 2812297, n.32 (May 30, 2024).
The NLRB has not yet initiated a rulemaking to update the text of 29 C.F.R.§ 103.40. As a result,
the Code of Federal Regulation text reflects that of the 2023 Final Rule, with the additional
notation that the district court vacated the 2023 Rule, "both insofar as it rescinds the current
version of 29 C.F.R. § 103.40 and insofar as it promulgates a new version of that regulation." 29
C.F.R. § 103.40.

"The content and meaning of the common law is a pure question of law that [this Court] reviews *de novo* without deference to the Board." *Browning-Ferris California*, 911 F.3d at 1206. Consequently, "to the extent that the Board's joint-employer standard is predicated on interpreting the common law," the Board receives "no deference." *Id.*

## SUMMARY OF ARGUMENT

1. At common law, whether an employer employs a particular employee turns on whether the employer has the right to control that employee. The employer's right to control can be established through evidence that the employer had reserved to itself the right to control the employee's conditions of employment through a policy or contract, whether or not that employer had exercised that reserved authority. Alternatively, the right to control can be established through evidence establishing that the employer had, in fact, controlled the employee's conditions of employment, whether or not a contract or policy gave it the right to do so.

The Final Rule takes one of these two common-law pathways and makes it the exclusive means through which one type of employment relationship—joint employment—can be established. The Final Rule does so by imposing an "actual-exercise" requirement, through which joint employment can be established only with a showing that the employer both possesses *and* exercises control over an

essential condition of employment. The Final Rule then doubles down on this requirement by holding, as an evidentiary matter, that NLRB decisionmakers are prohibited from even considering evidence of reserved authority except to the extent it supplements evidence of exercised authority.

By eliminating one of the established pathways through which litigants establish joint-employment relationships at common law, the Final Rule conflicts with the common law and the NLRA.

2.     Separate and apart from this statutory conflict, the Board's imposition of the Final Rule's actual-exercise requirement was arbitrary and capricious because the Board failed to consider and respond to commenters' concerns that the actual-exercise requirement would preclude meaningful bargaining about terms and conditions of employment.

Responding to the NPRM, many commenters explained to the Board that when employers reserve authority over essential terms and conditions of employment, the reserving employer must be present at the bargaining table to enable meaningful bargaining. Where the only employer at the bargaining table is a contractor whose decisions can be overridden by a contracting company with reserved control, the contracting company can render irrelevant any agreements the union reached with the contractor during bargaining. Thus, by taking bargainable issues off the table, an employer that has reserved to itself control over essential

terms and conditions of employment can effectively co-determine those terms without ever having to exercise its authority.

Commenters brought these practical concerns to the Board's attention, sharing examples from the representation of real-world employees. The Board acknowledged some of those comments but brushed aside commenters' significant concerns by digressing to an uncontested point: the Final Rule does not change the statutory responsibilities for employers once that status is established. Because the Final Rule is about what businesses do and do not have the status of "employer" over particular employees, the Board's non-response to these comments failed to engage with a significant aspect of the problem and was arbitrary and capricious.

3.      Finally, the Board's enumeration of an exhaustive list of essential terms and conditions of employment that excluded health and safety was arbitrary and capricious. Many commenters explained that health and safety terms were core concerns for represented employees and that health-and-safety concerns were particularly acute in workplaces with more than one employer. They explained how, if the Final Rule were adopted, unions would be stymied in their ability to bargain health-and-safety protections because the direct employer with which they would be able to bargain rarely controls the physical premises that largely determine how those protections can be implemented. As a result, these

commenters petitioned for inclusion of health-and-safety among the list of essential terms and conditions of employment.

In the Final Rule, the Board acknowledged these comments but gave no response. In the face of these significant comments, the Board's failure to explain its exclusion of health and safety from the list of essential terms was likewise arbitrary and capricious.

## STANDING

SEIU represents thousands of employees whose terms and conditions of employment are determined by more than one employer. This Court has repeatedly recognized that unions challenging an agency rule or guidance "have standing as employee representatives whose 'bargaining position' would be 'fundamentally diminished'" by the challenged action. *AFGE v. FLRA*, 25 F.4th 1, 4 (D.C. Cir. 2022) (quoting *NTEU v. Chertoff*, 452 F.3d 839, 853 (D.C. Cir. 2006)). SEIU has standing to seek review on behalf of the hundreds of thousands of members and employees it represents whose bargaining power will be adversely impacted by the Final Rule.

SEIU has "representational or organizational standing" on behalf of its members because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

In its comment, SEIU explained that the proposed Rule would harm its local affiliates' ability to contest discipline or bargain for better working conditions for some members employed by contractors because those local affiliates will only be able to bargain with the "*contractor*, and not the true decision maker." SEIU, Cmt. No. NLRB-001570, at 23-24. For example, under the Rule, property-service-worker members who are directly employed by contractors have no opportunity to bargain with a building owner who possesses reserved-but-unexercised control when those members are removed from a preferred position at the owner's site. *Id.* Likewise, physician assistants employed by a physician group contracting with a hospital will be unable to bargain with the hospital for changes to working conditions over which the hospital reserves extensive control. *Id.* SEIU's affiliates' comments explained how the inability to bargain with a putative joint employer that controls employee health and safety would likewise inhibit their ability to bargain workplace protections. 1199SEIU United Healthcare Workers East, Cmt. No. NLRB-000890, at 3. The Final Rule's injury to members' bargaining power supports standing. *See AFGE*, 25 F.4th at 4; *NTEU*, 452 F.3d at 853.

The second element for organizational standing, which requires "pertinence between litigation subject and organizational purpose," *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1218 (D.C. Cir. 2024) (quoting *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015)), is readily met here. SEIU primarily exists to secure better working conditions for the millions of workers it represents. The third element is also satisfied because SEIU raises legal arguments against the rule and requests vacatur as a remedy, so "[n]either the legal claims nor the relief sought involve individualized grievances." *Int'l Dark-Sky Ass'n*, 106 F.4th at 1218.

## ARGUMENT

### I. The Final Rule's Actual-Exercise Requirement Is not in Accordance with the National Labor Relations Act.

The Final Rule's treatment of reserved-but-unexercised authority is not in accordance with the NLRA because it conflicts with common-law agency principles. As both the Supreme Court and this Court have held, those principles must govern "employer" determinations under the Act. *United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968); *Browning-Ferris California*, 911 F.3d at 1207. While the common law permitted "employer" findings based only on reserved control, the Final Rule bars "employer" findings unless control is actually exercised. 85 Fed. Reg. at 11235 (setting 29 C.F.R. § 103.40(a)). The Final Rule requires the Board to blind itself to evidence of reserved, unexercised control unless such evidence "supplements and reinforces evidence of the entity's possession or exercise of

direct and immediate control over a particular essential term and condition of employment." *Id.* These limitations are foreign to the common law and not permitted by the NLRA.

