ORAL ARGUMENT NOT YET SCHEDULED

No. 25-1119

# United States Court of Appeals for the District of Columbia Circuit

SERVICE EMPLOYEES INTERNATIONAL UNION,

*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent*

---

On Petition for Review of a Final Rule of the National Labor Relations Board

---

**PAGE-PROOF BRIEF OF RESPONDENT NATIONAL LABOR RELATIONS BOARD**

---

CRYSTAL S. CAREY
*General Counsel*
LYNISA MICHALSKI
*Acting Dep. General Counsel*
NANCY E. KESSLER PLATT
*Associate General Counsel*
DAWN L. GOLDSTEIN
*Dep. Associate General Counsel*

KEVIN P. FLANAGAN
*Dep. Assistant General Counsel*
MICHAEL S. DALE
*Supervisory Attorney*
CRAIG EWASIUK
*Trial Attorney*
PHILLIP MELTON
*Attorney*

NATIONAL LABOR RELATIONS BOARD
1015 Half Street, S.E., 4th Floor
Washington, D.C. 20570
(202) 840-7258

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Following Circuit Rule 28(a)(1), Respondent National Labor Relations Board ("NLRB") certifies that:

### I. Parties and Amici

The parties to this case are the NLRB, an agency of the United States government, and the Service Employees International Union ("SEIU"). The American Federation of Labor-Congress of Industrial Organizations ("AFL-CIO") is participating as an amicus curiae in this case in support of SEIU.

### II. Rulings Under Review

SEIU seeks review of the final rule of the National Labor Relations Board titled, "Joint Employer Status under the National Labor Relations Act," which is published at 85 Fed. Reg. 11184 (Feb. 26, 2020) (codified at 29 C.F.R. § 103.40).

### III. Related Cases

This Rule has not previously been reviewed by this Court. Originally, SEIU filed its rulemaking challenge in the U.S. District Court for the District of Columbia, *SEIU v. NLRB*, No. 1:21-CV-02443 (D.D.C. 2021), which was stayed initially while the Board attempted to

rescind the 2020 Rule, *see* below at 18, and again, after the instant petition was filed in this Court. *See* Minute Order dated May 5, 2025, Case No. 1:21-CV-02443 (Dkt. No. 67).

## TABLE OF CONTENTS


COUNTERSTATEMENT OF JURISDICTION ........................................ 1

COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW .... 2

COUNTERSTATEMENT OF THE CASE ................................................ 2

I. Statutory and Historical Background of the Joint Employer Doctrine under the NLRA.......................................................... 2

II. *BFI I* and *II*........................................................................... 8

III. The 2020 Rule ......................................................................... 11

IV. *BFI III* and *Sanitary Truck Drivers & Helpers Loc. 350 v. NLRB*.................................................................... 15

V. The Board's 2023 Joint-Employer Rule .................................. 17

VI. Instant Petition ...................................................................... 18

VII. *BFI IV*.................................................................................... 19

SUMMARY OF THE ARGUMENT .......................................................... 19

STANDARD OF REVIEW ........................................................................ 21

ARGUMENT ........................................................................................... 23

I. The 2020 Rule is consistent with the common law and the NLRA........................................................................................ 23

A. The 2020 Rule's actual-exercise requirement fits comfortably within common-law boundaries and hence accords with the NLRA...................................... 24

1. The actual-exercise requirement reflects common-law precedent ............................... 24

2. The importance of the "right to control" in the common law of agency does not conflict with the Board's actual-exercise requirement ............ 31

B. The 2020 Rule's treatment of contractually reserved authority accords with the common law ....... 32

1. The common law permits the Board to give contractually reserved authority less weight than exercised control, and it does not require that contractually reserved authority be deemed sufficient to establish joint-employer status ............ 33

2. The 2020 Rule's treatment of contractually reserved authority does not undermine the Board's ability to police collective bargaining ............ 40

3. SEIU fails to show that the Board's treatment of reserved control is contrary to the structure and function of the NLRA ............ 42

II. The 2020 Rule is neither arbitrary nor capricious ............ 48

A. The Board fully explained why its requirement that a purported joint employer actually exercise substantial control over essential terms and conditions promotes collective bargaining ............ 49

B. The Board adequately justified its decision to exclude health and safety from its list of essential terms ............ 55

C. Even if the Rule is deemed arbitrary and capricious, the Court should remand the Rule to the Board without vacatur in order to avoid disruption and uncertainty ............ 61

CONCLUSION .................................................................................. 65

## TABLE OF AUTHORITIES

### Cases

*Ace-Alkire Freight Lines, Inc. v. NLRB*,
431 F.2d 280 (8th Cir. 1970) .................................................................. 6

*Adams & Assocs., Inc. v. NLRB*,
871 F.3d 358 (5th Cir. 2017) .................................................................. 29

*AFL-CIO v. NLRB*,
57 F.4th 1023 (D.C. Cir. 2023) ................................................................ 1

*Airborne Freight Co.*,
338 NLRB 597 (2002) .............................................................................. 7

*Allied Chem. & Alkali Workers, Loc. Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*,
404 U.S. 157 (1971) ................................................................................ 27

*Allied-Signal, Inc. v. U.S. Nuc. Reg. Cmm'n*,
988 F.2d 1461 (D.C. Cir. 1993) ......................................................... 62, 63

*Am. Hosp. Ass'n v. NLRB*,
499 U.S. 606 (1991) ................................................................................ 22

*AM Prop. Holding Corp.*,
350 NLRB 998 (2007) .............................................................................. 7

*AT&T v. NLRB*,
67 F.3d 446 (2d Cir. 1995) ...................................................................... 30

*Auciello Iron Works, Inc. v. NLRB*,
517 U.S. 781 (1996) .................................................................................. 2

*Bisson v. Winnipesaukee Air Serv.*,
13 A.2d 821 (N.H. 1940) ......................................................................... 27

*Black Oak Energy, LLC v. FERC*,
725 F.3d 230 (D.C. Cir. 2013) ................................................................. 65

*Bobik v. Indus. Comm'n*,
64 N.E.2d 829 (Ohio 1946) .............................................................. 37–39

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) .............................................................................. 3, 4

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ................................................................................ 48

*Browning-Ferris Indus. of Cal., Inc.* ("*BFI IV*"),
374 NLRB No. 46, 2026 WL 539422 (Feb. 23, 2026) ............................ 19

*Browning-Ferris Indus. of Cal., Inc.* ("*BFI III*")
369 NLRB No. 139, 2020 WL 4366383 (July 29, 2020) ........................ 15

*Browning-Ferris Indus. of Cal., Inc.*,
370 NLRB No. 86, 2021 WL 538938 (Feb. 11, 2021) ...................... 15, 16

*Browning-Ferris Industries of Cal., Inc.* v. *NLRB* ("*BFI II*"),
911 F.3d 1195 (D.C. Cir. 2018) ..................................................................
.....9, 10, 11, 14, 15, 19, 23, 25, 30, 31, 33, 34, 35, 36, 37, 43, 45, 46, 51, 53, 56, 57, 59, 61

*Browning-Ferris Industries of Cal., Inc.* ("*BFI I*")
362 NLRB 1599 (2015) .......................................... 8, 9, 10, 15, 19, 51, 63

*Bush v. Wilson & Co.*,
138 P.2d 457 (Kan. 1943) ............................................................... 38, 39

*C.C. E., Inc. v. NLRB*,
60 F.3d 855 (D.C. Cir. 1995) ................................................................. 31

*Casino Airlines, Inc. v. NTSB*,
439 F.3d 715 (D.C. Cir. 2006) ............................................................... 48

*Cellco P'ship v. FCC*,
357 F.3d 88 (D.C. Cir. 2004) ................................................................. 23

*Chamber of Com. of United States v. NLRB*,
723 F. Supp. 3d 498 (E.D. Tex. 2024) ...................................... 17, 18, 21

*Clackamas Gastroenterology Associates, P.C. v. Wells*,
538 U.S. 440 (2003) .......... 33

*Clinton's Ditch Co-op Co. v. NLRB*,
778 F.2d 132 (2d Cir. 1985) .......... 30

*Comcast Corp. v. FCC*,
579 F.3d 19 (D.C. Cir. 2009 .......... 62, 63, 64

*Denton v. Yazoo & M.V.R. Co.*,
284 U.S. 305 (1932) .......... 25, 26

*DiMucci Const. Co. v. NLRB*,
24 F.3d 949 (7th Cir. 1994) .......... 29

*Doe I v. Wal-Mart Stores, Inc.*,
572 F.3d 677 (9th Cir. 2009) .......... 32, 56

*Dunkin' Donuts Mid-Atl. Distribution Ctr., Inc. v. NLRB*,
363 F.3d 437 (D.C. Cir. 2004) .......... 29, 30

*Fall River Dyeing & Finishing Corp. v. NLRB*,
482 U.S. 27 (1987) .......... 22

*FedEx Home Delivery v. NLRB*,
563 F.3d 492 (D.C. Cir. 2009) .......... 33, 34

*Ford Motor Co. v. NLRB*,
441 U.S. 488 (1979) .......... 47

*G. Wes Ltd. Co.*,
309 NLRB 225 (1992) .......... 7

*Gen. Teamsters Loc. Union No. 326 v. NLRB*,
772 F.2d 894 (3d Cir. 1985) .......... 6

*Goodyear Tire & Rubber Co.*,
312 NLRB 674 (1993) .......... 8

*Green Valley Co-op. Dairy Co. v. Indus. Comm'n*,
27 N.W.2d 454 (Wis. 1947) .......... 38, 39

*Harlan v. Bryant*,
87 F.2d 170 (7th Cir. 1936)....................25

*Huerta v. Ducote*,
792 F.3d 144 (D.C. Cir. 2015)....................55

*Hy-Brand Industrial Contractors, Ltd.*,
365 NLRB 1554 (2017)....................9, 63

*Hy-Brand Industrial Contractors, Ltd.*,
366 NLRB No. 26, 2018 WL 1082557 (2018)....................9, 63

*Hychem Constructors, Inc.*,
169 NLRB 274 (1968)....................5

*Indus. Comm'n v. Meddock*,
180 P.2d 580 (Ariz. 1947)....................39

*Int'l Bhd. of Elec. Workers, Loc. 501 v. NLRB*,
341 U.S. 694 (1951)....................50

*Int'l Chem. Workers Union Local 483 v. NLRcB*,
561 F.2d 253 (D.C. Cir. 1977)....................28, 29

*Int'l House v. NLRB*,
676 F.2d 906 (2d Cir. 1982)....................30

*Jewel Tea Co.*,
162 NLRB 508 (1966)....................5

*Kanipe v. Grundy Cnty. Rural Elec. Co-op.*,
300 N.W. 662 (Iowa 1941)....................27

*Kelley v. S. Pac. Co.*,
419 U.S. 318 (1974)....................24, 25

*Laerco Transportation & Warehouse*,
269 NLRB 324 (1984)....................6, 7

*Libr. of Cong. v. FLRA*,
699 F.2d 1280 (D.C. Cir. 1983)....................47

*Loc. 777, Democratic Union Org. Comm. v. NLRB*,
603 F.2d 862 (D.C. Cir. 1978) .......... 31

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 21, 22

*Lutheran Welfare Servs. of Ill. v. NLRB*,
607 F.2d 777 (7th Cir. 1979) .......... 6

*Marion Steam Shovel Co. v. Bertino*,
82 F.2d 541 (8th Cir. 1936) .......... 26

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021) .......... 61

*Mgmt. Training Corp.*,
317 NLRB 1355 (1995) .......... 46

*Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*,
536 F.3d 640 (7th Cir. 2008) .......... 29

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 48, 58

*Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019) .......... 62, 63, 64

*Mut. Liab. Ins. Co. v. Indus. Comm'n*,
284 N.W. 548 (Wis. 1939) .......... 38

*N. Am. Soccer League v. NLRB*,
613 F.2d 1379 (5th Cir. 1980) .......... 6

*N. Am. Van Lines, Inc. v. NLRB*,
869 F.2d 596 (D.C. Cir. 1989) .......... 22, 31, 34

