[ORAL ARGUMENT NOT YET SCHEDULED]
**Case No. 25-1119**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

SERVICE EMPLOYEES INTERNATIONAL UNION,

*Petitioner*,

- *v.* -

NATIONAL LABOR RELATIONS BOARD,

*Respondent.*

On Petition for Review of A Final Rule from the National Labor Relations Board

# BRIEF FOR *AMICI CURIAE* INTERNATIONAL FRANCHISE ASSOCIATION, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, RESTAURANT LAW CENTER, AMERICAN HOTEL & LODGING ASSOCIATION, AND COALITION FOR DEMOCRATIC WORKPLACE IN SUPPORT OF DISMISSAL AND DENIAL

Pratik A. Shah
James E. Tysse
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 887-4000
pshah@akingump.com

*Counsel for International Franchise Association, Chamber of Commerce of the United States of America, Restaurant Law Center, American Hotel & Lodging Association, and Coalition for Democratic Workplace*

*Counsel List Continued on Next Page*

Sarah Davies
International Franchise Association
1201 New York Avenue, N.W., Suite 300A
Washington, D.C. 20005
*Counsel to International Franchise Association*

Stephanie A. Maloney
Jordan L. Von Bokern
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, D.C. 20062
*Counsel to Chamber of Commerce of the United States of America*

Chirag Shah
American Hotel & Lodging Association
1250 I Street, N.W., Suite 1100
Washington, D.C. 20005
*Counsel to American Hotel & Lodging Association*

Sean Kennedy
Restaurant Law Center
2055 L Street, N.W., Suite 700
Washington, D.C. 20036
*Counsel to Restaurant Law Center*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the International Franchise Association, Chamber of Commerce of the United States of America, Restaurant Law Center, American Hotel & Lodging Association, and Coalition for Democratic Workplace certify as follows:

### A. Parties and Amici

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief for Respondent: *amici* the International Franchise Association, Chamber of Commerce of the United States of America, Restaurant Law Center, American Hotel & Lodging Association, and Coalition for Democratic Workplace.

### B. Rulings Under Review

References to the rulings at issue appear in the Brief for Petitioner.

### C. Related Cases

Related cases are listed in the Brief for Petitioner.

*/s/ Pratik A. Shah*
Pratik A. Shah

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the International Franchise Association, Chamber of Commerce of the United States of America, Restaurant Law Center, American Hotel & Lodging Association, and Coalition for Democratic Workplace state that they are not publicly traded corporations, and that no publicly held company has 10% or greater ownership of their organizations.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

CORPORATE DISCLOSURE STATEMENT ..... ii

GLOSSARY ..... x

INTEREST OF *AMICI CURIAE* ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 5

ARGUMENT ..... 6

I. THIS COURT LACKS JURISDICTION TO HEAR SEIU'S RULEMAKING CHALLENGE ..... 6

A. District Courts Generally Exercise Original Jurisdiction Over APA Challenges To Agency Rulemaking ..... 6

B. Section 10(f) Of The NLRA Does Not Displace The Default Rule For Rulemaking Challenges ..... 7

*1. The text of Section 10(f) limits direct appellate review to orders resolving unfair labor practice cases.* ..... 8

*2. Section 10(f)'s structure confirms subsection (f)'s limited reach.* ..... 12

*3. Consistent historical and modern practice reflect the same interpretation.* ..... 15

C. This Court's Prior Decisions Do Not Require A Different Reading ..... 19

II. IF THIS COURT EXERCISES JURISDICTION, IT SHOULD REJECT SEIU'S CHALLENGE ON THE MERITS ..... 23

A. Requiring The Actual "Exercise" Of "Substantial Direct And Immediate Control" Comports With The Common Law ........ 23
B. SEIU's Proposed Approach Would Wreak Needless Disruption ........ 27
CONCLUSION ........ 34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuzeid v. Mayorkas*,
62 F.4th 578 (D.C. Cir. 2023) .......... 7

*ACA Int'l v. FCC*,
885 F.3d 687 (D.C. Cir. 2018) .......... 33

*AFL-CIO v. NLRB*,
466 F. Supp. 3d 68 (D.D.C. 2020) .......... 8, 20, 21, 22

*AFL-CIO v. NLRB*,
57 F.4th 1023 (D.C. Cir. 2023) .......... 20, 21, 22

*American Fed'n of Lab. v. NLRB*,
308 U.S. 401 (1940) .......... 13, 16

*Auciello Iron Works, Inc. v. NLRB*,
517 U.S. 781 (1996) .......... 30

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) .......... 7

*Browning-Ferris Indus. of Cal., Inc. v. NLRB*,
911 F.3d 1195 (D.C. Cir. 2018) .......... 26, 27, 32

*Butler v. Drive Auto. Indus. of Am., Inc.*,
793 F.3d 404 (4th Cir. 2015) .......... 25

*Capehardt v. Murta*,
145 S.W. 827 (Mo. Ct. App. 1912) .......... 24

*Chamber of Com. of U.S. v. NLRB*,
856 F. Supp. 2d 778 (D.S.C. 2012), *aff'd*, 721 F.3d 152 (4th Cir. 2013) .......... 16

*Chamber of Com. of United States v. NLRB*,
723 F. Supp. 3d 498 (E.D. Tex. 2024) .......... 4, 6, 9, 13, 14, 22

*Doe I v. Wal-Mart Stores, Inc.*,
572 F.3d 677 (9th Cir. 2009) .......... 26

*Enterprise Leasing Co. of Fla. v. NLRB*,
831 F.3d 534 (D.C. Cir. 2016) .......... 16

*Environmental Def. Fund, Inc. v. Costle*,
657 F.2d 275 (D.C. Cir. 1981) .......... 12