The "right-to-control element" of the joint employer analysis "has deep roots in the common law." *Browning-Ferris California*, 911 F.3d at 1199. At common law, reserved authority—whether or not it is exercised—is *the* critical determinant of whether a putative employer possesses sufficient control over a worker to find that an employer-employee relationship exists. Indeed, both common-law courts and the Board itself have held that the reservation of control, without any evidence that the employer exercised that control, is sufficient to support the finding that the employer controls the employee. The Final Rule, in contrast, only permits the factfinder to look at reserved control once the factfinder has already found evidence of exercised control. Therefore, by restricting a consideration that was sufficient to establish employment at common law to a mere plus-factor that can only be considered once joint employment is effectively established, the Board adopted a definition of "employer" that is inconsistent with the common law and thus the NLRA itself. The Final Rule's definition of "employer" is therefore invalid under the APA because it is "not in accordance with law." 5 U.S.C. § 706(2)(A); *Fin. Plan. Ass'n v. SEC*, 482 F.3d 493 (D.C. Cir. 2007) (vacating rule

for inconsistency with authorizing statute); *Nat. Res. Def. Council v. EPA*, 489

F.3d 1250, 1262 (D.C. Cir. 2007) (same).

   A.   **Common-Law Agency Principles Govern the Interpretation of**
        **"Employer" under the NLRA.**

Congress amended the NLRA to incorporate common-law agency

principles, and the Supreme Court, this Court, and the Board have all recognized

that those common-law principles control the definition of "employer" under the

Act. *United Ins. Co. of Am.*, 390 U.S. at 256; *Browning-Ferris California*, 911

F.3d at 1207; Final Rule, 85 Fed. Reg. at 11196.

The NLRA defines "employer" to mean "any person acting as an agent of an

employer, directly or indirectly." 29 U.S.C. § 152(2). "In determining whether any

person is acting as an 'agent' of another person so as to make such other person

responsible for his acts," the Act provides, "the question of whether the specific

acts performed were actually authorized or subsequently ratified shall not be

controlling." 29 U.S.C. § 152(13). The Act's definition of "employee," includes

"any employee, and shall not be limited to the employees of a

particular employer," with exceptions for "independent contractor[s]" and other

exceptions not relevant here. 29 U.S.C. § 152(3).

The incorporation of common-law principles into the NLRA resulted from

congressional amendment. In *NLRB v. Hearst Publications, Inc.*, the Supreme

Court interpreted "employee" under the NLRA to potentially include independent

contractors. 322 U.S. 111, 131-32 (1944); *see also Browning-Ferris California*, 911 F.3d at 1207 (explaining practical import of the *Hearst* decision). In 1947, Congress responded to *Hearst* by amending the definition of "employee" under the NLRA to explicitly exclude "independent contractors." *Browning-Ferris California*, 911 F.3d at 1207; *see* Labor Management Relations Act of 1947, Pub. L. 80–101, 61 Stat. 136 (codified as amended at 29 U.S.C. §§ 141–197) ("Taft-Hartley Amendments"). As the Supreme Court has explained, "[t]he obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act." *United Ins. Co. of Am.*, 390 U.S. at 256. Thus, post-Taft-Hartley, the Supreme Court looks to "the conventional master-servant relationship as understood by common-law agency doctrine" to define the employer-employee relationship. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989).

Based on that history, this Court has already held that "[u]nder Supreme Court and circuit precedent, the [NLRA's] test for joint-employer status is determined by the common law of agency." *Browning-Ferris California*, 911 F.3d at 1206. "Congress delegated to the Board the authority to make tough calls on matters concerning labor relations, but not the power to recast traditional common-law principles of agency in identifying covered employees and employers." *Id.* at

1207. So, whether it proceeds by case adjudication or rulemaking, the Board "must color within the common-law lines identified by the judiciary." *Id.* at 1208.

**B.  At Common Law, Contractually Reserved Control Is Sufficient to Find Joint Employment Whether or not that Control Has Been Exercised.**

Two key common-law principles shape the NLRA's definition of "employer" for purposes of the Board's joint-employer test. First, the identification of an employer is a fact-intensive, multifactor analysis. Second, possessing the right to control employees—whether or not that control has been exercised—determines whether the employer employs the particular employees.

Long before Congress passed the NLRA, the Supreme Court held that a "master-servant" relationship exists "whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, 'not only what shall be done, but how it shall be done.'" *Singer Mfg. Co. v. Rahn*, 132 U.S. 518, 523 (1889). Thus, the "master" is liable for the acts of the "servant," even when "the master did not authorize or know of the servant's act or neglect, or even if he disapproved or forbade it." *Id.* at 522-23.

This focus on the right to control the employee's work remained at the center of the analysis a century later, after the passage of the NLRA and the Taft-Hartley Amendments. And it carried over into the specific analysis of joint

employment under the NLRA. In *Boire v. Greyhound Corp.*, the Supreme Court explained that joint employer is a "factual issue" that turns on whether the putative joint employer "possessed sufficient indicia of control to be an 'employer'" under the Act. 376 U.S. 473, 481 (1964).

The Supreme Court's focus on the right to control—whether exercised or unexercised—reflected Taft-Hartley-era common-law courts' frequent elevation of reserved control above exercised control. In *Green Valley Co-op. Dairy Co. v. Indus. Comm'n*, for example, the Wisconsin Supreme Court found a cheesemaker to be a dairy's employee based solely on the dairy's reservation of control over the cheesemaker's work. 27 N.W.2d 454, 458 (Wis. 1947) ("[A]lthough Dairy did not exercise its right to control the details of the production of cheese, it did have that fundamental right."). The court explicitly held: "It is quite immaterial whether the right to control is exercised by the master so long as he has the right to exercise such control." *Id.* at 457 (quoting *Emps. Mut. Liab. Ins. Co. v. Indus. Comm'n*, 284 N.W. 548, 551 (Wis. 1939)). In a workers' compensation case, the Supreme Court of California similarly held that reserved but unexercised control established an employment relationship, reasoning that "the right to control, rather than the amount of control which was exercised, is the determinative factor." *S.A. Gerrard Co. v. Indus. Accident Comm'n*, 110 P.2d 377, 378 (Cal. 1941).