*NLRB v. Amax Coal Co., a Div. of Amax*,
453 U.S. 322 (1981) .......... 23

*NLRB v. Bell Aerospace Co. Div. of Textron*,
416 U.S. 267 (1974) .......... 3

*NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*,
691 F.2d 1117 (3d Cir. 1982) .................................................. 5, 6

*NLRB v. Checker Cab Co.*,
367 F.2d 692 (6th Cir. 1966) .................................................. 6

*NLRB v. CNN Am., Inc.*,
865 F.3d 740 (D.C. Cir. 2017) .................................................. 30

*NLRB v. Greyhound Corp.*,
368 F.2d 778 (5th Cir. 1966) .................................................. 5

*NLRB v. Hearst Publ'ns*,
322 U.S. 111 (1944) .................................................. 4

*NLRB v. Jewell Smokeless Coal Corp.*,
435 F.2d 1270 (4th Cir. 1970) .................................................. 6

*NLRB v. Town & Country Elec., Inc.*,
516 U.S. 85 (1995) .................................................. 4, 21

*NLRB v. United Ins. Co. of Am.*,
390 U.S. 254 (1968) .................................................. 4, 33, 38

*Pa. Interscholastic Athletic Ass'n, Inc. v. NLRB*,
926 F.3d 837 (D.C. Cir. 2019) .................................................. 33

*Painting Co. v. NLRB*,
298 F.3d 492 (6th Cir. 2002) .................................................. 29

*Pulitzer Pub. Co. v. NLRB*,
618 F.2d 1275 (8th Cir. 1980) .................................................. 30

*Radio City Music Hall Corp. v. United States*,
135 F.2d 715 (2d Cir. 1943) .................................................. 10

*Ref-Chem Co. v. NLRB*,
418 F.2d 127 (5th Cir. 1969) .................................................. 6

*S.A. Gerrard Co. v. Indus. Acc. Comm'n*,
110 P.2d 377 (Cal. 1941) .................................................. 38

*Sanitary Truck Drivers & Helpers Loc. 350 v. NLRB*,
45 F.4th 38 (D.C. Cir. 2022) .......... 16, 33

*SEIU, Loc. 32BJ v. NLRB*,
647 F.3d 435 (2d Cir. 2011) .......... 8

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
145 S. Ct. 1497 (2025) .......... 22, 48

*Shenker v. Baltimore & Ohio R.R. Co.*,
374 U.S. 1 (1963) .......... 24, 25

*Singer Mfg. Co. v. Rahn*,
132 U.S. 518 (1889) .......... 36, 37

*Standard Oil Co. v. Anderson*,
212 U.S. 215 (1909) .......... 25

*Susquehanna Int'l Grp., LLC v. SEC*,
866 F.3d 442 (D.C. Cir. 2017) .......... 64

*Thomas v. Great W. Min. Co.*,
1 P.2d 165 (Okla. 1931) .......... 26

*TLI, Inc.*,
271 NLRB 798 (1984) .......... 6, 7

*United Mine Workers v. Fed. Mine Safety and Health Admin.*,
920 F.2d 9606 (D.C. Cir.1990 .......... 62

*Wis. Dep't of Indus. v. Gould Inc.*,
475 U.S. 282 (1986) .......... 64

**Statutes**

5 U.S.C. § 706 .......... 22

28 U.S.C. § 2401 .......... 2

29 U.S.C. § 152 .......... 3

29 U.S.C. § 156 .......... 1, 3

29 U.S.C. § 157 .......... 3

29 U.S.C. § 158 .......... 1, 3

29 U.S.C. § 159 .......... 1, 3

29 U.S.C. § 160(a) .......... 64

29 U.S.C. § 160(f) .......... 1, 3

29 U.S.C. §§ 141–197 .......... 4

**Rules**

D.C. Cir. Rule 32(e)(1) .......... 76

Federal Rule of Appellate Procedure 32(f) .......... 76

Federal Rules of Appellate Procedure 32(a)(2)-(7) .......... 76

**Regulations**

29 C.F.R. § 103.40 .......... i, 18, 55

*The Standard for Determining Joint-Employer Status*, 83 Fed. Reg. 46681 (Sep. 14, 2018) .......... 4, 9, 50, 53

*Joint Employer Status under the National Labor Relations Act*, 85 Fed. Reg. 11184 (Feb. 26, 2020) .......... 1, 4, 5, 11–16, 23, 24, 32, 34, 36, 39–41, 43, 46, 49, 50, 53–60, 64

*Standard for Determining Joint Employer Status*, 88 Fed. Reg. 73946 (Oct. 27, 2023) .......... 16, 17, 63

*Withdrawal of 2023 Standard for Determining Joint Employer Status*, 91 Fed. Reg. 9707 (Feb. 27, 2026) .......... 18

**Other Authorities**

H.R. Rep. No. 245, 80th Cong. 1st Session (1947) .......... 27

93 Cong. Rec. 6599 (1947) .......... 27

Labor Management Relations Act of 1947,
Pub. L. 80-101, 61 Stat. 36 .......... 4

Restatement (Second) of Agency § 220(2)(a) .......... 36

Restatement (Second) of Agency § 227 .......... 26

Restatement (Second) of Agency § 277 .......... 24

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| American Federation of Labor-Congress of Industrial Organizations | ("AFL-CIO") |
| Federal Communications Commission | ("FCC") |
| Food and Drug Administration | ("FDA") |
| Federal Energy Regulatory Commission | ("FERC") |
| Federal Labor Relations Authority | ("FLRA") |
| National Labor Relations Act | ("NLRA" or "Act") |
| National Labor Relations Board | ("NLRB" or "Board") |
| National Transportation Safety Board | ("NTSB") |
| Notice of Proposed Rulemaking | ("NPRM") |
| Securities and Exchange Commission | ("SEC") |
| Service Employees International Union | ("SEIU") |

## COUNTERSTATEMENT OF JURISDICTION

The 2020 Rule at issue implicates Section 8 of the NLRA, 29 U.S.C. § 158, which defines unfair labor practices, as well as Section 9, 29 U.S.C. § 159, which concerns the Board's responsibilities to conduct representation elections. 85 Fed. Reg. at 11188.

The Board issued the 2020 Rule pursuant to its Section 6 rulemaking authority. 29 U.S.C. § 156. While Section 6 does not address where judicial review of final Board rules should occur, Section 10(f), 29 U.S.C. § 160(f), directs judicial review of any final unfair-labor-practice "order" to the circuit courts of appeals. When Congress enacted the NLRA, Congress spoke of "orders" as shorthand for final agency action, including rules. *AFL-CIO v. NLRB* ("*AFL-CIO*"), 57 F.4th 1023, 1031 (D.C. Cir. 2023) (citing cases). Thus, a Board rule concerning unfair labor practices should be directly reviewed in the courts of appeals. *See id.* at 1032 ("[S]ubsection 10(f) communicates that what is being directed to the court of appeals for the purpose of direct review is NLRB final orders (and, per binding precedent, rules) concerning unfair labor practices.") (citation modified).

SEIU's petition for review was timely, as the Act places no jurisdictional time limitation on such filings, and the petition was filed within the six-year time limit specified in 28 U.S.C. § 2401.

## COUNTERSTATEMENT OF ISSUES PRESENTED FOR REVIEW

1) Is the 2020 Rule's requirement that a joint employer actually exercise substantial control over an essential term and condition of employment consistent with the common law and the NLRA?

2) Is the actual exercise requirement arbitrary and capricious?

3) Was the Board's choice to exclude health and safety as an essential term arbitrary and capricious?

## COUNTERSTATEMENT OF THE CASE

### I. Statutory and Historical Background of the Joint Employer Doctrine under the NLRA

The aim of the NLRA "is industrial peace and stability, fostered by collective-bargaining agreements providing for the orderly resolution of labor disputes between workers and employees." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785 (1996). To this end, Section 7 of the NLRA grants employees the right "to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or

protection." 29 U.S.C. § 157. And Section 8(a)(5) imposes liability on employers who "refuse to bargain collectively with the representatives of [their] employees." *Id.* § 158(a)(5).

These statutory rights and duties are enforced by the National Labor Relations Board ("the Board"), which has two principal responsibilities: preventing unfair labor practices, *id.* § 160, and resolving questions concerning representation, *id.* § 159. The Board typically carries out these responsibilities through case-by-case adjudication, but it may do so by rulemaking. *Id.* § 156; *NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 294 (1974).

In interpreting and applying the NLRA, courts and the Board have long recognized that two or more entities can serve as joint employers of a group of employees. *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964); *cf.* 29 U.S.C. § 152(3) ("The term 'employee' . . . shall not be limited to the employees of a particular employer[.]"). Because the NLRA's definitions of "employer" and "employee" are terse and unspecific, *see* 29 U.S.C. §152(2), (3), the Board, with Supreme Court approval, relies on the common law of agency to guide its analysis of when a joint-employment relationship exists. *NLRB v. Town & Country*

*Elec., Inc.*, 516 U.S. 85, 92–95 (1995); *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968).[1]

For many years, the Board consistently found that evidence of an entity's exercised control over employees' essential terms and conditions of employment is central to joint-employer determinations. 2020 Rule, 85 Fed. Reg. at 11185 n.3; Notice of Proposed Rulemaking: The Standard for Determining Joint-Employer Status, 83 Fed. Reg. 46681, 46683 (Sep. 14, 2018) ("NPRM"). Indeed, the Supreme Court recognized in *Boire* the Board's factual conclusion that the two entities at issue there "exercised common control over the employees," and thus could appropriately be found joint employers. 376 U.S. at 475. On remand, the Fifth Circuit reiterated the importance of the control exercised by

[1] In 1947, Congress enacted the Taft-Hartley amendments to the NLRA. Labor Management Relations Act of 1947, Pub. L. 80-101, 61 Stat. 136 (codified as amended at 29 U.S.C. §§ 141–197), the "obvious purpose [of which] was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act," *United Ins.*, 390 U.S. at 256. Before Taft-Hartley, the Board had adopted statutory definitions of "employer" and "employee" that were broader than their common-law definitions. *See NLRB v. Hearst Publ'ns*, 322 U.S. 111, 124 (1944) (in the NLRA context, "Congress had in mind a wider field than the narrow technical legal relation of 'master and servant,' as the common law had worked this out in all its variations").

the putative joint employer "in actual practice," specifically via "detailed supervision" of its subcontractor's employees. *NLRB v. Greyhound Corp.*, 368 F.2d 778, 780 (5th Cir. 1966).

Over the next two decades, the Board's joint-employer test had not yet solidified, but it consistently regarded an employer's exercised control over employees' essential terms as relevant to joint-employer status, while the role of contractually reserved control varied. *See* 2020 Rule, 85 Fed. Reg. at 11185 n.5 (citing *Jewel Tea Co.*, 162 NLRB 508, 510 (1966); *Hychem Constructors, Inc.*, 169 NLRB 274 (1968)).