*Florida Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .......... 20

*Goodman v. Wilson*,
166 S.W. 752 (Tenn. 1914) .......... 24

*H.J. Heinz Co. v. NLRB*,
311 U.S. 514 (1941) .......... 31

*Inland Container Corp. v. NLRB*,
137 F.2d 642 (6th Cir. 1943) .......... 17

*International Ladies' Garment Workers Union, Loc. 415-475, AFL-CIO v. NLRB*,
501 F.2d 823 (D.C. Cir. 1974) .......... 9, 10, 17

*Investment Co. Inst. v. Board of Governors of Fed. Rsrv. Sys.*,
551 F.2d 1270 (D.C. Cir. 1977) .......... 19, 21

*Kaplan v. Central Bank of the Islamic Republic of Iran*,
896 F.3d 501 (D.C. Cir. 2018) .......... 5

*Knitter v. Corvias Military Living, LLC*,
758 F.3d 1214 (10th Cir. 2014) .......... 30

*Laundry Workers Int'l Union, Loc. 221 v. NLRB*,
197 F.2d 701 (5th Cir. 1952) .......... 10

*Loan Syndications & Trading Ass'n v. SEC*,
818 F.3d 716 (D.C. Cir. 2016) .......... 20

*Manhattan Constr. Co. v. NLRB*,
198 F.2d 320 (10th Cir. 1952) .......... 17

*Mathews Readymix, Inc. v. NLRB*,
165 F.3d 74 (D.C. Cir. 1999) .......... 16

*National Ass'n of Mfrs. v. NLRB*,
846 F. Supp. 2d 34 (D.D.C. 2012), *aff'd in part, rev'd in part*, 717 F.3d 947 (D.C. Cir. 2013) .......... 16

*National Auto. Dealers Ass'n v. FTC*,
670 F.3d 268 (D.C. Cir. 2012) .......... 7, 21

*National Mining Ass'n v. Department of Lab.*,
292 F.3d 849 (D.C. Cir. 2002) .......... 8, 20

*New York Indem. Co. v. Industrial Accident Comm'n*,
14 P.2d 160 (Cal. Dist. Ct. App. 1932) .......... 24

*New York Republican State Comm. v. SEC*,
799 F.3d 1126 (D.C. Cir. 2015) .......... 19, 20

*NFIB v. Department of Lab.*,
595 U.S. 109 (2022) .......... 18

*NLRB v. Browning-Ferris Indus. of Pa., Inc.*,
691 F.2d 1117 (3d Cir. 1982) .......... 25

*NLRB v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*,
484 U.S. 112 (1987) .......... 9, 12, 13, 17

*SEC v. McCarthy*,
322 F.3d 650 (9th Cir. 2003) .......... 10

*SEIU v. NLRB*,
Case No. 21-cv-2443-RC (D.D.C.) .......... 18

*Slack Techs., LLC v. Pirani*,
598 U.S. 759 (2023) .......... 15

*United Nat'l Foods, Inc. v. NLRB*,
138 F.4th 937 (5th Cir. 2025) .......... 17

*Watts v. SEC*,
482 F.3d 501 (D.C. Cir. 2007) .......... 7, 8

**Statutes**

5 U.S.C.
§ 551(6) .......... 9
§ 702 .......... 7

28 U.S.C.
§ 1331 .......... 5, 6, 21

29 U.S.C.
§ 141(b) .......... 30
§ 156 .......... 14
§ 160(a) .......... 13
§ 160(b) .......... 11, 13
§ 160(c) .......... 12, 13, 15
§ 160(d) .......... 13, 15
§ 160(e) .......... 13, 14, 15
§ 160(f) .......... 8, 9, 11, 14

**Rules and Regulations**

29 C.F.R. § 101.14 .......... 14

Fed. R. App. P. 29(a)(4)(E) .......... 1

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .......... 10, 12

H.R. Rep. No. 80-245 (1947) .......... 25

Int'l Franchise Ass'n, *The Value of Franchising* (Jan. 2026) .......... 29

*Joint Employer Status Under the National Labor Relations Act*, 85 Fed. Reg. 11,184 (Feb. 26, 2020) .......... 23

NLRB, *Agency Court Filings* .......... 18

NLRB, *Contempt, Compliance, and Special Litigation Branch Briefs* .......... 18

Oxford Economics, *Potential Consequences of the NLRB Joint Employer Rule* (Sept. 2023) .......... 32, 33

Restatement (Second) of Agency § 227 (1933) .......... 24

*Standard for Determining Joint Employer Status*, 88 Fed. Reg. 73,946 (Oct. 27, 2023) .......... 27, 29, 30, 31, 33

## GLOSSARY

| | |
|---|---|
| AHLA | American Hotel & Lodging Association |
| APA | Administrative Procedure Act |
| CDW | Coalition for Democratic Workplace |
| IFA | International Franchise Association |
| NLRA | National Labor Relations Act |
| RLC | Restaurant Law Center |
| SEIU | Service Employees International Union |
| Chamber | Chamber of Commerce of the United States of America |

## INTEREST OF *AMICI CURIAE*[1]

**International Franchise Association** (IFA) is the world's oldest and largest organization representing franchising worldwide. IFA represents all aspects of the franchise business model, with approximately 1,200 franchise brands and 10,000 franchise business owners in addition to approximately 600 industry suppliers who support the franchise sector. For over 60 years, IFA has worked through its government relations, public policy, media relations, and educational programs to advocate for the protection, promotion, and enhancement of franchising and the approximately 832,000 franchise establishments that support nearly 8.8 million direct jobs, $907 billion of economic output for the U.S. economy, and almost three percent of the gross domestic product. IFA's mission is to protect, promote, and enhance franchising, including by participating in lawsuits like this one.

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than *amici*, its members, and its counsel) have contributed money to fund the preparation or submission of this brief.

**Chamber of Commerce of the United States of America** (Chamber) is the world's largest business federation. The Chamber represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

**Restaurant Law Center** (RLC) is a public policy organization affiliated with the National Restaurant Association, the largest foodservice trade association in the world. RLC members include corporate-owned foodservice establishments, franchisees, and independent operators. Relevant here, the RLC routinely advocates on matters of labor-relations policy and represents the interests of its members in labor and workforce matters before courts and regulatory agencies.