Contemporaneous common-law courts similarly focused on the putative employer's reservation of the right to control, whether or not that control had been exercised as a matter of fact. *See, e.g.*, *Bush v. Wilson & Co.*, 138 P.2d 457, 457 (Kan. 1943) (explaining that, "[u]nder the 'right to control rule' . . . it is not necessary to show actual exercise of control"); *see also Bobik v. Indus. Comm'n*, 64 N.E.2d 829, 832 (Ohio 1946) (explaining that the test depends not on "the actual exercise of the right by interfering with the work but rather the right to control"); *see also Indus. Comm'n v. Meddock*, 180 P.2d 580, 584 (Ariz. 1947) (stating that "[i]t is the right to control rather than the fact that the employer does control that determines the status of the parties"). In sum, when Congress amended the NLRA to incorporate common-law agency principles defining employment relationships, the existence of reserved-but-unexercised control was recognized as a sufficient basis on which to establish that a common-law "employee" was employed by a common-law "employer."

The emphasis common-law courts placed on reserved control was later codified in the Restatement (Second) of Agency's definitions of the "master-servant" relationship. The Restatement defines "master" as a principal "who controls *or has the right to control* the physical conduct of the other in the performance of the service." Restatement (Second) of Agency § 2(1) (1958) (emphasis added). Likewise, "[a] servant is an agent employed by a master to

perform service in his affairs whose physical conduct in the performance of the service is controlled *or is subject to the right to control* by the master." *Id.* § 2(2) (emphasis added). It was thus clear, at the time of the Restatement, that either exercised control or the as-yet unexercised right to control the "servant's" work were alternative paths to establishing a "master-servant" relationship.

The Restatement's focus on the right to control—both exercised and unexercised—animated this Court's decision in *Browning-Ferris California*, this Court's recent decision reviewing the Board's joint-employment test under the NLRA. *See* 911 F.3d at 1211 ("[T]he 'right to control' runs like a leitmotif through the Restatement (Second) of Agency"). This Court rejected the employer's argument that reserved-but-unexercised control should be subordinate to actually exercised supervision. *Id.* at 1212. The Court held that the rule that reserved-but-unexercised control factors into the joint-employer test was "the common-law rule at the time of the National Labor Relations Act's passage in 1935," was "the common-law rule at the time of the Taft-Hartley Amendments in 1947," and "for what it is worth, it is still the common-law rule today." *Id.* at 1210.[5]

---

[5] Petitioner recognizes that the *Browning-Ferris California* court was not required to answer "whether the reserved right to control, divorced from any actual exercise of that authority, could alone establish a joint-employer relationship." 911 F.3d at 1213. The Final Rule's actual-exercise requirement and its relegation of reserved control to a meaningless plus-factor squarely raise that question, and the Taft-Hartley era common-law cases discussed above show that reserved-but-unexercised control over terms and conditions has always been a sufficient basis on which to find a "master-servant" relationship.

In short, pre-Taft-Hartley common-law decisions, the Restatement, and this Court's seminal joint-employment decision under the NLRA all recognize that, at common law, establishing that the putative employer possessed reserved-but-unexercised control over the employees is one of the classic ways through which litigants established the existence of an employment relationship. Therefore, it has always been the rule at common law that compelling evidence of reserved control, standing alone, is sufficient to establish that an employment relationship exists.

**C.    The Final Rule Conflicts with the Common Law Definition of "Employer" by Relegating Reserved Control to a Mere Plus-Factor.**

Unlike the common law, which foregrounds reserved control as the critical factor sufficient to support an employment relationship and one of the traditional ways parties establish the existence of an employment relationship, the Final Rule limits contractually reserved but unexercised control to a meaningless plus-factor. *See* 85 Fed. Reg. at 11187. The Final Rule does so by rendering reserved control a "potentially relevant consideration" that affects actual joint-employer findings "only to the extent it supplements and reinforces evidence of direct and immediate control over essential terms and conditions of employment." *Id.* Thus, under the Final Rule, reserved control will never be sufficient to support a joint-employer finding unless it happens to also be accompanied by evidence that the putative joint employer has exercised the control it has sought fit to reserve to itself. That aspect

of the Final Rule is inconsistent with the common-law definition of "employer,"
*see* Argument I.B, *supra*, and therefore with the NLRA itself. The conflict between
the Final Rule and the NLRA follows directly from the Rule's operation and is
illustrated by its incompatibility with the structure and function of the NLRA.

*1.* The Final Rule pays lip service to reserved control as "potentially
relevant." But in actual operation, the Final Rule hamstrings this essential factor
into near-irrelevance. The Final Rule does so by using exercised control as a
gatekeeping mechanism: the Rule prohibits the Board and its Administrative Law
Judges from considering any amount of reserved authority until the proponent of
joint-employer status first establishes that the putative joint employer has already
exercised "direct and immediate control over essential terms and conditions of
employment." 85 Fed. Reg. at 11187; *see also id.* at 11196-97 (factfinders cannot
evaluate whether reserved control is just business-to-business contracting unless
the proponent of joint-employer status first "proves that the entity exercises direct
and immediate control over at least one essential term and condition of
employment"). That gatekeeping ensures that reserved-but-unexercised control
will never prove dispositive in any factual scenario, because there are really only
two options.

Under the first option, there will be no threshold evidence of exercised
control, in which event the Board will not consider even clear evidence of reserved

control. Under the second option, the Board will have already found that the putative joint employer exercised control over an essential term of employment sufficient to establish joint-employment, rendering analysis of reserved-but-unexercised authority superfluous. In either scenario, evidence of reserved-but-unexercised control cannot meaningfully affect the analysis, violating this Court's admonition that the Board "must color within the common-law lines identified by the judiciary." *Browning-Ferris California*, 911 F.3d at 1208. Said another way, the Board's Final Rule disingenuously purports to recognize the importance reserved control has always played in the common-law employer analysis, while dictating that all actual joint-employment cases will come out the same way they would under a standard that failed to factor in reserved-but-unexercised control at all.