Then in 1982, the Third Circuit issued *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117 (3d Cir. 1982). Under that decision's formulation, "where two or more employers *exert significant control* over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers' within the meaning of the NLRA." *Id.* at 1124 (emphasis added). In applying that test, the Third Circuit focused on the many forms of control that Browning-Ferris exercised over the drivers with whom it contracted, including, inter alia, hiring, firing,

setting shift times and pay, and performing daily supervision. *See id.* at 1120–21, 1124–25. Moreover, many of the cases the court relied on to formulate its test found joint-employer status based on the presence of exercised control.[2]

A few years later, in *Laerco Transportation & Warehouse*, 269 NLRB 324 (1984), and *TLI, Inc.*, 271 NLRB 798 (1984), *enforced sub. nom.*, *Gen. Teamsters Loc. Union No. 326 v. NLRB*, 772 F.2d 894 (3d Cir. 1985) (unpublished table mem.), the Board applied the Third Circuit's test and concluded that substantial exercised control was

---

[2] *See id.* (citing, inter alia, *N. Am. Soccer League v. NLRB*, 613 F.2d 1379, 1382 (5th Cir. 1980) (sports league "exercises a significant degree of control over . . . the selection, retention, and termination of the players, the terms of individual player contracts, dispute resolution and player discipline"); *Lutheran Welfare Servs. of Ill. v. NLRB*, 607 F.2d 777, 778 (7th Cir. 1979) (entity "exert[ed] significant control" over employees by requiring approval for hiring, promotions, wage increases, fringe-benefit payouts, working hours, policies); *NLRB v. Jewell Smokeless Coal Corp.*, 435 F.2d 1270, 1271–72 (4th Cir. 1970) (entity had "de facto control" over employees' conditions of employment); *Ace-Alkire Freight Lines, Inc. v. NLRB*, 431 F.2d 280, 282 (8th Cir. 1970) (entity "exercised the right to discharge unsatisfactory employees, dispatched the drivers and monitored [common carrier] logs prepared by the drivers"); *Ref-Chem Co. v. NLRB*, 418 F.2d 127, 129 (5th Cir. 1969) (entity "[i]n practice . . . exercised its [contractual] control"); *NLRB v. Checker Cab Co.*, 367 F.2d 692, 694 (6th Cir. 1966) (examining "the nature and degree of control exercised by [the parent entity] over the employees of its members," including direction and supervision)).

necessary to establish joint-employer status, while contractually reserved authority was insufficient. *See Laerco*, 269 NLRB at 324–26 (joint-employer status not found based on "minimal" supervision and "routine" work assignments, despite company's reserved authority to determine qualifications of other employer's employees and reject them for assignments); *TLI*, 271 NLRB at 799, 803 (joint-employer status not found based on low degree of exercised control, despite company's lease agreement providing that it "will solely and exclusively be responsible for maintaining operational control, direction and supervision" over other company's employees).

In the following decades, the Board clarified the degree of exercised control necessary to find joint-employer status. *See Airborne Freight Co.*, 338 NLRB 597, 597 n.1 (2002) (exercised control must be "direct and immediate" under *TLI* standard); *G. Wes Ltd. Co.*, 309 NLRB 225, 226 (1992) (exercised control must not be "limited and routine in nature" under *Laerco* standard). It also explained that "the Board does not rely merely on the existence of . . . contractual provisions, but rather looks to the actual practice of the parties." *AM Prop. Holding Corp.*, 350 NLRB 998, 1000 (2007), *enforced in relevant*

*part sub nom.*, *SEIU, Loc. 32BJ v. NLRB*, 647 F.3d 435 (2d Cir. 2011); *see also Goodyear Tire & Rubber Co.*, 312 NLRB 674, 677 (1993) ("operational control clause" alone is not "evidence of joint employer status"; rather, it is "more appropriate to look to the actual handling of day-to-day business").

## II. *BFI I* and *II*

In its 2015 decision, *Browning-Ferris Industries of California, Inc.*, 362 NLRB 1599 (2015) ("*BFI I*"), the Board changed its joint-employer test and reevaluated its common-law underpinnings. The overarching analysis remained focused on whether two or more employers "share or codetermine those matters governing the essential terms and conditions of employment." *Id.* at 1600. But the Board established a two-part inquiry to answer this question. First, it asked whether there is "a common-law employment relationship with the employees in question." *Id.* In this regard, the Board rejected the actual-exercise requirements of the previous three decades and emphasized that "[t]he right to control, in the common-law sense, is probative of joint-employer status, as is the actual exercise of control, whether direct or indirect." *Id.* at 1614 (emphasis added). Second, it asked "whether

the putative joint employer possesses sufficient control over employees' essential terms and conditions of employment to permit meaningful collective bargaining." *Id.* at 1600. The Board applied this two-step inquiry to the case before it and concluded that Browning-Ferris, a recycling facility operator, and Leadpoint, a staffing agency, jointly employed sorters and other workers. *Id.* at 1616–18.[3]

In September 2018, while *BFI I* was pending review in this Court, the Board issued a notice of proposed rulemaking for the joint-employer rule challenged in the instant case. The Board proposed requiring that a putative joint employer "possess and actually exercise substantial direct and immediate control over the employees' essential terms and conditions of employment in a manner that is not limited and routine." NPRM, 83 Fed. Reg. at 46686.

About three months later, this Court issued its review decision in *Browning-Ferris Industries of California, Inc. v. NLRB* ("*BFI II*"), 911 F.3d 1195 (D.C. Cir. 2018). There, the Court held that "both reserved

---

[3] In 2017, a newly constituted Board overruled *BFI I* in *Hy-Brand Industrial Contractors, Ltd.*, 365 NLRB 1554 (2017). But two months later, it vacated that decision for ethics reasons, *Hy-Brand Industrial Contractors, Ltd.*, 366 NLRB No. 26, 2018 WL 1082557 (Feb. 26, 2018), so *BFI I* remained extant Board precedent.

authority to control and indirect control can be relevant factors in the joint-employer analysis" under the common law. *Id.* at 1222. However, the case did "not present the question whether the reserved right to control, divorced from any actual exercise of that authority, could alone establish a joint-employer relationship." *Id.* at 1213.

The Court also identified several errors in *BFI I*. First, the Court found that the Board had "failed to differentiate between those aspects of indirect control relevant to status as an employer, and those quotidian aspects of common-law third-party contract relationships." *Id.* at 1220. The Court explained that *BFI I*'s definition of indirect control required "some legal scaffolding that keeps the inquiry within traditional common-law bounds and recognizes that '[s]ome such supervision is inherent in any joint undertaking, and does not make the contributing contractors employees.'" *Id.* (quoting *Radio City Music Hall Corp. v. United States*, 135 F.2d 715, 718 (2d Cir. 1943) (L. Hand, J.)). Second, the Court faulted *BFI I* for failing to explain what terms and conditions of employment are "essential to permit meaningful collective bargaining," and "what meaningful collective bargaining entails." *Id.* at 1222 (citation modified). Finally, this Court asked the Board to

determine whether retroactive application of its new test would be proper, once that test was more clearly articulated. *Id.*

### III. The 2020 Rule

Almost seventeen months after the notice of proposed rulemaking, extending the notice-and-comment period three times, and considering almost 29,000 comments, the Board issued the challenged 2020 Rule. *See* 85 Fed. Reg. at 11186 and n.8, 11188. The Rule provides that an entity "may be considered a joint employer of a separate employer's employees only if the two employers share or codetermine the employees' essential terms and conditions of employment." 85 Fed. Reg. at 11235. The Board identified a finite list of essential terms: wages, benefits, hours of work, hiring, discharge, discipline, supervision, and direction. *Id.* To establish sharing or codetermination, "the entity must possess *and exercise* such substantial direct and immediate control over one or more essential terms or conditions of their employment as would warrant finding that the entity meaningfully affects matters relating to the employment relationship with those employees." *Id.* (emphasis added). Under the Rule, "substantial direct and immediate control," means "direct and immediate control that has a regular or continuous

consequential effect on an essential term or condition of employment of another employer's employees," in contrast to control that is "only exercised on a sporadic, isolated, or de minimis basis." *Id.* at 11236. The Board refers to this feature of the Rule as the "actual exercise requirement," and emphasized that exercised control is the "best evidence" of joint-employer status. *Id.* at 11199.

The 2020 Rule also explains what constitutes contractually reserved authority: "the authority that an entity reserves to itself, under the terms of a contract with another employer, over the essential terms and conditions of employment of that other employer's employees, *but that has never been exercised*." 85 Fed. Reg. at 11227 (emphasis added). Although contractually reserved authority "is probative of joint-employer status," this is "only to the extent it supplements and reinforces evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment."[4] *Id.* at 11235.

---

[4] The Board acknowledged that this "narrowing proviso" does not represent the outermost limits of what the common law permits, but it also does not "exceed the bounds of common-law principles," as "the Board [wa]s aware of no court that has found that reserved, unexercised

Similarly, the 2020 Rule establishes that control over mandatory subjects of bargaining that are not essential terms,[5] and "indirect" forms of control over essential terms, are not determinative of joint employer status unless they "supplement[] and reinforce[] evidence of [an] entity's possession or immediate control over a particular essential term and condition of employment." *Id.* at 11235. To clarify the difference between direct versus indirect control, the Board explained how these differ for each essential term and condition of employment. *Id.* at 11235–36. For example, an entity exercises direct and immediate control over discipline "if it actually decides to suspend or otherwise discipline another employer's employees." *Id.* at 11236. But the entity may exercise indirect control over discipline by "bringing misconduct or poor performance" to the attention of the primary employer, or "by refusing to allow another employer's employee to access its premises[.]" *Id.* Likewise, an entity exercises direct and immediate control over

---

control, standing alone, was sufficient to create a joint-employer relationship under the NLRA." *Id.* at 11209.

[5] There are many mandatory subjects of bargaining that an employer has a statutory duty to bargain over, even though they are not *essential* terms. *See id.* at 11186 (mentioning grievance adjustment, drug and alcohol testing, dress codes, and attendance policies, as examples).

discharges if it "actually decides to terminate the employment of another employer's employee." *Id.* By contrast, the entity may exercise indirect control by "expressing a negative opinion of another employer's employee, [or] by refusing to allow another employer's employee to continue performing work under a contract." *Id.* However, indirect control does not include "control or influence over setting the objectives, basic ground rules, or expectations for another entity's performance under a contract," which themselves are not probative of joint employer status. *Id.*

The Board directly addressed comments about *BFI II*, which discussed the place of reserved and indirect control in joint employer analysis. *Id.* at 11210–13; *see* above at 9–11. The 2020 Rule is consistent with *BFI II* because "[i]t incorporates indirect and reserved-but-unexercised control over essential terms and conditions and treats them as probative of joint-employer status to the extent they supplement and reinforce evidence of direct and immediate control." 85 Fed. Reg. at 11211. Moreover, the 2020 Rule excluded "setting the objectives, basic ground rules, or expectations for another entity's performance under a contract" from indirect control in response to this

Court's admonition that indirect control should be distinguished from the routine matter of shaping "the basic contours" of a service contract. *Id.*; *see BFI II*, 911 F.3d at 1221. Finally, the Rule makes clear that "meaningful" collective bargaining requires that a joint employer satisfy the actual-exercise requirement. 85 Fed. Reg. at 11212; *cf. BFI II*, 911 F.3d at 1222.

## IV. *BFI III* and *Sanitary Truck Drivers & Helpers Loc. 350 v. NLRB*

After this Court remanded *BFI I*, the Board refrained from reinterpreting the joint-employer test from the underlying Board decision, which the 2020 Rule had abrogated. *See Browning-Ferris Indus. of Cal., Inc.,* 369 NLRB No. 139, 2020 WL 4366383 (July 29, 2020) ("*BFI III*"). The Board determined that it would be unjust to apply its 2015 test retroactively; consequently, it found that "the joint-employer issue must be resolved under the prior longstanding standard requiring proof of direct and immediate control." *Id.* at *6. And as the Regional Director had not originally found joint-employer status based on the pre-2015 standard, the Board dismissed the underlying administrative complaint. *Id.* at *5–6. *See Browning-Ferris Indus. of*

*Cal., Inc.,* 370 NLRB No. 86, 2021 WL 538938 (Feb. 11, 2021) (denying reconsideration).

Upon review, this Court vacated and remanded that decision. *Sanitary Truck Drivers & Helpers Loc. 350 v. NLRB*, 45 F.4th 38 (D.C. Cir. 2022). The Court rejected the Board's finding that the 2015 test could not be applied retroactively, finding nothing unfair with acknowledging "the longstanding role of indirect control in the Board's joint-employer inquiry." *Id.* at 44. In this Court's view, the Board had "failed to consider its own recent 2020 rulemaking, which explained that it in fact had never actually ceased considering indirect and reserved control, even though it did not consider those factors dispositive standing alone." *Id.* (citing 2020 Rule, 85 Fed. Reg. at 11227). The Court summarized that the "the common law would not countenance ignoring reserved and indirect control in assessing joint-employer status." *Id.* at 47. Once again, *BFI* enforcement proceedings were remanded to the Board, which recently issued a new decision. *See* below at 19.