**American Hotel & Lodging Association** (AHLA) is the national association representing all sectors and stakeholders in the U.S. lodging industry, including owners, chains, franchisees, management companies, independent properties, suppliers, and state associations. AHLA strives to be an indispensable resource serving, supporting, and advocating on behalf of the American hospitality industry to build a vibrant and united hospitality industry that powers America's economy. For decades, AHLA has kept members informed about relevant policy changes from the Board and participated in lawsuits to protect members' interests.

**Coalition for Democratic Workplace** (CDW) represents hundreds of employer associations, individual employers, and other organizations that together represent millions of businesses of all sizes. CDW's members employ tens of millions of workers across the country in nearly every industry. Its purpose is to combat regulatory overreach by the Board that threatens the wellbeing of employers, employees, and the national economy.

All *amici* successfully challenged the Board's 2023 Joint Employer Rule in federal district court and defeated the Board's attempt to transfer

that case to the D.C. Circuit. *See Chamber of Com. of United States v. NLRB*, 723 F. Supp. 3d 498 (E.D. Tex. 2024).

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* all agree with the National Labor Relations Board that the challenge of the Service Employees International Union (SEIU) to the Board's 2020 Joint Employer Rule fails on the merits. *Amici* write first to address a threshold barrier to SEIU's petition: the lack of this Court's jurisdiction.[2]

In the 90 years since Congress created the Board, not one challenge to Board rulemaking has been heard first in a court of appeals. This has not been by mistake but by design. Congress provided in 28 U.S.C. § 1331 that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." And nothing in the National Labor Relations Act (NLRA) displaces that default rule when it comes to Administrative Procedure Act (APA) challenges to Board *rulemaking* (as opposed to "final orders of the Board" following unfair labor practice *adjudications*). In fact, the only court to squarely address SEIU's jurisdictional theory has squarely rejected it,

[2] Although the Board does not dispute jurisdiction, NLRB Br. 1, this Court "must *** assure itself" of jurisdiction regardless, *Kaplan v. Central Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018). *Amici* intend to move to participate in oral argument to ensure adversarial presentation on that threshold issue.

because "neither the text, structure, nor purpose of the [NLRA] supports" initial appeals court review of "prospective Board rulemaking." *Chamber of Com. of United States v. NLRB*, 723 F. Supp. 3d 498, 510 (E.D. Tex. 2024).

As for the merits, the Board is right that the Rule comports with the common law, which has always required a showing of actual and direct control to find "joint employment." Indeed, while the Board's Rule plainly "color[s] within the common-law lines," SEIU's preferred approach would create chaos in the collective-bargaining process and across industries more generally.

This Court should therefore either dismiss SEIU's petition for lack of jurisdiction or deny the petition on the merits.

## ARGUMENT

### I. THIS COURT LACKS JURISDICTION TO HEAR SEIU'S RULEMAKING CHALLENGE

#### A. District Courts Generally Exercise Original Jurisdiction Over APA Challenges To Agency Rulemaking

Unless Congress directs otherwise, agency rulemakings are subject to challenge in federal district court. Under 28 U.S.C. § 1331, district courts "shall have original jurisdiction of all civil actions" arising under

federal law. "Not *may* have jurisdiction, but *shall.* Not *some* civil actions arising under federal law, but *all.*" *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 205 (2023) (Gorsuch, J., concurring). That includes actions for "judicial review" under the APA, 5 U.S.C. § 702, which arise under federal law, *e.g.*, *Abuzeid v. Mayorkas*, 62 F.4th 578, 583 (D.C. Cir. 2023).

Thus, the "normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals." *National Auto. Dealers Ass'n v. FTC*, 670 F.3d 268, 270 (D.C. Cir. 2012) (quotation marks and citation omitted). Initial review at the appellate level occurs "only when a direct-review statute specifically gives the court of appeals subject-matter jurisdiction to directly review agency action." *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (Kavanaugh, J.).

### B. Section 10(f) Of The NLRA Does Not Displace The Default Rule For Rulemaking Challenges

SEIU nevertheless filed its challenge in this Court, citing section 10(f) of the NLRA as the basis for the Court's jurisdiction. SEIU Br. 3. But text, structure, history, the Board's prior positions, and relevant precedent all show that section 10(f) is inapplicable here.

### *1. The text of Section 10(f) limits direct appellate review to orders resolving unfair labor practice cases.*

Section 10 of the NLRA, titled "Prevention of unfair labor practices," includes a direct-review provision that states:

> Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of Title 28.

29 U.S.C. § 160(f). That language, which then-Judge Jackson construed as "quite specific and relatively narrow," *AFL-CIO v. NLRB*, 466 F. Supp. 3d 68, 83 (D.D.C. 2020), plainly excludes review of Board rulemaking.

Start with the focus on "final order[s]." Although the NLRA does not define "order," the APA does. *See Watts*, 482 F.3d at 505 (looking to the APA's definition of "order" when "agency's direct-review statute did not define" the term); *accord National Mining Ass'n v. Department of Lab.*, 292 F.3d 849, 856 (D.C. Cir. 2002) (per curiam). And it provides

that an "order" is the "final disposition *** of an agency in a matter *other than rule making*." 5 U.S.C. § 551(6) (emphasis added).

Section 10(f), moreover, refers to a specific type of "order"—namely, one that "grant[s] or den[ies]" some sort of "relief" that has been "sought." 29 U.S.C. § 160(f). "That precisely describes the posture of a Board *adjudication* of a charge that a person engaged in an unfair labor practice." *Chamber*, 723 F. Supp. 3d at 511 (emphasis added); *see also International Ladies' Garment Workers Union, Loc. 415-475, AFL-CIO v. NLRB*, 501 F.2d 823, 830 (D.C. Cir. 1974) (reading section 10(f) to cover Board action that "finally ends an unfair labor practice proceeding by 'granting or denying in whole or in part the relief sought'"), *abrogated on other grounds by NLRB v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112 (1987).