The Final Rule's relegation of reserved control to a meaningless plus-factor is quite different from how the Board traditionally analyzed reserved-but-unexercised control. In *Jewel Tea Co., Inc.*, for example, a retail-license agreement reserved sweeping authority for the licensor, including the power to mandate compliance with requests to discharge the licensee's employees, to set "rules and regulations" for licensee employees, to approve "hiring decisions," and "to set a vacation policy." 162 NLRB 508, 510 (1966). Despite these broad reserved powers, the retail-licensor had never exercised its authority over any of these

essential terms and conditions. *Id.* The Board nevertheless found that the licensor and licensee were joint employers, holding that the licensor's lack of actual exercise was "not material, for an operative legal predicate for establishing a joint-employer relationship is a reserved right in the licensor to exercise such control." *Id.*; *see also Value Village*, 161 NLRB 603, 607 (1966) ("Since the power to control is present by virtue of the operating agreement, whether or not exercised, we find it unnecessary to consider the actual practice of the parties regarding these matters as evidenced by the record."); *Hoskins Ready-Mix Concrete, Inc.*, 161 NLRB 1492, 1493 n.2 (1966) (lessor and lessee were joint employers of concrete employees because lease and operating agreements reserved control over terms and conditions to lessee, even though "the record indicates that [lessee] had not exercised any day-to-day supervision over [lessor's] operations"); *Manhattan Shirt Co.*, 84 NLRB 100, 101 (1949) (finding joint employment based solely on the "contractual relationship" between the two employers, because contract gave putative joint employer discretion to discharge and reject particular employees).[6]

---

[6] As these cases make clear, under the Board's prior, common-law practice, it was the reservation of authority over *terms and conditions of employment* that led to joint-employer findings absent evidence of exercised control. *E.g.*, *Jewel Tea*, 162 NLRB at 510 (lessor reserved for itself the right to make hiring decisions, set an employee vacation policy, or make employment rules). Reservation of the contractual authority to change elements of the business relationship other than those concerning the co-employer's terms and conditions of employment, including reservation of the right to cancel the contract or define the hours during which the reserving employer needs services, were never the type of contractually reserved authority that could support an employment relationship, either at common law or in the Board's joint-employment cases. Reservation of those types of contract rights are "the routine aspects of

If the Final Rule had been operative at the time the Board decided *Jewel Tea*, that case would have come out differently because the Board would not have been permitted to even consider the licensor's extensive reservation of control. That outcome illustrates why the Final Rule's treatment of reserved authority is sharply at odds with the common law: if *Jewel Tea*'s comprehensive contractually reserved authority cannot tip the scales in favor of joint employment, the Final Rule has rendered reserved-but-unexercised authority effectively meaningless.

*2.* The structure and function of the NLRA also demonstrate why any definition of "employer" that fails to meaningfully account for the role reserved-but-unexercised authority plays in the workplace is not in accordance with the NLRA and is divorced from its common-law underpinnings.

The NLRA sets the ground rules for collective bargaining. Collective bargaining is the process through which the employer and the exclusive representative of a group of employees meet at reasonable times and reasonable places to bargain over the terms and conditions of employment of those employees. 29 U.S.C. § 158(d). In the course of carrying out its duty to enforce the mutual obligation of employers and unions to bargain in good faith, 29 U.S.C. § 158(a)(5), (b)(3), the NLRB has articulated a set of mandatory subjects of bargaining over

---

company-to-company contracting." *Browning-Ferris California*, 911 F.3d at 1220; *see also* Final Rule, 85 Fed. Reg. at 11195 (whether exercised or not, control over the basic ground rules of the contract is not relevant to the joint employer analysis).

which employers and unions must bargain in good faith, *see Ford Motor Co. v. NLRB*, 441 U.S. 488, 495 (1979). The list of mandatory subjects includes each of the essential terms and conditions of employment articulated in the Final Rule, 85 Fed. Reg. at 11235-11236, as well as numerous other subjects over which employees have a statutory right to bargain, *see, e.g.*, John Higgins, *The Developing Labor Law*, Ch. 16.IV.C.1 (BNA 2025) (giving examples of the well-established mandatory subjects beyond wages and hours).

The Final Rule, however, permits employers to effectively evade their obligation to bargain over even essential subjects anytime the putative joint employer has reserved to itself exclusive control over that subject. In its comment, SEIU affiliate Local 32BJ, provided real-world examples of how this plays out for the janitorial and building-maintenance workers it represents. SEIU Local 32BJ, Cmt. No. NLRB-001599, at 8-9 (Jan. 28, 2019). An employer's sexual harassment policy is a mandatory subject of bargaining that can result in discipline and discharge. *Harris-Teeter Super Markets*, 293 NLRB 743, 743-44 (1989); *see also Anthony Motor Co., Inc.*, 314 NLRB 443, 447, 450 (1994) (employer required to furnish information concerning employer's sexual-harassment policies to enable union to bargain effective policies to avoid workplace discrimination and harassment). Local 32BJ represents thousands of employees directly employed by a cleaning contractor or managing agent, but who work at residential and

commercial buildings. Cmt. at 1. The contractors who serve as direct employers do not have the power to implement building-access policies or to limit interactions between building tenants and 32BJ-represented employees so as to prevent workplace sexual harassment by property managers employed by the building owner or by building tenants. *Id.* at 9. Without the building owner at the bargaining table, Local 32BJ cannot bargain for policies that provide sufficient protections to their represented employees.

The Final Rule creates similar problems for a range of other mandatory subjects of bargaining, such as drug testing policies required by building owners or illness-prevention policies imposed by hospitals. *See Johnson-Bateman Co.*, 295 NLRB 180 (1989) (drug testing policy is a mandatory subject); *see also In Re Virginia Mason Hosp.*, 357 NLRB 564, 568 (2011) (flu prevention policy is a mandatory subject); *see also* SEIU Local 32BJ, Cmt. at 8-9 (raising drug testing policy example); *see also* 1199SEIU United Healthcare Workers East, Cmt. No. NLRB-000890, at 3 (explaining that hospitals' control over the physical premises and hygiene policies "makes it all but impossible to address working conditions" without hospital at bargaining table). Under a common-law standard, unions would be entitled to bargain with building owners or hospitals over such subjects because the building owner or hospital has reserved to itself control over that subject. *See Browning-Ferris Indus. of Cal., Inc.*, 362 NLRB 1599, 1614 (2015) ("as a rule, a

joint employer will be required to bargain only with respect to such terms and conditions which it possesses the authority to control"), *vacated in part on other grounds*, 911 F.3d at 1221-22. Under the Final Rule, in contrast, a company that had reserved sweeping control over such a policy but had not yet exercised that control would be under no obligation to bargain with the union. The union would be powerless to affect these mandatory subjects of bargaining, irrespective of what the union is willing to give up to obtain policy changes.

The problem brought forward by SEIU affiliates Local 32BJ and 1199, whereby a common-law employer can effectively take an entire subject of bargaining off the table without subjecting itself to a bargaining obligation, repeats itself across the economy on many different essential subjects. These examples also show how, by reserving to itself the right to control an essential condition of employment, the reserving employer has effectively "co-determine[d] those matters governing the essential terms and conditions of employment," even without ever having to actually exercise the control it has reserved to itself. *Browning-Ferris California,* 911 F.3d at 1201 (quoting *Dunkin' Donuts Mid-Atlantic Distrib. Ctr., Inc. v. NLRB*, 363 F.3d 437, 440 (D.C. Cir. 2004)). The NLRA, which grants *to employees* the statutory right to bargain over their terms and conditions of employment, cannot bear a joint-employer definition that makes exercising that right impossible.