## V. The Board's 2023 Joint-Employer Rule

In 2023, the Board published a new joint-employer rule that attempted to rescind the 2020 Rule. *Standard for Determining Joint Employer Status*, 88 Fed. Reg. 73946 (Oct. 27, 2023). The 2023 Rule provided that "a common-law employer's possession of unexercised authority to control . . . one or more terms or conditions of employment would be sufficient to establish status as a joint employer." *Id.* at 73956. It also added "working conditions related to the safety and health of employees" to its list of essential terms. *Id.*

SEIU challenged the 2023 Rule before this Court, arguing that it violated the NLRA and was arbitrary and capricious for not including all mandatory subjects of bargaining in its list of essential terms. *See SEIU v. NLRB*, Case No. 23-1309 (D.C. Cir. 2023), Statement of Issues at 1–2 (Dkt. No. 2030428). A few days later, the Chamber of Commerce of the United States and other entities challenged the 2023 Rule in the United States District Court for the Eastern District of Texas. *Chamber of Com. of United States v. NLRB*, 723 F. Supp. 3d 498 (E.D. Tex. 2024). The Board challenged the district court's jurisdiction and moved to have

that case transferred to the D.C. Circuit, relying on this Court's *AFL-CIO* decision. *See id.* at 510–13.

The 2023 rule never went into effect because after the Eastern District of Texas disagreed with *AFL-CIO* as to jurisdiction, *id.* at 512–13, the district court ultimately vacated that rule based on its "sweep beyond common-law limits," *id.* at 517. It also found that the 2023 Rule's recission of the 2020 Rule was arbitrary and capricious. *Id.* at 518. This Court later dismissed SEIU's petition for review of the 2023 Rule as moot. *SEIU v. NLRB*, Case No. 23-1309 (Aug. 26, 2024), Dkt. No. 2071711. Hence, the 2020 Rule remains operative. 29 C.F.R. § 103.40; Withdrawal of 2023 Standard for Determining Joint Employer Status, 91 Fed. Reg. 9707 (Feb. 27, 2026).

## VI. Instant Petition

In 2025, following the resolution of the 2023 Rule litigation, SEIU filed the instant petition challenging the 2020 Rule. While this case is pending, the previously filed D.C. district court litigation is once again stayed, *see* above at i–ii.

## VII. *BFI IV*

The Board returned to the *BFI* enforcement proceeding again pursuant to this Court's 2022 remand. *See* above at 16. In this latest decision, the Board applied a clarified version of the *BFI I* standard as law of the case to decide the particular matter before it on remand. *Browning-Ferris Indus. of Cal., Inc.* ("*BFI IV*"), 374 NLRB No. 46, 2026 WL 539422, at *10–14 (Feb. 23, 2026). Notably, the Board emphasized that while it would be applying the clarified standard of *BFI IV* retroactively to the parties in the case, it would not apply to any cases arising after April 28, 2020, the effective date of the 2020 Rule. *Id.* at *1, 10 n.33, 11.

## SUMMARY OF THE ARGUMENT

In response to a period of instability and uncertainty, the Board enacted the 2020 Rule. This Rule is consistent with the common law, the NLRA, and this Court's instructions in *BFI II.* Its actual-exercise requirement comports with the accumulated, settled meaning of the employer-employee relationship under common-law principles predating the Taft-Hartley amendments to the NLRA. Furthermore, its treatment of contractually reserved authority stays within the

boundaries of the common law, in a way that is consistent with the cautious approach of this Court and others, which have not found reserved authority suffices on its own to create a joint-employer relationship.

The 2020 Rule is also neither arbitrary nor capricious. The Board explained and justified the actual-exercise requirement as necessary to promote meaningful collective bargaining, foster labor-management stability by simplifying the joint-employer test, and provide clarity in determining what would count as a joint-employment relationship. The Board also explained its exclusion of health and safety—along with other corporate social-responsibility provisions—from the list of essential terms. Including these sorts of provisions would turn ordinary third-party contracting terms into evidence of joint employment.

Finally, if this Court finds some part of the Rule insufficiently supported, it should remand the Rule to the NLRB but without vacatur. This would avoid the upheaval that would result from setting aside the 2020 Rule, which has stabilized this area of the law for the past six years.

## STANDARD OF REVIEW

This Court reviews de novo "pure questions of law about the scope of traditional common-law agency principles." *BFI II*, 911 F.3d at 1207–08. "[T]o the extent that the Board's joint-employer standard is predicated on interpreting the common law," its view on the limits that the common law imposes is not entitled to deference. *Id.* at 1206. Rather, "[t]he policy expertise that the Board brings to bear on applying [the Act] to joint employers is bounded by the common-law's definition of a joint employer," as established by the best judgment of this Court. *Id.* at 1208.

While "[t]he common law sets the outer limits of a permissible standard for bargaining duties as a joint employer, . . . the Board has long been permitted to draw on its expertise to erect prudential requirements within those bounds." *Chamber of Com. of U.S.*, 723 F. Supp. 3d at 517; *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024) (courts make room for agency policymaking by "polic[ing] the outer statutory boundaries" where policymaking authority comes up against court-defined terms); *Town & Country Elec.*, 516 U.S. at 94 (within common-law bounds, "the Board's construction of that term

[employee] is entitled to considerable deference") (quotation omitted)); *N. Am. Van Lines*, 869 F.2d at 599 ("As long as the Board's conclusions accord with principles of agency law . . . the court must . . . allow some latitude for the Board's judgment.").

When the Board stays within common-law limits and acts "in accordance with law," the Administrative Procedure Act then "mandate[s] that judicial review of agency policymaking . . . be deferential." *Loper Bright*, 603 U.S. at 391–92; *see also id.* (contrasting courts' deferential review of agency policymaking with de novo review of agency's accordance with law, both under 5 U.S.C. § 706(2)(A)).

This cabined deferential standard applies to NLRB rulemaking, *see Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 617–19 (1991), as well as adjudication*, see Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42 (1987) ("If the Board adopts a rule that is rational and consistent with the Act . . . then the rule is entitled to deference from the courts."). Under this standard, the inquiry is not whether the court "agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025). This

Court "presumes the validity of agency action" and will affirm it unless the agency "failed to consider relevant factors or made a clear error in judgment[.]" *Cellco P'ship v. FCC*, 357 F.3d 88, 93–94 (D.C. Cir. 2004).

## ARGUMENT

### I. The 2020 Rule is consistent with the common law and the NLRA.

As this Court has explained, the Board's joint-employer test "must color within the common-law lines identified by the judiciary." *BFI II*, 911 F.3d at 1208. In issuing the 2020 Rule, the Board concluded that the actual-exercise requirement, and its treatment of contractually reserved authority as potentially probative but non-dispositive, fall within common-law lines. *See* 85 Fed. Reg. at 11214 (stating that "no court has ever found impermissible on common-law grounds" the actual-exercise requirement of earlier Board law); *id.* at 11209 (explaining that "no court" has found contractually reserved authority "standing alone, was sufficient to create a joint-employer relationship under the NLRA").

First, the actual-exercise requirement comports with the "accumulated settled meaning" of the employer-employee relationship under common-law principles. *NLRB v. Amax Coal Co., a Div. of Amax*, 453 U.S. 322, 329 (1981). Such principles predate the 1947 Taft-Hartley

amendments. And after Taft-Hartley, courts not only continued to acknowledge the primacy of exercised control for establishing joint-employer status under the NLRA but often required it.

Second, the 2020 Rule's treatment of contractually reserved authority also colors within common-law lines. Treating contractually reserved authority as probative but non-dispositive is consistent with the cautious approach of this Court and other appellate courts, which have refrained from holding that such authority can be sufficient to establish joint-employer status under the NLRA, or even that it be given the same weight as exercised control.

### A. The 2020 Rule's actual-exercise requirement fits comfortably within common-law boundaries and hence accords with the NLRA.

#### 1. *The actual-exercise requirement reflects common-law precedent.*

The Board agreed with commenters who, relying on loaned-servant cases, argued that the actual-exercise requirement is consistent with the common law. *See* 2020 Rule, 85 Fed. Reg. at 11200–01 & n.133 (citing *Kelley v. S. Pac. Co.*, 419 U.S. 318, 324 (1974); *Shenker v. Baltimore & Ohio R.R. Co.*, 374 U.S. 1, 6 (1963); Restatement (Second) of Agency § 277 & cmt. d (A.L.I. 1958)). The loaned-servant doctrine

addresses when an employer loans its employees to another, and the borrower becomes liable for the actions of the employees by assuming control over them. *Shenker*, 372 U.S. at 5–6. It is relevant that before Taft-Hartley, federal courts frequently required the exercise of immediate and direct control to establish the liability of borrower employers for injuries suffered or caused by the employees of the loaning employer. *See BFI II*, 911 F.3d at 1213 (the common law governing "assign[ment of] liability for specific tortious conduct or breaches of contracts" informs NLRA joint-employer analysis). And like joint-employer cases, the loaned-servant context involves two putative employers.

The loaned-servant test "ascertain[s] who has the power to control and direct the servants in the performance of their work," which meant providing "authoritative direction and control." *Standard Oil Co. v. Anderson*, 212 U.S. 215, 222 (1909); *accord Shenker*, 374 U.S. at 6 ("[U]nder the common law loaned-servant doctrine immediate control and supervision is critical in determining for whom the servants are performing services."); *Kelley*, 419 U.S. at 330 n.10 (same); *see also Denton v. Yazoo & M.V.R. Co.*, 284 U.S. 305, 308 (1932) (liability of

borrowing employer established by "ascertaining under whose authority and command the work was being done"); *Harlan v. Bryant*, 87 F.2d 170, 174 (7th Cir. 1936) ("[T]he true test of the existence of the relation of master and servant . . . [is] whether the master actually exercises supervision and control over the servant during the time he was such servant."); *Marion Steam Shovel Co. v. Bertino*, 82 F.2d 541, 545 (8th Cir. 1936) ("Where a master loans the labor of his servant to a borrower, retaining supervision and control, the loaned servant does not become the servant" of the borrower); Restatement (Second) of Agency § 227 cmt. d (to become servant of borrower, the borrower must "exercise[] such control over the conduct of the employee as would make the employee his servant were it not for his general employment"). In other words, exercised control was the gold standard to establish a common-law master-servant relationship.

During this same period, state courts often emphasized the control exercised by the borrowing employer to establish liability, not the formalities of the service contract. *See, e.g.*, *Thomas v. Great W. Min. Co.*, 1 P.2d 165, 166 (Okla. 1931) ("[T]he true test of the existence of the relation of master and servant . . . [is] whether the master actually

exercises supervision and control over the servant during the time he uses such servant."); *accord Kanipe v. Grundy Cnty. Rural Elec. Co-op.*, 300 N.W. 662, 665 (Iowa 1941) (stating that for liability to attach, employee must be "under the control and direction of the borrower in the performance of the particular act"); *Bisson v. Winnipesaukee Air Serv.*, 13 A.2d 821, 823 (N.H. 1940) (finding liability where employee was "under the direction and supervision" of borrowing employer, and "was to take his orders" from it).

The Taft-Hartley amendments ensured that the statutory term "employee" would not "embrace persons outside that category under the general principles of the law of agency." 93 Cong. Rec. 6599 (1947). The amendments' legislative history noted that "'[e]mployees work for wages or salaries under *direct supervision*." H.R. Rep. No. 245, 80th Cong. 1st Session, at 18 (1947) (emphasis added). The Supreme Court identified this core intent of Congress and was persuaded that the statutory meaning of the employer-employee relationship was "not to be stretched beyond its plain meaning embracing only those who work for another for hire." *Allied Chem. & Alkali Workers, Loc. Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 166 (1971).