Indeed, at the Board's urging, courts have long understood the phrase "final order of the Board" to "refer[] *solely* to an order of the Board either dismissing a complaint in whole or in part or directing a remedy for the unfair labor practices found—in either case an order entered as *the culmination of the procedure described in Section 10(b) and (c) of the Act*," *i.e.*, after an unfair-labor-practice complaint has been filed (Section

10(b)) and adjudicated (Section 10(c)). *E.g.*, *Laundry Workers Int'l Union, Loc. 221 v. NLRB*, 197 F.2d 701, 703 (5th Cir. 1952) (emphases added) (adopting, as its holding, this quotation from the Board's brief); *see also International Ladies*, 501 F.2d at 827-828 (recognizing Board's same argument).[3]

Meanwhile, agency *rules* (unlike orders) do not "grant" or "deny" "relief" sought by particular parties—at least not in the way those terms are commonly used. "Relief" is usually "sought" (and then granted or denied) in an adjudicatory setting. *See Relief*, Black's Law Dictionary (11th ed. 2019) (defining "relief" as the "redress or benefit *** that a party asks of a court"); *Prayer for Relief*, Black's Law Dictionary (11th ed. 2019) ("A request addressed to the court and appearing at the end of a pleading; esp., a request for specific relief or damages."); *see also SEC v. McCarthy*,

[3] The Board reiterated this point in court as recently as 2020. *See* Br. in Supp. of Defs.' Mot. to Dismiss for Lack of Subject Matter Jurisdiction 8, *International Ass'n of Machinists & Aerospace Workers v. Ring*, No. 2:19-cv-3214-BHH (D.S.C. Jan. 31, 2020), ECF No. 25-1 ("Section 10(e) and (f) provides for review, in an appropriate court of appeals, *only* of 'a final order of the Board' entered in an unfair labor practice proceeding under Section 10.") (emphasis added).

322 F.3d 650, 657 (9th Cir. 2003) ("parties seek legal and/or equitable relief before a court of law through the filing of a formal complaint").

Other features of section 10(f)'s text reinforce that it covers only unfair labor practice adjudications, not rulemakings. The subsection defines the appropriate venue by reference to "*the* unfair labor practice *in question* [that] was alleged to have *been engaged in*"—which assumes that a specific unfair labor practice is being adjudicated. 29 U.S.C. § 160(f) (emphases added). That would of course be true in an unfair labor practice proceeding granting or denying relief—but not a rulemaking.

Finally, section 10(f) instructs "the aggrieved party" to file in the appellate court "the record in the proceeding, certified by the Board." 29 U.S.C. § 160(f). Yet the only "proceeding" section 10 contemplates is the "hearing" held to resolve charges of unfair labor practices. *See id.* § 160(b) ("In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the *said proceeding* and to present testimony. Any such *proceeding* shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the

rules of civil procedure for the district courts of the United States[.]") (emphases added); *id.* § 160(c) (if "evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges as the case may be, shall issue and cause to be served on the parties *to the proceeding* a proposed report, together with a recommended order") (emphasis added); *see also Administrative Proceeding*, Black's Law Dictionary (11th ed. 2019) ("usu[ally] adjudicatory in nature"). And requiring "the aggrieved party" to file the record makes no sense in the context of a *rulemaking* proceeding where "the record" is the "administrative record before the agency at the time the decision was made." *Environmental Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981).

At bottom, section 10(f)'s plain text limits direct review to Board orders arising out of unfair labor practice proceedings. Board rulemakings are not covered.

2. *Section 10(f)'s structure confirms subsection (f)'s limited reach.*

Section 10's structure compels the same reading. The section concerns the "*adjudication* of [unfair labor practice] complaints." *United Food*, 484 U.S. at 124. And every subsection within it "exclusively"

concerns such "proceedings," *American Fed'n of Lab. v. NLRB*, 308 U.S. 401, 407 (1940); "not one" of the provisions "mentions rulemaking," *Chamber*, 723 F. Supp. 3d at 511:

- Subsection (a) authorizes the Board "to prevent any person from engaging in any unfair labor practice *** affecting commerce," 29 U.S.C. § 160(a);
- Subsection (b) sets out the Board's procedures for "[w]henever it is charged that any person has engaged in or is engaging in any such unfair labor practice," *id.* § 160(b);
- Subsection (c) provides that if the Board finds by a "preponderance of the testimony taken" that "any person named in the complaint has engaged in *** any such unfair labor practice, then the Board shall state its findings of fact and shall issue *** an order requiring such person to cease and desist from such unfair labor practice," *id.* § 160(c);
- Subsection (d) then allows the Board to "modify or set aside, in whole or in part, any finding or order made or issued by it" so long as "the record" has not yet "been filed in a court," *id.* § 160(d); and
- Subsection (e) empowers the Board to "petition any court of appeals of the United States *** for the enforcement of such order," *id.* § 160(e).

Read in its entirety, section 10 "exhaustively sets out the stages" of adjudicatory proceedings brought to address unfair labor practices—"from the filing of a complaint, to a Board determination, and to judicial enforcement and review." *United Food*, 484 U.S. at 131. By its terms,

the section simply does not cover *rulemakings* of any sort. In fact, rulemaking is discussed in an entirely separate section—section 6—which contains no discussion of direct review. *See* 29 U.S.C. § 156. It would make no sense for Congress to hide a jurisdictional provision for rulemaking in the middle of section 10. *See Chamber*, 723 F. Supp. 3d at 511 ("Th[e] contrast between § 6's separate discussion of rulemaking and § 10's specialized scheme for issuance and review of orders adjudicating allegations against specific parties is a strong textual and structural sign that § 10's judicial-review provisions do not cover Board rulemaking.").