**II.** **The 2020 Final Rule Is Arbitrary and Capricious Because the Board Failed to Address How the Actual-Exercise Requirement Threatens Collective Bargaining.**

Congress passed the NLRA to enable employees, unions, and employers to engage in effective collective bargaining. 29 U.S.C. §§ 151, 158(d). Numerous commenters, including the SEIU and multiple SEIU affiliates, explained that the Board's actual-exercise requirement would, as practical matter, frustrate that statutory purpose by undermining bargaining over terms and conditions of employment. The Board's response provided no reasoned explanation why the Final Rule would not impede bargaining in the manner suggested by those commenters. In failing to consider the Final Rule's practical effect on bargaining, the Board failed to consider an important aspect of the problem, rendering the Final Rule arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A); *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019).

*1.* An agency violates the arbitrary and capricious standard where it "'entirely fail[s] to consider an important aspect of the problem'" and where it "fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments." *Carlson*, 938 F.3d at 344 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), then quoting *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977)). "An agency is required to provide a meaningful opportunity for comments, which means that the

agency's mind must be open to considering them." *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998). "An agency must also demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant." *Id.*

This Court has held that an agency acts arbitrarily and capriciously where its response to comments shows that its "analysis overlook[ed] a key problem," *Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022), where its response "brushed aside critical facts," where the agency failed to "adequately analyze the . . . consequences" of its policy, *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017), and where the agency "never responded" to or failed to rebut the claim made in a significant comment, *AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 853 (D.C. Cir. 2021).

Where an agency's analysis is sufficiently flawed, the proper remedy is to vacate the rule. *See AFGE v. FLRA*, 24 F.4th 666, 674-75, 677 (D.C. Cir. 2022) (vacating policy statement where agency "failed to offer a reasoned explanation for its decision"); *AFGE Loc. 1929 v. FLRA*, 961 F.3d 452, 456-59, 461 (D.C. Cir. 2020) (vacating agency memorandum where agency "departed from precedent based on a misreading of case law and without explaining the departure"); *Carlson*, 938 F.3d at 352 (vacating relevant portion of rule for "fail[ure] to consider the relevant policies of the [governing statute], particularly those raised in the public

comments"); *Am. Wild Horse Pres. Campaign*, 873 F.3d at 932 (vacating relevant part of agency decision for unreasoned decisionmaking); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (following the "ordinary practice" and vacating rule amendment for "fail[ure] to offer a reasoned explanation").

*2.* Here, the Board failed to provide a reasoned explanation for imposing an actual-exercise requirement despite commenters' specific concerns that an actual-exercise requirement practically impedes effective bargaining.

A statutory purpose of the NLRA is "encouraging the practice and procedure of collective bargaining." 29 U.S.C. § 151. To effectuate that purpose, Section 8(d) of the Act imposes on employers and unions a mutual "obligation to bargain collectively," meaning "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, . . . and the execution of a written contract incorporating any agreement reached." *Id.* § 158(d).

As commenters including SEIU explained to the Board, the actual-exercise requirement in the Final Rule frustrates effective collective bargaining, undermining a statutory purpose of the Act and impeding employers and unions from carrying out this shared obligation. As SEIU put it, "[t]he Proposed Rule directly undermines [the Act's] statutory purposes by excusing from the bargaining table the entity or entities whose presence is actually necessary for effective

negotiation of terms and conditions of employment." SEIU, Cmt. No. NLRB-001570, at 7.

Commenters also explained why an actual-exercise requirement is inconsistent as a practical matter with effective collective bargaining. SEIU affiliate Local 32BJ explained that the actual-exercise requirement will undermine the statutory purpose of "encouraging the practice and procedure of collective bargaining" because "workers will not be able to meaningfully bargain over wages, benefits, and working hours because the entity that effectively controls those terms cannot be brought to the table." SEIU Local 32BJ, Cmt. No. NLRB-001599, at 5-6. In Local 32BJ's experience, bargaining between a contractor and union over working hours for office cleaners has been impeded where "the building owners (the cleaning contractor's clients) were not at the bargaining table, yet extending the hours for the workers would have required the building owners to keep lights on and HVAC systems running for additional hours." *Id.* at 10. Local 32BJ similarly explained how bargaining to address workplace harassment can be frustrated when the entity with reserved control is not at the table. *Id.* at 9; *see supra* at 39-40. As Local 32BJ explained, when employees of a contractor report sexual harassment on the job, "if the harasser is a property manager who does not work for the contractor, then the contractor does not have the power to address the claim," meaning that 32BJ cannot effectively remedy the problem through

bargaining or grievance processing. *Id.* at 9. Where workers cannot bargain with the entity controlling these conditions, they will use other tactics, such as leafletting and urging boycotts, undermining the NLRA's "premise that it is preferable to channel disputes about wages, benefits, and working conditions to the bargaining table rather than relegating workers to the streets." *Id.* at 7.

The AFL-CIO, a federation that now includes SEIU, raised additional practical concerns with the effects of the Final Rule on collective bargaining. The AFL-CIO argued that the Rule would frustrate the purposes of the Act because it "would permit an entity that maintains a right to control terms and conditions of employment to move back and forth from being a joint employer to not being a joint employer merely by exercising that control when it deems it necessary and not exercising it at other times." AFL-CIO, Cmt. No. NLRB-000897, at 46. And the Rule "does not classify an entity as a joint employer until it is too late"; "an entity may reserve control over terms and conditions of employment and yet have no duty to bargain over those terms," then "[o]nly after the entity exercises that authority without bargaining does it become a joint employer under the proposed rule and assume an obligation to bargain." *Id.*

An example illustrates the AFL-CIO's concern. On Day 1, the direct employer is at the bargaining table with the union but the putative joint employer is not because it has not yet exercised its comprehensive reserved control. On Day

150, after the direct employer has agreed to a collective-bargaining agreement and the union's members have ratified it, the indirect employer exercises its reserved right to control and rejects one or more of the essential terms and conditions of employment contained in the CBA. The indirect employer's exercise of the reserved control it always possessed likely turns it into a joint employer with a bargaining obligation going forward (at least for some undefined period of time); but, in the meantime, the CBA has been undermined by the indirect employer's modifications of its terms. The Final Rule thus draws an entirely arbitrary distinction between that indirect employer on Day 149 and that same employer on Day 151: the employer always had the exact same right to control employee terms and conditions, but its bargaining obligation only materialized well into its employment of those employees. Treating one as an entity outside the bargaining relationship and the other as an employer subject to the statutory bargaining obligation imposes an artificial and unjustifiable distinction.