In the following decades, courts looked to exercised control as the lead indicator of joint-employer status, even when reserved control was also considered. For example, in *International Chemical Workers Union Local 483 v. NLRB*, this Court agreed with the Board that the Cabot Corporation was not the joint employer of employees of Payne and Keller of Louisiana Inc. (P & K), because "Cabot did not exercise the type of control which would establish a joint employer relationship." 561 F.2d 253, 257 (D.C. Cir. 1977). P & K directly supervised its own employees, while Cabot's contract-compliance monitoring "did not involve [it] in supervising the actual work." *Id.* at 256–57. The Court also rejected the dissenting Board member's claim that the "contract between the parties established that Cabot retained the right to control P & K employees, thereby establishing a joint employer relationship." *Id.* at 258. Specifically, the fact that "[t]he contract . . . gave Cabot the right to have P & K remove an employee from the Cabot job," was not dispositive. *Id.* at 256. Nor was it dispositive that "[t]he contract . . . required P & K to perform certain work according to Cabot's drawings and specifications and subject to Cabot's approval," as this "d[id] not necessarily involve" Cabot in the details of P & K's employees' work,

and there was "no finding . . . that Cabot actually did control the employees of P & K to that extent[.]" *Id.*

It is not disputed that exercised control can be sufficient to establish joint-employer status. *See* SEIU Br. 21; *see also, e.g.*, *Painting Co. v. NLRB*, 298 F.3d 492, 501 (6th Cir. 2002); *DiMucci Const. Co. v. NLRB*, 24 F.3d 949, 952 (7th Cir. 1994). More importantly, some circuit courts have expressly required exercised control to find joint-employer status, even when contractually reserved control was also present. *See Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 378 (5th Cir. 2017) (contractual "reservation of [business's] right to discipline . . . is insufficient to establish a joint-employer finding, absent evidence that the right was ever exercised"); *accord Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) (holding generally that to find joint-employer status, "each alleged employer must exercise control over the working conditions of the employee").

Consistent with the primacy of exercised control, this Court has enforced Board joint-employer orders relying on this factor. *Dunkin' Donuts Mid-Atl. Distrib. Ctr., Inc. v. NLRB*, 363 F.3d 437, 440–41 (D.C. Cir. 2004) (joint-employer status found based on numerous forms of

exercised control, including hiring, assigning, and firing), *cited in BFI II*, 911 F.3d at 1209. And conversely, this Court and others have refused to enforce Board joint-employer orders where there was insufficient evidence of exercised control. *See NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017) (Board can apply the "direct and immediate control standard" to establish joint-employer status) (citation modified); *AT&T v. NLRB*, 67 F.3d 446, 452 (2d Cir. 1995), *as clarified on reh'g*, (2d Cir. Sep. 29, 1995) ("[T]he control exercised over [other employer's] employees by AT&T falls . . . far short of the type of control necessary to establish a joint employer."); *Clinton's Ditch Co-op Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985) (joint-employer status not found where company had no actual involvement in hiring or firing employees, and "[t]here was no evidence" that it "directly administered any discipline to" employees or "meaningfully supervis[ed]" them); *Int'l House v. NLRB*, 676 F.2d 906, 913 (2d Cir. 1982) ("[A]n essential element under any determination of joint employer status . . . is . . . some evidence of immediate supervision or control of the employees."); *Pulitzer Pub. Co. v. NLRB*, 618 F.2d 1275, 1281 (8th Cir. 1980) (joint-employer status not properly found where "degree to which [the business] exercises control

of the . . . terms and conditions of employment of [the subcontractor's employees] is not substantial").

In sum, the 2020 Rule's actual-exercise requirement is consistent with the accumulated, settled meaning of the common law.

*2. The importance of the "right to control" in the common law of agency does not conflict with the Board's actual-exercise requirement.*

SEIU argues that the Rule's actual-exercise requirement conflicts with the NLRA because it diminishes the weight of the common law "right-to-control element." SEIU Br. 27 (quoting *BFI II*, 911 F.3d at 1199). But actual exercise is not distinct from the right to control; rather, exercised control plays a critical role in the right-to-control analysis. *See N. Am. Van Lines*, 869 F.2d at 599 (under right-to-control test, "the extent of the actual *supervision* exercised by a putative employer over the 'means and manner' of the workers' performance is the most important element to be considered") (quoting *Loc. 777, Democratic Union Org. Comm. v. NLRB*, 603 F.2d 862, 873 (D.C. Cir. 1978)); *C.C. E., Inc. v. NLRB*, 60 F.3d 855, 858 (D.C. Cir. 1995) ("Th[e] right-to-control test requires an evaluation of . . . the extent of the actual supervision exercised by a putative employer.") (citation

modified); *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 682 (9th Cir. 2009) ("A finding of the right to control employment requires . . . a comprehensive and immediate level of day-to-day authority over employment decisions.") (citation modified), *cited in* 2020 Rule, 85 Fed. Reg. at 11200 n.133. Indeed, SEIU seems to acknowledge this point. *See* SEIU Br. 21 (noting that the right to control can be established "through evidence establishing that the employer had, in fact, controlled the employee's conditions of employment").

### B. The 2020 Rule's treatment of contractually reserved authority accords with the common law.

The Board's treatment of contractually reserved authority as probative of joint-employer status, insofar as it reinforces and supplements evidence of exercised control, also accords with the common law and the NLRA. *See* 85 Fed Reg. at 11209. Because the Board has not contravened common-law principles, it is entitled to "formulate a joint-employer standard based on the common law applied *in the context of the NLRA*." *Id.* at 11208 (emphasis added).

### 1. *The common law permits the Board to give contractually reserved authority less weight than exercised control, and it does not require that contractually reserved authority be deemed sufficient to establish joint-employer status.*

As this Court has made clear, the "'common-law element of control is the principal guidepost' in determining whether an entity is an employer of another." *BFI II*, 911 F.3d at 1211 (quoting *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 448 (2003)). As a form of control, contractually reserved authority cannot be ignored when assessing joint-employer status under the NLRA, *Sanitary Truck Drivers*, 45 F.4th at 47, and it "can be relevant" to that inquiry, *BFI II*, 911 F.3d at 1222.

Beyond this guidance, the common law provides "no shorthand formula or magic phrase that can be applied" to establish an employee-employer relationship. *United Ins.*, 390 U.S. at 258; *see also Pa. Interscholastic Athletic Ass'n, Inc. v. NLRB*, 926 F.3d 837, 839–40 (D.C. Cir. 2019) (establishing such a relationship "is more art than science"). In generating a statutory test bounded by the common law, the Board can prioritize certain common-law factors to create a "more accurate proxy" for the statutory issue and make "line drawing . . . easier."

*FedEx Home Delivery v. NLRB*, 563 F.3d 492, 496 (D.C. Cir. 2009).[6] Specifically, when certain common-law factors are integral to the "central inquiry" of a statutory test, then surrounding factors may be considered "probative only to the extent that they bear upon and further that inquiry." *N. Am. Van Lines*, 869 F.2d at 600.

The Board respected those principles in its treatment of contractually reserved authority in the 2020 Rule. *See* above at 12 & n.4 (discussing how exercised control is the best indicator of joint-employer status, and how contractually reserved authority can be useful to support evidence of exercised control); *see also* above at 24–31 (explaining how courts have more heavily relied on exercised control).

SEIU's assertion (SEIU Br. 34) that contractually reserved authority should be deemed sufficient to establish joint-employer status goes far beyond this Court's observation that it "can be relevant" to that inquiry. *See BFI II*, 911 F.3d at 1222. Consistent with that observation, the 2020 Rule maintains that evidence of contractually reserved authority is insufficient by itself to establish a joint employer

---

[6] In this regard, amicus AFL-CIO is incorrect that designating "superior and subordinate forms of common law control" for a statutory purpose violates the common law. AFL-CIO Br. 7; *see also id.* at 12–15.

relationship but "is relevant . . . to the extent such evidence supplements and reinforces evidence of direct and immediate control over essential terms and conditions." 2020 Rule, 85 Fed. Reg. at 11210.

Relying on independent-contractor cases, SEIU incorrectly contends that this "Court rejected . . . the argument that reserved-but-unexercised control should be subordinate to actually exercised supervision." SEIU Br. 33 (citing *BFI II*, 911 F.3d at 1212); *see also* AFL-CIO Br. 16–17. Although this Court affirmed that reserved control is relevant to the independent-contractor analysis, 911 F.3d at 1212–13, it also found that the independent-contractor and joint-employer analyses are significantly different, *id.* at 1213–14. As this Court explained, the independent-contractor analysis asks, "who, if anyone, controls the worker other than the worker herself," while the joint-employer analysis "asks how many employers control individuals who are unquestionably superintendent." *Id.* at 1214.

This distinction makes sense. After all, in independent-contractor cases, there is no ambiguity that the putative employer is the entity exercising control over the putative employees. For example, the putative employer engages the workers to perform a task, determines

and pays their compensation, sets the scope of their employment, decides on the level of supervision and direction that is necessary, and establishes the conditions for termination of the contract. *See, e.g.*, *Singer Mfg. Co. v. Rahn*, 132 U.S. 518, 523–24 (1889).

By contrast, in joint-employer cases, the Board must assess whether an additional employer exercises similar control over the employees. 2020 Rule, 85 Fed. Reg. at 11194. That assessment requires a more thorough examination of how control is exercised by the putative joint employer, who does not necessarily engage the employees in the same manner as the primary employer. The right-to-control test in independent-contractor cases does not address this key part of the analysis. *See id.* at 11210 ("[T]he common-law factors relative to determining employee or independent-contractor status are instructive but of limited utility in the joint-employer context.") (citing *BFI II*, 911 F.3d at 1214–15); *see also* Restatement (Second) of Agency, § 220(2)(a) (right-to-control test in the independent-contractor context assesses "the extent of control which, by the agreement, the master may exercise over the details of the work"). Ultimately, the Board's treatment of independent-contractor principles as instructive, but not determinative,

aligns with the Court's explanation in *BFI II* that the independent-contractor and joint-employer analyses are not "essentially the same," and the former only "roughly assists" the latter. *Id.* at 11209–10 (quoting *BFI II*, 911 F.3d at 1212, 1215).

Although independent-contractor cases can be instructive in the joint-employer inquiry,[7] SEIU's cases, in particular, do not support its position on contractually reserved authority. While many of SEIU's cases announce the importance of the right to control, they do not limit their analyses merely to contractual terms. Rather, those cases examine whether control had actually been exercised. For example, *Bobik v. Industrial Commission* (SEIU Br. 32) states that, "the right to control the manner of doing the work" is the test, not "the actual exercise of the right by interfering with the work." 64 N.E.2d 829, 832 (Ohio 1946). But the court discusses how the employee (a driver) had in fact "received and followed his instructions from the [transportation] company; and that in addition to instructing him as to the work to be performed, the

---

[7] For example, *Singer*, 32 U.S. 518, lays out the right-to-control test for independent-contractor cases by focusing on control over the manner in which work is performed. *See* SEIU Br. 30. But this is of limited relevance to joint-employer analysis.

company designated the route for him to follow on his trip." *Id.*; *accord Bush v. Wilson & Co.*, 138 P.2d 457, 460–61 (Kan. 1943) (putative employer gave plaintiff direct instructions "several times a week," sent supervisors "two or three times a week and instruct[ed plaintiff] about what he should do," and "told him what hours to stay open and that he must be sure and stay open on Saturday"); *S.A. Gerrard Co. v. Indus. Acc. Comm'n*, 110 P.2d 377, 378 (Cal. 1941) (employees' work was supposed to be performed "under the supervision of and in accordance with the directions" of the putative employer); *Emps. Mut. Liab. Ins. Co. v. Indus. Comm'n*, 284 N.W. 548, 551 (Wis. 1939) (employee was working under and "subject to instructions and directions given him by the [employer's] board of directors").

Moreover, two cases cited by SEIU (SEIU Br. 31–32) contradict the Supreme Court's finding in *United Insurance Company*, that an employer's contractual right to discharge workers "at any time" is not dispositive of employee status under the common law. 390 U.S. at 258. Yet these cases inferred the right to control the details of employees' work based solely on such a provision. *See Green Valley Co-op. Dairy Co. v. Indus. Comm'n*, 27 N.W.2d 454, 458 (Wis. 1947) ("When an

employer has such right of summary discharge, he obviously has the right to control details of the work."); *see also Indus. Comm'n v. Meddock*, 180 P.2d 580, 584 (Ariz. 1947) ("We cannot conceive of an independent contractor subject to being summarily . . . dismissed without liability as the contract states, and yet not be under the order and control of another party.").

In sum, common-law precedent does not establish that contractually reserved authority, standing alone, is sufficient to establish joint-employer status under the NLRA. The independent contractor cases SEIU cites in support of this proposition do not meaningfully shed light on control in the joint-employer context and alternatively, announce tests that the courts do not rely upon in practice (*Bobik*, *Bush*, *Gerrard*, *Employers Mutual*) or contradict Supreme Court precedent (*Green Valley*, *Meddock*).[8]

---

[8] SEIU's assertion that the 2020 Rule's treatment of reserved-but-unexercised control is different from how the Board treated this issue in the past is a truism not an argument. SEIU Br. 36. The Board acknowledged in the Rule that its joint-employer test has changed over the years (85 Fed. Reg. at 11185 & n.5). The task before this Court is to decide whether the Board's 2020 Rule complies with the common law and reasonably considered the various interests at stake.