At the very least, subsection (f) should be read in harmony with subsection (e). Both subsections concern appellate review of Board orders: Subsection (e) allows the Board to seek *enforcement*, while subsection (f) allows an "aggrieved party" to seek *review*. 29 U.S.C. §§ 160(e)-(f). Subsection (f) even cross-references subsection (e). *Id.* § 160(f) ("[T]he court shall proceed in the same manner as in the case of an application by the Board under subsection (e)."). And the Board's regulations treat Board enforcement and party review as two sides of the same coin. *See* 29 C.F.R. § 101.14 ("If the respondent does not comply with the Board's order, or the Board deems it desirable to implement the

order with a court judgment, the Board may petition the appropriate Federal court for enforcement. Or, the respondent or any person aggrieved by a final order of the Board may petition the circuit court of appeals to review and set aside the Board's order.").

Critically here, subsection (e) refers only to orders in unfair labor practice cases. It follows subsections (c) and (d), which address orders in unfair labor practice cases, and empowers the Board to petition for enforcement of "such order[s]." *See* 29 U.S.C. §§ 160(c)-(e); *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) ("The word 'such' usually refers to something that has already been 'described' or that is 'implied or intelligible from the context or circumstances.'") (citation omitted). Indeed, it would make no sense for the Board to go to a court of appeals to enforce a legislative "rule" (unlike an adjudicatory "order"). Subsection (e) is thus further proof that, in section 10, Congress contemplated judicial enforcement and review of adjudicatory orders alone.

#### 3. *Consistent historical and modern practice reflect the same interpretation.*

If the overwhelming textual evidence were not enough, reading section 10(f) as limited to orders in unfair labor practice cases also adheres to established practice and understanding.

Since the NLRA was enacted in 1935, the Board has issued countless orders in unfair labor practice cases and published many rules. Review of each has followed a well-worn path: Challenges to orders in unfair labor practice cases go first to courts of appeals, while challenges to rules go first to district courts. Examples abound. *Compare, e.g.*, *Enterprise Leasing Co. of Fla. v. NLRB*, 831 F.3d 534 (D.C. Cir. 2016) (petition for review of order in unfair labor practice case); *Mathews Readymix, Inc. v. NLRB*, 165 F.3d 74 (D.C. Cir. 1999) (same), *with, e.g.*, *National Ass'n of Mfrs. v. NLRB*, 846 F. Supp. 2d 34 (D.D.C. 2012) (district-court challenge to unfair labor practices rule), *aff'd in part, rev'd in part*, 717 F.3d 947 (D.C. Cir. 2013); *Chamber of Com. of U.S. v. NLRB*, 856 F. Supp. 2d 778 (D.S.C. 2012) (same), *aff'd*, 721 F.3d 152 (4th Cir. 2013).

Courts have not second-guessed that longstanding practice. To the contrary, courts have read section 10(f) as limited to orders granting or denying relief in unfair labor practices proceedings. For example, the Supreme Court said that the NLRA "on its face *** indicates a purpose to limit the review afforded by § 10 to orders of the Board prohibiting unfair labor practices." *American Fed'n of Lab.*, 308 U.S. at 409; *see also*

*United Food*, 484 U.S. at 129 ("Section 10 specifies the procedure for *adjudicating* unfair labor practice charges.").

This Court has likewise read section 10(f) to cover only Board action that "finally ends an unfair labor practice proceeding." *International Ladies*, 501 F.2d at 830. Other courts have done the same—including just last year. *See United Nat'l Foods, Inc. v. NLRB*, 138 F.4th 937, 943 (5th Cir. 2025) (section 10(f) "refers solely" to Board adjudications); *Manhattan Constr. Co. v. NLRB*, 198 F.2d 320, 321 (10th Cir. 1952) (similar); *Inland Container Corp. v. NLRB*, 137 F.2d 642, 643 (6th Cir. 1943) (similar). To be sure, these cases largely involved questions about the finality of adjudicatory orders, not the proper forum for challenging Board rulemakings. But the long and uniform judicial understanding of section 10(f) as permitting review only of Board adjudicatory orders—along with the absence of any direct-review challenges to NLRB rulemaking for the first 88 years of the Board's existence—strongly supports the plain-text reading.

All that explains why, until SEIU's petition for review of the 2023 joint employer rule, no one had ever challenged a Board rule directly in a court of appeals. Indeed, SEIU itself filed its prior challenge to the 2020

Rule in district court. *See SEIU v. NLRB*, Case No. 21-cv-2443-RC (D.D.C.) (currently stayed). And until 2020, the Board itself had never disputed that district courts were the proper venue for such challenges. *See* Board Reply 26, *AFL-CIO v. NLRB*, Nos. 20-5223 & 20-5226 (D.C. Cir.) (admitting position on section 10(f) is "new"); *NFIB v. Department of Lab.*, 595 U.S. 109, 119-120 (2022) (finding "lack of historical precedent" a "telling indication" that an agency's position is wrong) (quotation marks and citation omitted). Even the Board's own website, to this day, describes orders eligible for direct appellate review as those issued "in a contested unfair labor practice case," NLRB, *Agency Court Filings,* [4] and dubs "actions to review Board rulemaking" as "*not* statutorily based on Sections 10(e) and (f) of the Act," NLRB, *Contempt, Compliance, and Special Litigation Branch Briefs* (emphasis added).[5]

---

[4] https://www.nlrb.gov/guidance/memos-research/agency-court-filings [https://perma.cc/P4UY-FD3Y].

[5] https://www.nlrb.gov/guidance/memos-research/agency-court-filings/contempt-compliance-and-special-litigation-branch [https://perma.cc/ML67-BP7C].