The Final Rule's exclusion of employers with reserved-but-unexercised authority cannot be reconciled with the "friendly adjustment of industrial disputes" the NLRA seeks to bring about through collective bargaining. *See* 29 U.S.C. § 151. Industrial disputes are never actually resolved if a party outside the bargaining relationship can at any time snap its fingers and unravel the resolution. The Final Rule therefore threatens stable labor relations, one of the NLRA's primary

statutory objectives. *See, e.g.*, *Appalachian Shale Prods. Co.*, 121 NLRB 1160, 1161 (1958).

3.      The Board provided no reasoned explanation in response to the practical impediments the actual-exercise requirement creates for effective collective bargaining, demonstrating a "fail[ure] to consider an important aspect of the problem." *Carlson*, 938 F.3d at 344 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Indeed, after summarizing the arguments commenters raised "that an exercise requirement will impede collective bargaining," the Board stated that "[n]othing in this rule changes the ordinary rights and obligations of employees, employers, and unions under the Act. Every employer remains subject to all rights and obligations defined by Sections 8 and 9 of the Act with respect to its employees." 85 Fed. Reg. at 11200.

The Board's response is a non-sequitur. The Final Rule determines whether a business is classified as an employer of the employees, and therefore whether that business is subject to rights and obligations under the Act. Where the actual-exercise requirement excludes a business that has reserved significant control over essential conditions of employment because that business has not yet exercised its control, the business has no obligations as an employer. In other words, while the Final Rule—and the commenters' concerns—address the standard for classifying an "employer," the Board's explanation says nothing about that standard, instead

noting that the Rule does not change the obligations flowing from the classification.

The Board's failure to analyze the practical consequences of the actual-exercise requirement on collective bargaining, a statutory objective, was arbitrary and capricious. "Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 102-03 (D.C. Cir. 2020), (holding agency acted arbitrarily and capriciously through "failure to account for . . . a matter of importance under the statute"), *vacated as moot following revocation of agency action*, 142 S. Ct. 1665 (2022). Nor does the Board's summary of the concerns excuse it from actually considering and responding to the substance of those concerns. "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). The Board's analysis failed to meaningfully engage with an important aspect of the problem, and its adoption of the actual-exercise requirement was therefore arbitrary and capricious.

III.  **The Final Rule's Exclusion of both Reserved and Exercised Control over Health and Safety Matters from the Exhaustive List of Essential Terms and Conditions of Employment Was Arbitrary and Capricious.**

Under the Final Rule, the joint-employer determination turns on whether two entities "share or codetermine the employees' essential terms and conditions of employment." 85 Fed. Reg. at 11235 (setting 29 C.F.R. § 103.40(a)). The Rule

defines "essential terms and conditions of employment" to mean "wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction." *Id.* at 11235-11236 (setting § 103.40(b)). Under the Final Rule, that list is "exhaustive." *Id.* at 11187. However, the Board claimed it would not entirely ignore all other mandatory subjects of bargaining, deeming control over such subjects "probative of joint-employer status, but only to the extent it supplements and reinforces evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment." *Id.* at 11235 (setting 29 C.F.R. § 103.40(a)).

In response to this proposed list of essential terms, numerous commenters raised a glaring exclusion: health and safety matters, which are a paramount concern for employees ranging from nurses facing pandemic diseases to fast food workers cooking with hot oil to janitors cleaning up often hazardous messes. The Board acknowledged that commenters objected to the exclusion of health and safety from its exhaustive proposed list, but it did not respond to those comments or explain its reason for that exclusion. The Board failed to consider an important aspect of the problem: how the exclusion of health and safety from those essential terms would impede employees' and employers' ability to bargain in good faith about this key employment term as the Act envisions. *See* 29 U.S.C. §§ 151,

158(d); *see also supra*, Argument II.1 (describing standard for vacating agency decision as arbitrary and capricious).

*1.* Commenters articulated three important reasons for including health and safety matters as an essential condition of employment under the joint-employer test: (1) the prevalence of outsourcing in industries with heightened health and safety concerns, (2) the health and safety risks that excluding these concerns creates for workers in those industries, and (3) the effect of that exclusion on the collective-bargaining rights protected under the NLRA.

First, multiple commenters explained that the use of labor contractors is widespread in industries where employees face outsized health and safety risks on the job. SEIU affiliate 1199SEIU United Healthcare Workers East explained that "the primary employers of our members (*e.g.*, hospitals, nursing homes, healthcare agencies), often outsource key aspects of their businesses to cut costs, avoid legal obligations, and increase their flexibility." 1199SEIU United Healthcare Workers East, Cmt. No. NLRB-000890, at 2. Under these conditions, "entire practice areas or entire job classifications within acute care hospitals are being outsourced." *Id.* Where that outsourcing occurs, "general health and safety concerns are dictated by the hospital or nursing home, but the structure of the service contracts between the supplying employer and the hospital/nursing home makes it all but impossible to

address working conditions without having a hospital or nursing home employer at the bargaining table." *Id.* at 3.

Second, commenters explained that excluding health and safety matters from the list of essential terms and conditions would expose workers to health and safety risks because the only employer at the bargaining table, the labor contractor, would be unable to address their concerns. 1199SEIU United Healthcare Workers East provided several examples: "a hospital controls the movement of psychiatric patients within its walls and the ratio of contracted staff assigned to patients who might present a hazard to themselves or caregivers," and "[a] nursing home orders the supplies used by contracted staff tasked with disposal of bio-medical waste." 1199SEIU United Healthcare Workers East, Cmt. No. NLRB-000890, at 5. "A contracted employee assigned to a hospital, nursing home or patient residence has little recourse through a contractor when presented with unsafe working conditions." *Id.* SEIU Local 32BJ raised additional examples of health and safety risks that can only be remediated through the intervention of the user-employer: the presence of asbestos in building environments and the temperature of outdoor booths where security guards are stationed. SEIU Local 32BJ, Cmt. No. NLRB-001599, at 11.