#### 2. *The 2020 Rule's treatment of contractually reserved authority does not undermine the Board's ability to police collective bargaining.*

As discussed (*see* above at 12), under the Rule's actual-exercise requirement, contractually reserved authority is probative of joint-employer status, insofar as "it supplements and reinforces evidence of the entity's possession or exercise of direct and immediate control over a particular essential term and condition of employment." 2020 Rule, 85 Fed. Reg. at 11235.

SEIU claims that Board adjudications will be compromised by the actual-exercise requirement because it renders contractually reserved control "a meaningless plus-factor." SEIU Br. 34. Relatedly, SEIU portrays the actual-exercise requirement as a "gate-keeping mechanism," which "prohibits the Board and its Administrative Law Judges" from considering contractually reserved authority unless exercised control has first been established. *Id.* at 35. This is incorrect.

The 2020 Rule "take[s] parties' contractual allocation of rights and responsibilities into account as part of the totality of the relevant facts in each particular employment setting." 85 Fed. Reg. at 11199. True, such an analysis "need not be conducted" unless there is already

evidence of exercised control. *Id.* at 11196. But the possession of "contractually reserved authority that, *if exercised*, would result in" controlling an essential term and condition may "supplement[] and reinforce[] evidence of direct and immediate control. *Id.* at 11197 (emphasis added).

Non-dispositive factors like contractually reserved authority remain important in NLRB adjudications under the 2020 Rule. This includes when the parties dispute the significance of evidence that an entity exercises substantial direct and immediate control over an essential term, or when a party claims that evidence is "not credible[,] or is too isolated or sporadic" to be considered substantial. *Id.* at 11186. For example, if parties dispute whether a putative joint employer exercises control over hiring and discharge, the "right to have input on who provides services may be probative of joint-employer status," so long as "the evidence demonstrates that such input . . . would determine which particular individuals another employer will hire and which it will not[,] or would directly result in the discharge of another employer's employee." *Id.* at 11197.

Similarly, if the parties dispute whether the putative joint employer actually directs employees, its right "to monitor performance" may show that this "encompasses instructing individual employees how to perform their work or issuing performance appraisals," which may indicate actual direction. *Id.* And the right "to dictate times, manner, and method of performance may be probative of joint-employer status to the extent such authority encompasses determining work schedules or work hours . . . instructing another employer's employees how to perform their work, or assigning particular employees their individual work schedules, positions, and tasks." *Id.* Thus, the Board fully explained why its approach does not render reserved control "a meaningless plus-factor."

*3. SEIU fails to show that the Board's treatment of reserved control is contrary to the structure and function of the NLRA.*

Finally, SEIU argues that the Rule's treatment of reserved control conflicts with the NLRA because it undermines collective bargaining. *See* SEIU Br. 38–41. SEIU claims that the Rule "permits employers to effectively evade their obligation to bargain over even essential subjects anytime the putative joint employer has reserved to itself exclusive

control over that subject," while the party in the best position to bargain (the one making contractual demands on the primary employer) will not be at the bargaining table. *Id.* at 39. To demonstrate this point, SEIU points to two hypothetical scenarios, one concerning sexual-harassment policies, *see id.* at 39–40, and the other concerning drug-testing or illness-prevention policies, *see id.* at 40. But SEIU's claim fails to withstand scrutiny.

As an initial matter, SEIU fails to identify any essential term or condition of employment bearing upon either scenario. Under the Board's Rule, an entity must exercise control over an essential term or condition to be deemed a joint employer. 85 Fed. Reg. 11235; *see also BFI II*, 911 F.3d 1195. But not every term and condition of employment that is a mandatory subject of bargaining is deemed essential. *See* 85 Fed. Reg. 11235 (listing eight essential terms); above at 13 & n.5. Though sexual-harassment and drug-testing policies are mandatory subjects of bargaining, the Rule does not treat them as essential subjects of bargaining. Thus, even if reserved control standing alone were sufficient to establish joint-employer status, reserved control over the mandatory, non-essential subjects identified by SEIU here would

still be insufficient.

Put simply, SEIU's criticism here is directed at the Board's exclusion of health-and-safety-related terms, which include sexual-harassment and drug-testing policies, from its list of essential terms, not the Board's treatment of reserved control. But neither SEIU's Statement of Issues to be Raised, *see* Doc. No. 211904, nor SEIU's Statement of Issues in its brief, *see* SEIU Br. 3–4, include the claim that the Board's exclusion of health and safety terms from the Rule's list of essential terms contravenes the NLRA or the common law. Nor does SEIU claim that every mandatory subject of bargaining must be an essential subject of bargaining to determine joint-employer status.[9] Instead, SEIU only claims that exclusion of health and safety as essential is arbitrary and capricious. SEIU Br. 49–56.[10]

But even had SEIU properly raised such an argument, it would

---

[9] SEIU did include this claim in its rulemaking comment. *See* NLRB-001582 ("[I]f the Proposed Rule does not define "essential terms and conditions" to include *at a minimum* all mandatory subjects of bargaining, it plainly violates the Act."). But it appears to have rightly dropped that argument in its petition for review.

[10] As discussed below, *see* Section III.B, the Board adequately explained its reasons for excluding health and safety from its list of essential terms.

fail. SEIU provides no authority for the proposition that the NLRA requires these terms to be essential or that all mandatory subjects of bargaining must be essential, for that matter. Indeed, such a conception of joint-employer status would be directly at odds with this Court's instruction that the control exercised by a joint employer cannot rest solely on the "the routine components of a company-to-company contract," *BFI II*, 911 F.3d 1195, many of which could be mandatory subjects of bargaining.

The extraordinary breadth of SEIU's conception of joint-employer status is illustrated by its sexual-harassment hypothetical. In this example, SEIU urges that an entity must become a joint employer when it reserves the right to "implement building-access policies or to limit interactions between building tenants and [union]-represented employees." SEIU Br. 40. But that would seemingly transform any building owner into a joint employer, just because building access could have an impact on sexual-harassment-policy bargaining, and violating a sexual-harassment policy "can result in discipline and discharge." SEIU

Br. 39.[11] This capacious vision of joint-employer status is clearly beyond the limits of the common law, as this Court wisely recognized in *BFI II*. Ultimately, SEIU offers no NLRA- or common-law-based principle for adopting such a broad joint-employer standard.

Fundamentally, SEIU's criticism of the 2020 Rule as to reserved control ignores the fact that the Board has long acknowledged that "employees can engage in meaningful collective bargaining with their employer even though another entity controls some essential terms and conditions and cannot be compelled to participate in collective bargaining." 2020 Rule, 85 Fed. Reg. at 11222 (citing *Mgmt. Training Corp.*, 317 NLRB 1355 (1995)). In *Management Training*, the Board specifically explained that "employers are frequently confronted with demands concerning matters which they cannot control as a practical matter or because they have made a contractual relationship with private parties." 317 NLRB at 1359.

[11] Plus, discipline and discharge are only relevant to such a policy if an employee is actually disciplined or discharged for violating it. But this is far too attenuated to establish joint-employer status, as violation of *any* employment policy could in theory subject an employee to discipline or discharge. In any event, if an entity did actually exercise control over an employee's discipline or discharge, it could be found a joint employer under the rule. *See* 2020 Rule, 85 Fed. Reg. at 11236.

When a primary employer has a duty to bargain over a mandatory subject of bargaining, it can and must fulfill its statutory duties even when third-party contracts indirectly limit what it can currently offer. This is because the employer "holds future, if not present, leverage over" the terms of its third-party contracts. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 503 (1979); *see also Libr. of Cong. v. FLRA*, 699 F.2d 1280, 1288 (D.C. Cir. 1983) (even if employer's leverage is limited by third-party contract, "bargaining about an issue will not be futile if the employer has *some* influence over the decision on that issue").

The fact that collective bargaining is often limited by factors outside of the parties' control is part and parcel of the NLRA bargaining process. *See Ford Motor*, 441 U.S. at 503. No court has suggested that a third party must be deemed a joint employer just because the third-party contract limits what the primary employer can offer at the bargaining table.

*   *   *

In sum, the 2020 Rule's actual-exercise requirement and treatment of contractually reserved authority are consistent with the common law and the NLRA. The actual-exercise requirement reflects

the added weight given to exercised control since before the Taft-Hartley amendments and until the Board's 2015 *Browning-Ferris* decision. And the 2020 Rule's treatment of reserved contractual authority as potentially probative but non-dispositive falls squarely within common-law boundaries of the Board's policymaking authority.

## II. The 2020 Rule is neither arbitrary nor capricious.

As noted above, the Supreme Court recently explained that arbitrary-and-capricious analysis asks "only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal*, 145 S. Ct. at 1511. Moreover, courts will "uphold a decision . . . if the agency's path may reasonably be discerned," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), even if the decision is "of less than ideal clarity." *Casino Airlines, Inc. v. NTSB*, 439 F.3d 715, 717 (D.C. Cir. 2006) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281, 285–86 (1974)).

As shown below, neither the Rule's actual-exercise requirement nor its exclusion of health and safety from the list of essential terms should be considered arbitrary or capricious.

### A. The Board fully explained why its requirement that a purported joint employer actually exercise substantial control over essential terms and conditions promotes collective bargaining.

Fundamentally, the 2020 Rule maintains that

> the policies of the Act are furthered, not hindered, by requiring only those entities to come to the bargaining table that have sufficient control over essential terms and conditions of employment to warrant a finding that they meaningfully affect matters relating to the employment relationship, and that direct and immediate control over at least one essential term is necessary to warrant such a finding.

85 Fed. Reg. at 11192. By contrast, having entities that do not meet these criteria at the bargaining table would "frustrate, rather than promote," collective bargaining. *Id.* at 11221. Contrary to SEIU's claim that the Board did not provide a reasoned explanation for the actual-exercise requirement (SEIU Br. 44), the Board fully explained the need for this requirement and carefully considered the varying interests at stake.

First, the Board found that "*meaningful collective bargaining* is best promoted by a standard that places at the bargaining table only those entities" who meet the actual-exercise requirement. *Id.* at 11213 (emphasis added). The requirement filters out entities that may only

have some minimal connection to the workplace. Otherwise, their seat at the table would result in "fragmented bargaining," wherein the parties dispute who has control of what. *Id.* at 11230; *see also* NPRM, 83 Fed. Reg. at 46685. This makes the already-difficult "give-and-take" of bargaining even more difficult, as the parties are unclear about what concessions they can make concerning multiple subjects. *Id.*

Second, the Board explained that the actual-exercise requirement "promote[s] labor-management stability because it simplifies the test for joint employment." 2020 Rule, 85 Fed. Reg. at 11229. Imposing a bargaining obligation only on entities that "have actually played an active role in establishing essential terms and conditions" minimizes industrial strife. *Id.* at 11220. Otherwise, multiple entities may be targeted in a labor dispute over which they have little control, *id.* at 11224, thereby exposing them "to what would otherwise be unlawful secondary union activity, and derivative unfair labor practice liability," *id.* at 11228; *see also Int'l Bhd. of Elec. Workers, Loc. 501 v. NLRB*, 341 U.S. 694, 705 (1951) (secondary boycotts are a "substantive evil condemned by Congress").

Third, the actual-exercise requirement provides much-needed clarity as to when "joint-employer status will and will not attach." *Id.* at 11217.[12] The Board explained that this requirement "draws a discernible and predictable line, providing 'certainty beforehand.'" *Id.* at 11205. For employers, it provides "more certainty over whether the Board will or will not find them to be joint employers of another employer's employees." *Id.* at 11199. For the Board, "[a] fuzzier standard with no bright lines would make it difficult . . . to distinguish between arm's-length contracting parties and genuine joint employers." *Id.* at 11205. And clarity results in consistency, as it "will make it easier for the Board, and ultimately for the courts, to reach consistent decisions across a range of individual cases." *Id.* at 11199.