### C. This Court's Prior Decisions Do Not Require A Different Reading

**1.** None of this is to say that a direct-review provision referring to agency "orders" could never cover agency rules. This Court has read the term "order" in other differently worded direct-review provisions to cover rules. *See, e.g., New York Republican State Comm. v. SEC* (*NYRSC*), 799 F.3d 1126 (D.C. Cir. 2015); *Investment Co. Inst. v. Board of Governors of Fed. Rsrv. Sys.*, 551 F.2d 1270 (D.C. Cir. 1977). But the Court did so in those cases because it found the direct-review provisions "ambiguous" in scope. It then reasoned that "when a direct review provision's applicability to an agency action is 'ambiguous,' [this Court] presume[s] that Congress intended to locate jurisdiction in the courts of appeals." *NYRSC*, 799 F.3d at 1133.

Section 10(f), however, is different than the direct-review provisions this Court has found ambiguous. Those provisions simply "creat[ed] a right of direct judicial review in the court of appeals of an administrative 'order.'" *NYRSC*, 799 F.3d at 1131. There was "no evidence showing that Congress intended to withdraw from the courts of appeals *** jurisdiction to hear challenges to rules," or otherwise limit the jurisdictional scope. *Id.* at 1132. Meanwhile, as shown above, the text and structure of

section 10 "ma[ke] 'rather clear' that 'Congress used the term "order" to refer to an adjudicatory [unfair labor practices] order, not the promulgation of a regulation.'" *Id.* at 1133 (quoting *National Mining*, 292 F.3d at 856-857). So this Court's "presumption" of direct review is inapplicable; Congress's words control. *See Loan Syndications & Trading Ass'n v. SEC*, 818 F.3d 716, 720 (D.C. Cir. 2016) ("[T]his presumption, however helpful, cannot overcome the commands of Congress."); *NYRSC*, 799 F.3d at 1129 (recognizing that the term "order" may not encompass rules if there is "countervailing indicia of congressional intent"); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 746 (1985) ("Whether initial subject-matter jurisdiction lies initially in the courts of appeals must of course be governed by the intent of Congress[.]").

Besides, the main reason for applying the presumption is absent here. In *Florida Power & Light*, the Supreme Court stressed that the direct-review presumption is meant to avoid "bifurcat[ed]" review. 470 U.S. at 743. But a bifurcated system *already exists* under subsection 10(f): This Court concluded in *AFL-CIO v. NLRB* that the subject of a section 10(f) petition "must be an NLRB action that pertains to unfair

labor practices as opposed to any other topic that the agency might have acted to address." 57 F.4th 1023, 1033 (D.C. Cir. 2023) (quotation marks and citation omitted).

To the extent that "requiring petitioners challenging regulations to go first to the district court results in unnecessary delay and expense," *Investment Co.*, 551 F.2d at 1276, that is true for all APA cases. Yet starting in district court is still the "default rule." *National Auto. Dealers*, 670 F.3d at 270. Indeed, absent a contrary instruction, that is what 28 U.S.C. § 1331 requires.

**2.** In the end, SEIU and the Board are left hanging their jurisdictional hat on *AFL-CIO*'s passing suggestion that section 10(f) might encompass not only Board orders but also Board rules "concerning unfair labor practices." SEIU Br. 3 (citing *AFL-CIO*, 57 F.4th at 1033-1034); NLRB Br. 1 (citing *AFL-CIO*, 57 F.4th at 1032).

But this Court never actually resolved that question. The Court held that "the district court *correctly* exercised jurisdiction over the AFL-CIO's challenge to the 2019 Rule" because section 10(f) does *not* permit direct review of rules concerning representation elections. *AFL-CIO*, 57 F.4th at 1032-1033 (emphasis added). And given that holding, the Court

had no occasion to decide whether section 10(f) applies to rules "concerning unfair labor practices" because, "*even accepting that 'final order' also extends to rules*," it did not apply to the rule at issue. *Id.* at 1033 (emphasis added). In other words, "whether section [10(f)]'s reference to 'orders' in the context of unfair labor practice disputes should be interpreted to include 'rules' that pertain to unfair labor practices *** [wa]s not before" this Court or the district court. *AFL-CIO*, 466 F. Supp. 3d at 87 n.9 (Jackson, J.); *see also Chamber*, 723 F. Supp. 3d at 512 ("[*AFL-CIO*'s] statement is *dictum* because the Board rule there concerned only 'representation matters.' The court's remark about other types of rules was not necessary to its decision.").

Even assuming section 10(f) covered rules "concerning unfair labor practices"—which would make no sense given the overwhelming textual and other evidence—the 2020 Joint Employer Rule would not qualify. The Rule is not specific to unfair labor practices; nor does the Rule make it an unfair labor practice for an employer to be deemed a "joint employer." Instead, the Rule defines a term that is relevant to whether an entity is an "employer" subject to the NLRA as a threshold matter, applicable in both unfair labor practice and representation proceedings.

*See Joint Employer Status Under the National Labor Relations Act*, 85 Fed. Reg. 11,184, 11,184 (Feb. 26, 2020). A rule "concerning unfair labor practices" must be more targeted toward unfair labor practices specifically. Otherwise, there may as well be no distinction between rules at all. (And the difficulty of drawing that line further shows that this is the wrong approach.)

All in all, section 10(f) confers no direct appellate jurisdiction over SEIU's petition for review, and no precedent compels this Court to ignore that pellucid reading.

## II. IF THIS COURT EXERCISES JURISDICTION, IT SHOULD REJECT SEIU'S CHALLENGE ON THE MERITS

If this Court nevertheless concludes that it has jurisdiction, it should deny SEIU's petition on the merits. The Board's 2020 Joint Employer Rule fits within the bounds of the common law, and it avoids the disruption of SEIU's preferred approach.

### A. Requiring The Actual "Exercise" Of "Substantial Direct And Immediate Control" Comports With The Common Law

**1.** SEIU's brief paints the picture of a "clear" common-law rule: An "as-yet unexercised right to control" an employee's work is sufficient

to find joint employment. SEIU Br. 33. Precedent and history, however, tell a different story.