Third, commenters explained that the exclusion of health and safety matters would undermine a statutory purpose of the NLRA: "encouraging the practice and

procedure of collective bargaining." 29 U.S.C. § 151. The American Federation of Teachers explained that, where upstream firms control working conditions including those affecting health and safety, "[e]mployees cannot bargain with the actual entity that has the power and resources to improve their working conditions and instead must bargain only with an entity with small profit margins and a cost structure that is inflexibly created by upstream firms." American Federation of Teachers, Cmt. No. NLRB-001062, at 2. "This situation makes a mockery of collective bargaining and is contrary to the purposes of the Act, which includes a meaningful right for employees to collectively bargain." *Id.* (citing 29 U.S.C. § 151). Other commenters underscored this point by describing the importance of health and safety matters at the bargaining table. The International Union of Operating Engineers (IUOE) explained that "safety and training issues are front and center bargaining concerns of the IUOE, as heavy equipment operators on construction sites are operating large, expensive, and potentially very dangerous machinery, and stationary engineers face the devastating consequences of boiler explosions, while both sets of workers are frequently exposed to hazardous wastes or materials[.]" IUOE, Cmt. No. NLRB-001395, at 17. 1199SEIU further emphasized the point, stating that its members are "stymied at the bargaining table when hospitals and nursing homes are not present to discuss the working

conditions of medical professionals providing care in their facilities." 1199SEIU United Healthcare Workers East, Cmt. No. NLRB-000890, at 3.

*2.* Faced with these significant and widespread comments, the Board failed to engage in reasoned decisionmaking concerning its exclusion of health and safety matters from the list of essential terms and conditions of employment that would determine joint-employer status. The Board acknowledged that it "received comments proposing expansion of the proposed list of essential terms and conditions to include . . . health and safety[.]" 85 Fed. Reg. at 11205 (citing Comments of 1199SEIU United Healthcare Workers East and IUOE). But after making that acknowledgment, the Board offered no explanation for excluding health and safety from the list. *See id.* at 11205-11208. Indeed, after acknowledging that commenters had specifically advocated the inclusion of health and safety, *id.* at 11205, the Board concluded its discussion of the essential terms and conditions of employment without again using the words "health" or "safety" except as part of the name of the Occupational Safety and Health Administration, *id.* at 11205-11208. The Board's failure to give any explanation for this exclusion rendered the Final Rule arbitrary and capricious. *See Bloomberg L.P*, 45 F.4th at 477 (concluding rule was arbitrary and capricious because it failed to explain how the costs incurred for building the data service would be paid if the agency disapproved the fee structure in subsequent proceedings).

Just as the Board failed to explicitly respond to these comments, its justifications failed to even implicitly address any of commenters' concerns over excluding health and safety. *See AT&T Servs.*, 21 F.4th at 853 (remanding to the agency for further action where the agency's cited evidence "does not rebut the [commenter's] claims"). The Board justified its exhaustive list by explaining that "[t]he Act's purpose of promoting collective bargaining is best served by a joint-employer standard that places at the bargaining table only those entities that control terms and conditions that are most material to collective bargaining." 85 Fed. Reg. at 11205. The commenters who called for the inclusion of health and safety matters explained why those core issues were among the most important for the members they represent, including workers handling hazardous waste, nurses caring for psychiatric patients, and guards stationed outside in below-freezing temperatures, placing bargaining over those subjects at the heart of the unions' collective-bargaining strategy. *See supra* at 53. Despite hearing from commenters why health and safety subjects were highly "material" to their collective bargaining, the Board never explained its reason for deciding that such matters were not "most material to collective bargaining." Nor did the Board's other defenses of its list—the need for "bright lines," 85 Fed. Reg. at 11205, 11207 and "provid[ing] clarity and predictability"—justify excluding health and safety, a discrete topic, from the exhaustive list.

In sum, the NLRA requires the Board to adopt rules that permit employees, their representatives, and employers to meaningfully bargain about wages, hours, and terms and conditions of employment. 29 U.S.C. §§ 151, 158(d). Commenters explained why health and safety concerns present risks to their members in the workplace and why outsourcing renders their workers unable to address those concerns at the bargaining table without contracting employers present. In the face of those explanations, it was incumbent on the Board to at least explain why it considered control over workplace health and safety to be less probative of joint-employer status than the eight terms of employment that it elevated to "essential" status. For this additional reason, the Board's failure to provide that explanation or to otherwise respond to those comments in any meaningful way rendered the Final Rule arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, Petitioner SEIU respectfully requests that this Court grant the Petition for Review and vacate the Final Rule.

Respectfully submitted,

s/ *Adam Bellotti*
Adam Bellotti
Grace Rybak
BREDHOFF & KAISER P.L.L.C.
805 15th St. NW, Suite 1000
Washington, D.C. 20005
202-842-2600
abellotti@bredhoff.com
grybak@bredhoff.com

Steven Ury
John D'Elia
Service Employees International Union
1800 Massachusetts Ave. NW
Washington, D.C. 20036
steven.ury@seiu.org
john.d'elia@seiu.org

*Counsel to the Petitioner*

Dated: September 26, 2025

## CERTIFICATE OF COMPLIANCE

This filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,979 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type for text and footnotes.

*s/ Adam Bellotti*
Adam Bellotti


## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

*s/ Adam Bellotti*
Adam Bellotti

# <u>ADDENDUM</u>

# STATUTORY AND REGULATORY AUTHORITIES

**1.     5 U.S.C. § 706 Scope of review - provides, in relevant part:**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

*     *     *     *     *

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**2.     29 U.S.C. § 151 Findings and declaration of policy**

The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

Experience has proved that protection by law of the right of employees to

organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed.

It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

**3.    29 U.S.C. § 152 Definitions - provides, in relevant part:**

When used in this subchapter--

\*      \*      \*      \*      \*

**(2)** The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

**(3)** The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states

otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

*    *    *    *    *

**(13)** In determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

## 4.    29 U.S.C. § 156 Rules and regulations

The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by subchapter II of chapter 5 of Title 5, such rules and regulations as may be necessary to carry out the provisions of this subchapter.

## 5.    29 U.S.C. § 157 Right of employees as to organization, collective bargaining, etc.

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

**6.     29 U.S.C. § 158 Unfair labor practices**

**(a) Unfair labor practices by employer**
It shall be an unfair labor practice for an employer--

**(1)** to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

**(2)** to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided*, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

**(3)** by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

**(4)** to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

**(5)** to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

**(b) Unfair labor practices by labor organization**

It shall be an unfair labor practice for a labor organization or its agents-

   **(1)** to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

   **(2)** to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

   **(3)** to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title;

   **(4)(i)** to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

      **(A)** forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e);

      **(B)** forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

**(C)** forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

**(D)** forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

*Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

**(5)** to require of employees covered by an agreement authorized under subsection (a)(3) the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;

**(6)** to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; and

**(7)** to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer

to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

**(A)** where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,

**(B)** where within the preceding twelve months a valid election under section 159(c) of this title has been conducted, or

**(C)** where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection.

**(c) Expression of views without threat of reprisal or force or promise of benefit**

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

**(d) Obligation to bargain collectively**

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or

any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided*, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification--

**(1)** serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

**(2)** offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

**(3)** notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

**(4)** continues in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2) to (4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159(a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158, 159, and 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer. Whenever the collective bargaining involves

employees of a health care institution, the provisions of this subsection shall be modified as follows:

(A) The notice of paragraph (1) of this subsection shall be ninety days; the notice of paragraph (3) of this subsection shall be sixty days; and the contract period of paragraph (4) of this subsection shall be ninety days.