The Board also addressed SEIU's comment that "the rise of contingent employment and alternative workforce arrangements [i]s a significant reason for opposing the proposed rule." *Id.* at 11213. The Board was not persuaded that this trend warranted losing the benefits

[12] This was in response to comments that sought greater clarity on who would incur bargaining obligations, *see id.* at 11199–11202, and to this Court's criticism of *BFI I*, where "the Board failed to 'clarify what meaningful collective bargaining might require,'" *id.* at 11212 (quoting *BFI II*, 911 F.3d at 1222) (citation modified).

of the actual-exercise requirement, *id.*, and it ultimately decided not to base the 2020 Rule on predictions about the economic effects of these work relationships, *id.* at 11214. Instead, the Board explained that its final rule was based upon policy reasons, and its efforts to "best promote meaningful collective bargaining" and provide "clear and readily discernible lines" for the regulated community. *Id.* Just because third-party contractual relationships may have become more common does not mean that retaining the actual-exercise requirement is arbitrary or capricious. Rather, it is logical and predictable.

SEIU also argues that the actual-exercise requirement would negatively impact "effective collective bargaining." SEIU Br. 48. But the examples SEIU provides (*id.* at 45) show that its attack on the Rule is based on its disagreement with the Board's core policy justifications for the 2020 Rule, rather than any lack of reasoning on the Board's part.

According to SEIU, joint-employer status should be found where a property owner determines the hours when it needs a subcontractor's service, because otherwise the union might not be able to schedule shifts when the owner does not want "to keep lights on and HVAC systems running for additional hours." *Id.* (quotation omitted). The

Board addressed this hypothetical, making clear that "establishing an enterprise's operating hours . . . will not constitute direct and immediate control." 2020 Rule, 85 Fed. Reg. at 11211–12. This was to "provide[] the legal scaffolding the D.C. Circuit found lacking in the Board's *Browning-Ferris* standard." *Id.* at 11211; *see also* NPRM, 83 Fed. Reg. at 46697 (explaining the role of operating hours in franchisor-franchisee context). As this Court observed, the Board's previous joint-employer test had failed to distinguish meaningful controls from controls over "the basic contours of a contracted-for service," which would not indicate joint-employer status. *BFI II*, 911 F.3d at 1221. The 2020 Rule makes clear that a business's operating hours are exactly such a quotidian aspect of business-to-business contracting.

In another example, SEIU argues that if a property manager sexually harasses its members at the property where they work, the property-management company should be considered a joint-employer of those members, for otherwise, "the contractor does not have the power to address the claim." SEIU Br. 45. The 2020 Rule responded to this point by explaining that because sexual-harassment policies fall within basic expectations of a business, such policies, "or other

measures to encourage compliance with the law or to promote desired business practices generally will not make joint-employer status more likely under the Act." 2020 Rule at 11194.

Finally, SEIU argues that under the 2020 Rule, a business could "move back and forth from being a joint employer to not being a joint employer merely by exercising that control when it deems it necessary and not exercising it at other times," SEIU Br. 46 (quotation omitted), thereby creating "an entirely arbitrary distinction." *Id.* at 47. But this argument ignores that under the 2020 Rule, once an entity actually exercises substantial immediate and direct control over an essential term (meaning that the effect of the control has already been deemed "regular or continuous," 2020 Rule, 85 Fed. Reg. at 11236), it is a joint employer for the purposes of the NLRA. *See id.* at 11200 (once an entity is found to be a joint employer, it "remains subject to all rights and obligations defined by Sections 8 and 9 of the Act with respect to its employees"). Whether and how joint-employer status can change due to new circumstances or contractual disclaimers is not addressed by the 2020 Rule, and could be addressed in future adjudications.

In sum, the Board adequately explained the considerations that went into its adoption of the actual-exercise requirement.[13]

### B. The Board adequately justified its decision to exclude health and safety from its list of essential terms.

The Board's rejection of some commenters' proposals to include health and safety as an essential term does not make the Rule arbitrary or capricious. 85 Fed. Reg. at 11205. The Board deliberately chose not to include such terms to avoid ordinary terms of routine third-party contracting agreements from becoming evidence of joint-employer status. *Id.* at 11203, 11205. As this Court and other commenters have noted, including such contracting terms would convert ordinary arm's-length contracts into unintended employment relationships, exposing

[13] AFL-CIO levels a separate arbitrary or capricious attack on the Board's Rule: that the distinctions between four categories of control (direct, indirect, exercised, and reserved) are insufficiently explained. *See* AFL-CIO Br. 25–28. First, SEIU makes no similar claim, and "ordinarily this court will not entertain an *amicus*'s argument if not presented by a party." *Huerta v. Ducote*, 792 F.3d 144, 151 (D.C. Cir. 2015). Second, the Rule itself devotes significant attention to explaining the contours of these categories. For example, the Board describes the boundaries of direct and immediate control for each essential term and condition of employment. *See* 29 C.F.R. § 103.40(c). And there is further guidance on the meaning of these terms in other sections. *See id.* § 103.40(d), (e), (f). As such, the Board's treatment of the various forms of control is not arbitrary or capricious.

companies to what would otherwise be unlawful secondary activity. *BFI II,* 911 F.3d at 11208; *see also* above at 50–51. The Board's decision not to include health and safety as an essential term avoids these unwarranted entanglements and follows this Court's commands. The Board also recognized that a looser standard might fail to address this Court's admonition in *BFI II* that the Board must "delineate[] what terms and conditions are 'essential' to make collective bargaining 'meaningful.'" 2020 Rule, 85 Fed. Reg. at 11212 (quoting *BFI II*, 911 F.3d at 1221–22).

Following this logic, the Board promulgated a rule with a finite list of essential terms and conditions, 85 Fed. Reg. at 11205, which did not include health and safety. The Board explained that health and safety terms are part of "social responsibility provision[s]," *id.* at 11193, 11194, such as those that "requir[e] workplace safety practices, sexual harassment policies, morality clauses, wage floors, or other measures to encourage compliance with the law or to promote desired business practices," *id.* at 11194; *see also id.* 11227–28 (citing *Doe I,* 572 F.3d at 680–83); *id.* at 11228 (referring to terms that "set[] minimal standards for hiring, performance, or conduct, such as those required by

government regulation; requiring the contractor to institute safety or sexual-harassment policies . . . or anything else that promotes legal compliance or sets the objectives, basic ground rules, or expectations for a contractor's performance.").

The Board explained that such terms "generally will not make joint employer status more likely under the Act," *id.* at 11194, because social-responsibility provisions set basic ground rules or expectations between contracting parties, *id.*, and are part of everyday contractual relationships, rather than signs of joint-employer relationships, *id.* at 11197. As such, to include health and safety within the list of essential terms would not have the desired effect of "facilitat[ing] consistent application of the standard across a broad spectrum of industries and business-to-business relations." *Id.* at 11224. Thus, the Board determined that such social-responsibility terms should not be considered as sufficient evidence of control over employees. *Id.* at 11187, 11227; *see also BFI II*, 911 F.3d at 1220 ("[T]hose types of employer decisions that set the objectives, basic ground rules, and expectations for a third-party contractor cast no meaningful light on joint-employer status.").

The Board's conclusion is consistent with several comments noted in the Rule. *See* 85 Fed. Reg. at 11193. One commenter explained that "companies have sound business reasons for establishing operational, production, and safety standards in their agreements with suppliers and contractors," using the example of a manufacturer requiring its parts suppliers to test its employees for alcohol and drugs. *Id.* at 11197. Other commenters noted that these sorts of social-responsibility standards, including safety, are as commonplace in company-to-company contracts as performance and quality standards. *Id.* at 11193, 11221. These commentors persuaded the Board that such provisions should not be considered meaningful evidence of a joint employer's reserved and indirect control over employees, but rather, are common and routine terms of company-to-company agreements.

Thus, the Board's choice to exclude health and safety (along with other social-responsibility provisions) from the list of essential terms, *id.* at 11205, does not make that definition arbitrary or capricious. *See State Farm*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."). The Board did not ignore SEIU's

request that the Board include health and safety as an essential term due to the prevalence of outsourcing in industries with particular health and safety concerns. *See* SEIU Br. 51. Rather, the Board followed this Court's direction to set out the essential terms necessary to find employer status without also including "those quotidian aspects of common-law third-party contract relationships." *BFI II*, 911 F.3d at 1220.

Had it done otherwise, the Board would have risked creating bargaining obligations and unfair-labor-practice liability for an overly broad cadre of employers. *See* 85 Fed. Reg. at 11205 ("[A] less demanding standard would unjustly subject innocent parties to liability for others' unfair labor practices and coercion in others' labor disputes."); above at 50 (discussing potential exposure of putative joint employers to otherwise prohibited secondary economic activity). In this respect, the Board explained how the uniquely broad obligations of a joint-employment relationship under the NLRA are distinguishable from joint-liability laws protecting health and safety, which are focused on discrete types of liability for certain acts or omissions. 85 Fed. Reg. at 11208.

Though the Board's Rule does not elevate health and safety to an essential term, it also does not forbid consideration of health and safety standards to assess joint-employer status, provided those standards are probative of "substantial control over one or more essential terms or conditions of employment," *id.* at 11194, or if control of these terms "supplements and reinforces evidence of . . . direct and immediate control over a particular essential term and condition of employment," *id.* at 11205. While the Board wished to avoid creating joint-employer relationships solely based upon routine contracting terms, it also did not wish to ignore evidence of control over health and safety standards to the extent such evidence reinforces other evidence of direct control. *Id.* at 11225. The Rule thus seeks to avoid ascribing unintended meaning to routine contracting practices, as well as ignoring evidence of a joint-employment relationship from terms and practices that are not routine. Thus, SEIU's claims that the Board failed "to give any explanation" for excluding health and safety from the list of essential

terms, SEIU Br. 54, and failed to justify this exclusion, *id.* at 55, are incorrect.[14]

After considering comments that advocated for inclusion of similar social-responsibility provisions, and this Court's direction "to hew to the relevant common-law boundaries that prevent the Board from trenching on common and routine decisions" in contracting, *BFI II*, 911 F.3d at 1219, the Board reached a reasoned decision to exclude all social-responsibility terms from the list of essential terms and conditions. *See* above at 56–57.

### C. Even if the Rule is deemed arbitrary and capricious, the Court should remand the Rule to the Board without vacatur in order to avoid disruption and uncertainty.

If this Court finds the Rule insufficiently supported, it should remand it to the Board, without vacatur, to permit the Board to address

[14] Although the Board's justification for this point is found throughout the Rule, this Court has explained that the focus in arbitrary and capricious review is not "so much on the specific location of the agency's rationale as . . . on the agency's articulation of its rationale *at the time* it takes its action so that a court is able to review that rationale." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 942 (D.C. Cir. 2021). Thus, an agency does not have to address a significant comment in a single place or section. *Id.* at 942–43.

its concerns, and thus avoid disruption and uncertainty caused by vacating a six-year-old rule.

When deciding whether to vacate an order, this Court considers "the seriousness of [its] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Mozilla Corp. v. FCC*, 940 F.3d 1, 86 (D.C. Cir. 2019) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). This is an exception to the Court's standard remedy when it finds a rule inadequately supported, namely, vacatur and remand for further consideration. *E.g.*, *Allied-Signal,* 988 F.2d at 150. Nevertheless, this Court "commonly remand[s] without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking," or "where the order was otherwise arbitrary and capricious." *United Mine Workers v. Fed. Mine Safety and Health Admin.*, 920 F.2d 960, 966 (D.C. Cir.1990) (citation modified); *Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009). This Court will remand a rule without vacatur when: (1) vacatur would create regulatory uncertainty; and (2) the agency is likely to

properly justify a rule on remand. *Allied-Signal*, 988 F.2d at 151; *Comcast*, 579 F.3d at 9.