When the NLRA amended the Taft-Hartley Act of 1947, a "joint employer" was widely understood to be a person who exercises direct and immediate control over the work being performed in an employment relationship. Specifically, to show that a second employer had assumed a duty of care of another firm's employee, the common-law consensus was that there had to be shared "operation and control" over that employee's work. *Capehardt v. Murta*, 145 S.W. 827, 828 (Mo. Ct. App. 1912); *see, e.g.*, *New York Indem. Co. v. Industrial Accident Comm'n*, 14 P.2d 160, 161-162 (Cal. Dist. Ct. App. 1932) ("joint employer" must "superintend" the work of another employer's employee "even to the extent of discharging him"); *Goodman v. Wilson*, 166 S.W. 752, 753 (Tenn. 1914) ("joint employer" is "founded on the superintendence and control which the master is supposed to exercise over his servant"); *see also* Restatement (Second) of Agency § 227 (1933) (recognizing 15 years before the Taft-Hartley Amendments that direct and immediate "control" was required to form a master-servant relationship).

The requirement of exercise of direct and immediate control is also how Congress interpreted the common law when it enacted the Taft-Hartley Amendments. Indeed, the accompanying House Report emphasized that "[e]mployees work for wages or salaries *under direct supervision*." H.R. Rep. No. 80-245, at 18 (1947) (emphasis added).

All that explains why courts repeatedly upheld the Board's longstanding practice of requiring direct and immediate control of employees before a company could be deemed a joint employer of another company's employees, including for collective-bargaining purposes. As the Third Circuit—citing authority from the Supreme Court and numerous other circuits—explained:

> [T]he Board chose the correct standard—the "joint employer" standard—to apply to its analysis of the facts of this case: *where two or more employers exert significant control over the same employees*—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute "joint employers" within the meaning of the NLRA.

*NLRB v. Browning-Ferris Indus. of Pa., Inc.* (*Browning-Ferris I*), 691 F.2d 1117, 1124 (3d Cir. 1982) (emphasis added) (citing cases). And courts have continued to apply that same standard. *See, e.g.*, *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 414 (4th Cir. 2015) (joint

employment requires "day-to-day supervision of the individual, including employee discipline"); *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 683 (9th Cir. 2009) (retailer was not the joint employer of supplier's employees because retailer's control "d[id] not constitute an 'immediate level of day-to-day' control *** so as to create an employment relationship").

This Court did not adopt a different reading of the common law in *Browning-Ferris Indus. of Cal., Inc. v. NLRB* (*Browning-Ferris II*), 911 F.3d 1195 (D.C. Cir. 2018). True, the Court there said that "[r]etained but unexercised control has long been a relevant factor in assessing the common-law master-servant relationship." *Id.* at 1210. But—as SEIU acknowledges in a footnote (at 33 n.5)—the Court explicitly declined to answer "whether the reserved right to control, divorced from any actual exercise of that authority, could *alone* establish a joint-employer relationship." *Browning-Ferris II*, 911 F.3d at 1213 (emphasis added). That deferral necessarily undercuts SEIU's argument: If contractually reserved control is so obviously sufficient to establish joint employment under the common law, there would have been no need for this Court to reserve ruling on the question.

**2.** In any event, even if SEIU were right that the common law *allows* a joint employment finding based only on a never-exercised "right" to control, that would not mean that the 2020 Joint Employer Rule "conflicts" with the common law. Nothing in the NLRA requires the Board to define "joint employment" as broadly as the common law allows. To the contrary, this Court has explained that the common law sets the *outer limits* of a permissible joint employment standard. *See Browning-Ferris II*, 911 F.3d at 1208 ("The policy expertise that the Board brings to bear on applying the [NLRA] to joint employers is bounded by the common-law's definition of a joint employer."). Thus, while "[t]he Board's rulemaking *** must color within the common-law lines," *id.*, nothing precludes the Board from adopting "a narrower standard that promotes the Act's policies," *Standard for Determining Joint Employer Status*, 88 Fed. Reg. 73,946, 73,988 (Oct. 27, 2023) (Kaplan, M., dissenting).

### B. SEIU's Proposed Approach Would Wreak Needless Disruption

**1.** Additionally, SEIU's preferred rule—that an entity with contractually reserved but never exercised control over the essential terms and conditions of employment (including employee "health and safety") is a "joint employer"—would pose serious practical problems.

As an initial matter, the "reserved-but-unexercised authority" component of SEIU's proposed approach, SEIU Br. 26, risks destabilizing entire business models. Take franchising: Franchisors typically set standards and reserve authority over certain franchisee operations—including use of the franchisor's marks, facility design and color schemes, and hygiene standards (including food safety standards)—to protect the brand and maintain the value of the tradename and trademarks under which members of the franchise system operate. Although those issues can affect how the franchisee's employees perform their duties, franchisors typically do not directly exercise authority over those employees—opting instead to leave direct and immediate control and day-to-day supervision of the franchisee's employees to the franchisee itself. Nevertheless, under SEIU's proposed rule, that franchisors hypothetically *could* exercise such authority if the franchisee's employees acted in a manner that might jeopardize the brand or its customers' health and safety—*e.g.*, by not following food safety protocols—would be enough to make them "joint employers."

In response, some franchisors might "distance" themselves from their franchisees, thereby increasing their franchisees' costs. 85 Fed.