(B) Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given by the labor organization to the agencies set forth in paragraph (3) of this subsection.

(C) After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence, the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement. The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute.

(e) **Enforceability of contract or agreement to boycott any other employer; exception**

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible[1] and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further*, That for the purposes of this subsection and subsection (b)(4)(B) the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.

**(f) Agreement covering employees in the building and construction industry**

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided*, That nothing in this subsection shall set aside the final proviso to subsection (a)(3): *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

**(g) Notification of intention to strike or picket at any health care institution**

A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of subsection (d). The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

**7. 29 U.S.C. § 159 Representatives and elections**

**(a) Exclusive representatives; employees' adjustment of grievances directly with employer**

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment.

**(b) Determination of bargaining unit by Board**

The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided*, That the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit; or (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation or (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

**(c) Hearings on questions affecting commerce; rules and regulations**

**(1)** Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board--

**(A)** by an employee or group of employees or any individual or labor

organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a), or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a); or

**(B)** by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a);

the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

**(2)** In determining whether or not a question of representation affecting commerce exists, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition or the kind of relief sought and in no case shall the Board deny a labor organization a place on the ballot by reason of an order with respect to such labor organization or its predecessor not issued in conformity with section 160(c) of this title.

**(3)** No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this subchapter in any election conducted within twelve months after the commencement of the strike. In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election.

**(4)** Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the Board.

**(5)** In determining whether a unit is appropriate for the purposes specified in subsection (b) the extent to which the employees have organized shall not be controlling.

**(d) Petition for enforcement or review; transcript**

Whenever an order of the Board made pursuant to section 160(c) of this title is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsection (e) or (f) of section 160 of this title, and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.

**(e) Secret ballot; limitation of elections**

**(1)** Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158(a)(3) of this title, of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.

**(2)** No election shall be conducted pursuant to this subsection in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held.

## 8. 29 U.S.C. § 160 Prevention of unfair labor practices

**(a) Powers of Board generally**

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided*, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

**(b) Complaint and notice of hearing; answer; court rules of evidence inapplicable**

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of Title 28.

**(c) Reduction of testimony to writing; findings and orders of Board**

The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: *And provided further,* That in determining whether a complaint shall issue alleging a violation of subsection (a)(1) or (a)(2) of section

158 of this title, and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

### (d) Modification of findings or orders prior to filing record in court

Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it.

### (e) Petition to court for enforcement of order; proceedings; review of judgment

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection

shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of Title 28.

### (f) Review of final order of Board on petition to court

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

### (g) Institution of court proceedings as stay of Board's order

The commencement of proceedings under subsection (e) or (f) of this section shall not, unless specifically ordered by the court, operate as a stay of the Board's

order.

**(h) Jurisdiction of courts unaffected by limitations prescribed in chapter 6 of this title**

When granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified or setting aside in whole or in part an order of the Board, as provided in this section, the jurisdiction of courts sitting in equity shall not be limited by chapter 6 of this title.

**(i) Repealed. Pub. L. 98-620, Title IV, § 402(31), Nov. 8, 1984, 98 Stat. 3360**

**(j) Injunctions**

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

**(k) Hearings on jurisdictional strikes**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

**(l) Boycotts and strikes to force recognition of uncertified labor organizations; injunctions; notice; service of process**

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States

district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: *Provided further*, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period: *Provided further*, That such officer or regional attorney shall not apply for any restraining order under section 158(b)(7) of this title if a charge against the employer under section 158(a)(2) of this title has been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: *Provided further*, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b)(4)(D) of this title.

### (m) Priority of cases

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of subsection (a)(3) or (b)(2) of section 158 of this title, such charge shall be given priority over all other cases except cases of like character in the office where it is filed or to which it is referred and cases given priority under subsection (l).

## 9.     29 C.F.R. § 103.40 Joint Employers

(a) An employer, as defined by section 2(2) of the National Labor Relations Act (the Act), is an employer of particular employees, as defined by section 2(3) of the Act, if the employer has an employment relationship with those employees under common-law agency principles.

(b) For all purposes under the Act, two or more employers of the same particular employees are joint employers of those employees if the employers share or codetermine those matters governing employees' essential terms and conditions of employment.

(c) To "share or codetermine those matters governing employees' essential terms and conditions of employment" means for an employer to possess the authority to control (whether directly, indirectly, or both), or to exercise the power to control (whether directly, indirectly, or both), one or more of the employees' essential terms and conditions of employment.

(d) "Essential terms and conditions of employment" are

(1) Wages, benefits, and other compensation;

(2) Hours of work and scheduling;

(3) The assignment of duties to be performed;

(4) The supervision of the performance of duties;

(5) Work rules and directions governing the manner, means, and methods of the performance of duties and the grounds for discipline;

(6) The tenure of employment, including hiring and discharge; and

(7) Working conditions related to the safety and health of employees.

(e) Whether an employer possesses the authority to control or exercises the power to control one or more of the employees' essential terms and conditions of employment is determined under common-law agency principles. For the purposes of this section:

(1) Possessing the authority to control one or more essential terms and conditions of employment is sufficient to establish status as a joint employer, regardless of whether control is exercised.

(2) Exercising the power to control indirectly (including through an intermediary) one or more essential terms and conditions of employment is sufficient to establish status as a joint employer, regardless of whether the power is exercised directly.

(f) Evidence of an entity's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles and that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of whether the entity is a joint employer.

(g) A party asserting that an employer is a joint employer of particular employees has the burden of establishing, by a preponderance of the evidence, that the entity meets the requirements set forth in paragraphs (a) through (f) of this section.

(h) A joint employer of particular employees

(1) Must bargain collectively with the representative of those employees with respect to any term and condition of employment that it possesses the authority to control or exercises the power to control, regardless of whether that term or condition is deemed to be an essential term and condition of employment under this section for the purposes of establishing joint-employer status; but

(2) Is not required to bargain with respect to any term and condition of employment that it does not possess the authority to control or exercise the power to control.

(i) The provisions of this section are intended to be severable. If any paragraph of this section is held to be unlawful, the remaining paragraphs of this section not deemed unlawful are intended to remain in effect to the fullest extent permitted by law.