Most importantly, the consequences of vacating the Rule would be seriously disruptive for the businesses that have relied on the Rule in structuring their operations since 2020. This Court is understandably reluctant to vacate a rule when it would disrupt reliance interests or where regulatory vacillation would create a burden. Here, the Board's joint-employer standard has been the subject of repeated (and attempted) changes. After the Board issued *BFI I* in 2015, the Board attempted to reverse that decision in *Hy-Brand*, which was vacated for ethics reasons. *See* above at 9 n.3. More recently, the prior Board attempted to undo this 2020 Rule in its 2023 rulemaking, which was vacated by the Eastern District of Texas. *See* above at 17–18; *Mozilla Corp.*, 940 F.3d at 86 (order had "been the subject of protracted litigation, with broadband providers subjected to and then released from . . . regulation over the previous decade. We decline to yet again flick the on-off switch of . . . regulation").

One of the Rule's key goals is to formalize common-law doctrine in such a way as to foster "predictability and consistency" when

structuring business relationships. 85 Fed. Reg. at 11188. When the Board proposed moving away from the Rule at issue in 2023, several commenters "point[ed] to reliance interests related to the 2020 rule," including "many staffing agencies [that] entered into contracts using the 2020 rule as their guide." 88 Fed. Reg. 73946, 73976 (Oct. 27, 2023).

Moreover, unlike other cases where complementary regulatory regimes can fill the gap and provide some guidance, *see Comcast*, 579 F.3d at 9 (antitrust law would continue to safeguard competition in absence of FCC rule), no other law can stand in for the NLRA. *See* 29 U.S.C. § 160(a) (NLRB has exclusive authority to prevent unfair labor practices affecting commerce); *Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (states prohibited from regulating any "activity that the NLRA protects, prohibits or arguably protects or prohibits"). There is no other source for a joint-employer rule to be applied to the NLRA context in the meantime.

Separately, the Board should be able to address on remand any issues that this Court finds the Board failed to adequately consider. *See Mozilla*, 940 F.3d at 86; *Susquehanna Int'l Grp., LLC v. SEC*, 866 F.3d 442, 451 (D.C. Cir. 2017) ("[T]he SEC may be able to approve the Plan

once again, after conducting a proper analysis on remand."); *see also* *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (remanding without vacatur where it was "plausible that FERC can redress its failure of explanation on remand while reaching the same result").

The Court should be loath to use the blunt tool of vacatur to upend the labor-relations stability and reliance-based relationships the Rule has engendered. This is especially so when any arbitrary-and-capricious deficiencies can be remedied. Should this Court conclude that further reasoning is necessary, it should remand the Rule for further analysis without vacatur.

## CONCLUSION

This Court should deny SEIU's petition for review of the Rule.

Respectfully submitted,

CRYSTAL S. CAREY
*General Counsel*

LYNISA MICHALSKI
*Acting Dep. General Counsel*

NANCY E. KESSLER PLATT
*Associate General Counsel*

DAWN L. GOLDSTEIN
*Deputy Associate General Counsel*

KEVIN P. FLANAGAN
*Dep. Assistant General Counsel*

MICHAEL S. DALE
*Supervisory Attorney*

PHILLIP MELTON
*Attorney*

/s/ Craig Ewasiuk
CRAIG EWASIUK
*Trial Attorney*
Tel: (202) 840-7258
Fax: (202) 273-4244

National Labor Relations Board
Contempt, Compliance, and
Special Litigation Branch
1015 Half Street, SE, 4th Floor
Washington, D.C. 20003

Dated: March 2, 2026
Washington, D.C.

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing brief were filed electronically with this Court's CM/ECF system on this date, which will send an electronic notice to all registered parties and counsel.

/s/ Craig Ewasiuk

CRAIG EWASIUK
*Trial Attorney*
National Labor Relations Board
1015 Half Street, SE, 4th Floor
Washington, D.C. 20570
Tel: (202) 840-7258
craig.ewasiuk@nlrb.gov

Dated: March 2, 2026
Washington, D.C.

## CERTIFICATE OF COMPLIANCE

The National Labor Relations Board certifies that this document complies with the typeface, type-style, and length requirements in D.C. Cir. Rule 32(e)(1) and Federal Rules of Appellate Procedure 32(a)(2)-(7) because it contains 12,819 words, excluding those exempted by Federal Rule of Appellate Procedure 32(f), proportionally-spaced, 14-point Century font, using Microsoft Word for Office 365 word-processing software.

/s/ Craig Ewasiuk

CRAIG EWASIUK
*Trial Attorney*
National Labor Relations Board
1015 Half Street, SE, 4th Floor
Washington, D.C. 20570
Tel: (202) 840-7258
craig.ewasiuk@nlrb.gov

Dated: March 2, 2026
Washington, D.C.

## STATUTORY ADDENDUM

### Selected Provisions of the Administrative Procedure Act

### 5 U.S.C. § 706. Scope of Review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

* * *

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]

### Selected Provisions of the National Labor Relations Act

### 29 U.S.C. § 152. Definitions

When used in this subchapter—

**(2)** The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act [45 U.S.C. 151 et seq.], as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

**(3)** The term “employee” shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

**29 U.S.C. § 156. Rules and Regulations**

The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by subchapter II of chapter 5 of Title 5, such rules and regulations as may be necessary to carry out the provisions of this subchapter.

**29 U.S.C. § 157. Right of employees as to organization, collective bargaining, etc.**

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

**29 U.S.C. § 158. Unfair labor practices**

(a) Unfair labor practices by employer

It shall be an unfair labor practice for an employer--

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided*, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the

periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

(b) Unfair labor practices by labor organization

It shall be an unfair labor practice for a labor organization or its agents--

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title;

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or

otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e);

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

*Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or

approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

(5) to require of employees covered by an agreement authorized under subsection (a)(3) the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;

(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; and

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

(A) where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,

(B) where within the preceding twelve months a valid election under section 159(c) of this title has been conducted, or

(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection.

(c) Expression of views without threat of reprisal or force or promise of benefit

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

(d) Obligation to bargain collectively

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided*, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification--

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2) to (4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159(a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158, 159, and 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer. Whenever the collective bargaining involves employees of a health care institution, the provisions of this subsection shall be modified as follows:

(A) The notice of paragraph (1) of this subsection shall be ninety days; the notice of paragraph (3) of this subsection shall be sixty days; and the contract period of paragraph (4) of this subsection shall be ninety days.

(B) Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given by the labor organization to the agencies set forth in paragraph (3) of this subsection.

(C) After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence, the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement. The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute.

(e) Enforceability of contract or agreement to boycott any other employer; exception

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible[1] and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further*, That for the purposes of this subsection and subsection (b)(4)(B) the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.

(f) Agreement covering employees in the building and construction industry

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action

defined in subsection (a) as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided*, That nothing in this subsection shall set aside the final proviso to subsection (a)(3): *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

(g) Notification of intention to strike or picket at any health care institution

A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of subsection (d). The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

**29 U.S.C. § 159. Representatives and elections**

(a) Exclusive representatives; employees' adjustment of grievances directly with employer

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment.

(b) Determination of bargaining unit by Board

The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided*, That the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit; or (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation or (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly

or indirectly with an organization which admits to membership, employees other than guards.

(c) Hearings on questions affecting commerce; rules and regulations

(1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board--

(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a), or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in subsection (a); or

(B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a);

the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

(2) In determining whether or not a question of representation affecting commerce exists, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition or the kind of relief sought and in no case shall the Board deny a labor organization a place on the ballot by reason of an order with respect to such labor organization or its

predecessor not issued in conformity with section 160(c) of this title.

(3) No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held. Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this subchapter in any election conducted within twelve months after the commencement of the strike. In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election.

(4) Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the Board.

(5) In determining whether a unit is appropriate for the purposes specified in subsection (b) the extent to which the employees have organized shall not be controlling.

(d) Petition for enforcement or review; transcript

Whenever an order of the Board made pursuant to section 160(c) of this title is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsection (e) or (f) of section 160 of this title, and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.

(e) Secret ballot; limitation of elections

(1) Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158(a)(3) of this title, of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.

(2) No election shall be conducted pursuant to this subsection in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held.

## 29 U.S.C. § 160. Prevention of unfair labor practices

(a) Powers of Board generally

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided*, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

(b) Complaint and notice of hearing; answer; court rules of evidence inapplicable

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of Title 28.

(c) Reduction of testimony to writing; findings and orders of Board

The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in

any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: *And provided further,* That in determining whether a complaint shall issue alleging a violation of subsection (a)(1) or (a)(2) of section 158 of this title, and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

(d) Modification of findings or orders prior to filing record in court

Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it.

(e) Petition to court for enforcement of order; proceedings; review of judgment

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make

new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of Title 28.

(f) Review of final order of Board on petition to court

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

(g) Institution of court proceedings as stay of Board's order

The commencement of proceedings under subsection (e) or (f) of this section shall not, unless specifically ordered by the court, operate as a stay of the Board's order.

(h) Jurisdiction of courts unaffected by limitations prescribed in chapter 6 of this title

When granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified or setting aside in whole or in part an order of the Board, as provided in this section, the jurisdiction of courts sitting in equity shall not be limited by chapter 6 of this title.

(i) Repealed. Pub.L. 98-620, Title IV, § 402(31), Nov. 8, 1984, 98 Stat. 3360

(j) Injunctions

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

(k) Hearings on jurisdictional strikes

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed

upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

(l) Boycotts and strikes to force recognition of uncertified labor organizations; injunctions; notice; service of process

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: *Provided further*, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period: *Provided further*, That such officer or regional attorney shall not apply for any restraining order under section 158(b)(7) of this title if a charge against the employer under section 158(a)(2) of this title has been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person

involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: *Provided further*, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b)(4)(D) of this title.

(m) Priority of cases

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of subsection (a)(3) or (b)(2) of section 158 of this title, such charge shall be given priority over all other cases except cases of like character in the office where it is filed or to which it is referred and cases given priority under subsection (l).

## Code of Federal Regulations

## 29 C.F.R. § 103.40. Joint Employers

(a) An employer, as defined by section 2(2) of the National Labor Relations Act (the Act), is an employer of particular employees, as defined by section 2(3) of the Act, if the employer has an employment relationship with those employees under common-law agency principles.

(b) For all purposes under the Act, two or more employers of the same particular employees are joint employers of those employees if the employers share or codetermine those matters governing employees' essential terms and conditions of employment.

(c) To “share or codetermine those matters governing employees' essential terms and conditions of employment” means for an employer to possess the authority to control (whether directly, indirectly, or both), or to exercise the power to control (whether directly, indirectly, or both), one or more of the employees' essential terms and conditions of employment.

(d) “Essential terms and conditions of employment” are

(1) Wages, benefits, and other compensation;

(2) Hours of work and scheduling;

(3) The assignment of duties to be performed;

(4) The supervision of the performance of duties;

(5) Work rules and directions governing the manner, means, and methods of the performance of duties and the grounds for discipline;

(6) The tenure of employment, including hiring and discharge; and

(7) Working conditions related to the safety and health of employees.

(e) Whether an employer possesses the authority to control or exercises the power to control one or more of the employees' essential terms and conditions of employment is determined under common-law agency principles. For the purposes of this section:

(1) Possessing the authority to control one or more essential terms and conditions of employment is sufficient to establish status as a joint employer, regardless of whether control is exercised.

(2) Exercising the power to control indirectly (including through an intermediary) one or more essential terms and conditions of employment is sufficient to establish status as a joint employer, regardless of whether the power is exercised directly.

(f) Evidence of an entity's control over matters that are immaterial to the existence of an employment relationship under common-law agency principles and that do not bear on the employees' essential terms and conditions of employment is not relevant to the determination of whether the entity is a joint employer.

(g) A party asserting that an employer is a joint employer of particular employees has the burden of establishing, by a preponderance of the evidence, that the entity meets the requirements set forth in paragraphs (a) through (f) of this section.

(h) A joint employer of particular employees

(1) Must bargain collectively with the representative of those employees with respect to any term and condition of employment that it possesses the authority to control or exercises the power to control, regardless of whether that term or condition is deemed to be an essential term and condition of employment under this section for the purposes of establishing joint-employer status; but

(2) Is not required to bargain with respect to any term and condition of employment that it does not possess the authority to control or exercise the power to control.

(i) The provisions of this section are intended to be severable. If any paragraph of this section is held to be unlawful, the remaining paragraphs of this section not deemed unlawful are intended to remain in effect to the fullest extent permitted by law.