Reg. at 11,214 (highlighting that "franchisor 'distancing'" ultimately "resulted in lost output of between $17.2 billion and $33.3 billion per year"). Other franchisors might take the opposite approach and become *more* active in the day-to-day operations of franchise businesses, thereby "turning previously independent owners of franchisees into glorified managers." 88 Fed. Reg. at 74,001 (Kaplan, M., dissenting). Either way, SEIU's rule would threaten the well-established franchise model, which has been especially successful in improving the lives and economic prospects of owners from every walk of life. *See generally* Int'l Franchise Ass'n, *The Value of Franchising* (Jan. 2026).[6]

Including employee health and safety as an essential term and condition would only introduce more chaos across multiple sectors. Suppose, for example, Company A operates a cleaning company that provides on-site cleaning services to 100 different clients. To protect the clients' brands and allow them to maintain a safe workplace, Company A's contracts contain provisions that give the client the right to require Company A's employees to follow the client's health and safety rules,

---

[6] https://www.franchise.org/wp-content/uploads/2026/01/IFA_ValueOfFranchisingFINAL.pdf.

including any prohibitions on "using particular cleaning supplies." 88 Fed. Reg. at 73,987 (Kaplan, M., dissenting). Incorporating such provisions would not be surprising. Courts have acknowledged that entities "naturally would be concerned about [their supplier's employees'] safety, even if only for liability purposes, just as they would for any employee or non-employee on premises." *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1230 (10th Cir. 2014).

So large a bargaining table would not further the purposes of the NLRA. The NLRA's declared purpose is to achieve "industrial peace and stability, fostered by collective-bargaining agreements." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785 (1996) (citing 29 U.S.C. § 141(b)). And requiring all clients of Company A to bargain would frustrate, not facilitate reaching agreements: Company A and its clients are unlikely to have an equal say in the kinds of terms and conditions of employment typically found in collective bargaining agreements (*e.g.*, wages, benefits, hours of work, *etc.*). Nor are the clients likely to know much about the employees or the different workplaces at issue. So the clients could not *meaningfully* contribute to the collective bargaining process. Even worse, Company A and a client might both "insist, in good faith, on different

wage rates[.]" 88 Fed. Reg. at 73,999 (Kaplan, M., dissenting). Or the clients might all insist on different wage rates. In the end, an agreement might be "held up" by just one client's refusal to agree to wage rates agreeable to both Company A and the union. *Id.* That cannot be what Congress intended. *See, e.g.*, *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 523 (1941) ("object" of collective bargaining under the Act is "an agreement between employer and employees as to wages, hours and working conditions").

Worse still, to avoid such scenarios, entities might avoid efforts to protect other employers' employees, maintain general safety standards, or apply safety measures "more protective than legally-mandated minimums." 88 Fed. at Reg. 74,004 (Kaplan, M., dissenting). Certainly, the Board did not act arbitrarily and capriciously in guarding against that outcome. *See id.* (forcing the regulated industry to "choose between robust workplace health and safety standards contractually mandated and monitored on the one hand and, on the other hand, a potential joint employer classification over individuals whom all involved considered to be employees of only one employer, is bad public policy") (quotation marks and citation omitted).

**2.** In any event, granting SEIU's petition and vacating the 2020 Joint Employer Rule would not automatically result in its preferred approach. *See* SEIU Br. 56 (seeking vacatur). That would instead require the Board to revert to having no joint employer rule—*i.e.*, to deciding joint employment on a case-by-case basis.

Neither SEIU nor the *amicus* supporting it explain how having *no* joint employer rule would provide a more "comprehensible standard with meaningful guidance to regulated parties" than the current Rule. AFL-CIO Br. 26. Nor could they. Determining joint employment on a case-by-case basis would leave employees, unions, and employers in a position where there can be no certainty or predictability regarding the identity of the "employer." Indeed, from 2015 to 2018, the Board through case-by-case adjudication flipflopped on the meaning of joint employer three times. *See Browning Ferris II*, 911 F.3d at 1224 (Randolph, J., dissenting) (describing chain of decisions).

Such uncertainty was detrimental to all sorts of industries then. *See generally* Oxford Economics, *Potential Consequences of the NLRB*

*Joint Employer Rule* (Sept. 2023).[7] And it would be no less detrimental now. Franchisors, for example, might pull back support due to unclear legal guidance, reducing both franchisee opportunities and brand quality. *See* pp. 27-31, *supra*. Meanwhile, certain industries would lessen, if not avoid altogether, contracting with staffing firms. Rather than risk being deemed a joint employer of the staffing firm's employees, "user businesses might well decide to bring their contracted-out work in-house, to the detriment of staffing firms generally and the broader economy." 88 Fed. Reg. at 74,002 (Kaplan, M., dissenting). Put simply, no rule threatens substantial instability in bargaining relationships, and will result in substantial burdens, expense, and liability for innumerable parties. *Cf. ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) ("If a purported standard is indiscriminate and offers no meaningful guidance to affected parties, it will fail the requirement of reasoned decisionmaking.") (quotation marks and citation omitted).

---

[7] https://www.franchise.org/wp-content/uploads/2025/04/Oxford-Economics-Report-for-IFA-on-Joint-Employer-Rule.pdf.

## CONCLUSION

This Court should dismiss SEIU's petition for lack of jurisdiction. But if the Court does not, it should deny the petition on the merits.

Dated: March 9, 2026

Respectfully submitted,


*/s/ Pratik A. Shah*
Pratik A. Shah
James E. Tysse
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, D.C. 20006
(202) 887-4000
pshah@akingump.com
*Counsel for International Franchise Association, Chamber of Commerce of the United States of America, Restaurant Law Center, American Hotel & Lodging Association, and Coalition for Democratic Workplace*

Sarah Davies
International Franchise Association
1201 New York Avenue, NW, Suite 300A
Washington, D.C. 20005
*Counsel to International Franchise Association*

Stephanie A. Maloney
Jordan L. Von Bokern
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, D.C. 20062
*Counsel to Chamber of Commerce of the United States of America*

Chirag Shah
American Hotel & Lodging Association
1250 I Street, NW, Suite 1100
Washington, D.C. 20005
*Counsel to American Hotel & Lodging Association*

Sean Kennedy
Restaurant Law Center
2055 L Street, NW, Suite 700
Washington, D.C. 20036
*Counsel to Restaurant Law Center*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because: this brief contains 6,352 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, 14 point Century Schoolbook.

*/s/ Pratik A. Shah*
Pratik A. Shah

Dated: March 9, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Pratik A. Shah*
Pratik A. Shah